245

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - X
                        :
3  UNITED STATES OF AMERICA,  :  21-CR-54(RPK)
                        :
4                       :
      -against-         :  United States Courthouse
5                     :  Brooklyn, New York
                     :
6  DAVID GENTILE and JEFFRY  :
  SCHNEIDER,           :  June 13, 2024
7                    :  10:30 a.m.
          Defendants.  :
8                     :
  - - - - - - - - - - - - - X
9
      TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
10    BEFORE THE HONORABLE RACHEL P. KOVNER
         UNITED STATES DISTRICT JUDGE
11

12         A P P E A R A N C E S:

13  For the Government:  BREON PEACE, ESQ.
                   United States Attorney
14                Eastern District of New York
                   271-A Cadman Plaza East
15                Brooklyn, New York 11201
                BY: ARTIE McCONNELL, ESQ.
16                  NICHOLAS AXELROD, ESQ.
                  JESSICA WEIGEL, ESQ.
17                  KATE MATHEWS, ESQ.
                  Assistant United States Attorneys
18
  For the Defendant     KOBRE & KIM LLP
19  David Gentile:        800 Third Avenue, 6th Floor
                  New York, New York 10022
20                BY: SEAN BUCKLEY, ESQ.
                  JONATHAN D. COGAN, ESQ.
21                  ALEXANDRIA ELVIRA SWETTE, ESQ.

22                KOBRE & KIM LLP
                  201 South Biscayne Boulevard
23                19th Floor, Suite 1900
                  Miami, Florida 33131
24                BY: ADRIANA RIVIERE-BADELL, ESQ.
                  MATTHEW I. MENCHEL, ESQ.

25

246

1                    A P P E A R A N C E S: (Cont'd)

2   For the Defendant     ARENTFOX SCHIFF LLP
    Jeffry Schneider:         1301 Avenue of the Americas
3                             42nd Floor
                              New York, New York 10019
4                         BY:  GLEN COLTON, ESQ.
                               APEKSHA VORA, ESQ.
5
                          ARENTFOX SCHIFF LLP
6                             1717 K. Street NW
                              Washington, DC 20006
7                         BY:  MICHAEL DEARINGTON, ESQ.
                               LAURA ZELL, ESQ.
8
                          LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
9                             1 SE 3rd Avenue, Suite 2600
                              Miami, FL 33131
10                        BY:  STEPHEN JAMES BINHAK, ESQ.

11

12  REPORTED BY:
    Jamie Ann Stanton, RMR, CRR, RPR
13  Official Court Reporter
    jamiestanton.edny@gmail.com

14
    Proceedings recorded by computerized stenography.  Transcript produced by
15  Computer-Aided Transcription.

16                 *         *         *         *

17          (In open court; jury not present.)

18          THE COURT:  So in the interest of efficiency, I

19  think we have the same appearances as yesterday.

20          Now and I am told that the jurors are here and I

21  think we are ready to get started.  So we can probably --

22  yes?

23          MS. WEIGEL:  Your Honor, can I just flag one

24  scheduling issue?

25          THE COURT:  Yes.

1          MS. WEIGEL:  The second witness is going out of
2    town on an international trip tomorrow.  I don't think that
3    should be a problem, because it's essentially one-and-a-half
4    witnesses that we need to get through today, but I just
5    wanted to flag it.  We have already mentioned it to defense
6    counsel.  Putting it on the record.
7          THE COURT:  Great.
8          MR. COLTON:  And just to be fair, it is going to
9    be a fairly lengthy cross, which I also told the Government.
10   I didn't assure them that it would be no problem, we are
11   just letting --
12         THE COURT:  I think what we should do is just get
13   started and that's going to put us in the best position, so
14   let's get the witness on the stand.
15              (Witness takes the stand.)
16         MR. McCONNELL:  Your Honor, would you like me to
17   set up?
18         THE COURT:  Yes.
19              (Jury enters.)
20         THE COURT:  Everybody can be seated.  And I think
21   we are ready to resume.
22         MR. McCONNELL:  Thank you, Your Honor.
23   MARVIN JONES,
24              called as a witness, having previously been duly
25              sworn/affirmed, was further examined and

1          testified as follows:

2    CONTINUED DIRECT EXAMINATION

3    BY MR. McCONNELL:

4    Q    Mr. Jones, good morning.

5    A    Good morning, sir.

6    Q    When we left yesterday, we were talking about the

7    summer of 2018.

8          Do you remember that?

9    A    Yes.

10         MR. McCONNELL:  And if I can have what's already

11   in evidence as Government Exhibit 1390 published.

12         THE COURTROOM DEPUTY:  Where are we working?  From

13   the laptops?

14         MR. McCONNELL:  Yes.

15         (Exhibit published.)

16         MR. McCONNELL:  There we go.

17   Q    Mr. Jones, Government 1390 is your August account

18   statement, correct?

19         MR. McCONNELL:  If we can just zoom in on the

20   detail portion.

21   Q    Now, up to receiving this account statement on

22   August 15th of 2018, you said yesterday that from the time

23   you invested, you had always received your monthly

24   distribution, correct?

25   A    Yes, sir.

*Jones - direct - Mr. McConnell*                          249

1    Q    The amount had never changed?

2    A    Yes, sir.

3    Q    The rate had never changed, right?

4    A    Yes, sir.

5    Q    And looking at the left side of the exhibit here, total

6    invested capital, did that amount ever change on your

7    statement?

8    A    On the right side is -- no, it never did.

9    Q    So yesterday I had shown you a letter that you had

10   received on August 17th of 2018.

11           Oh, and by the way, on Government Exhibit 1390,

12   that was the first time you had received an account

13   statement with those two-foot notes on it; is that right?

14   A    That is correct.

15           MR. McCONNELL:  And just to go down to the

16   footnote portion of the statement.  On the second page,

17   Ms. Bates.  Thank you.

18   Q    And again, just looking at footnote one, it says:

19   Current cash distributions are not a performance indicator.

20   Current cash distributions have been and may in the future

21   continue to be paid out of available working capital

22   including, but not limited to, investor contributions.

23           That was the first time that that information had

24   been conveyed to you?

25   A    Yes, sir.

*Jones - direct - Mr. McConnell*                250

1  Q    I want to show you what's marked for identification as

2  Government Exhibit 139 -- I'm sorry, Government

3  Exhibit 8205.

4         MR. McCONNELL:  If we can just zoom in on the top

5  portion there.

6  Q    Mr. Jones, I believe yesterday you said you recalled

7  receiving this letter two days after you received your

8  statement?

9  A    Yes, sir, I do.

10        MR. McCONNELL:  Your Honor, given our discussions

11  about this and with the caveat of the redaction, we would

12  move this exhibit, Government Exhibit 8205, into evidence at

13  this time.

14        THE COURT:  Admitted and the objections are

15  preserved.

16        (Government's Exhibit 8205 received in evidence.)

17        MR. McCONNELL:  And if we can have that published

18  to the jury, please.

19        (Exhibit published.)

20        MR. McCONNELL:  Ms. Bates, can we just zoom out so

21  we can see the whole letter there?

22        And if we can just zoom in again at the top now,

23  it says, just the date and the first paragraph.

24  Q    So it's dated August 17, 2018; is that correct,

25  Mr. Jones?

*Jones - direct - Mr. McConnell*                    251

1   A    Yes, sir.

2   Q    That's two days after you received the account

3   statement we just looked at?

4   A    Yes, sir.

5   Q    And it says:  Dear valued partner.

6        That's you, right?

7   A    Yes, sir.

8        MR. McCONNELL:  If we can go to the end of the

9   letter, Ms. Bates, just to the signature block, please.

10  Q    Who is the letter signed by, Mr. Jones?

11  A    Mr. David Gentile.

12       MR. McCONNELL:  If we can go back to the fourth,

13  the fourth and fifth paragraph, Ms. Bates.

14  Q    I'm not going to read the whole letter, Mr. Jones, but

15  I do want to direct your attention to these two paragraphs.

16       Can you please read the first paragraph in the

17  pop-out window, it's the fourth paragraph in the letter?

18  A    Read the what?  I'm sorry.

19  Q    The first -- the first sentence there.

20  A    Okay.

21       The company has decided to suspend redemptions

22  until such time as the company has issued its 2017 audited

23  financial statements and filed its registration statement.

24  Q    So Mr. Jones, when you read that, what did you

25  understand --

1          First of all, what are redemptions in the context

2     of this investment?

3     A    Redemptions is if you want part of your investment

4     back, you notify the company, and they will give you part of

5     your redemptions back.

6               May I add this, please sir?

7               What I found really offensive, they had just

8     finished doing a large capital raise on new money, they went

9     out and recruited new money, and I think that closed --

10    without looking at note or history or whatever -- I think it

11    was June of 2018, and then this letter shows up a few months

12    later.

13    Q    So when it says "suspend redemptions," what did you

14    understand that to mean when you read it?

15    A    That means your money's locked up.  You can't have

16    access to it if you want it.

17    Q    Now, isn't that it typically the case in a private

18    equity investment, sir?

19    A    No, sir.  Only in extenuating circumstances and

20    certainly not after you have gone out, generally speaking,

21    and raised hundreds of millions of dollars from new

22    investors.

23    Q    It says redemptions will be suspended until the 2017

24    audited financial statements are filed.

25               You talked about audited financial statements

1   yesterday.  Why were the audited financial statements

2   important to you?

3                MR. COGAN:  Objection.

4                THE COURT:  Overruled.

5                You can answer the question.

6                THE WITNESS:  Thank you.

7   A    I think the word I used yesterday is you can get

8   financial statements from a company or a Chief Financial

9   Officer of the company, but unless they're audited, meaning

10  a third party has inspected your work, verified that whoever

11  is owed money that you claim is owed money, whoever owes you

12  money owes you money, they verify they're an independent

13  third party and they're responsible for their work.  So

14  before they put their seal of approval on it, audited

15  financials is the Holy Grail.  Investors traditionally will

16  not look at anything other than.

17  Q    So Mr. Jones, prior to receiving that August account

18  statement and this August letter, were you interested in

19  investing more money in the Automotive Portfolio?

20  A    I was very much interested.

21  Q    Why?

22  A    Because, again, up until this time, we were getting our

23  8.7 percent distribution just like we were assured.  The

24  company was still acquiring dealerships.  Everything from

25  the surface appeared okay with one exception:  We regularly,

*Jones - direct - Mr. McConnell*                    254

1    frequently asked for audited financial statements, and there

2    was always a reason and an excuse why it didn't happen.

3    Q    So I want to look at the second paragraph of Government

4    Exhibit 8205 that's displayed --

5            MR. McCONNELL:  I'm sorry, Ms. Bates, the one that

6    you have popped out, the fifth paragraph in the letter.  The

7    one that starts, "Additionally."

8    Q    Mr. Jones, if you can just read the last sentence of

9    that paragraph, second paragraph there?

10   A    Starting with "Therefore"?

11   Q    Yes, sir.

12   A    Therefore, the company's 2015 and 2016 financial

13   statements in the independent accountant report thereon

14   should no longer be relied on.

15   Q    And what was your opinion when you read that?

16           MR. COGAN:  Objection.

17           THE COURT:  Sustained.

18           MR. McCONNELL:  I will withdraw the question.

19   Q    I want to show you your September --

20           MR. McCONNELL:  Well, I will just put it up.

21           Government Exhibit 1389, please, if that can just

22   be shown to the witness?

23   Q    Mr. Jones, do you recognize this exhibit?

24   A    It's an account statement of mine.

25   Q    What's the date on it?

*Jones - direct - Mr. McConnell*                    255

1    A    Settlement 14, 2018.

2    Q    And did you receive this account statement?

3    A    Yes, sir, I believe I did.

4    Q    Your name and address is on there?

5    A    Yes, sir.  I looked at all of them that came to my

6    portal, so.

7              MR. McCONNELL:  Your Honor, I offer Government

8    Exhibit 1389.

9              THE COURT:  Admitted.

10             (Government's Exhibit 1389 received in evidence.)

11             MR. McCONNELL:  If we can publish that to the

12   jury, Your Honor.

13             (Exhibit published.)

14             MR. McCONNELL:  Oh, there it is.

15   Q    So Mr. Jones, again, were you paid a distribution in

16   September of 2018?

17   A    Yes, sir.

18   Q    And was it the same amount?

19   A    Yes, sir.

20   Q    And was it the same rate?

21   A    Yes, sir.

22   Q    And previously you had said that receiving your

23   distribution indicated certain things about the health and

24   the performance of the company.

25             What was your view receiving this account

1    statement after receiving that August 17th letter that we

2    looked at?

3    A    I didn't have good feelings.

4    Q    Why not?

5              MR. COGAN:  Objection.

6              THE COURT:  Sustained.

7    Q    What was your view of your investment after receiving

8    that August 17th letter and looking at this statement?

9              MR. COGAN:  Same objection.

10             THE COURT:  Can you ask a more specific question?

11   What was your view of your investment?  I'm not sure I

12   understand what you are asking.

13   Q    Did you have a view of the health of the Automotive

14   Portfolio as a result of that -- the letter and this account

15   statement?

16             MR. COGAN:  Objection.

17             MR. COLTON:  Objection.

18             THE COURT:  Sustained.

19             MR. McCONNELL:  Sorry?

20             THE COURT:  Sustained.

21             MR. McCONNELL:  If we can go to the second page of

22   the exhibit, please.

23   Q    So Mr. Jones, now there's three footnotes on the second

24   page.

25             MR. McCONNELL:  And if we can just look at the --

*Jones - direct - Mr. McConnell*                    257

1    Q    Well, I'll just ask, Mr. Jones, the last account

2    statement we saw had two footnotes.  This one now has three,

3    correct?

4    A    Yes, sir.

5    Q    Is there anything that you notice in these that was

6    significant to you?

7    A    Footnote number three.

8    Q    What about footnote number three was significant to

9    you?

10            MR. COGAN:  Objection.

11            THE COURT:  Overruled.

12   A    May I read it just to?  Okay.

13            When I -- I'd like to back up one step to answer

14   your question, please, sir?

15            You receive a letter that 40 percent of your

16   investment had vaporized overnight.

17            MR. COLTON:  Objection, Your Honor.  There's no

18   letter that said vaporized.

19            THE COURT:  I think that probably the witness

20   should just answer the question that was asked.

21            So I think maybe if the question that's pending is

22   about what was significant about this footnote to you, I

23   think you should --

24            THE WITNESS:  Okay, this footnote only.

25            THE COURT:  Yeah.

1          THE WITNESS:  Okay.

2    A    It stated that the distribution you are to receive is

3    coming directly out of your investment which was in total

4    contrary to everything that we had been assured and promised

5    in writing, that only out of operating cash flow/profit

6    would your distribution be paid.

7    Q    Now, did there come a time when you stopped receiving

8    monthly distributions from your Automotive Portfolio

9    investment?

10   A    Yes, sir.

11   Q    Do you recall approximately when that was?

12   A    Maybe October of 2018, maybe.

13          MR. McCONNELL:  I want to go back to Government

14   Exhibit 8258-B please, which is in evidence.

15          (Exhibit published.)

16   Q    So Mr. Jones, do you remember yesterday I asked you a

17   few questions about the Private Placement Memorandum or PPM?

18   A    Yes, sir.

19   Q    And did you review this Private Placement Memorandum

20   prior to investing?

21   A    I did.

22   Q    Did you review it with your advisor, Mr. Frederick?

23   A    Yes, sir.

24   Q    So it's about 118 pages long.

25          MR. McCONNELL:  But if we can page 21, please,

1  with the note at the bottom.  Yes, there it is.

2         So if you can just zoom in, Ms. Bates, on the

3  second paragraph on page 21 -- no, one more -- yes, that

4  one.

5         Actually, I'm sorry, Ms. Bates, if you can pull

6  from where the title of that section is, that paragraph,

7  that would be great.

8  Q   So Mr. Jones, I just want to direct your attention to

9  this portion of Private Placement Memorandum.  It says:

10 General investment risks.  And the second header there says:

11 No assurance of distributions.

12        Do you see that?

13 A   Yes, sir, I do.

14 Q   Can you just read that to the members of the jury,

15 please?

16 A   Yes, sir.

17        No assurance of distributions.  The process of

18 identifying, screening, and successfully acquiring and

19 operating private companies is difficult and risky.  We can

20 provide no assurance that we will be able to continue to

21 generate the operating cash flow sufficient to make

22 distributions to the LPs, the Limited Partners.  Thus,

23 there's no guarantee that we will pay any particular amount

24 of distributions, if at all.  Furthermore, while we have no

25 present plans to do so, we could include LPs, investment

1    capital, in amounts we distribute to the LPs, which may

2    reduce the amount of capital available to acquire and

3    operate dealerships and make other permitted acquisitions as

4    well as negatively impact the value of LPs' investments,

5    especially if a substantial portion of our distributions

6    were paid from our LPs' investment capital.

7    Q    So Mr. Jones, we looked at some of the marketing

8    materials that you reviewed prior to investing.  I just want

9    to you to concentrate on this paragraph in the PPM.

10          Can you explain to the members of the jury how you

11   understood this paragraph of the Private Placement

12   Memorandum for the Automotive Portfolio?

13   A    Yes, sir.  The first half was aligned with the

14   materials we had seen that there's, you know, if operating

15   cash flow or profitability wasn't sufficient to support the

16   distribution or the dividend, they reserve the right at

17   their discretion to either reduce it or eliminate it, which

18   is -- you'd expect that.  When it talked about returning

19   your capital, that happens frequently.  When you have

20   surplus capital, and you don't have a place to put it to

21   work and you're having to pay 8.7 percent for that capital,

22   a financially responsible organization will return the

23   excess capital to the people that invested.  It cuts off

24   having to service the 8.7 percent debt load that you have to

25   service.  So that's common practice.

1  Q    Mr. Jones, you testified yesterday, though, that had

2  you known that your distribution was a return of your

3  capital, you wouldn't have invested?

4  A    No.  If -- if the distribution was from the capital

5  only, absolutely not.  And who would have?

6            MR. COLTON:  Objection, Your Honor.

7            THE COURT:  Overruled.

8  Q    Now, in the materials that we --

9            Well, did this -- in reading this, did you feel

10  that your 8.7 percent monthly distribution was going to be

11  return of your own capital?

12            MR. COGAN:  Objection.

13            THE COURT:  Overruled.

14  Q    You can answer.

15  A    I'm sorry, sir?  Would you repeat that?

16  Q    In reading this, did you feel like the distribution you

17  were going to be receiving, if you invested, would be a

18  return of your own capital?

19            MR. COLTON:  Object to form, Your Honor.

20  A    Absolutely not.

21            MR. COLTON:  His feelings are not the issue.

22            THE COURT:  It probably shouldn't be feel, right?

23  Q    Your understanding?

24  A    No.

25  Q    Why not?

*Jones - direct - Mr. McConnell*                    262

1   A    It said there -- there's no guarantee that we will pay

2   any or particular amount of distributions if at all.  And

3   before that, it says that we will be able to continue to

4   generate operating cash flow sufficient to make

5   distributions.

6         Again, it goes -- ties back to the materials that

7   if you do not -- if you do not generate the operating cash

8   flow from the underlying business, you'll suspend or reduce

9   the distribution.

10  Q    Now, this Private Placement Memorandum was dated

11  June 30th of 2016; is that correct?

12  A    Yes, sir.

13  Q    And it says:  Though we have no present plans to do so.

14        If, as an investor, those plans had changed, would

15  you have wanted to have been informed of that?

16  A    Would I have?  I'm sorry?

17  Q    Wanted to have been informed of that?

18  A    Oh, absolutely I would have.

19  Q    Why?

20  A    You don't want to invest in a company that's just

21  taking a share of your money and then giving you a portion

22  of it back over time.

23        MR. McCONNELL:  Can I have one moment, please?

24        Mr. Jones, thank you very much.

25        I have no further questions.

*Jones - cross - Mr. Colton* 263

1          THE COURT:  Cross.

2          MR. COLTON:  Yes, Your Honor.

3          For this particular witness, I am going first,

4   even though I think typically the first Defendant goes

5   first?

6          THE COURT:  Okay.

7          MR. COLTON:  May I inquire, Your Honor?

8          THE COURT:  Go ahead.

9   CROSS-EXAMINATION

10  BY MR. COLTON:

11  Q    Good morning, Mr. Jones.

12  A    Good morning, sir.

13  Q    My name is Glenn Colton.  I represent Jeffry Schneider.

14  I'm going to be asking you some questions.  If you don't

15  hear me, let me know.  If you don't understand a question I

16  ask you, please let me know.

17  A    Yes, sir.

18  Q    Thank you.

19          Now, Mr. Jones, your career has been described by

20  you during the course of the direct examination with

21  Mr. McConnell and you described some positions you held,

22  right?

23  A    Yes, sir.

24  Q    Now, in addition to some of the positions you

25  described, you were also a Registered Investment Advisor

1  with Ethos Capital, correct?

2  A    I took the exam.  I never renewed.  No, sir, I am not.

3  Q    Let me ask you again, were you actually a Registered

4  Investment Advisor with Ethos Capital?

5  A    Yes, sir, I was, for one year.

6  Q    In fact, you were actually registered for a few years,

7  correct?

8  A    I never renewed.  Is that incorrect?

9  Q    In fact, you were actually registered -- you started

10  Ethos Capital; didn't you?

11  A    I helped Mr. Frederick get it started, yes, sir.

12  Q    So you and Mr. Frederick started this investment

13  advisor together and you were a Registered Investment

14  Advisor at least for some period of time?

15  A    Yes, sir, for a year, I think it was.

16  Q    And as a Registered Investment Advisor, you are

17  sophisticated in financial matters, right?

18  A    Well, I have a pretty good understanding, yes, sir.

19  Q    And you've also been an asset manager for 20 years,

20  correct?

21  A    Yes, sir.  Actually, longer than that.  A little longer

22  than that.

23  Q    Thank you.

24        And as we discussed yesterday, you have an MBA in

25  economics and finance, right?

*Jones - cross - Mr. Colton*     265

1    A    Yes, sir.

2    Q    And you were an executive with Nabisco?

3    A    I was.

4    Q    And as an executive with Nabisco, you had financial

5    responsibilities, right?

6    A    Yes, sir.

7    Q    You had your own P&L, if you will, your own financial

8    statement for your unit?

9    A    That is correct.

10    Q    So you are familiar with financial statements and how

11    they work?

12    A    Yes, sir.

13    Q    And just to set the stage, you invested $150,000 in GPB

14    Automotive Portfolio in or around the beginning of

15    September 2016, right?

16    A    Yes, sir.

17    Q    And you did that investment actually in the name of

18    your family trust, right?

19    A    Yes, sir, I did.

20    Q    And one of the things you certified when you did that

21    is your family trust was worth more than $5 million, right?

22    A    I did.

23    Q    Now, let's talk just briefly about private equity.

24          You would agree with me that private equity is

25    riskier than a bank account?

1   A    That's a fair statement, yes, sir.

2   Q    And private equity is riskier than a bond issued by

3   either a Government or a major corporation?

4   A    Yes, sir.

5   Q    In fact, it is called an alternative investment, right?

6   A    It is.

7   Q    And private equity is only offered to a credited

8   investor, sophisticated people, correct?

9   A    Yes, sir.

10  Q    And part of the reason for that, based on your

11  knowledge as an investment advisor, is because it is riskier

12  than typical non-alternative investments?

13  A    I would agree with that.

14  Q    It's fair to say the risk is greater and the potential

15  return of private equity is greater than more traditional

16  investments?

17  A    It depends on what industry you're going in.

18  Q    Well, you would agree with me the potential return of

19  private equity is greater than a treasurer bond?

20  A    Than a treasury bond, should be, under the right

21  conditions.

22  Q    And the reason one would invest in private equity is

23  for the potential of a substantial return, that would be a

24  major reason to do that, correct?

25  A    Yes.

1  Q    And that was one of your potential goals in investing

2  in GPB Auto, correct?

3  A    Was to make a -- yes, an above return from a bond.

4  Q    Now, when you did and entered the investment in GPB

5  Auto, you signed the subscription agreement, correct?

6  A    I did.

7           MR. COLTON:  Can we show the Defense Exhibit

8  QQQQI, or quad Q-I, just to the witness and Counsel?

9           Your Honor, in the interest of moving it, we will

10 go to plan B.

11          THE COURT:  Go ahead.

12 Q    Mr. Jones, I show you what's been marked as Defendant's

13 Exhibit QQQQI.

14          MR. COLTON:  Your Honor.

15 Q    Mr. Jones, do you recognize defense QQQQI?

16 A    Yes, sir.

17 Q    And I would ask you to please turn to what is marked as

18 page 20 in the bottom right corner.  It says QQQQI in the

19 bottom right.

20 A    Wait a second.  You said page 20?

21 Q    Yes.  It's labeled dash, zero-two-zero.

22          Actually, I take that back.  Page 13, please.

23 A    I'm sorry, one more time, sir?

24 Q    Thirteen.

25          MR. COLTON:  Permission to approach and help the

1   witness?

2            THE COURT:  Sure.

3   Q    That's 14.

4   A    You said -- okay, yeah.  Oh.

5   Q    Mr. Jones, that's your signature on the left-hand

6   side --

7   A    Yes.

8   Q    -- above the name that says Marvin W. Jones?

9   A    That's my signature.

10  Q    And you signed this document, correct?

11  A    I did, correct, yes, sir.

12           MR. COLTON:  Your Honor, the defense offered QQQI

13  into evidence.

14           MR. McCONNELL:  No objection.

15           THE COURT:  Admitted.

16           MR. MENCHEL:  It's actually four Qs.

17           MR. COLTON:  Quad Q-I for the record.  Thank you.

18           (Government's Exhibit QQQQI received in evidence.)

19           MR. COLTON:  Are we able to publish?

20           (Exhibit published.)

21           MR. COLTON:  Your Honor, some of this is hard to

22  read.  May I be able to give a few copies to the jury?

23           THE COURT:  Sure.  You might want to use the ELMO.

24  How do you feel about that?

25           MR. COLTON:  I'm fine with it, it's just that

*Jones - cross - Mr. Colton*                    269

1    they're bad copies, so perhaps just -- I'm not going to do

2    that for every exhibit.  Just for this one, candidly,

3    because it's hard to read.

4              THE COURT:  Okay.

5              The screen is working now.  I don't know if that

6    changes your calculus.

7              MR. COLTON:  For this one, because it's not great

8    quality.  Other than that, I do not plan to do it every

9    time.

10             THE COURT:  All right.

11             MR. COLTON:  Permission to hand one to each row?

12             THE COURT:  Go ahead.

13             (Exhibit published.)

14   Q    Mr. Jones, we are looking at page 13 where your

15   signature is.

16             At the top of page 13, it says:  The undersigned

17   hereby represents, agrees and certifies that the undersigned

18   has carefully read and understands the memorandum agreement

19   and the LPA.

20             Do you see that at the very top of the page?

21   A    Yes, sir.

22   Q    And the memorandum is what we've been talking about,

23   the Private Placement Memorandum you were shown earlier by

24   Mr. McConnell, correct?

25   A    That is correct.

*Jones - cross - Mr. Colton*                                              270

1   Q    And when you certify something, you take that

2   seriously, right?

3   A    Yes, sir, I do.

4   Q    And you did, indeed, read and understand the Private

5   Placement Memorandum, correct?

6   A    I did.

7   Q    And then it says you read and understand and you

8   certified that you read and understand the LPA.

9         Now, that refers to the Limited Partnership

10  Agreement, correct?

11  A    Yes, sir.

12  Q    That's the agreement between you, as an investor, or at

13  least the representative of your trust as the investor, and

14  the auto portfolio company, correct?

15  A    Yes, sir.

16  Q    And you certified that you read and understood the LPA,

17  the contract, as well, correct?

18  A    That is correct.

19  Q    And then it says, in the small two, The execution of

20  this signature page constitutes the execution of an

21  agreement to be bound by all of the provisions of the

22  agreement and the LPA, correct?

23  A    Where's that wording at, sir?

24  Q    At the top of the page, second line, "ii."

25  A    Oh, yes, sir, I got it, yes.  You are correct.

*Jones - cross - Mr. Colton*                                    271

1   Q    And the PPM, the Private Placement Memorandum that's

2   being referenced in your certification of what you read was

3   the June 30, 2016 PPM, correct?

4   A    Yes, sir.

5   Q    Now, if you go to page 7 of Defense QQQQI, please.  I'm

6   sorry, actually, page 6, my apologies.

7            This lists a whole set of terms and conditions,

8   correct?

9   A    Okay.  I'm sorry, which page are you on?

10  Q    I am on what is in the bottom right corner, QQQQI-006?

11           THE COURT:  Those Bates marks are not on the

12  copies that you distributed.

13           MR. COLTON:  I apologize.

14  Q    So if you look at the top, okay, do you see the fax

15  line?

16  A    On page 7?

17  Q    That's page 7 at the bottom, yes.

18  A    Okay.

19  Q    I'm sorry about the numbering.

20  A    Okay.  And you want me to look where?  Make sure I'm

21  reading the same thing you wish.

22  Q    In the third paragraph down.

23  A    Okay.

24  Q    It says:  The subscriber represents and warrants to,

25  and agrees with the company, GPB Capital Holdings, as

1    follows.

2              Do you see that?

3    A    Yes.

4    Q    And there's a whole bunch of things that you warrant

5    there, correct?

6    A    Yes, sir.

7    Q    And one of the things you warrant is in number one,

8    again, that you received and carefully read and understood

9    the Private Placement Memorandum, correct?

10   A    Yes, sir.

11   Q    And it says:  The subscriber recognized the investment

12   in units involved substantial risk and is fully cognizant of

13   and understands all of the risk factors of the purchases of

14   the unit.

15              Correct?

16   A    That is correct.

17   Q    And you took that certification that you understood all

18   the risks very seriously, right?

19   A    I did.

20   Q    And you understood that the company was going to rely

21   on your certification in this document that you signed?

22   A    I did.

23   Q    Now, I'd like to show you what is already in evidence,

24   we can put it on the screen, as Government Exhibit 8258-B.

25              (Exhibit published.)

*Jones - cross - Mr. Colton*                         273

1      MR. COLTON:  And specifically, Michelle, if we can

2  go to page 63 in the bottom numbers.

3  Q    Page 63 starts, it is the Limited Partnership Agreement

4  to which we were referencing.

5      I'm sorry, Mr. Jones, this will be on your screen.

6  You can put the other document to the side.  I apologize.

7  A    Can you zoom in on that, please, sir?

8      MR. McCONNELL:  If we can do just the top part of

9  it so he can see what the document is.  That's perfect,

10  thank you.

11 Q    This is the Limited Partnership Agreement that was

12  attached to the Private Placement Memorandum that you

13  discussed with Mr. McConnell earlier today and yesterday,

14  correct?

15 A    The one dated June 30th.

16 Q    Correct.

17 A    Okay, yes, sir.

18 Q    And let's take a look specifically in the Limited

19  Partnership Agreement at page 87, Section 9.2.

20      It's in bold, says:  Representations and

21  warranties that the limited partners.

22      Do you see that?

23 A    I do.

24 Q    But you, your trust, actually, but you as the

25  representative, was the Limited Partner, correct?

*Jones - cross - Mr. Colton*                    274

1   A    Yes, sir.

2   Q    And it states:  Each of the limited partners hereby

3   represents and warrants to the partnership, and the other

4   partners, as of the date that such Limited Partner is

5   admitted to the partnership.

6           Do you see all of that?

7   A    I do.

8   Q    And it goes on to say that such Limited Partners

9   admitted to the partnership and each date upon which it

10  acquires any unit that the information provided by such

11  Limited Partner pursuant to the subscription documents

12  completed and executed by such Limited Partner and the

13  representations and warranties contained in such

14  subscription documents are true and correct and complete at

15  all times from and after the date which the subscription

16  documents were completed and executed by the Limited

17  Partner, through and including the date upon which the

18  Limited Partner acquired such units.

19          Do you see that?

20  A    I do.

21  Q    So these are representations and warranties that you

22  made, and it applies to your subscription agreement where

23  you represented and warranted you understood all of the

24  risks that were listed in the Private Placement Memorandum,

25  correct?

1    A    I did.

2    Q    Now, you understood that, as I said, I think, earlier,

3    but I just want to make sure that you had to be -- or your

4    trust had to be a credited investor even to be eligible to

5    purchases GPB units, correct?

6    A    I did.

7    Q    And if we go back to the QQQQI in evidence, four Q-I.

8    You actually certified that you are, indeed, a sophisticated

9    investor, correct?

10   A    Yes, sir.

11   Q    You certify that you have knowledge and experience in

12   financial matters, correct?

13   A    Yes, sir.

14   Q    You certified that you understood that this is an

15   illiquid investment?

16   A    I did.

17   Q    And that you are capable of evaluating the merits and

18   risks of the investment, correct?

19   A    Yes, sir.

20   Q    And you knew that you had to conduct your own

21   investigation into the investment, correct?

22   A    I did.  I did my diligence.

23   Q    And by doing your diligence, you read the entire

24   Private Placement Memorandum and all of the risks

25   associated, correct?

*Jones - cross - Mr. Colton*                                      276

1   A    I read that, I did.

2   Q    So when you bought for your trust the GPB units, you

3   knew it was illiquid, correct?

4   A    I did.

5   Q    And illiquid means that there's no ready market to sell

6   the units, correct?

7   A    I did (sic).

8   Q    And it also means that you have no right to get your

9   cash back, correct?

10  A    No right in a certain period of time.

11  Q    So let's take a look at the Limited Partnership

12  Agreement.

13           MR. McCONNELL:  If we could pull up from

14  Government Exhibit 8258-B.  Specifically, if we could pull

15  up page 81, Section 5.4.

16  Q    You understood, because you warranted that you read and

17  understood the Limited Partnership Agreement, what is in

18  bold under return of capital:  No partner has the right to

19  demand or receive the return of such partner's capital

20  contributions even in the event of the withdrawal of the

21  general partner.

22           Do you see that?

23  A    I do.

24  Q    So it was made clear to you in a document you certified

25  you read that you had no right to return of your capital, no

1  right to redeem your investment, correct, that's what it

2  says?

3  A    That's what it says in this document.

4  Q    And that's what you certified you understood?

5  A    Yes, sir.

6  Q    And that's not the only place in the document that it

7  says there is no right to redemption, or to get your money

8  back.

9         MR. McCONNELL:  Let's go to page 11.

10  Q    At the bottom of the page, again, in bold, it says:

11  Redemption and liquidity.

12         In the Private Placement Memorandum that you read

13  and understood, it says:  Limited Partners do not have the

14  right to redeem their Class B units except in limited

15  circumstances described below.

16         Correct?

17  A    That is correct.

18  Q    So when you entered the investment, you knew it was a

19  long-term investment and you had no right to demand your

20  money back, correct?

21  A    That is correct, but may I add, please, sir?

22  Q    No.

23  A    Okay.

24  Q    If the answer's incorrect, then I want to know, but if

25  it's correct, please tell me.

*Jones - cross - Mr. Colton*                    278

1   A    That -- the verbiage of that is correct.

2   Q    Thank you.

3        And that was not hidden from you, that verbiage?

4   A    No.

5   Q    And it was in multiple places in the document?

6   A    Multiple places.

7        (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. COLTON:

2  Q    You also understood when you invested in GPB Capital's

3  offering of GPB Auto, that you could lose your entire

4  investment, correct?

5  A    Very much aware of that.

6  Q    And that's typical of high-risk-high-reward investments,

7  correct?

8  A    That's typical in many investments, not just high-risk,

9  high-reward.

10 Q    But I would be correct, generally, from your knowledge as

11 an investor manager --

12 A    Yes, sir.

13 Q    -- that higher the risk, generally, the higher the

14 potential reward, generally?

15 A    That a correct axiom.

16 Q    So given that you knew that the investment -- you could

17 lose your entire investment, you also knew that there's no

18 guarantee of any profits, correct?

19 A    There's never any guarantee of profit, but there is a low

20 risk associated with this investment.

21 Q    Well, let's -- you certified that you understood the

22 risks, so let's go over some more of them then.

23        MR. COLTON:  Let's look at Page 6 of Government

24 Exhibit 8258-B.

25        Can we put that up on the screen, please.

1  Q    It says -- correct me if I'm wrong -- there can be no

2  assurance that we will achieve our objective or avoid

3  substantial losses, including the loss of the investor's

4  entire amount.

5         It says that, correct?

6  A    Yes, sir.

7  Q    And you understood that, correct?

8  A    Yes, sir.

9  Q    It goes on to say, An investor should not make an

10  investment in the Class B units unless they can hold such

11  Class B units for the long term or with the expectation of

12  sheltering income.

13         You saw that, right?

14  A    I did.

15  Q    And you knew that when you made the investment, correct?

16  A    Yes, sir.

17         MR. COLTON:  Let's go now to Page 24 of the

18  document.  The document being 8258-B, in evidence.

19  Q    The top of that page in all capitals in bold says, risk

20  factors, correct?

21  A    Yes, sir.

22  Q    So it's fair to say that the fact of risks and the risk

23  factors weren't hidden in this document, but more bolded in

24  all capitals, correct?

25  A    That is correct.  Standard.

1    Q    And at the top of that page, if we can zoom a little

2    less, second sentence, the risks discussed in this memorandum

3    can adversely affect our operations, operating results,

4    financial conditions and prospects, this could cause the value

5    of the Class B units to decline and could cause you to lose

6    all or part of your investment, correct?

7    A    That's what the document says.

8    Q    And it says it over and over again, correct?

9    A    Many times.

10   Q    So just to sum this up, the risk of losing money, not

11   hidden?

12   A    Correct.  Not at all.

13   Q    Risk of the illiquidity, the inability to get your money

14   back, not hidden?

15   A    Not at all.

16   Q    You also knew that GPB was a relatively young business

17   with limited operating history, correct?

18   A    That bought existing dealerships, that is correct.

19   Q    And you would agree with me that a business like GPB with

20   a limited operating history has more risk than a company

21   that's been operating for 20 or 30 years?

22   A    They bought existing businesses with a proven track

23   record of throwing off positive cash.

24   Q    Let me ask the specific question I'm asking you, okay.

25        An investment manager that has limited operating

1  history has greater risk than investing with an investment

2  manager that has substantial operating history, correct?

3  A    I can't agree with your conclusion because I don't agree

4  with your premise.

5  Q    Let me put it to you a different way:  You went to see an

6  investment manager and he or she tells you, I've been doing

7  this for one day, and then you see a second investment manager

8  that says, I've been doing this for 30 years, one of them is

9  riskier than the other, correct?

10  A    There are investments that's more riskier than another,

11  yes, sir, that's correct.

12  Q    But the fact that GPB Capital had not been running funds

13  for a very long time was completely disclosed and completely

14  known to you, correct?

15  A    It was disclosed, but the underlying business was not new

16  and was not young operators.

17  Q    And with all of the risks we've been discussing, it was

18  made clear to you in the private placement memorandum that

19  there are even more risks that aren't even listed in the

20  memorandum, despite all of ones we've gone over, correct?

21  A    There's a lot of risk, yes, sir.  Different areas.

22  Q    And it's also risky a potentially reward to use leverage

23  to purchase assets, correct?

24  A    Yes, sir, it is.

25  Q    And leverage is when you borrow money to purchase

1  something, correct?

2  A    Yes, sir.

3  Q    That's leverage?

4  A    Yes.

5  Q    And if you use leverage, your risk is even higher, but

6  your potential reward is higher, right?

7  A    Yes, sir.

8  Q    Because in essence, if I have $10 and I borrow $10, then

9  I could buy stuff worth $20, right?

10  A    Yes, sir.

11  Q    And you knew the possibility that GPB Auto fund would use

12  leverage to purchase dealerships which both increased the risk

13  and the potential reward, correct?

14  A    Up to 50 percent debt slash leverage only, and the word

15  was sparingly.  They would use it sparingly.

16         MR. COLTON:  If we could go to Page 29 of 8258-B,

17  please.

18         Can we just blow up the section that says leverage,

19  please.

20  Q    Mr. Jones, are you able to read that?  I know it's small.

21  A    I need to zoom it in --

22  Q    No problem.  I thought maybe you'd have better eyesight

23  than me.

24         Do you see it now?

25  A    Leverage, yes, sir, I do.

1    Q    This is in bold, leverage, right?

2    A    Yes, sir.

3    Q    And it says, Our acquisitions directly or indirectly may

4    be leveraged acquisitions.  Utilization of leverage is a

5    speculative technique and involves risk to investors.  While

6    the leverage may enhance total returns to investors, if

7    operating cash flows fail to cover the borrowing cost, then

8    the returns to the LPs will be lower than if there had been no

9    borrowing, correct?

10   A    Yes, sir.

11   Q    And that was fully disclosed to you as a risk factor, as

12   well?

13   A    It is.

14   Q    Now, when discussing your distributions or, technically,

15   the distributions to your trust that were received by virtue

16   of the investment in GPB Auto -- do you remember that

17   discussion?

18   A    Yes, sir.

19   Q    I believe you testified that you would not have made the

20   investment if you knew that the investment could -- that the

21   distributions could come, in part or in whole, from return of

22   capital?  You said that, right?

23   A    From --

24   Q    From return of capital?

25   A    Yes, sir.

1   Q    And you also certified that you read and understood the

2   private placement memorandum that we've been looking at,

3   correct?

4   A    Yes, sir.

5   Q    And that private placement memorandum said, in no

6   uncertain terms, that a substantial portion of the

7   distributions can be paid from partner's invested capital,

8   correct?

9   A    Yes, sir.  And my understanding, very clear, if you have

10  excess capital, you return it, and I made that statement, for

11  the record, as well.

12  Q    But just to be 100 percent clear, it was not hidden from

13  you because it's directly in the PPM that you certified you

14  read and understood that your distributions could come from

15  return of capital, correct?

16  A    Yes.  That is correct.

17  Q    Indeed, you were told a substantial portion of your

18  distributions could come from return of capital.

19          MR. COLTON:  If we could pull up Page 26.

20  Q    Do you see the highlighted portion?

21  A    Yes, I do.

22  Q    So it was made known to you that a substantial portion of

23  the distributions could be return of capital or investor

24  capital, correct?

25  A    Yes, sir.  And I hoped I got all my capital back.

1    Q    And you read this PPM before you made the investment?

2    A    I did.

3    Q    So when you made the investment, you certified you knew

4    that you could get your distributions in the form of

5    substantially investor capital, correct?

6    A    Yes, sir, as I described.

7    Q    Let me turn your attention to the due diligence event you

8    described that you attended in October 26th, 27th, 2016.

9            Do you remember testifying about that?

10   A    Yes, sir.

11   Q    And the reason you were able to attend that is because

12   you had been a registered investment advisor, correct?  That

13   was an event for investment advisers?

14   A    I had been, years before.

15   Q    Let me ask it to you differently.  Do you recall the

16   event?

17   A    I recall the event.

18   Q    And the attendees were largely investment advisers or

19   financial professionals, correct?

20   A    I didn't know many people in the room.  I don't know who

21   all was there.

22   Q    You went with Jay Frederick, correct?

23   A    I went with Jay Frederick, yes, sir.

24   Q    And you and he were partners in Ethos Capital, correct?

25   A    We were when he first got started for about a year.

1  Q    And when you went to that event, you paid attention,

2  right?

3  A    Yes, sir.

4  Q    And one of the things that was disclosed to you during

5  the presentation was that there was, at that time, in October

6  of 2016, a shortfall, correct?

7  A    I don't recall that.

8  Q    Do you recall meeting with the U.S. Attorney and the FBI

9  and doing some interviews?

10 A    I had a phone interview.

11 Q    Did you provide information to the FBI and the Department

12 of Justice?

13 A    Would you say that one more time, sir.

14 Q    Did you have meetings at which you were questioned about

15 your GPB investment with the FBI and the DOJ?

16 A    I had -- yes.

17 Q    And one of those meetings was in December of 2019,

18 correct?

19 A    I can't remember the date.

20 Q    Do you remember in or around 2019, having a --

21 A    That sounds right.

22 Q    -- a telephone interview with members of the Government?

23 A    I had a telephone interview with the Government, yes,

24 sir.

25 Q    And you understood the importance of telling the truth at

1    that interview, correct?

2    A    Yes, sir.

3    Q    You didn't lie to the FBI, did you?

4    A    No.

5         MR. COLTON:  One second, Your Honor.  I apologize.

6    I'll come back to that in a moment.

7         (Pause in the proceedings.)

8         MR. COLTON:  Thank you.  I apologize for the delay.

9    Q    Is it true, Mr. Jones, that you said to the FBI, when you

10   understood importance of telling the truth, that a member of

11   Ascendant Capital was making a presentation and somebody asked

12   whether profitability from operations was enough to cover the

13   dividend for that year and the audience was told there was a

14   shortfall, but they hoped to make up for the shortfall in the

15   coming year?

16        You were told that, correct?

17   A    I do recall that, yes, I do.

18   Q    So then within a month of investing in GPB Auto, you were

19   told there was a possible shortfall in covering the dividends,

20   correct?

21   A    I'm trying to -- was it in automotive?  Does it state if

22   it was automotive or other funds?  Was it specific to that?  I

23   can't recall.  It was so many years ago.

24   Q    Do you have any reason to believe that the FBI agent

25   wrote down what you said, incorrectly?

1   A     No.  I have no reason to doubt they did not.

2              MR. McCONNELL:  Objection.

3              THE COURT:  Sustained.

4              MR. COLTON:  Your Honor, I'm referring 3500-MJ-1,

5   and I would ask that the statement that I read be admitted

6   into evidence as a prior recollection recorded.

7              MR. McCONNELL:  No.  Your Honor, objection.

8              I'd like to approach.

9              THE COURT:  I don't think that's prior recollection

10  recorded, is it?  It's not his --

11             MR. COLTON:  It's absolutely his, yes.

12             THE COURT:  All right.  Let's talk about it at

13  sidebar.

14             (Continued on the next page.)

15             (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

1              (The following occurred at sidebar.)

2              THE COURT:  Can I see?  This is consistent -- this

3    is exactly what he said on the stand.

4              MR. COLTON:  He said he didn't recall it, I thought.

5              THE COURT:  I thought he said -- you asked him

6    something about whether it was specifically auto or something

7    else, and he didn't recall something about that.  But what he

8    said, he affirmed that they said this general stuff about

9    there was a shortfall, he recalled being told that.

10             MR. COLTON:  If that's what the record says, that's

11   fine.

12             (End of sidebar conference.)

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; Jury present.)

2           THE COURT:  Go ahead.

3           MR. COLTON:  Just making sure the reporter was

4   ready.  Thank you.

5   BY MR. COLTON:

6   Q    So Mr. Jones, just to be clear, at the event you attended

7   in the month after you invested in GPB, there was a disclosure

8   of a potential shortfall in covering distributions for one of

9   the funds at a minimum?

10  A    I do -- now since you mentioned that and you took a

11  break, that was disclosed from the stage.  I do remember that

12  now, and I believe they were talking about automotive.  But

13  with the expectations to make it up.

14  Q    And after you heard that, you didn't demand or attempt to

15  demand your investment back, correct?

16  A    No, sir.

17  Q    And you didn't ask any follow-up questions at the event,

18  correct?

19  A    I did ask questions at the event.  Scott Naugle.

20  Q    You asked specific questions, yes or no, of Scott Naugle?

21          Scott Naugle is the CFO of GPB Auto at the time?

22  A    Yes, sir.

23  Q    Did you tell the Government that when you met with them?

24  A    If they -- unless -- I'd have to look at the interview.

25  But I did ask questions.  They had a Q and A session, and they

 1   brought me the mic and I asked him questions and he came to me

 2   afterwards and visited with me about it.

 3   Q    Isn't it true, sir, that you told the FBI you did not

 4   recall additional questions about the sources of dividends in

 5   the case of a shortfall?

 6   A    Now, of the dividend is one thing.  But you asked if I

 7   asked questions there, and I did ask questions.

 8   Q    So very fair point.  Let me ask it specifically.

 9        After you heard about a potential shortfall within

10   one month of doing can your investment, you did not ask any

11   follow-up questions about that potential shortfall, correct?

12   A    No, sir, because it was stated from the stage that they

13   expected to make it up.

14   Q    It's your testimony, I think, and you correct me if I'm

15   wrong, that in order to determine if -- where your

16   distributions come from, you said you called it cash from

17   operations, that's what you said?  That's what you expected?

18   A    That's what the material stated, yes.

19   Q    So you -- it was your understanding, when you made the

20   investment, that it was cash from operations that would make

21   up the distributions?

22   A    Yes, sir.

23   Q    And so in essence, you could look at a financial

24   statement and see the cash from operations and determine if

25   they're higher or lower distributions, correct?

1   A    Yes, sir.

2   Q    And you're familiar with financial statements, correct?

3   A    Yes, sir.

4         MR. COLTON:  I'd like to show just the witness, and

5   of course, the Court and counsel, Government Exhibit 2042.

6   Q    And as you look at this document, just a general

7   question, you received reports of partnership for automotive

8   portfolio as an investor, correct?

9   A    I did.

10  Q    And they were posted to that portal that you discussed

11  yesterday, correct?

12  A    Yes, sir.

13  Q    And this was important to you, so you looked at those

14  reports of partnership and financial statements, correct?

15  A    I did.

16        MR. COLTON:  If we could go to Page 9 -- Page 9 of

17  this document.  Actually, let me just ask -- offer, Government

18  Exhibit 2042 into evidence, Your Honor.

19        THE COURT:  Is it in already?

20        MR. McCONNELL:  That's fine.

21        THE COURT:  All right.  Admitted.

22        (Government Exhibit 2042, was received in evidence.)

23        MR. COLTON:  If we can now publish to the jury.

24        THE COURT:  Go ahead.

25        (Exhibit published.)

1          MR. COLTON:  So we can blow that up, please.

2   Q    So this is a page of the financial statement that you

3   received as an investor in the GPB Auto fund, correct?

4   A    Yes, sir.

5   Q    And this is for the year end of December 31, 2016,

6   correct?

7   A    Yes, sir.

8   Q    About three plus months after you made your investment?

9   A    Yes, sir.

10  Q    And it has a line of distributions, correct?

11  A    Yes, sir.

12  Q    And it says the distribution's approximately

13  $14.3 million, correct?

14  A    On what I'm looking at, I don't see that.

15  Q    If you see total line, total column, I should say, and it

16  says contributions, syndication offering costs, and then

17  distributions, do you see that?

18  A    Yes.  The number you used was what, though?

19  Q    Fourteen, 339.  I rounded to 14.3.

20  A    Oh, yes, sir, I see it.

21  Q    So you distributions, you were told, in the auto

22  portfolio for the year 2016 was 14,339,000, correct?

23  A    Yes, sir.

24         MR. COLTON:  Now, if we could go to Page 7.  And if

25  we could blow that up.

1  Q    You're familiar with financial statements that look

2  similar to this, correct?

3  A    Yes, sir.

4  Q    And you reviewed this particular financial statement when

5  it came in or close to when it came in, about your investment

6  for your family trust in the GPB Auto, correct?

7  A    Yes, sir.

8  Q    And now you said that it was important to you that

9  distributions come from cash from operations.  Let's talk

10  about that.

11  A    Yes, sir.

12  Q    In private equity, private equity owns a number of

13  businesses, correct?

14  A    Yes, sir.

15  Q    And the businesses are at one level, gesturing down, and

16  then they feed up to the owner, the fund, correct?

17  A    Yes, sir.

18  Q    So the funds that the cash or the revenue that the

19  portfolio companies generate feed up into the fund, right?

20  A    Yes, sir.

21  Q    So sort of to put it in a different way, if you and I and

22  Mr. McConnell had a fund -- we'll call it Jones, McConnell,

23  Colton, and we owned a whole bunch of dealerships, the

24  dealerships would give their cash up to our fund and then that

25  would go to the top line of our fund, correct?

1  A    Yes, sir.

2  Q    So here, the auto dealerships for GPB Auto, the cash flow

3  of those went to the top line of this financial statement for

4  GPB Auto, correct?

5  A    Yes, sir.

6  Q    Okay.  So the cash flow, if you look at the statement, at

7  the top line, that's the total investment income, correct, the

8  amount that flowed into the fund?

9  A    Yes, sir.

10  Q    And how much is that number?

11  A    2,424,000.

12  Q    And then the total investment income, in bold?

13  A    16,115,000.

14  Q    So you would agree with me that 16 million in total

15  investment income or revenue is greater than 14 million in

16  distributions, correct?

17  A    Yes, sir.

18  Q    So the cash flow from the fund, from the portfolio

19  companies was greater than the distributions, correct?

20  A    Yes, sir.

21  Q    Okay.  So if it was represented to you that the cash flow

22  would be sufficient to cover the distributions, based on this

23  financial statement, that was true?

24  A    Yes, sir.

25  Q    Now, separately, you're a sophisticated investor and a

1  sophisticated finance person, so you looked at the rest of the

2  form, correct?

3  A    Looked at the what?

4  Q    The rest of the form, not just the top line?

5  A    Yes.

6  Q    And on the bottom line, it says, net income, correct?

7  A    Yes, sir.

8  Q    Net income says $5,056,000, correct?

9  A    Yes, sir.

10 Q    And that's less than the distributions of 14 million,

11 correct?

12 A    Yes, sir.

13 Q    So neither of these pieces of information was hidden from

14 you in any way?

15 A    No, sir.

16 Q    So just to be clear, if one were to use net income as a

17 measure as opposed to the total income, you were fully

18 informed at how net income compared to distributions, correct?

19 A    Yes, sir.  But there's many factors that go into that

20 that can distort that number from realty --

21 Q    I'm sorry, I interrupted you.

22 A    I'm sorry, sir.  That's why they used the word cash flow.

23 Q    Got it.  And cash flow, just so we're clear, is the cash

24 flowing from the portfolio companies to its owner, the fund?

25 A    The reference that I'm providing is, you can accelerate

1   depreciation and show an oversized loss in a given year, you

2   can do other accounting maneuvers to make your net income look

3   lower than the actual cash you have.  Take advantage of tax

4   laws, things of that nature.  So that in itself is not a total

5   snapshot.

6   Q    So if I understand your testimony, net income is not a

7   fair measure of cash flow, that's what you're saying?

8   A    Well, statements of cash flow is a better measurement.

9   Q    So we'll take another look at this document.  There's

10  also a line called net investment income.  Do you see that?

11  It's sort of two thirds the way down in bold.

12  A    Yes, sir.

13  Q    You would agree then, based on your testimony, that net

14  investment income is not a fair measure of cash flow from the

15  portfolio companies as well, correct?

16  A    It's not the only measurement.  You don't know or you --

17  are you writing down good will.  You buy a dealership, which

18  they were in the business of doing, you pay $5 million for it,

19  but the assets are only 3 million.  That two or million is

20  good will.  Do you write that down?  Those are variables I

21  never knew about.

22  Q    So you got the financial statements though, right?

23  A    Yes, sir.

24  Q    And all of the information in the larger document for

25  financial statements would show things like gains,

1  depreciation, all these things you're talking about would be

2  in the financial statements, correct?

3  A    Yes, sir.  Should.

4  Q    And you got financial statements, no dispute?

5  A    Yes, sir.

6  Q    And you reviewed them?

7  A    At non-audited financial statements outside of '16.

8  Q    I understand you had testimony about audited financial

9  statements, and that's a different subject.  The question I'm

10  asking you, though, is you got information, and it was

11  provided to you every three months, correct?

12  A    I got some information.  I can't tell you if it's

13  three months or not.

14  Q    But there's -- it's common for businesses to have both

15  audited and unaudited financial statements, correct?

16  A    I generally only get audited financial statements, sir.

17  Q    You got these statements, correct, and this is an

18  unaudited financial statement?

19  A    Yes, sir.

20  Q    And it's not the only statement you got, correct, that

21  was unaudited?

22  A    Yes, sir, that's correct.

23          MR. COLTON:  I'd like to now -- if we could take

24  that down -- go to Government Exhibit 2051, please.  Just for

25  the Court, the witness, and counsel.

1    Q    Do you recognize this as the 2017 GPB Auto portfolio

2    annual report of partnership?

3    A    I recognize this screen.  I recognize what's on the

4    screen.

5    Q    But you did receive annual reports of partnership as an

6    investment or at least as the trustee of the trust investor,

7    correct?

8    A    If it was on my portal, I did.

9    Q    Do you have any reason to believe this annual report was

10   not posted to --

11   A    I'm sure I do not.

12          MR. COLTON:  We offer Government Exhibit 2051, Your

13   Honor.

14          MR. McCONNELL:  That's fine.

15          THE COURT:  Admitted.

16          (Government Exhibit 2051, was received in evidence.)

17          MR. COLTON:  If we could publish, Your Honor.

18          (Exhibit published.)

19          MR. COLTON:  If we could go to Page 12.

20   Q    Since we've done this one before, I think you will easily

21   fine the distribution line.  Can you?  It's the fourth line

22   down.

23   A    Yes, sir.

24   Q    And it says there that the distributions were 27,441,000,

25   correct?

1  A    Yes, sir.

2           MR. COLTON:  If we can now go to Page 10.

3  Q    If we look at the top, the total investment income, the

4  cash or revenue coming from the portfolio companies to the

5  fund, that says 27,957,000, correct?

6  A    Yes, sir.

7  Q    And you'd agree with me that 27,957,000 is greater than

8  27,441,000, correct?

9  A    I would.

10 Q    So based on this financial statement, the cash or revenue

11 from the portfolio companies to the fund is greater than the

12 distributions, correct?

13 A    Yes, sir.

14 Q    And if one were to look at the net income line, the net

15 income of 3 million was less than the distributions for the

16 year?

17 A    Yes, sir.

18 Q    And both of those pieces of information were available to

19 you?

20 A    They were made available.

21           MR. COLTON:  You can take that down.

22 Q    Now, earlier today and yesterday, Mr. McConnell showed

23 you a bunch of account statements.

24           Do you remember that?

25 A    Yes, sir.

1              MR. COLTON:  If we can pull up one of those account

2    statements that was shown to.  Let's go with GX, Government

3    Exhibit 1410, which is already in evidence.  And blow that up.

4    Q    Do you remember this document from earlier in your

5    testimony?

6    A    Yes, sir, I do.

7    Q    All the way to the right, it says, total invested

8    capital.

9              Do you see that?

10   A    Yes, sir.

11   Q    It says $150,000 correct?

12   A    Yes, sir.

13   Q    And that's a true statement, you invested $150,000,

14   right?

15   A    Yes, sir.

16   Q    Now, this also says, in the second line, distribution,

17   correct?  Transaction type, distribution, on the left?

18   A    Yes, sir.

19   Q    It does not say dividend, it says distribution, correct?

20   A    Yes, sir.

21   Q    Okay.  So with respect to the total invested capital,

22   this statement truly states what you invested?

23   A    Yes, sir.

24   Q    Okay.

25              MR. COLTON:  We can take that down.  Now, let's --

1    if we could go to Government Exhibit 1391.  We're skipping

2    ahead a couple.

3              This is already in evidence, Your Honor.

4    Q    Now, this is a different financial -- account statement

5    that you received, right?

6    A    Yes, sir.

7    Q    And in the far right, it says, total capital invested, it

8    says $150,000, right?

9    A    That is correct, yes.

10   Q    And that remains a true statement, you invested $150,000?

11   A    Yes, sir.

12   Q    And again, it doesn't say dividend as a transaction type,

13   it says distribution, correct?

14   A    That's correct.

15   Q    Now, you know the difference between a dividend and a

16   distribution, correct?

17   A    I do.

18   Q    And a dividend implies profit, correct?

19   A    Yes, sir.

20   Q    And a distribution is simply cash you receive, could be

21   from profit, could be from another source, correct?

22   A    Dividends is commonly used in corporations.  This is a

23   limited liability or a limited partner.  Distributions is a

24   common vernacular.

25   Q    Distributions.  And there is a difference between the two

1   concepts of distribution and dividend, correct?

2   A    There is a contrast, yes.  Underlying corporation versus

3   limited partnership.

4   Q    And it was made known to you in the private placement

5   memorandum, the difference between distributions and

6   dividends, correct?

7   A    I don't -- you'd -- does it show a contrast? Because I

8   don't recall that.

9   Q    Let's -- that's fair.

10          MR. COLTON:  Let's take a look at Government

11  Exhibit 8258 in evidence, please.  And specifically, Page 48.

12  If we could blow up the bottom portion.  I'm sorry, I'm

13  looking at the wrong portion.  You can take that down.

14          Maybe go up a little higher.  I'll show you.  I

15  apologize.  I'll find it in one moment.

16          (Pause in the proceedings.)

17          MR. COLTON:  It's on Page 48 of 8258.  It's the

18  second to last full paragraph.

19  Q    Do you see that portion, Mr. Jones?

20  A    Yes, sir, I do.

21  Q    And in the PPM that you read it says, If we are

22  classified as an associations, taxable as a corporation

23  instead of a partnership for any year, we will would subject

24  to U.S. Federal Income tax on our taxable income at rates up

25  to 35 percent with adjustments to recapture lower graduated

1  rates, and any applicable state and local taxes.

2  Distributions to limited partners would be taxable as

3  dividends.

4           So this document makes clear there's a difference

5  between distributions and dividends, correct?

6  A    For taxation purposes.

7  Q    But you knew they were different?

8  A    Did I know they were different?

9  Q    Mm-hmm.

10 A    Because you -- corporations pay dividends, limited

11 partners pay distributions.

12 Q    Right.  Distributions aren't necessarily for profits,

13 which is why distributions aren't necessarily taxable,

14 correct?

15 A    Aren't taxable?

16 Q    Distributions are not necessarily from profits,

17 therefore, they are not necessarily taxable, correct?

18 A    They return capital at times for tax purposes.

19 Q    And as we discussed, you knew that your distributions

20 could well be returns of capital, instead of profits, correct?

21 A    As I described I did, yes, sir.

22 Q    Mr. Jones, you made some statements earlier about what

23 you would have done in terms of your investment for your

24 family trust, had you known certain things.

25           Do you remember that?

1   A    Yes, sir.

2   Q    You told the FBI that if you knew about the fees that

3   were going to be charged by the fund, you wouldn't have

4   invested.

5         Do you remember telling them that?

6   A    I don't remember that.

7   Q    Well, let me ask it a different way.

8         Is it fair to say that you were aware when you

9   invested, by virtue of reading the private placement

10  memorandum, of the fees that were involved in the fund?

11  A    There was a breakdown of fees, there's two percent and

12  other things to go with that.

13  Q    I'm sorry.  I apologize, I didn't hear you.

14  A    There's a list of fees in the PPM, two percent, you know,

15  for -- and then there's others listed as you go along.

16  Q    And none of these fees were hidden?

17  A    No, sir, not -- no.  Not at all.  I believe what I was

18  referencing was the indemnification and the attorney fees in

19  the event something went wrong.  I believe that's what I was

20  referencing if I did.

21  Q    And that too, it was not hidden?

22  A    It was not hidden, no, sir.

23  Q    So not only were the risks all disclosed in the PPM as

24  well as a disclosure of potential additional risks, the fees

25  were all disclosed, as well?

1    A    Yes, sir.

2    Q    Not hidden?

3    A    No, sir.  That's part of diligence.

4    Q    Now, Mr. Jones, you were shown some other documents

5    yesterday that you had testified you received prior to making

6    your investment.

7             Do you recall that?  Just generally?

8    A    Yes.  Yes, I do.  Yes, sir, I do.

9             MR. COLTON:  If we could call up Government

10   Exhibit 1434 in evidence.

11   Q    Do you recall this document?

12   A    I do.

13   Q    And do you recall testifying to that you reviewed it

14   before you invested in the GPB Auto fund for your family

15   trust?

16   A    Yes, sir, I did.

17            MR. COLTON:  Let's take a look specifically at

18   Page 2, please.

19   Q    If you look at the top, can you read that or do you need

20   it blown up, sir?  I would need it blown up, so there's no

21   harm in that.

22            Can you see that, Mr. Jones?

23   A    I do, yes, sir.

24   Q    The very first page of writing of this document,

25   Government Exhibit 1434, it says, an investment in the company

1   involves a high degree of risk.  You should only purchase only

2   if you could afford a loss of some or all of your investment.

3   You should carefully consider the information set forth in the

4   risk factors section of our confidential and private placement

5   memorandum, correct?

6   A    Yes, sir.

7   Q    So not only did the private placement memorandum disclose

8   the risk, so did other documents that you received?

9   A    Yes, sir.  That's why in doing diligence, it's important

10  to understand the business you're engaged in and where your

11  capital is going and what the inspection is.  Based on the

12  assurance that's outlined in writing, they will only buy

13  existing business, they'll offer 15 percent return or equity,

14  and their margins will be 17 percent or greater.  That's why

15  it was very important, because it mitigates that risk.

16  Q    So let's go over this document and explore some of those.

17  A    Yes, sir.

18  Q    Right.  In this document, starting on the fifth line, it

19  says, This material does not constitute an offer to sell or a

20  solicitation of an offer to buy any securities and may not be

21  relied upon in connection with any offer or sale of

22  securities.

23         Do you see that?

24  A    Yes, sir.

25  Q    And you read that, right?

*Jones - Cross - Mr. Colton*                                          309

1    A    On sale of securities, I did.

2    Q    Okay.  So you knew that you could not rely on this

3    document alone, correct?

4    A    I did.

5    Q    And you knew that an offer to sell securities that are

6    not registered had to be through a private placement

7    memorandum of the type that you certified you read and

8    understood, correct?

9    A    Yes, sir.

10   Q    Now, in this first page, if you go down, it also says in

11   the second paragraph, if we could go to the second paragraph.

12   Perfect.

13          It says in the middle, Expenses will be significant.

14   Will decrease the amount of distributable cash, and the

15   expenses will be paid regardless of the success of the

16   companies, correct?

17   A    Yes, sir.

18   Q    So you understood even, from this document, that the

19   amount of distributable cash could be affected by the

20   expenses?

21   A    Yes, sir.

22          MS. WEIGEL:  Let's take a look at Page 4, in the

23   bottom left corner.

24          (Continued on the following page.)

25

Jones - cross - Colton                    310

1    BY MR. COLTON:   (Continuing.)

2    Q    It says in the very bottom, past performance is not

3    indicative of future results; correct?

4    A    That's correct.

5    Q    And that's something that as a financial professional you

6    knew and understand?

7    A    Absolutely.

8    Q    And you knew that when you reviewed the information in

9    this exhibit, Government 1334?

10   A    Yes.

11   Q    And nobody hid the fact that past performance is not

12   indicative of future performance?

13   A    No, sir, common language.

14   Q    Common because it's important and it's true; correct?

15   A    In all -- all marketing material is an investment, yes,

16   sir.  You'll find that.

17   Q    Let's take a look at page six, please.  You were shown

18   this chart.  Let's take a look at the explanations below.  The

19   second sentence says, "Distributions could be more, less or

20   not at all, depending on the cash flow in the portfolio and

21   the order of priority of distribution payments"; correct?

22   A    Yes, sir.

23   Q    So, no, it was not hidden that distributions were not

24   guaranteed and may or may not be made depending on what the

25   company does?

Jones - cross - Colton                          311

1  A    Well, in this document it also says that distributions

2  will be paid out of cash flow and if at such time they do not

3  meet, they can be reduced or eliminated.

4  Q    You also would agree it says there's no guarantee?

5  A    Sure.

6  Q    And you knew you might not get them?

7  A    Absolutely.

8  Q    You also knew that past performance may not happen in the

9  future was the case, and the question and -- I believe,

10 Mr. Jones, you said absolutely?

11 A    Yes, sir.

12 Q    You also agree with me that in this document, let's look

13 at page eight.  Looking at this page eight of Government

14 Exhibit 1434, it talks about distributions being targeted;

15 correct?

16 A    Yes, sir.

17 Q    That means you might hit your target and you might not,

18 right?

19 A    That's the objective.

20 Q    And objective is not a promise or a guarantee; it's an

21 aspirational hope, right, that's the goal?

22 A    Yes, sir.

23 Q    Okay.  Let's now move to another document that you were

24 shown during your direct examination which is Government

25 Exhibit 1435.

1                (Exhibit published.)

2    Q    You said this was a document, correct me if I'm wrong,

3    that you relied upon in making your investment?

4    A    I invested in 2000 -- September 2016, I believe, and this

5    would have came out at the conclusion of that year which you'd

6    have probably got to third or fourth quarter of 2017.

7    Q    Okay, so your testimony is now that you did not rely on

8    this document, Government 1435?

9    A    I thought it was 2015 I looked at.  I had already

10   invested -- this the -- is this the annual report for 2016?

11   Q    I can only tell you it says "Document in evidence

12   Portfolio Snapshot 2016."

13   A    I looked at a '15 and a '16 yesterday.

14   Q    You're not sure as you sit here today whether you

15   reviewed or relied on Government Exhibit 1435?

16   A    I remember seeing this document, yes, sir, I do and I

17   remember some of the content in it.

18   Q    Thank you.  So let's take a look at what is the third

19   page of the document.

20           MR. COLTON:  Just to clear this up while we're

21   getting the third page up, can we focus in on the bottom

22   portion, please, Michelle.

23   Q    We now agree this is something you reviewed and was

24   important to your either decision making or monitoring of the

25   investment?

1    A    Yes, sir.  Now, I thought that that was an annual report

2    you were showing me.  I'm sorry.

3    Q    So, let's take a step back just to make sure the record

4    is clear.  Government Exhibit 1435 is a document you reviewed

5    and relied on in making your investment decision?

6    A    Yes, sir.

7    Q    Okay.  Now, let's take a look at what is said here in the

8    blown-up portion.  It talks about yields; correct?

9    A    Yes, sir.

10   Q    And it says, "Yields are calculated at the dealership

11   level and do not necessarily represent the company's

12   performance and do not include the company-related fees and

13   expenses.  Revenue and vehicles sold are obtained from the

14   December 2015 dealership financial report and are unaudited."

15          So despite the fact that it was unaudited, you

16   relied on this document; correct?

17   A    Yes, sir.

18   Q    And it also says, "Past performance again is not

19   indicative of future results," in bold letters; is that

20   correct?

21   A    Yes, sir, it does.

22   Q    Let's go to another document you were shown during the

23   course of your testimony yesterday, Government Exhibit 1438.

24          (Exhibit published.)

25   Q    Do you remember this document?

1   A     Yes, sir, I do.

2   Q     And I believe you said you reviewed this document as part

3   of your investment decision or investment monitoring.  I'm not

4   sure what you said.

5   A     Yes, sir.

6   Q     And we discussed the percentages that are listed in the

7   GPB Auto line here; right?

8   A     Yes, sir.

9   Q     What we didn't discuss is the note at the bottom.

10          Before we do that, let me ask you a question:  In

11  your experience as a financial professional, reviewing

12  financial statements, the footnotes often contain important

13  information and important definitions; correct?

14  A     Yes, sir.

15  Q     So let's look at the footnote here.  It says, "The

16  returns listed are cash distributions paid to investors as a

17  percentage of their gross investment."  That's what it says;

18  correct?

19  A     Yes, sir.

20  Q     So the calculation that is being disclosed here says

21  specifically it is simply a mathematical calculation; the cash

22  received on top divided by the amount you invested; correct?

23  A     Yes.

24  Q     And it makes no representation in this chart about the

25  source of that cash; correct?

1  A    That's correct.

2  Q    And based on your investment, you received cash every

3  month after the third month starting in December of 2016

4  basically through most of 2018; correct?

5  A    Yes, sir.

6  Q    And if you took that cash that you received on the top

7  and divided it by the amount you invested, you would have the

8  percentage return that you got under this definition; correct?

9  A    Yes, sir.

10          MR. COLTON:  Your Honor, I'm at a stopping point.  I

11  don't know what your schedule is, but it's 12:25 and I wanted

12  to alert the Court --

13          THE COURT:  Sure.  Do you think you have more than

14  fifteen or twenty minutes?

15          MR. COLTON:  I don't think I have more than that.

16          THE COURT:  I think we should finish with the

17  witness and then go to lunch.

18          MR. COLTON:  There's another defendant.

19          THE COURT:  I think a great stopping point would be

20  when you've finished.

21          MR. COLTON:  Okay.  I just wanted to give the Court

22  the option.

23          THE COURT:  Unless --

24          Tell me if you all need a break.  Does anyone need a

25  break right now?

Jones - cross - Colton                      316

1           They're saying go ahead.

2           MR. COLTON:  And then we shall.

3    BY MR. COLTON:

4    Q    I want to take a step back quickly, Mr. Jones.  When

5    you're evaluating financial performance of a company or an

6    investment, there are different time periods that can be

7    examined; correct?

8    A    Time periods?

9    Q    Yes.

10   A    Yes, sir.

11   Q    You can look at a quarter or a year --

12   A    Yes.

13   Q    -- or the life of the investment; correct?

14   A    Yes, sir.

15   Q    And the shorter the time period, the less reliable the

16   results; correct?

17   A    It depends on how much -- yes, sir, how much weight you

18   put on historical versus understanding present and future

19   businesses.

20   Q    Fair to say that if you were trying to calculate your

21   return on your investment, any investment, you would look over

22   the life of the investment how much has it returned to you;

23   right?

24   A    That's one variable you would use, but only one.

25   Q    Okay.  But it's a reasonable variable?

Jones - cross - Colton                317

1    A     It depends on what you're looking at.

2    Q     Yes, sir.  And it's typical in businesses to have

3    cyclical cash flow; right?

4    A     Yes, sir.

5    Q     In the auto business that you were very interested in and

6    did invest in is a typical cyclical business; right?

7    A     To degrees.  Even in recessions of '08 and '09, they were

8    over double digit cash flows.

9    Q     Let me re-ask that.  My apologies.

10         During the course of a year, people tend to buy more

11   cars at different parts of the year; they don't buy them

12   consistently every month the same; right?

13   A     That's correct.

14   Q     And the dealers tend to offer and the manufacturer offers

15   rebates and financial incentives and things of that nature;

16   right?

17   A     Yes, sir.

18   Q     And you tend to see more car sales at least in the

19   northeast in the summer than the winter because people don't

20   want to ruin their brand new cars in the winter with snow and

21   salt and things of that nature.

22   A     I don't know seasonality here in this area.

23   Q     All right.  But the auto business is not the only

24   cyclical business during the course of the year; right?

25   A     Yes, sir.

Jones - cross - Colton                          318

1   Q    And it's common in lots of businesses -- in consumer

2   goods, let's say, people buy a lot of things in December for

3   holiday gifts?

4   A    Yes, sir.

5   Q    So there are more sales in December.

6         So when you look at cash flow of a business, just

7   looking at individual months is not as useful as looking

8   during the course of a longer period like a year where you

9   can account for the cyclical nature of the business;

10  correct?

11  A    Yes, sir.

12  Q    And when you were running your own profit and loss at

13  Nabisco, you would look at a longer period of time because,

14  again, in that business there tends to be higher and lower

15  sales months and quarters; correct?

16  A    Yes, sir.

17  Q    And that would be common business practice to look at

18  somewhat longer periods of time to account for that

19  seasonality or cyclical nature?

20  A    Yes, sir.

21        MR. COLTON:  If we could now take a look, just for

22  the Court, counsel and the witness, at Defendant's Exhibit

23  D-I.

24        (Exhibit published to witness, counsel and Court only.)

25        MR. COLTON:  Your Honor, the redaction is solely

1    personal identifying information.

2              THE COURT:  Okay.

3    BY MR. COLTON:

4    Q    Mr. Jones, are you familiar with what you see on your

5    screen?  We're trying to blow it up for you.

6    A    Yes, sir.

7    Q    And that's what is known colloquially as a K-1; correct?

8    A    Yes, sir.

9    Q    And a K-1 is a tax form issued to limited partners, such

10   as the trust that you had that invested in a limited

11   partnership, in this case Auto Portfolio; correct?

12   A    Yes, sir.

13   Q    Okay.  And this is the K-1 you received for year 2016;

14   correct?

15   A    Yes, sir.

16             MR. COLTON:  We offer Defendant's D-I, Your Honor.

17             MR. McCONNELL:  That's fine.

18             THE COURT:  Admitted.

19             (Defendant's Exhibit D-I received in evidence.)

20             (Exhibit published.)

21   BY MR. COLTON:

22   Q    If we could go to the next page, please.  Do you

23   recognize this page which says at the top "K-1"?

24   A    Yes, I do.

25   Q    Do you see that?

Jones - cross - Colton                    320

1    A    I do.

2    Q    If you look at the bottom left box?

3         MR. COLTON:  Blow that up.  And, Michelle, thank you

4    for maneuvering through this.

5    A    Yes, sir.

6    Q    That has a "Capital Contributed During the Year" line;

7    right?

8    A    Yes, sir.

9    Q    It says "$150,000"?

10   A    Yes, sir.

11   Q    And that was the amount you contributed through your

12   trust; correct?

13   A    That's correct.

14   Q    And in the form that you were sent showed an ending

15   capital account of 148,830; correct?

16   A    Yes, sir.

17   Q    So you were formed informed that your capital account

18   went down; correct?

19   A    Yes, sir.

20        MR. COLTON:  Let's look now at Defendant's Exhibit

21   D-S, again for counsel, the witness and the Court.

22        (Exhibit published to witness, counsel and Court only.)

23        MR. COLTON:  Perhaps I can short circuit this.  It's

24   up on the screen.

25        Your Honor, we're going to offer this document, if

Jones - cross - Colton                          321

1    there's no objection.  It will go faster.

2              MR. McCONNELL:  No objection.

3              (Defendant's Exhibit D-S received in evidence.)

4    Q    The redaction, Mr. Jones, is just your address.  I didn't

5    want to put it up on the screen in public.

6              (Exhibit published.)

7    Q    Do you recognize this document?

8    A    Oh, yes, sir, I do.  I do.

9    Q    This is the letter that accompanied the K-1 form for 2017

10   for your Auto Portfolio investment; correct?

11   A    Yes, sir.

12   Q    And if we look at the second page, again, the bottom left

13   L box.  And, again, the redactions on that page were address

14   and Social Security and things of that nature that we didn't

15   want to put up for you, Mr. Jones.

16              Do you see it says "Beginning capital account

17   148,830"?

18   A    I do.

19   Q    And do you see that it says, "Ending capital account,

20   131,036"?

21   A    I do.

22   Q    You received this document?

23   A    Yes, sir.

24   Q    And you were told that your capital account went down;

25   right?

Jones - cross - Colton                          322

1    A    Yes, sir.  And I was told -- again, common practice,

2    return the capital first.  For tax efficiency it's a common

3    practice that's used in limited partnerships.

4    Q    I just want to make sure I heard you correctly.

5             Return of capital is a common practice in limited

6    partnerships, is that what you're saying?

7    A    Yes, sir, in private equity.

8    Q    So there's nothing internally wrong with return of

9    capital in private equity?

10   A    That's a common -- this is a tax form.  It does not

11   stipulate the underlying health or deficiency of the business.

12   This is for reporting taxation and it's for tax efficiency

13   only.  The question was raised not only by me and that's

14   exactly what we were told, but I do that to be common

15   practice.

16   Q    It's also what you were told, that there's a difference

17   between tax accounting and financial accounting is true, it's

18   not false; correct?

19   A    Yes, sir.

20             MR. COLTON:  One moment with counsel, Your Honor.

21             (Pause in proceedings.)

22   BY MR. COLTON:

23   Q    Just a few more minutes, Mr. Jones, and I appreciate your

24   patience.

25             Prior to testifying here today you had multiple

Jones - cross - Colton                                    323

1    meetings with the Government; correct?

2    A    Yes, sir, this week.

3    Q    And you reviewed the questions -- they reviewed the

4    questions that they would ask you; correct?

5    A    They did, yes.

6    Q    And you practiced giving answers; correct?

7    A    They asked me questions, yeah.  I mean, I answered them.

8    Q    And defense counsel asked to meet with you to go over and

9    get the truthful information as well, but you did not seek --

10   agree to meet with defense counsel; correct?

11   A    Would you say that one more time?

12   Q    The defense counsel, counsel for Mr. Gentile and

13   Mr. Schneider asked to meet with you and you did not want to

14   meet with us, correct?

15   A    Asked for what?

16   Q    To meet with you?

17   A    Nobody asked me to meet with you.  No, sir.  I never

18   heard that.

19   Q    You and Mr. Frederick are close; correct?

20   A    Very much so.

21   Q    And the two of you have communicated about your meetings

22   with the Government; correct?

23   A    We've had conversations, limited conversations, if that's

24   what you're asking.

25   Q    And, in fact, you introduced Mr. Frederick to his first

Jones - cross - Colton                    324

1  client that he put in to GPB; correct?

2  A    I don't know.

3            MR. McCONNELL:  Objection.

4            THE COURT:  Overruled.

5  A    I don't know.

6  Q    Did you introduce Mr. Frederick to Mrs. Harvey?

7  A    I did.

8  Q    And to your knowledge Mrs. Harvey invested with

9  Mr. Frederick and GPB?

10  A    Yes, sir.

11  Q    Why did you end up resigning from Ethos Capital?

12  A    From what Capital?

13  Q    Ethos Capital?

14  A    Because I got involved with Jay and I had a lot of

15  contacts from being older and established and when he left

16  Merrill Lynch he wanted to start a firm and I told him I would

17  help him getting started, but I had no interest in operating

18  it with you.

19            I walked in, I took the Series 65.  I passed it and

20  worked with him for about a year and that was it.

21  Q    So you previously testified in a civil case in the

22  Eastern District of Arkansas in May of 2013; correct?

23  A    I don't -- what case was it?

24  Q    Bradbury.

25  A    Yes, sir, I'm familiar with that.

Sophie Nolan, RCR RPR - Official Court Reporter

Jones - cross - Colton                     325

1    Q    And you gave a deposition in that case; correct?

2    A    Okay.

3    Q    And you were sworn to tell the truth at that deposition;

4    correct?

5    A    Yes, sir.  Yes, sir.

6    Q    You did tell the truth?

7    A    I did tell the truth.

8    Q    So, looking at the transcript on page 29 --

9              MR. McCONNELL:  Objection to the form, Your Honor.

10   We're just reading from a transcript now.

11             MR. COLTON:  I apologize, Your Honor.  Poorly

12   phrased.

13             Page 29, line 13, for counsel and the Court.

14             MR. McCONNELL:  Same objection.

15             THE COURT:  So, I take it that's not a question for

16   the witness.

17             So, go ahead.

18   BY MR. COLTON:

19   Q    Mr. Jones, isn't it true that under oath you left Ethos

20   Capital --

21             MR. COLTON:  I'm sorry, Your Honor.  One second.

22   Q    Isn't it true you left Ethos Capital not because you just

23   choose to leave, but there was negative publicity on some

24   other matter?

25   A    Absolutely not.  I was never paid -- I never took one

Jones - cross - Colton                    326

1    dime from Ethos Capital.

2    Q    I apologize for the delay.  Isn't it true you were asked

3    the following question and gave the following answer under

4    oath --

5                MR. McCONNELL:  I'm sorry, Your Honor --

6                MR. COLTON:  Line -- page 29, line 14.

7                MR. McCONNELL:  Page 29 in the transcript?

8                MR. COLTON:  Page 20 of the transcript in the

9    Min-U-Script.

10               MR. McCONNELL:  Okay.

11   A    Am I supposed to follow this?

12   Q    You can or you can listen.  It's totally up to you.

13   A    I want just to be sure I have the page right.  I don't

14   have it.

15   Q    Isn't it true you were asked the following question and

16   gave the following answer:

17               "Okay.  In 2006, what did you two after you left

18   North American Baking?

19               "Answer:  I've been a professor of economics at

20   Arkansas State University and I've done some miscellaneous

21   stuff.  I started another company that I ended up having to

22   resign from because of all of the negative publicity and I'm

23   waiting for this to clear because I'm going back into the

24   consumer package goods.

25               "Question:  Okay.  What's the other company you

Jones - cross - Colton                         327

1    started?

2              "Answer:  Ethos Capital."

3    A    That's true.

4    Q    So it's fair to say that you left Ethos Capital because

5    of some negative publicity, not just because you decided to

6    leave it?

7    A    That was the design from day one, spend about a year and

8    leave.  I was there to have Jay get business started, and I

9    did, and then I left, because I had plenty of other stuff to

10   do.

11             But lawsuits and negative publicity is not good for

12   anyone.  That is indeed a fair statement and I would do it

13   again if it happened today because I do not want to tarnish

14   Jay.

15             MR. COLTON:  One moment, please.

16             (Pause in proceedings.)

17             MR. COLTON:  Your Honor, I have nothing further at

18   this time, obviously reserving any potential recross.

19             THE COURT:  Great.  Let's take a break for lunch.

20             If you all could come back at 1:45, that would be

21   great.

22             THE COURTROOM DEPUTY:  All rise.

23             (Jury exits.)

24             THE COURT:  You can step down.

25             (Witness steps down.)

Sophie Nolan, RCR RPR - Official Court Reporter

Proceedings                                      328

1       MR. COGAN:  Your Honor, could you please tell the

2  witness not to speak with --

3       THE COURT:  Don't talk to the Government or anybody

4  about your testimony while you're on cross.

5       THE WITNESS:  Excuse me?

6       THE COURT:  I'm telling you, you shouldn't talk to

7  the Government.  They won't try to talk to you while you're on

8  cross-examination.

9       THE WITNESS:  Thank you.

10      THE COURT:  Anything you want to take up?

11      MS. WEIGEL:  Yes, Your Honor.  Just so we can plan,

12  we were just wondering how long the expected cross is from the

13  second defendant's attorney.  We happy to move things around

14  but we want to be able to be fair to the witness who is

15  waiting.

16      MR. COGAN:  I'm going to be handling the cross of

17  this witness.  I have some.  I think if you give me a little

18  bit of time during the lunch break, I can give you what's

19  hopefully a fair estimation as to how much, but I do need a

20  little bit of time to figure it out.

21      THE COURT:  The next witness you were hoping on was

22  going to get on a plane.  This is really your department, not

23  my department, but it does seem unlikely that we'll get

24  through the cross of that witness today.  So maybe you all

25  should talk about how you want to handle that issue.

Proceedings                                      329

1          MS. WEIGEL:  Your Honor, we may have to break early

2     in this case because we were hoping to have the witness at

3     this point because he's going away for two weeks and we don't

4     have someone else lined up.  We will try to work things during

5     the break, but I want to preview for the Court that that might

6     not be possible.

7          THE COURT:  Okay.  Let's do a one-time pass for

8     having to break early.

9          MS. WEIGEL:  We're not saying we need to, Your

10    Honor.

11         THE COURT:  Obviously, I'm hoping this is the one

12    time it happens.  I will see you all at 1:45.

13

14         (Luncheon recess.)

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N    S E S S I O N

2              (Time noted:  1:45 p.m.)

3          THE COURT:  We can bring in the jury.

4          (Witness takes the stand.)

5          (Jury enters.)

6          THE COURT:  All right.  Everybody can be seated.

7          Go ahead, counsel.

8          MR. COGAN:  Thank you, Your Honor.

9     CROSS-EXAMINATION

10    BY MR. COGAN:

11    Q    Good afternoon.  Mr. Jones, my name is John Cogan.  I

12    represent Mr. Gentile.  You and I have never met before, have

13    we?

14    A    Not that I know of, Mr. Cogan.

15    Q    This is the first time we've gotten a chance to talk;

16    right?

17    A    I believe that's right.

18    Q    Okay.  I want to go back to the October 2016 due

19    diligence event that you told the jury that you attended in

20    Austin, Texas, okay?

21    A    Okay.

22    Q    And yesterday when you testified about that due diligence

23    event, I believe you said it was like a cheerleading session;

24    right?

25    A    Yes, sir.

1    Q    That everything was positive and nothing was negative;

2    right?

3    A    Pretty much.

4         MR. COGAN:  Andy, can we pull up from the transcript

5    yesterday page 188, line 21 down to the end of the page and if

6    we can fit it onto the screen, the first two-thirds of page

7    one 89.

8         MR. COGAN:  Your Honor we may have to switch the IT

9    over so we can control this, if that's okay.

10        (Published.)

11   BY MR. COGAN:

12   Q    Do you have that on your screen in front of you, sir?

13   A    Jest.

14   Q    You told the jury -- yesterday you were asked:

15        "Well, I'll start with Mr. Gentile" -- this is now

16   the prosecution asking you questions.

17        "I'll start with Mr. Gentile saying about GPB and

18   the automotive portfolio.

19        "Answer:  Business was healthy, pursuing more

20   acquisitions wanting to continue to grow.  Everything was very

21   positive.

22        "Question:  Did anyone tell you that the

23   distributions were going to be return of investor capital?

24        "Answer:  Absolutely not."

25        Skipping down to line 10, sir:

Jones - cross - Cogan                        332

1          "Did anyone say anything about the profitability of

2    the dealerships that was negative?

3          "Answer:  No.  There was nothing negative.  It was a

4    cheerleading session.

5          "Question:  What was it?

6          "Answer:  It was a cheerleading session."

7          That's what you told the jury yesterday; right?

8    A    Yes.

9    Q    Now, on cross-examination with Mr. Colton earlier today,

10   you actually acknowledged that at that session you were told,

11   along with everyone else in the audience, that coverage for

12   the auto portfolio had dipped; correct?

13   A    Yes, sir.  I also said that they were going to make it up

14   in future months or years.  Everything was very positive and I

15   stand by that statement.

16   Q    You said that or they said that?

17   A    They said that.

18   Q    Okay.  What they actually said, sir, as you told us

19   earlier today was that profitability for operations was not

20   enough to cover the distribution for that year and that the

21   audience was told that there was a shortfall, but that they

22   hoped it would recover; correct?

23               MR. McCONNELL:  Objection.

24               THE COURT:  You can answer the question.

25   A    Okay.  Would you repeat that one more time, please,

Jones - cross - Cogan                    333

1    Mr. Cogan?

2    Q    What you were told back in Austin, Texas back in 2016 in

3    front of an entire group of professional investors was that

4    profitability from operations was not enough to cover the

5    dividend for that year and that the audience was told that

6    there was a shortfall; correct?

7    A    I do recall that.

8    Q    Okay.  And then they expressed the hope that it would

9    recover the following year; right?

10   A    Yes, sir.

11   Q    A possibility that it would recover the following year;

12   right?

13   A    And to put it in context they did say that acquisition

14   was continuing, everything was healthy.

15   Q    They were hopeful, as we just established, that things

16   would recover the following year, right?

17   A    Absolutely.

18   Q    No guarantees that it would recover; correct?

19   A    Never a guarantee.

20   Q    And you understood that; right?

21   A    Always understood that.

22   Q    So, when you told us yesterday that you had just

23   assumed month after month when you were getting your

24   statements monthly that all of the distributions you were

25   getting were coming from funds from operations and not from a

1   return of capital, that was in the face of them telling you

2   that coverage had already dipped a month after you invested;

3   right?

4   A    With the expectations of making it up on out months.

5   And, again, it was clearly defined in the literature, in

6   writing.  If operations did not generate enough cash flow,

7   they had the sole discretion to reduce or eliminate.  You take

8   what they say at face value.

9   Q    Is the answer to my question, sir, yes?  Correct?

10  A    Okay.  Would you please repeat --

11  Q    I'll withdraw the question.  I'll ask it to you again.

12         When you told us yesterday that you assumed that you

13  were getting -- that you were getting account statements month

14  after month and it showed distributions coming back to you and

15  you assumed that those were distributions being fully funded

16  from operations from the underlying portfolio companies.

17         Do you recall that testimony?

18  A    Yes, sir.

19  Q    Okay.  You made that assumption even though you were told

20  from the outset that at least in 2015 when you first invested,

21  coverage had already dipped; right?

22  A    At that meeting, they had a shortfall and I don't recall

23  if it was for a month, but the expectations were that they

24  were going to make it out, just like the previous counsel

25  said, you have cycles that go up and down.

1  Q    By the way, the revelation that it's a shortfall, that's

2  not part of a cheerleading session, is it?

3  A    I would assure you most everything was cheerleading,

4  raising money, and it was a big party.

5  Q    Telling investors and potential investors, which is who

6  was in that audience, that coverage had dipped for 2015 and

7  there was only a hope that it would recover is actually a

8  moment of candor, right, sir?

9  A    I don't dispute that.

10 Q    I just didn't get the answer.

11 A    I do not dispute that, no, sir.

12 Q    Now, I want to talk to you about another portion of the

13 presentations that you listened to back in October 2016 in

14 Austin, okay?

15 A    Are you saying '15 or '16?

16 Q    I'm saying '16, but I'll try to be clearer.

17         You were -- just to make sure we're on the same

18 page, you invested approximately September of 2016 and then

19 you attended an event down in Austin in October of 2016;

20 correct?

21 A    Yes.

22 Q    So I'm referring to the October 2016 event that you

23 attended?

24 A    May I make one point of clarity?

25 Q    Sure.

1   A    The October 2016 was not my diligence that I conducted.

2   That was after the fact.  My diligence took place before I

3   ever went to Austin.

4   Q    Right --

5   A    Because you refer to it as diligence.  I want to make

6   sure that we're on the same page.

7   Q    Well, sir, you understand that GPB and Ascendant referred

8   to it as a due diligence event, right, sir?

9   A    I don't recall that.

10  Q    There were, like, 100 other people in the audience all

11  doing due diligence.

12  A    Okay.

13  Q    All hearing Ascendant and GPB candidly tell the audience

14  that coverage had dipped; right?

15  A    I presume, yes, sir.

16  Q    No one whispered it; correct?

17  A    No, they said it.  They said they hoped to make it up.

18  Q    All right.  I want to talk to you about another portion

19  of the session that you attended in October of 2016, okay?

20          Isn't it true that Mr. Gentile at that session

21  presented on performance guarantees?

22  A    I don't recall.

23  Q    All right.  Let me see if I can refresh your

24  recollection, sir.

25          MR. COGAN:  Andy, just for the witness and counsel,

Jones - cross - Cogan                                337

1    can we bring up tab 24 --

2    Q    Sir, let me just orient you to what you're looking at for

3    a second?

4         (Exhibit published to witness, counsel and Court only.)

5    Q    Do you recall testifying earlier today to having had sat

6    for interviews with the FBI?

7    A    Yes, sir.

8    Q    Okay.  I ask you just to take a moment and read what's on

9    the screen to yourself and once you're done reading just look

10   back up at me.

11   A    And this is from the FBI right here on my phone

12   interview?

13   Q    All I'm asking you, sir, is to take a look at the screen;

14   read it, review it and then I'll have a question for you.

15   A    Okay.  (Reviewing.)

16         Yes, sir.  I read that.

17         MR. COGAN:  You can take that down, Andy.

18   A    Yes, sir.

19   Q    Having reviewed that document does it refresh your

20   recollection that Mr. Gentile presented at that session on

21   GPB's usage of performance guarantees?

22   A    Yes.

23   Q    And what he told both you and everyone else in the

24   audience was that performance guarantees were things that GPB

25   commonly used; right?

1  A    Yes, sir.

2  Q    And you regarded that, by the way, as a good thing,

3  right, sir?

4  A    Yes.

5  Q    And the reason that that's a good thing, the jury heard

6  about this yesterday, but I would like to ask you about it.

7  The reason it's a good thing is because the performance

8  guarantee is a guarantee from the operator of a dealership

9  that has been acquired by GPB that the dealership will

10  accomplish a certain amount of financial success in a given

11  time period; correct?

12  A    That is correct.

13  Q    So that if, for example, a dealership is projected to

14  make, let's say, $2 million, but only makes 1 million, what

15  the performance guarantee says is that the operator is going

16  to make up the difference.  It's going to pay GPB the

17  additional million dollars; right?

18  A    Yes, sir.

19  Q    And that's a level of protection to investors, right?

20  A    Yes, sir.

21  Q    By the way, a performance guarantee would only trigger,

22  as you understood it, if there had been a failure on the part

23  of the underlying dealerships to meet their financial

24  projections, right?  That wasn't a good question.  Let me ask

25  it again.

1            What a performance guarantee, if it actually winds

2     up getting triggered, tells you is that a dealership

3     underperformed, true?

4     A    In that context, yes, sir.

5     Q    And, so, disclosing to investors the that performance

6     guarantees have been triggered in a given year, is clear --

7     withdrawn.  Let me ask it a different way.  If a performance

8     guarantee -- withdrawn.

9            If GPB's financials disclose that performance

10    guarantees have actually been triggered and paid, that's

11    telling investors that underlying dealerships did not succeed;

12    correct?

13    A    I've never seen that line on a performance financial

14    statement.

15    Q    I'm not asking you about a particular line item on a

16    financial statement.  I'm asking you, you would agree with me

17    that a disclosure that performance guarantees were triggered

18    and paid, means that the underlying dealerships that needed

19    the performance guarantees to be triggered and paid had not

20    performed up to expectation; correct?

21    A    In that context, yes, sir, but that's not what I recall

22    about him speaking about, per se.

23    Q    I'm just -- I appreciate that.

24    A    Okay.

25    Q    I'm asking you what your understanding was having done

Jones - cross - Cogan                    340

1   due diligence and invested in this company as to what a

2   performance guarantee tells investors.  It tells investors, if

3   it winds up getting paid, that the underlying dealerships did

4   not perform to expectation; correct?

5   A    Or if I get the performance they exceeded expectations,

6   yes, sir.

7   Q    Well, if they -- if they meet or exceeded expectations,

8   there would be nothing for the guarantor to actually kick in

9   at the end of the year; right?

10  A    There's two sides to it.  There's a penalty and a reward

11  to it.

12  Q    Okay.  You think that even when the dealerships that were

13  providing -- that were being sold into GPB performed up to

14  expectations, the guarantors nonetheless had to put additional

15  money in?

16              MR. McCONNELL:  Objection.

17              THE COURT:  Overruled.

18  A    No, sir.  If a set of objectives was set with a new

19  dealer and the new dealers were required to have an ownership

20  stake -- this was a performance that if you exceed certain

21  objectives, you can get a payback.  If you don't, you can end

22  up being clawed back based on the underperformance.  So,

23  again, my understanding was it went both ways.

24  Q    Right.  So I understand that, but what the guarantor is

25  doing is saying that if I don't meet those projections, I'll

1    kick in the difference; right?

2    A    Yes, sir.  Yes, sir.

3    Q    And if that actually happens, that's telling people that

4    the underlying dealership did not perform as well as

5    projected; right?

6    A    Yes.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jones - cross - Mr. Cogan*                          342

1   BY MR. COGAN: (Continuing.)

2   Q    It's not hiding the performance of the underlying

3   dealerships in any way; is it?

4   A    No, sir.

5   Q    I want to ask you --

6          MR. COGAN:  And Andy, if we could pull up -- I

7   think it's Government Exhibit 8258-B already in evidence.

8   Q    This is the PPM that you were asked questions about

9   earlier today.

10          (Exhibit published.)

11          MR. COGAN:  And if we could turn, Andy, to page 26

12   of the exhibit, which is page 21 of the PPM, and blow up the

13   language with no assurance of distributions.

14          You are one step ahead of me, thank you.

15   Q    So you recall testifying about this provision in the

16   PPM earlier today?

17   A    Yes, sir.

18   Q    I want to ask you some additional questions about the

19   language here to make sure I understand your testimony,

20   okay?

21   A    Yes, sir.

22   Q    This provision says, if we could read it together:  No

23   assurance of distributions.

24          Right?

25   A    Yes, sir.

1  Q    And it says:  The process of identifying, screening and

2  successfully acquiring and operating private companies is

3  difficult and risky.

4       Correct?

5  A    Yes, sir.

6  Q    And we talked about all the risks earlier.  I'm not

7  going to go over that again, right?

8       We can provide no assurances that we will be able

9  to continue to generate operating cash flow sufficient to

10 make distributions to LPs.  Thus, there is no guarantee that

11 we will pay any particular amount of distributions if at

12 all.  Furthermore, while we have no present plans to do so,

13 we could include LP's invested capital in amounts we

14 distribute to LPs, which may reduce the amount of capital

15 available to acquire and operate dealerships and make other

16 permitted acquisitions as well as negatively impact the

17 value of the LP's investments.

18      Okay.  Let me stop there for a second.

19      First, you'd agree with me that what this document

20 disclosed to you in plain language is that a distribution

21 could be made to you that returns your capital, right?

22 A    Yes, sir.  And I explained what that could mean.

23 Q    We're going to look at what it means right now

24 together.

25      What it says, sir, is that the return of capital

1   that would happen in that scenario, and I'm now on the --

2   one, two, three, four -- fifth line, may reduce the amount

3   of capital available to acquire and operate dealerships and

4   make other permitted acquisitions, right?

5   A    Yes, sir.

6   Q    In other words, what GPB was telling you was that it

7   could return your capital to you, and as a result of that,

8   it could have a negative impact on the ability of GPB to

9   continue to operate in the same way it had previously been

10  operating, right?

11  A    Well, for clarity, I read that very clearly that you

12  can return my capital.  I interpret that as -- as stating to

13  me you have a surplus of capital and you are not able to

14  make the acquisition because of the strict criteria they

15  outlined.  And as a result, instead of paying us

16  8.7 percent, as a good financial steward would be, they'd go

17  to return part of your capital, which is a common practice.

18          So while I am sure that it would reduce our

19  capital, it would also reduce the amount of excess capital

20  that GPB had to make acquisitions.

21          So -- and again, that -- that's a common practice.

22  Q    Yes.  Returning capital is a common practice in private

23  equity, right, sir?

24  A    Yes.

25  Q    And you knew that when you invested, right, sir?

1  A    And I had no problem under that scenario as I

2  interpreted that.  You're returning my capital because you

3  don't have usage for it, reducing 8.7 percent.

4  Q    Can I hear the end of that answer again?

5  A    And it's going to allow GPB not to have to pay the

6  8.7 percent distribution or dividend.

7  Q    Sir, is it your testimony that GPB told you that if it

8  could not fund 8.7 percent fully funded from operations,

9  that it could not return capital to make up that 8.7 percent

10  and distribute it to you on a monthly basis?

11  A    You asked me about this sentence.

12  Q    Yes, sir.

13  A    That's exactly what that sentence means to me.

14  Q    The language in the sentence goes on to say that that

15  return of capital could negatively impact the value of the

16  LP's investments.

17          Do you see that?

18  A    I do.

19  Q    Okay.  And it says, especially, if a substantial

20  portion of our distributions are paid from LP's invested

21  capital, right, sir?

22  A    It's going to reduce the amount of capital they have to

23  make acquisitions.

24  Q    So what it's saying to you, sir, is that it's saying

25  there's a potential that it could negatively impact, right,

1    yes?

2    A    Yes.

3    Q    Okay.  And that a substantial portion of your

4    distribution could be paid from investor capital, right,

5    sir?

6    A    And I explained why.  Giving me my capital back because

7    you have a surplus of capital that you are -- cannot find

8    opportunities to deploy that.  And instead of having to pay

9    the 8.7 percent, which is unproductive because they don't

10   have assets that they've been able to put the money to work,

11   that they're giving it -- they're returning capital to avoid

12   from having to pay 8.7 percent which is a fiduciary

13   responsibility for its partners.

14   Q    And you got that 8.7 percent distribution starting

15   three months after you invested in September of 2016, right?

16   A    Yes, sir.

17   Q    Every single month, all the way through middle of 2018,

18   as you testified to earlier, right?

19   A    Yes, sir.

20   Q    And in all of those payments, that was money going back

21   into your pocket, right, sir?

22   A    Yes, sir.

23   Q    So we talked earlier about this being a potentially

24   risky event -- investment, right?

25   A    Yes, sir.

1  Q    And paying money back to you actually, to use the

2  phrase, de-risks your investment, right?

3  A    Yes, sir.

4  Q    It reduces the risk that you face, right, sir?

5  A    Yes, sir.

6  Q    Because rather than having $150,000 at risk, which is

7  what you had in the beginning, you got money back every

8  single month, correct?

9  A    Yes, sir.

10 Q    And that reduced the risk to you, right, sir?

11 A    Yes, sir.  There's less dollars at risk.

12 Q    And you still owned, despite those returns of

13 distributions on a monthly basis, the same number of units

14 of GPB Capital, correct?

15 A    Yes, sir.

16 Q    So when you were getting those monthly distributions,

17 it wasn't in exchange for you giving back your ownership

18 interest in this fund, right?

19 A    No, sir.  That money I was given back was a result of

20 operations going off in excess of 8.7 percent returns.

21 Q    Sir, again, you told us that they told you in no

22 uncertain terms back in October, the first month after you

23 invested, that they weren't throwing off the 8.7 percent

24 fully funded from operations, right?

25 A    Mr. Cogan, the marketing materials, innumerable times,

1   it clearly states that the dealership operations would throw

2   off 15 to 17 percent margins and at any time the operations

3   fails to generate 8.7 percent or greater, they have the

4   autonomy and discretion to reduce those dismissed ends or

5   eliminate them.  At that time there was no communication

6   throughout the first two years that anything other than the

7   company was doing well, except, couldn't get audited

8   financial statements.  There was a line at Austin that said

9   there was a shortfall this month.  There wasn't elaboration

10  on it.  What am I to believe?  What is all of us to believe?

11  Q    Well, sir, did you do any followup when they told you

12  that there had been a shortfall?

13  A    I can't recall what the followup was, because they said

14  they expect to make it up.

15  Q    Okay.

16  A    And my expectation was if it was there, the operator to

17  make it up, I wasn't overly concerned because one month.

18  Q    Oh, now you recall the message that they communicated

19  was that it was just one month?

20  A    I believe that's what was said.

21  Q    Let me ask you, sir --

22          MR. COGAN:  Andy, if we can pull back up just for

23  the witness only tab 24.  I will ask you, Andy, for the

24  witness, highlight the bottom paragraph on page 2 and then

25  carrying over to the top paragraph on page 3.

1   A    Okay.  It's in the upcoming year.  It's in the upcoming

2   year.  And this was in October, right?  That session took

3   place in October.  And so it was a few months.  Okay.

4   Q    So what you were actually told at that session was not

5   that there was a one-month dip, but that funds from

6   operations for the entire year were not sufficient to cover

7   the distributions?

8   A    In the upcoming -- to make up the shortfall in the

9   upcoming year, that's what I recall, sir.

10  Q    Now, you testified both yesterday and today about

11  audited financials, right, sir?

12  A    Yes, sir.

13  Q    And you described them both yesterday and today as the

14  Holy Grail?

15  A    I did.

16  Q    When you were considering investing in GPB in 2016,

17  prior to the investment, I take it then, sir, you reviewed

18  those audited financials?

19  A    There was -- I reviewed audited, I believe it was the

20  year before?

21  Q    Well, let's take a look.

22  A    Okay.

23       MR. COGAN:  Andy, could you bring up just for the

24  witness Government Exhibit 2125.

25  A    It was '15 I reviewed, that's what it was.  Yes, sir,

1  that's it.

2  Q    Okay.  Do you recognize this as the audited financials

3  for GPB Automotive Portfolio year end 2015?

4  A    That looks like what I reviewed, yes, sir.

5         MR. COGAN:  Okay.  I'd offer this.

6         MR. McCONNELL:  No objection.

7         THE COURT:  Admitted.

8         (Government's Exhibit 2125 received in evidence.)

9         MR. COGAN:  May we publish?

10         (Exhibit published.)

11         MR. COGAN:  Andy, if we could just go to the third

12  page of exhibit.

13  Q    You recognize this to be the first page of the audited

14  financials, this is a letter from the auditors that is the

15  cover letter to the audited financials, right?

16  A    Yes, sir.

17  Q    Okay.

18         MR. COGAN:  And Andy, could you just blow out,

19  sir, just expand out so that we don't focus in on this

20  particular language.  At least on my screen, it's

21  highlighted particular language.  Can you just highlight the

22  top portion of the letterhead showing the auditor's

23  letterhead?

24  Q    And the auditors for GPB Auto were a firm called

25  Margolin, Winer & Evens?

1  A    Yes, sir.

2  Q    They were one of the largest accounting and advisory

3  firms in the northern part of the United States, right, sir?

4  A    Yes, sir.

5  Q    They had been around for over 75 years, right?

6  A    I don't know how long they would been around.

7            MR. COGAN:  And if you could turn to the second

8  page of the letter, Andy.  I'm sorry, I apologize.  I am

9  referring to the fourth page of the exhibit, the second page

10 of the letter.  There we go.  And just blow up the date

11 there so that everyone can see it.

12 Q    And so you see, sir, that these audited financials were

13 issued on May 5, 2016?

14 A    Yes, sir.

15 Q    And so that was a few months before you actually

16 invested in the auto fund?

17 A    Yes, sir.

18 Q    And these were the audited financials that you

19 carefully reviewed in making a determination about whether

20 or not you wish to invest, right?

21 A    Yes, sir.

22            MR. COGAN:  Let's go, now, Andy, if we could, to

23 page 7 of the exhibit.  And if we could just blow the

24 language up a little bit more so that people can see it on

25 the screen.

1    Q    This is a statement of operations, part of the audited

2    financials that you reviewed, right?

3    A    Yes, sir.

4    Q    I am not going to go through the entire, all the line

5    items here.  I know that Mr. Colton walked you through some

6    similar-looking documents.

7         I want to direct your attention, though, first to

8    the top of the page.  Do you see where it says total

9    investment income?  Are you able to see that okay?

10   A    I can.

11        MR. COGAN:  My screen is flickering, is that just

12   on my screen?  Okay.  I will go to the hard copy.

13   Q    And that is the total investment income that was being

14   reported for 2015 for the auto fund, right?

15   A    Yes, sir.

16   Q    And then below that are a number of expenses that were

17   taken out of the auto fund -- excuse me, taken out of the

18   net investment income in order to arrive at a different

19   figure, which was net investment income.

20        Do you see that?

21   A    Yes, sir.

22        MR. COGAN:  And if you could highlight the net

23   investment income and the number, as well, please.

24   Q    So the net investment income was 3,339,375, correct?

25   A    Yes, sir.

*Jones - cross - Mr. Cogan*                    353

1        MR. COGAN:  And if we could turn briefly to the

2   next page, Andy, of the exhibit.

3   Q    Do you see that -- it's already blown up on the screen

4   for you, do you see that the distributions are 4,729,096?

5   A    I see that.

6   Q    Okay.  So I know that you spoke earlier today with

7   Mr. Colton about various different ways that a financial

8   statement can provide information to investors, right?

9   A    Yes, sir.

10  Q    Are you aware, sir, that the Government in this case

11  contends that net investment income --

12       MR. McCONNELL:  Objection.

13       THE COURT:  Sustained.

14  Q    Are you aware, sir --

15       Did you have a view, back when you were deciding

16  whether or not to invest, as to how to calculate whether or

17  not the fund was fully covered from funds from operations?

18  A    Did I have a view?

19  Q    Yeah.

20  A    Well, I can speak of this one right here.  Your total

21  net income for fiscal 2015 was not 3,339,375.  It was

22  $5,091,918.  And they put out distributions of $4,729,096.

23  So you did cover your funds.

24       However, I will say this.  Yes, I did have a view.

25  When you start up an organization, you -- when you're making

1   these acquisitions, you do incur a higher degree of

2   expenses, but as you build that critical mass which they

3   were doing and they were adding a lot of dealerships, your

4   expense structure as a percentage of sales decline.  And the

5   profitability should go up.  You've got more leverage,

6   because you're a larger dealer.  There's a lot of variables

7   going into that.  But looking at a historical financial data

8   is not a true picture of what you're investing in.  It's the

9   future is what you're investing in.  And that's one of the

10  things I bought into based upon the business model.

11  Q    Sir, you told the jury that the audited financial is

12  the Holy Grail for investors, right?

13  A    It is when you are evaluating the historical standard,

14  absolutely, they must be audited.

15  Q    And I want to understand, sir, is it your testimony

16  that it is not, in your view, proper to use net investment

17  income to determine whether or not distributions are fully

18  funded?

19            MR. McCONNELL:  Objection.

20            THE COURT:  Overruled.

21            You can answer the question.

22            THE WITNESS:  Okay.

23  A    I look at more than one variable.  There were many

24  variables.  And in this case right here, because of the

25  surplus cash -- and I can't read it because it's covered --

```
 1   I know the net income was in excess of 5 million and they
 2   distributed it in excess of four.  I also know repeatedly if
 3   their operations does not cover that dividend or
 4   distribution, they are to reduce it or eliminate it.
 5            MR. COGAN:  Can I get my question read back,
 6   please?
 7            (Record read.)
 8            MR. McCONNELL:  Your Honor, I am going to object
 9   to the question again.
10            THE COURT:  Overruled.
11   Q    Can you answer my question, sir?
12   A    I'm sorry, would you ask me again?
13   Q    Sure.  Let's do it this way:  Would you agree with me,
14   sir, that using that investment income as a metric, more is
15   being distributed than it is being shown as net investment
16   income, correct?
17   A    I'm sorry, would you ask me one more time?
18   Q    I am going to do a calculation to try to make this
19   clear.
20            MR. COGAN:  Can I have the ELMO, please?  Did that
21   get switched over?
22            MR. MENCHEL:  It just did.
23            MR. COGAN:  Okay.
24   Q    I am going to write here the net investment income and
25   then we'll see whether or not we can make this show up on
```

1    camera.

2              Can you read that all right, sir?

3    A    Yes, sir.

4    Q    And then that figure is the net investment income that

5    the auto fund reported for 2015, right, sir?

6    A    Yes, sir.

7    Q    And that you reviewed prior to investing?

8    A    Yes, sir.

9    Q    And then the distributions figure from the following

10   page, which we looked at before was 4,729,096,

11   distributions.

12             MR. COGAN:  Last time I did a trial, the judge

13   made fun of how I'm holding pen.

14   Q    Do you see those numbers up there?

15   A    Yes, sir, I do.

16   Q    Okay.  So before we do any calculations here, agree

17   with me that the distribution number being reported in the

18   audited financials is greater than the net income, net

19   investment income figure being reported in the financials,

20   right?

21   A    You're right, yes, sir.

22   Q    And I left my phone at the table and I won't -- I don't

23   have a calculator on me, but is it fair to say that what

24   this reflects is a coverage ratio -- oh, look at this, we

25   have a calculator.

1          Approximately 70.6 percent using net investment

2    income.

3          Fair?

4          MS. RIVIERE-BADELL:  Move it over.

5          MR. COGAN:  That's so anticlimactic.  Here we go.

6    Q    Yes?

7    A    It's below 75 percent.  I presume your math is right.

8    I don't dispute that.

9          But I do not concede the fact -- total income.

10   Q    You like total income better?

11   A    In this scenario, because I'm -- I'm looking at this, I

12   don't know how much is -- where the money's coming from, I

13   don't know what accelerated depreciation.  And net income

14   can be altered.  It can be greater or less.  I just do not

15   know.

16   Q    I take your point, sir.  You are saying there are

17   multiple different metrics you could use to cover a

18   calculation --

19   A    Yes.

20   Q    -- and not just net investment income?

21   A    Yes.  But on this particular financial statement, the

22   net income is greater than the dividend distribution amount.

23   Q    I just want to make sure I got an answer to my

24   question.

25   A    Yes, sir.

1   Q    If I'm understanding your testimony correctly, you

2   would agree with me that there is not only one metric to use

3   to compute coverage, correct?

4   A    Yes, sir, that's correct.

5            MR. COGAN:  Your Honor, may I have a minute?

6   Q    And sir, so just to pick up --

7            MR. COGAN:  If we can go back to the regular

8   document and blow up this, Andy, if you could.  Can we just

9   get back on to the regular document?  Thank you.

10  Q    And so you testified, sir, if I understood you

11  correctly, that the metric you would use here was net

12  income, right?

13  A    I'm saying that's one of the metrics.  That's one of

14  the elements that's used when we evaluate an investment,

15  sir, that's all.

16  Q    And all I'm trying to ask you, sir, and I think you've

17  already agreed with me, is that if we were to use net income

18  and compare it to distributions, then they were fully

19  covered, right?

20  A    Yes, sir, yes, sir.

21           MR. COGAN:  I have nothing further.

22           THE COURT:  Redirect?

23           MR. McCONNELL:  Yes, can we leave the exhibit?  Or

24  we have to switch back.

25           Can we pull that exhibit up, Ms. Bates?

1          MR. COGAN:  I was just going to need a minute.

2          MR. McCONNELL:  Take your time.

3          May I inquire, Judge?

4          THE COURT:  Yes.

5   REDIRECT EXAMINATION

6   BY MR. McCONNELL:

7   Q    Mr. Jones, I just want to follow up on a couple of

8   things you were asked about by the defense attorneys, all

9   right?

10  A    Yes, sir.

11  Q    Let's start with this document because we've been

12  looking at it.

13          First, you testified that the profitability of the

14  dealerships was important to you when evaluating an

15  investment in the Automotive Portfolio, correct?

16  A    Yes, sir.

17  Q    And we looked at an exhibit where dealerships that GPB

18  had purchased were generating 15, 18, sometimes even greater

19  profits; is that correct?

20  A    Yes, sir.

21  Q    Now, Mr. Cogan showed you these audited financial

22  statements, right?

23  A    Yes, sir.

24  Q    And the net investment income for this year, 2015, was

25  lower than the amount of distributions paid, correct?

1  A    Yes, sir.

2            MR. COLTON:  Objection to the leading, Your Honor.

3            MR. McCONNELL:  I'm just going back over what

4  we've done.

5            THE COURT:  All right.

6            MR. McCONNELL:  Thank you.

7  Q    What was your understanding, again, of where your

8  8.7 percent monthly distribution was coming from?

9  A    In writing, it was coming from the operation of the

10  underlying dealership that was going to generate between 15

11  and 17 percent returns.

12            (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REDIRECT EXAMINATION (Continued)

2    BY MR. McCONNELL:

3    Q    So if the next investment income for a particular period,

4    whether it's a quarter or a year or month, is lower than the

5    amount of distributions that were paid out in that period, how

6    could you think that your distribution was coming from

7    profits?

8              MR. COGAN:  Objection.

9              THE COURT:  Sustained.

10   Q    Did you think your distributions were still coming from

11   profits in that situation?

12   A    I'm sorry, Mr. McConnell --

13   Q    In a circumstance where, like Mr. Cogan showed you, net

14   investment income was lower than the amount of distributions

15   paid during that period, did you think that your monthly

16   distribution was coming from somewhere other than profits?

17   A    If the net income was lower than the distribution, did I

18   think it was coming from somewhere other than profit?

19   Q    Correct.

20   A    Okay.  You could have deferred receivables coming in from

21   rebates from manufacturer.  You could have numerous, numerous

22   other factors.  You could accelerate, again, depreciation,

23   good will that would show a negative net income, but it didn't

24   impact your cash.  But the assurance that we had repeatedly is

25   that your dividend is going to be 8.7 percent, but there's a

1  caveat with that.  If operations fails to deliver the

2  operating profit to do so, management has the sole discretion

3  to reduce or eliminate it.  And that was an assurance that we

4  had, so -- which is exactly what I would expect.

5           MR. McCONNELL:  So if we can go to Page 15 of this

6  document, please.

7  Q    Mr. Jones, you talked about performance guarantees.

8           Do you remember being asked questions about

9  performance guarantees?

10 A    Yes, sir.

11          MR. McCONNELL:  Fifteen of the PDF, I'm sorry.  So

12 if we could just zoom in on the one, two, three, four, fifth

13 paragraph here.

14 Q    Mr. Jones, can you just read that paragraph, please?

15 A    In some cases, the partnership has agreements in place

16 with the operating partners to guarantee a certain amount of

17 income at the dealership-level for a specific amount of time.

18 For the year ended December 31, 2015, a $1,050,000 was earned

19 by the partnership and is included in income receivable for

20 investments on the balance sheet.  1,050 was collected in

21 April of 2016.

22 Q    Okay.  And going back to -- so does this paragraph refer

23 to the performance guarantees that you were talking about?  If

24 you know?

25 A    I don't know, sir.

1   Q    So just generally, with respect to performance

2   guarantees, would it matter if a performance guarantee had

3   been back-dated?

4   A    I'd have to know more about it.

5   Q    Would it matter if someone other than the operator paid

6   that performance guarantee?

7   A    Would it matter to me as an investor?

8   Q    Mm-hmm.

9   A    I'm sorry --

10  Q    Okay.  I'll withdraw the question.

11  A    I'm sorry.

12  Q    Mr. Jones --

13          MR. McCONNELL:  If we can pull up Government

14  Exhibit 1434, which is in evidence.  And go to, I think it's

15  Page 9.

16  Q    Can you see that, sir?

17  A    Yes, sir.

18  Q    You were asked by Mr. Colton if private equity was a

19  risky investment and you acknowledged that it was, correct?

20  A    Yes, sir.

21  Q    Was GPB a risky private equity investment, in your

22  opinion?

23  A    I did not see it that way at all.

24  Q    Can you explain to the members of the jury why?

25  A    Yes, sir.  Again, I come from a family of automobile

1   people.  Ever since I was a kid.  You have the average

2   automobile was 12 year old.  Just as an example, in writing,

3   in 2008 and 2009, the worst recession most all of us in this

4   room will ever experience and have experienced in our

5   lifetime, and even during that time, when Wall Street banks

6   failed --

7                THE COURT:  Sorry.  Go ahead.

8                MR. McCONNELL:  You can continue your answer.

9   A    Okay.  2008 and 2009, banks failed.  Hundred-year-old

10  banks failed.  Even during that time, the auto dealerships

11  across this country made double-digit returns because it's

12  recession-resistant.  Why?  Because they have -- people's cars

13  break down, they have a service department, they have new

14  cars, used cars.  It's a simple business to understand.  And

15  people have to have cars.  It's recession-resistant, a lot

16  like the food business.

17  Q    And looking at Government Exhibit 1434 on Page 9 here,

18  how is GPB categorized in relation to other types of

19  investments, private equity?

20  A    Well, as it continues to operate, if I'm reading this

21  correctly and what's being depicted on the horizontal line is,

22  is with time, the risk goes down.

23  Q    It's on the end, it says lower risk, right?

24  A    Yes, sir.

25  Q    You were also asked about redemptions.

*Jones - Redirect - Mr. McConnell*                              365

1              What did you understand your ability to redeem your

2      investment to be?

3      A    Okay.  In private equity, most charters have a sunset.

4      Meaning, that the objective to get investors' moneys back, is

5      at some time in the future, you will sell it to an existing

6      operator called a strategic buyer or you will sell it to a

7      financial buyer which is for the finance.  I was in no hurry

8      to get my redemption back.  I was making 8.7 interest.  I was

9      going to be comfortable all the way until the end until we

10     exited.

11     Q    What about in this particular investment with GPB.

12             Did you understand that you could redeem your

13     investment before it closed?

14     A    They did have -- yes, they could allow redemption, but I

15     had no desire to.  I didn't know if that's what you were

16     asking.

17     Q    Okay.  I want to show you Government Exhibit 8205,

18     please.  And just go to the fourth paragraph.  This is from

19     the August 17th, 2018, letter you received.

20             It says, The company has decided to suspend

21     redemptions.

22             Do you see that?

23     A    Yes, sir, I do.

24     Q    So now I want to show you from the PPM, Government

25     Exhibit 8258-B, please.

1    MR. McCONNELL:  And if we can go to Page 46.  If we

2  can just highlight the limited redemption rights there?

3  A    Forty-one or 46?  Which one did you say, Mr. McConnell?

4  Q    Forty-one.  I'm sorry.

5    MR. McCONNELL:  If we can blow that up first.

6  Q    So just looking at this it says, LPs who have had their

7  units for at least one year may request that we repurchase

8  all, but not less than all of their units.

9    Do you see that, sir.

10  A    Yes, sir.

11  Q    The next says, LPs do not have a right to demand a return

12  of their capital.

13    Do you see that?

14  A    I'm trying to follow along.

15    Yes, sir, I do.  I was looking at the wrong line.

16  Sorry.

17  Q    Just let me know when you're done.

18  A    Yes, sir.

19  Q    So this part of the PPM talks about GPB's policy towards

20  redemptions, right?

21  A    Yes, sir.

22  Q    I want to ask you about Government Exhibit 1438.  Well,

23  actually, let me just stop.

24    You were shown something that defense counsel

25  identified and you identified as K1s.

1          Do you remember that line of questioning?

2     A     Would you refresh me, please.

3     Q     When the defense attorneys were asking you questions,

4     they showed I K1 forms?

5     A     Oh, yes.  Yes, sir.

6     Q     And u mentioned that K1 is a tax form, right?

7     A     Yes, sir.

8     Q     And I don't know what exhibit number they were.  I think

9     it was DDI.

10         MR. McCONNELL:  If we could pull that up.  We don't

11    need to pull that up.

12    Q     But you remember that the amount of total capital

13    contribution was lower?

14    A     Yes, sir.

15    Q     So did you think that you were not being paid your

16    distribution from profits after looking at this K1?

17    A     Did I think my distribution was from profits?

18    Q     Did you think that you were being paid your distribution

19    in your own capital or from profits after looking at these

20    K1s?

21    A     Did I think that it was coming from profits or capital?

22    Q     From your own -- you've said that you believed your

23    monthly 8.7 percent distribution was from profits of the

24    company, correct?

25    A     Yes, sir.

1    Q    After looking at this K1, did that view change?

2    A    Well, no, because it's a tax document.  It's for tax

3    purposes only.  And in private equity, they use, FIFO.  To be

4    technical, first in, first out.  They can show they returned

5    capital, but the underlying strength of the operation is from

6    the dealership, and they're throwing off an excess of

7    8.7 percent dividend.

8              MR. McCONNELL:  Let's go to Government Exhibit 1438,

9    please.

10   Q    You were asked questions by defense counsel about the

11   8.7 percent being a target, right?

12   A    Yes, sir.

13   Q    Because you can't guarantee profits, right?

14   A    Yes, sir.

15   Q    So looking at this chart, which you reviewed prior to

16   investing, the title is Fund-level Track Record, right?

17   A    Yes, sir.

18   Q    Is there anything on this chart that indicates that these

19   distributions are a return of investor capital?

20   A    No, sir.

21   Q    What does it tell you when the fund to date annualized

22   return for the year is above that 8.7 percent target?

23   A    They're exceeding their profit projections.

24   Q    They're exceeding their profit projection, right?

25   A    Yes, sir.  And they're sharing part of the additional

1   profitability with the company -- I mean with the investors.

2           MR. McCONNELL:  Can I see one of the account

3   statements, please.  Maybe 14.  How about 1398, please.  And

4   just blow up the...

5   Q    Mr. Jones, if you were receiving your own capital back,

6   would you expect the number on the right-hand side of your

7   account statement to change?

8   A    I would.

9   Q    Why?

10  A    Because if you're taking part of my capital and returning

11  it to me, that means my capital is reduced, and that should be

12  showing up.

13  Q    I want to ask you about the PPMs and the subscription

14  agreements.

15          MR. McCONNELL:  If we could just pull up first, the

16  PPM 8258-B, please.  Can we go to the, no present plans to do

17  so, page.  It's Page 21.  Thank you.

18  Q    So Mr. Jones, we spent a lot of time on this paragraph.

19          You stated that you believed this paragraph to state

20  that you will get your monthly 8.7 percent targeted

21  distribution from cash flow, operating cash flow; is that

22  right?

23  A    Yes, sir.

24          MR. COLTON:  Objection to the leading, Your Honor.

25          THE COURT:  Yeah, let's just try not to lead.

1   Q    In looking at this paragraph, where do you understand

2   your monthly 8.7 percent targeted distribution to be coming

3   from?

4   A    That second sentence is very clear to me, we can provide

5   no assurance that we will be able to continue to generate

6   operating cash flow sufficient to make distributions to LPs.

7   Thus, there is no guarantee that we will pay any particular

8   amount of distributions.

9   Q    In the next sentence, while it says, While we have no

10  present plans to do so, were you ever informed prior to

11  receiving that August 2018 account statement that you had been

12  being given investor capital back as part of your

13  distribution?

14  A    Never.

15  Q    Would you have wanted to know that?

16  A    I would have wanted to know that day one was part of the

17  process.

18  Q    Did anyone ever tell you that GPB Auto portfolio had been

19  paying investor capital back as the monthly distribution for

20  over 10 months before this PPM came out?

21  A    No, sir.

22          MR. COLTON:  Objection.

23          THE COURT:  Overruled.

24  Q    Did you know that, sir?

25  A    No, sir.

1  Q    Did anybody ever tell you that?

2  A    Nobody ever told me that.

3            MR. COLTON:  Objection.

4            That assumes facts not no evidence.

5            THE COURT:  I'm not really sure where we are at this

6  point.

7            What is the question that's pending?

8            MR. McCONNELL:  If anyone made him aware that GPB

9  had been paying investor capital as part of the monthly

10 distribution for over 10 months prior to this PPM be

11 published?

12           THE COURT:  Had anybody of told you that?

13 Q    Anyone ever tell you that?

14 A    No, sir.  May I add?

15           You raise some new money and you're paying me

16 anything other than operating profit, absolutely not.

17 Q    Now, let's bring back up the agenda from the due

18 diligence event that you went to.

19 A    Yes, sir.

20           MR. McCONNELL:  It's Government Exhibit 8185-C,

21 please.

22 Q    I did the math at the table, so I'm not going to do

23 Mr. Cogan's math on the ELMO.  But these three days,

24 Mr. Gentile made presentations that totalled about three hours

25 according to this agenda.  Mr. Schneider was on the stage for

1   an hour and a half.

2          At any point, did either of them tell you that GPB

3   Automotive portfolio had been returning investor capital for

4   over a year at that point?

5   A    No, sir.

6   Q    You were asked about disclaimers that you signed in the

7   PPM and the subscription agreement.

8          Do you remember that?

9   A    Yes, sir.

10         MR. McCONNELL:  Your Honor, if I can approach the

11   witness with hard copies?

12         THE COURT:  Sure.

13         MR. McCONNELL:  Thank you.  So this is Government

14   Exhibit 8258-B, the PPM, and Defense Exhibit QQQQI, both of

15   which are in evidence.

16   Q    Mr. Jones, is there anything in either of those two

17   documents?  And if there is, please turn to the page where you

18   signed a disclaimer agreeing that it was okay to give you

19   false information.

20         MR. COLTON:  Objection.

21         THE COURT:  Overruled.

22   Q    Is there anything in those documents that say it's okay

23   to lie to you?

24   A    No, sir.

25         MR. McCONNELL:  Nothing further.

1           THE COURT:  Okay.

2           MR. COLTON:  I'm sorry, recross, Your Honor?

3           THE COURT:  Yes.

4   RECROSS-EXAMINATION

5   BY MR. COLTON:

6   Q    I'll try to make this brief, Mr. Jones, and I appreciate

7   your patience.

8   A    Thank you, sir.

9   Q    Mr. McConnell just asked you about what you signed and

10  didn't sign in the subscription agreement.

11          So let's just be clear, you signed that you read the

12  entire PPM, correct?

13  A    Yes.

14  Q    You read the entire LPA, limited partnership agreement,

15  correct?

16  A    Yes, I did.

17  Q    And that you did your own due diligence, correct?

18  A    Yes, sir.

19  Q    And that you reviewed financial statements, correct?

20  A    2015 financial statements.

21  Q    2015 financial statements.  You did your own homework?

22  A    Yes, sir.

23  Q    And you read all of the risks, you read all of the

24  disclosures about return of capital, right?

25  A    Yes, sir.

1  Q     And the risks weren't hidden, correct?

2  A     Absolutely.

3  Q     And the right to return capital wasn't hidden, correct?

4  A     That was not hidden either.

5  Q     And the fact that you don't have the right to redeem was

6  not hidden, correct?

7  A     That's correct.

8  Q     And the financial statements were provided to you,

9  correct?

10 A     2015 only.  The only audited financials that I reviewed

11 was 2015 prior to investing.

12 Q     And, of course, having invested in September of 2016, it

13 couldn't possibly have given year end 2016, because the year

14 wasn't over?

15 A     Yes, sir.

16 Q     And if the audited financial statements, as you say, are

17 the holy grail, then you had the most recent holy grail that

18 existed?

19 A     Yes, sir.

20 Q     And you were able to review it, nobody pressured you to

21 just do it quickly or anything like that?

22 A     No, sir.

23 Q     Now, you discuss the question of distributions were

24 supposed to be from profits.

25        You remember that statement?

1   A    Yes, sir.

2   Q    That's profits of the portfolio companies the fund owns,

3   right?

4   A    One more time.

5   Q    You're referring to profits that the portfolio -- of the

6   portfolio companies that the funds own, right?

7   A    Yes, sir.

8           MR. COLTON:  Now, if we could call up quickly and I

9   only have a couple of questions, Government 1438.

10  Q    You recall this document, having seen it a few minutes

11  ago, right?

12  A    Yes, I do.

13          MR. COLTON:  If we could blow it up slightly,

14  please.

15  Q    And you were asked about whether you expected this to

16  reflect quote, profits.

17          Do you remember that question?

18  A    I'm sure I was.  I just don't remember.

19  Q    I'll ask a different way.

20  A    Okay.

21  Q    You will agree with me that this exhibit, Government

22  Exhibit 1438, the word, profit, appears nowhere on this

23  document?

24  A    No.  That's right.

25  Q    And you would agree with me that the note that we -- the

1  note that you testified earlier, notes are important, the

2  returns listed are cash distributions paid to investors,

3  that's what it says, right?

4  A    Yes.

5  Q    Doesn't say, the returns listed are profits?  Doesn't say

6  that?

7  A    Not in that document.

8  Q    That's all I'm asking you, sir.  Thank you.

9          MR. COLTON:  We can take that down.

10          Let's take another quick look at Government

11  Exhibit 1398.

12  Q    And again, everyone is at this point familiar with this

13  document.  I'm sure you are, Mr. Jones?

14  A    Yes, sir.

15  Q    The phrase to the right says, total capital invested,

16  correct?

17  A    Yes, sir.

18  Q    It does not say, current value of fund, does it?

19  A    You're right, yes, sir.

20          MR. COLTON:  One moment, Your Honor.  Just

21  approximately two or three more questions.

22  Q    We looked at the 150,000.  That's the amount you

23  invested, correct?

24  A    Yes, sir.

25  Q    No dispute.  And the entire time you've been invested in

1  the GPB Auto fund, your trust that you invested for has

2  maintained the same percentage ownership of the fund?

3  Whatever percentage you had, no matter what distributions you

4  got, you still have the same percentage ownership in the event

5  of a sale, correct?

6  A    No.  They're raising new capital, so that should dilute

7  my ownership percentage on the share.

8  Q    Well, let me put it to you a different way.

9       You invested $150,000?

10 A    Yes, sir.

11 Q    And when they calculate what percentage of a sale you

12 might get, that's going to be calculated off the 150,000 you

13 put in, no matter what distributions you get, right?

14 A    Yes, sir.

15 Q    To use a simple example, if the fund was only worth

16 300,000, they only took in your 150 and someone else's 150,

17 you've got 50 percent?

18 A    Yes, sir.

19 Q    And no matter what distributions you get paid, you still

20 have your 50 percent, and no matter the source of the

21 distributions you get paid, you still have your 50 percent?

22 A    Yes, sir.

23 Q    Thank you.

24      MR. COLTON:  Nothing further, Your Honor.

25      MR. COGAN:  I just have a few.  I'll stay here in

1    the interest of time.

2             THE COURT:  Sure.

3    RECROSS-EXAMINATION

4    BY MR. COGAN:

5    Q    Mr. Jones, you were asked by Mr. McConnell a few minutes

6    ago whether at any point during the presentation in October of

7    2016 in Austin, Mr. Gentile told you that your distributions

8    were not fully covered, correct?

9             Do you recall that testimony -- that question?

10   A    Yes, that conversation.

11   Q    And isn't it the case, sir, that Mr. Gentile never said

12   during any point of that one-and-a-half-day information

13   session that your distributions were fully covered?

14   A    Were or were not?

15   Q    Were.  He never said, ladies and gentlemen, your

16   distributions are fully covered?  He didn't say that?

17   A    I don't recall that specific answer or that response, no,

18   sir.

19   Q    And he didn't say, sir, I'm telling you right now, we're

20   never returning capital to anybody?  He didn't say that

21   either, did he?

22   A    He didn't say that no, sir.

23            MR. COGAN:  And if we could look one last time,

24   hopefully, at the PPM language, 8258, Government

25   Exhibit 8258-B, Page 26, in evidence.  If we could just go to

1  Page 26, please and blow up the language.  Yup.  Perfect.

2  Q    Sir, isn't it true that nowhere in this paragraph does

3  GPB guarantee you that it would only distribute profits?

4  A    In that paragraph, no.  Other materials, yes.

5  Q    Any -- this entire PPM, nowhere in the PPM does it

6  guarantee you that GPB would only distribute profits?

7  A    No, sir.  But it does in the marketing materials, sir.

8  Q    The marketing materials guaranteed you that in no

9  scenario would GPB ever distribute anything but profits,

10 that's your testimony?

11 A    That is what the brochure said.  If at any time the

12 profitability does not generate 8.7 percent or greater, they

13 reserve the right to reduce or eliminate.

14 Q    They reserve the right to reduce it, is what it says,

15 right?

16 A    That's right.

17 Q    It doesn't say we guarantee that we will reduce it no

18 matter what, does it?

19 A    It's -- you're -- granted.

20         MR. COGAN:  I have nothing further.

21         THE COURT:  Anything else?

22         MR. McCONNELL:  No, Your Honor.  Thank you.

23         THE COURT:  You're excused, sir.  Thank you.

24         THE WITNESS:  Free to go home?

25         THE COURT:  You're free to go home.

1          THE WITNESS:  Okay.  Leave this page here?

2          THE COURT:  You can leave it there, yes.

3          (The witness was excused.)

4          This might be a good time for everybody to take a

5     five-minute break.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury exits the courtroom.)

8          THE COURTROOM DEPUTY:  You may be seated.

9          THE COURT:  I don't have anything to take up with

10    you unless you have something you want to take up with me.  So

11    you can take a break if you want.

12          (A recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                       381

1    (continuing.)

2                THE COURT:  So what's the exhibit you all --

3                MR. McCONNELL:  8030, Your Honor.

4                THE COURT:  I may need some help.  It looks like

5    it's a letter from Mr. Gentile signed -- dated December 20,

6    2018.

7                So, tell me, what's the dispute?

8                MR. DEARINGTON:  On behalf of Mr. Schneider, we

9    would request an instruction because we find that a lot of the

10   statements in here are hearsay that are not admissible against

11   Mr. Schneider.  We're asking that the Court provide an

12   instruction and we have language drafted that we proposed to

13   the government last night that says that there's nothing in

14   this letter that's inadmissible.

15               MR. McCONNELL:  Your Honor, from our perspective

16   there's going to be lots of communications in the case that

17   one party is on than another is.  I don't think each piece of

18   evidence justifies an instruction.  The solution to this is of

19   course at the end of the case Your Honor is going to instruct

20   the jury that each defendant has to be considered and

21   evaluated separately and certainly a letter that Mr. Schneider

22   is not on cannot be considered an admission of

23   Mr. Schneider's.

24               However, the Government's position is that this is a

25   statement in furtherance.  The letter is clearly minimizing an

Proceedings                                    382

1   attempt to cover up the prior fraud.

2           THE COURT:  I do not know what the letter is about.

3   Is this letter being offered for its truth or not?

4           MR. McCONNELL:  Yes.

5           THE COURT:  It's being offered for its truth, okay.

6   So then you would need a hearsay exception.  You need it to be

7   a coconspirator statement or --

8           MR. McCONNELL:  To admit it against Mr. Schneider,

9   yes.

10          THE COURT:  Should we talk about whether you have a

11  basis to do that or should I give a limiting instruction

12  because it seems like those are the --

13          MR. AXELROD:  Your Honor, I apologize, we think it's

14  in furtherance.  It's minimizing and covering up what happened

15  here.  It says, "In accordance with the waterfall," which is

16  in the PPM which I'm sure is going to feature prominently in

17  the testimony" --

18          THE COURT:  How do you guys realistically expect me

19  to be making a finding that this is a coconspirator statement

20  when I'm looking at this on a five-minute break and you're

21  kind of telling me what the document is -- this is making it

22  really hard for me to handle these evidentiary issues that

23  should have been given to me in advance.

24          MR. DEARINGTON:  I think the issue is actually quite

25  simple, Your Honor.  It's very clear that the coconspirator

Proceedings                                              383

1   exception to the rules against hearsay does not apply here.

2   The Government has framed in the indictment saying that the

3   conspiracy is now over.  Look at this letter.  They're making

4   some sort of, according to the Government, admission.

5           They cannot say that this letter is in furtherance

6   of the conspiracy if this is the death knell to the

7   conspiracy, the end of it.  They can't have it both ways, Your

8   Honor.

9           MR. AXELROD:  So, Your Honor, there are two things

10  and I want to address them both quickly.  In terms of whether

11  we get to this letter today I'd like to take a second to see

12  if that's the case.  I take your point, Your Honor, and if we

13  can defer it until Tuesday so everyone can consider it, I get

14  that that's the preference.

15          With respect to what Mr. Dearington just said, there

16  is a fundamental disconnect -- there's a difference between

17  when the conspiracy is charged in an indictment and in the

18  course of a conspiracy and those two things are not always and

19  not necessarily the same.

20          But if you just give me a second to consult with

21  co-counsel, we may be able to give you --

22          (Pause in proceedings.)

23          MR. McCONNELL:  This would feature -- and I'm sorry

24  we're switching speakers, Judge.  This does not really become

25  an issue until the end of the next witness's direct.  I would

Proceedings                                                    384

1   expect the direct of this witness would be longer than the

2   prior witness which I think was about an hour so this may get

3   us to the end of the day anyway before having this issue come

4   up during the questioning.

5          THE COURT:  Okay.  Let's get the jury.

6          MR. DEARINGTON:  Just for the record, I just want to

7   add that we would also raise this issue not just with respect

8   to hearsay but also under *Bruton*, Your Honor.

9          THE COURT:  Okay.

10         (Jury enters.)

11         THE COURT:  Everybody can be seated.

12         The Government can call its next witness.

13         MR. McCONNELL:  The Government calls Jay Frederick,

14  Your Honor.

15         THE COURTROOM DEPUTY:  Please raise your right hand

16  for me.

17         Do you solemnly swear or affirm that the testimony

18  you are about to give will be the truth, the whole truth and

19  nothing but the truth?

20         THE WITNESS:  Yes.

21         THE COURTROOM DEPUTY:  State and spell your name for

22  the record?

23         THE WITNESS:  Jay Michael Frederick, J-A-Y

24  M-I-C-H-A-E-L F-R-E-D-E-R-I-C-K.

25         THE COURTROOM DEPUTY:  Thank you.  Have a seat.

1  **JAY MICHAEL FREDERICK,**

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5  DIRECT EXAMINATION

6  BY MR. McCONNELL:

7  Q    Mr. Frederick, good afternoon.

8  A    Good afternoon, sir.

9  Q    Where are you from originally?

10 A    I am from central Arkansas.

11 Q    What do you do for a living?

12 A    I am a registered investment advisor and certified

13 financial planner.

14 Q    And how long have you been in the finance and investment

15 world?

16 A    I went to work for a large investment firm right out of

17 college in 2001.

18 Q    And can you tell the members of the jury a bit about what

19 you do as a registered financial advisor?

20 A    Yes.  So, you know, we work with clients on concerns like

21 retirement planning, college savings for children or

22 grandchildren.  We also work for, work -- devise investment

23 strategies, what the client needs across the spectrum.  Larger

24 clients need more complex planning, but it's primarily

25 centered around investments and planning.

Frederick - direct - McConnell                    386

1   Q    And can you tell the members of the jury a bit about your

2   educational background?

3   A    Sure.  I have a Bachelor's degree in business

4   administration and my professional credentials are registered

5   investment advisor and CFP.

6   Q    And who do you work for now?

7   A    I own a firm called Ethos Capital Group.

8   Q    And approximately how many clients do you represent

9   personally?

10  A    Who I represent personally?  About 60.

11  Q    And what about other -- are there other members of your

12  firm or are you the sole practitioner?

13  A    I have another advisor who works for me and he has

14  roughly 100 clients.

15  Q    And typically what's their financial profile?

16  A    Oh, that varies widely.

17  Q    What do you mean?

18  A    Well, sometimes I work with younger people who are just

19  getting started.  They're setting up an IRA that they're

20  putting some money into.  Other times I'm working with clients

21  who sold a family business for tens of millions of dollars.

22  Q    And are your clients generally based in Arkansas?

23  A    Generally, yes.

24  Q    Do you have clients in other parts of the country as

25  well?

Frederick - direct - McConnell                    387

1    A    I have.

2    Q    Now, as part of your work as a financial advisor, do

3    you review potential investment opportunities for your

4    clients?

5    A    Yes.

6    Q    Generally, how do you learn about potential investments

7    that your clients might be interested in?

8    A    Sometimes it's something you find through your own

9    research, sometimes it's something other advisors in our, you

10   know, advisor community like the CFP group and other times

11   it's through direct marketing by investment firms, which is

12   very common.

13   Q    Tell us a bit about that.  What's direct marketing for an

14   investment firm?

15   A    That runs the gamut from companies like Vanguard,

16   Fidelity making calls, take a look at using their products,

17   take a look at using their platforms down to hedge funds,

18   private equity.  All kinds of firms.  We get lots of calls and

19   e-mails from various firms.

20   Q    You mentioned the term private equity.  What is private

21   equity?  What kind of an investment is that?

22   A    So, private equity is best explained when you contrast it

23   with public equity.  Public equity are the individual stocks

24   we're all familiar with, Apple and Microsoft and Exxon.

25            Private equity is a business that is not publicly

1    traded.  It's not listed on an exchange.  It's not easily

2    invested into by the public.  It's a private fund.

3    Q    And who typically invests in a private equity

4    opportunities?

5    A    High net worth individuals and families.

6    Q    Do institutions also make private equity investments?

7    A    Yes.

8    Q    When I say "institutions" what do you understand that to

9    mean?

10   A    College endowments is a common one, pension funds for

11   corporations, pension funds for public employees.

12   Q    Are you familiar with the term wholesalers?

13   A    Yes.

14   Q    What's a wholesaler?

15   A    Wholesaler is another term for the marketing

16   representatives for investment firms, whether that be a mutual

17   fund company or a private equity group.

18   Q    So once you hear about a potential investment opportunity

19   that you're interested in, what do you do?

20   A    I request materials.  Items to read, go do some research,

21   due diligence, on whatever background available -- whatever

22   background information is available.

23   Q    You used the term due diligence.  Can you tell the

24   members of the jury what you mean by that?

25   A    Yes.  So, due diligence is -- so, due diligence is doing

Frederick - direct - McConnell                389

1  your homework on, hey, what's this investment comprised of,

2  who's involved with it, what are the objectives, what are the

3  risks, what are the expectations, how does it operate.

4  Q    And what sorts of things comprise your due diligence?  Is

5  it just looking at written materials?

6  A    No, that's Phase I.  You end up in meetings with either

7  the representatives of the investment or the principals of the

8  investment.  The principal would be, like, who owns and

9  operates an investment fund, some private equity or hedge

10  funds, or sometimes you're dealing directly with the founder

11  as part of your due diligence.

12  Q    Are you familiar with private placement memorandum --

13  memoranda?

14  A    Yes.

15  Q    Are those commonly referred to as PPMs?

16  A    Yes.

17  Q    What is he a PPM?

18  A    A private placement memorandum is what exists in the

19  private equity world whereas in, like, with a mutual fund you

20  would have a prospectus?  In private equity instead of a

21  prospectus you have a private placement memorandum and

22  it's essentially a list of terms and conditions and

23  expectations.

24  Q    What's generally contained -- you mentioned --

25         What's the significance of the private placement

Frederick - direct - McConnell                390

1    memorandum when considering other information on an

2    investment?

3    A    It is the official document that will govern the

4    security.

5    Q    So do you only review the private placement memorandum?

6    A    No, you review the private placement memorandum and all

7    the other materials that are provided to you by that fund

8    company.

9    Q    How are you compensated as an investment advisor?

10   A    So, I am a registered investment advisor only.  I am not

11   what's called a -- there's something called dual registration

12   and that's also where you also have a Series 7.  You have

13   what's called a broker/dealer relationship.

14         So to explain that, the broker/dealers are Morgan

15   Stanley, Merrill Lynch, Goldman Sachs, LPO; companies where

16   there are product commissions involved in the -- to the

17   advisor for selling the product.

18         We don't operate that way.  When I left working for

19   a large investment firms, I gave up my Series 7.  I went

20   RIA-only which means our firm's only source of revenue are the

21   fees paid to us by our clients.  We don't take any product

22   communications.

23   Q    Do you make any additional fee or compensation for

24   recommending a particular stock or investment to a client?

25   A    No.  And that's actually why I started Ethos and why it's

Frederick - direct - McConnell                391

1  called Ethos.  I worked for a large investment bank when the

2  Great Recession occurred in 2008 and 2009 and I had a crisis

3  of conscious over being at the epicenter of that calamitous

4  event and decided I had to go.

5           And I decided to start a firm that doesn't take

6  product commissions because of the conflicts that that creates

7  and where that tends to lead.

8  Q    Are you familiar with a private equity fund called GPB

9  Capital?

10 A    I am.

11 Q    When were you first introduced to GPB Capital?

12 A    I received a phone call from one of their marketing

13 representatives named Michael Mann on September 1st of 2015.

14 Q    And Mr. Mann, do you know -- did he work for GPB Capital?

15 A    He worked for Ascendant Capital.  That is the company

16 that does all of the marketing and capital raising or money

17 raising for GPB.

18 Q    And if -- what do you remember about that phone call?  I

19 know it was a while ago.

20 A    What I recall primarily is -- the emphasis was on the

21 income distributions from the investment and that the private

22 equity fund was invested in consistent high-income-producing

23 companies.  And the draw -- the appeal was the distribution.

24 Q    When you say "the distribution" what do you mean?

25 A    Well, for example, we ended up investing in just one of

1    their funds and it had an 8.7 percent distribution funded by

2    the operating cash flows, profits, from the companies that it

3    owned.

4    Q    And, why was that an attractive feature of the investment

5    for you?

6    A    Well, at the time interest rates were near zero.  So if

7    you were buying, you know, bank CDs or treasury bonds, you

8    were making, you know, very, very low returns, one or two

9    percent.  Even in corporate bonds you were earning then fairly

10   thin margins.  So this being a distribution that was funded by

11   operating cash flows instead of being funded by debt,

12   prevailing interest rates, it had a rather attractive annual

13   return -- annual distribution.

14   Q    I want to talk about the other aspects of the investments

15   that you found attractive but on that first phone call, how do

16   you -- was that a phone call that you solicited or was it an

17   unsolicited phone call?

18   A    Unsolicited.

19   Q    And is that normal?

20   A    Yes.

21   Q    So how many of these kinds of phone calls do you get?

22   A    I've gotten to where I don't answer them.  We get lots of

23   them.  I couldn't quantify it.

24   Q    How long did you speak to Mr. Mann for on the phone that

25   first time you heard about GPB Capital?

Frederick - direct - McConnell                    393

1    A    Several minutes.  I don't have a memory of how long we

2    spoke.  I said okay, I'll take a look at it.  E-mail me what

3    you have.

4    Q    Do you receive an e-mail?

5    A    I did.

6             MR. McCONNELL:  If we can show the witness

7    Government Exhibit 1443, please.

8         (Exhibit published to witness, counsel and Court only.)

9    Q    Mr. Frederick, do you recognize what is marked Government

10   Exhibit 1443?

11   A    I do.

12   Q    And what is it?

13   A    This is the follow up e-mail I received from Michael Mann

14   in which he requests time to discuss further.  And --

15   Q    One moment, Mr. Frederick.

16            MR. McCONNELL:  Your Honor, at this time I would

17   like to offer Government Exhibit 1443 into evidence.

18            THE COURT:  Admitted.

19            (Government Exhibit 1443 received in evidence.)

20            MR. COGAN:  Just note for the record our standing

21   objection that we discussed yesterday.

22            THE COURT:  What is the nature of your objection?

23            MR. COGAN:  The agency issue that we discussed.

24            THE COURT:  Okay.  It's admitted.

25            MR. McCONNELL:  If we can publish it with the

Frederick - direct - McConnell                394

1    Court's permission.

2            (Exhibit published.)

3            MR. McCONNELL:  It's hard to read, Ms. Bates.  If we

4    can take the top half first.  Thank you.  So, Mr. Frederick,

5    just looking at Government Exhibit 1443, that's your e-mail

6    address up there?

7    A    Yes, sir.

8    Q    And it's from MichaelMann@AscendantCapital.com --

9    A    Yes.

10   Q    -- AscendantCap.com?

11           This e-mail was sent the same day you spoke to him

12   on the phone?

13   A    Yes.

14   Q    If you can -- and what's --

15           What did you understand this e-mail to be, the

16   purpose of it?

17   A    Well -- oh, it was for him to get more time to discuss it

18   further with me.  Because when you do catch a call like that,

19   to be honest, you typically try to screen them out.  When you

20   do catch a call like that if someone does have something that,

21   oh, well, that might be worth investigating, you agree to read

22   the materials they want to send and then of course they want

23   to get in front of you again to talk about investing in the

24   product.

25   Q    So, can you just read the last paragraph?  The first

Sophie Nolan, RPR - Official Court Reporter

Frederick - direct - McConnell                 395

1  part is self-explanatory, "We're trying to schedule a time

2  to talk," but the last part that's up on the screen there,

3  the "You are familiar."  Can you just read that for us,

4  please?

5  A    "You are familiar with equity investing in public

6  companies.  We are simply making equity investments in private

7  companies.  We are investing in car dealerships" and they list

8  ticker symbols from publicly traded car dealerships, like Auto

9  Nation, Group 1, managed IT services, "and we do loan money to

10  some private companies also."

11         MR. McCONNELL:  And if we could just look at the

12  second half of the e-mail, Ms. Bates.

13  Q    Can you just tell us what these five -- it says

14  "Everything we invest in must have the following five

15  criteria."

16         Could you just very briefly tell the members of the

17  jury what you understand these five criteria to mean?

18  A    Sure.  So, here he's talking about how -- well, recession

19  brings resiliency, which is something that car dealerships are

20  known for.  Car dealerships tend to be recession resilient.

21         Even in difficult overall economic times, while all

22  of us are out buying fewer new cars, we are instead there at

23  the dealership paying to have our aging cars serviced and

24  repaired.  So, they're recession resilient and then he goes

25  on --

Frederick - direct - McConnell                396

1  Q    What's number two?

2  A    It's talking about the yield; 10 percent gross return on

3  equity, high barriers to entry.  It's not easy for too many

4  dealerships to come in and disrupt an existing dealership's

5  business because Ford is not going to put a Ford dealership

6  across from a Ford dealership.  So you have high barriers of

7  entry to ensure continued profitability.

8          It talks about -- in private equity, you end up

9  having operating partners.  They go out buying companies.

10  They need individuals who know how to successfully operate the

11  company that the private equity fund has purchased.

12          And then define a profitable exit strategy.  This

13  was, you know, in addition to the distribution upon which

14  there was a lot of emphasis, there was also, you know, the

15  idea that the more dealerships you bring together under one

16  entity, the higher value per dealership they tend to sell for

17  in the marketplace.  So, the idea is you -- you know, you

18  acquire dealerships at a price down here.  You operate them

19  and collect the cash flow and then once you've acquired enough

20  dealerships and achieve critical mass of operations, that it's

21  operating well and it's throwing off significant profits and

22  cash flow," that you sell it at a price up here.

23          So that's what they mean by defined and profitable

24  exit strategy.

25  Q    Just going back to number 2.  Tell the members of the

Frederick - direct - McConnell                397

1    jury what yield means?

2    A    So, yield is the cash flow, profits that is being

3    generated by the companies stated as a yield, means that

4    amount of money divided by how much you paid for the company

5    and that gives you a yield.  So, if you paid $100 for

6    something and it's generating $10 a year, you have a 10

7    percent yield.

8    Q    And did you request additional information from Mr. Mann

9    based on the phone call and e-mail that you received on

10   September 1, 2015?

11   A    Yes.

12   Q    And what sorts of materials did you receive and review?

13   A    Several marketing pieces talking about the businesses

14   they were investing in and the performance of those

15   businesses.

16   Q    And did you also review any financial statements?

17   A    Yes.

18   Q    Did you review audited financial statements for any GPB

19   investments?

20   A    Well, that's a tricky question.

21   Q    Well, prior to investing?

22   A    Yes.  The reason I say that's a tricky question is

23   because there -- the financial statements, their status is

24   being audited was later revoked by the auditors.

25   Q    We'll get to that.

Frederick - direct - McConnell                    398

1          MR. COGAN:  Objection.

2    Q    Just prior to making an investment in GPB Capital did you

3    review what at the time were audited financial statements for

4    GPB funds?

5    A    I did.

6    Q    Which GPB funds do you remember looking at information

7    about?

8    A    Oh, there were several.  Obviously the automotive

9    portfolio, that's the only one we invested in but there was an

10   IT services, there was healthcare, there was cold storage,

11   there was Waste Management.

12   Q    Do you recall GPB Fund Holdings 1?

13   A    Yes.

14   Q    Do you recall GPB Fund Holdings 2?

15   A    Yes.

16   Q    Did you invest in either of those funds?

17   A    No.

18   Q    Which fund did you ultimately invest in?

19   A    The GPB Automotive Retail portfolio.

20   Q    Now, we're going to look at some of the materials you

21   reviewed, but can you explain generally to the jury the main

22   features of the automotive portfolio that you found attractive

23   as a potential investment?

24   A    One was the simplicity.  You know, car dealerships are

25   car dealerships.  You have a franchise agreement with a

1    manufacturer.  They tend to be safe, not a lot of car

2    dealerships go bankrupt.  They are particularly recession

3    resilient.  They are known for generating very steady high

4    levels of cash flow.  And this is an interesting point what I

5    found attractive; because you have to be an approved buyer to

6    buy a lot of dealerships they tend to sell in the marketplace

7    at relatively low prices given how profitable they are.  You

8    can't merely sell it to any highest bidder.  That buyer has to

9    be approved by the manufacturer.

10            So that's how this industry tends to generate

11   so much cash flows because it's a limited buyer market.

12   Q    You mentioned that these dealerships are profitable,

13   they're recession resilient.  Was there an income-producing

14   component to the GPB investment on a monthly basis?

15   A    Yes.

16   Q    Can you tell the jurors about that?

17   A    It's 8.7 percent annually broken into monthly

18   distributions funded by the operating cash flows of the car

19   dealerships.

20   Q    And can you just explain that in the simplest terms

21   possible?  What did you understand operating cash flow from

22   the dealerships to mean?

23   A    Oh, it's the ongoing operations.  It's selling cars and

24   changing oil and doing warranty work and repair work.  It's

25   the profit that comes from all of those activities from

Frederick - direct - McConnell                400

1  finance and insurance and all the things that car dealerships

2  do.

3  Q    Was that a guaranteed 8.7 percent return or was it a

4  target?

5  A    Oh, it's a targeted return.

6  Q    And based on your review of the materials that you were

7  provided and the other due diligence that you had done, what

8  was your understanding of what would happen to that 8.7

9  percent annual distribution paid monthly if for some reason

10  the dealerships were not making enough profit?

11  A    That distribution -- we were told no assurance of

12  distribution but if the profits, the cash flows, will not

13  support the distribution, the distribution would be reduced or

14  suspended.

15  Q    Now, you have evaluated probably hundreds of investments,

16  thousands of investments, over the course of your career; is

17  that fair to say?

18  A    Yes.

19  Q    Did you think, based on your due diligence, that that 8.7

20  percent annual distribution paid monthly was a reasonable

21  expectation?

22  A    I did, based on the profitability of the underlying car

23  dealerships.

24  Q    Can you just explain that a little bit?

25  A    Sure.  So, again, car dealerships tend to be very high

Frederick - direct - McConnell                401

1   cash flow generating investments or businesses because they

2   don't sell at very high prices relative to their cash flow and

3   income.  So an 8.7 percent distribution, you know, we were

4   consistently told -- they would send us updates on car

5   dealerships that were purchased that were generating 15-plus

6   percent, what they called cash-on-cash yield -- how much

7   profit is being generated divided by -- cash on cash yield is,

8   again, profits divided by how much you paid for the

9   dealership.

10          So, if it's a 15 percent cash-on-cash yield, that

11  means say they paid $10 million for a car dealership.  It's

12  then generating $1.5 million a year in profit.  They're paying

13  out $870,000 in distributions.  So distributions are very well

14  more than covered by those cash-on-cash yields.

15  Q    So --

16          MR. COGAN:  Your Honor, I'm sorry.  So that I don't

17  have to continue to interrupt, I just want to confirm that the

18  standing objection that I alluded to before just remains and I

19  don't have to continue to object to these agency issues.

20          THE COURT:  I am not sure what your objection would

21  be to what he just said.

22          MR. COGAN:  It was --

23          THE COURT:  He's explaining.

24          MR. COGAN:  It was earlier in the narrative where he

25  described, we were always told.  He's alluding to what he had

1   been told.

2          THE COURT:  I think you should just object if you've

3   got an objection.

4          MR. COGAN:  Okay.

5   BY MR. McCONNELL:

6   Q    So just to be clear, Mr. Frederick, if a dealer was

7   making, say, 15 or 18 percent profits, that would cover the

8   8.7 percent target distribution that the investor would

9   receive?

10  A    Correct.  8.7 percent is significantly lower than 15

11  percent, 18 percent, 20 percent.

12  Q    And in conducting your due diligence about the GPB

13  automotive portfolio, were you aware of something called

14  special distributions?

15  A    Yes.

16  Q    And can you explain to the members of the jury what you

17  understood special distributions to be based on your due

18  diligence?

19  A    As it was explained to us --

20          MR. COLTON:  Objection.

21          MR. COGAN:  Objection.

22  A    -- by --

23          THE COURT:  Well, do you want to -- I mean if you

24  want to say by, go ahead.

25          I think you should probably elicit the source of the

Frederick - direct - McConnell                403

1   information.

2   Q    Mr. Frederick, what's the source of your -- and if it's

3   more than one let us know, but what are the sources of

4   information that you received in conducting your due diligence

5   about special distributions?

6   A    It's multiple sources so that would be e-mails received

7   from Michael Mann, e-mails received from Mark Engelbrecht,

8   conversations with Michael Mann, conversations with Mark

9   Engelbrecht and presentations and discussions involving David

10  Gentile and Jeff Schneider.

11           MR. COGAN:  Objection.

12           THE COURT:  I note your objection and it's

13  overruled.

14  BY MR. McCONNELL:

15  Q    So, based on, again, the totality of your due diligence,

16  and we'll talk about the specifics that you mentioned, but

17  based on all of your due diligence, can you just describe for

18  the members of the jury generally what you understood special

19  distributions to be?

20  A    Special distributions were distributions in addition to

21  the 8.7 percent target distribution.  So, again, if your

22  target distribution is 8.7, but the underlying car dealerships

23  that you own are doing really well and they are throwing off

24  15-plus percent yields, then it is not uncommon for the fund

25  manager to make additional income distributions on top of the

Frederick - direct - McConnell                    404

1  state -- the target rate and so that's what the special

2  distributions were.

3  Q    And again, the target rate was what?

4  A    8.7 percent.

5  Q    And the special distribution would then be on top of

6  that?

7  A    Correct.

8  Q    And when you evaluated the investment based on your due

9  diligence, what did the fact that special distributions had

10 been previously paid tell you about the profitability of the

11 fund and its overall health?

12            MR. COLTON:  Objection.

13            THE COURT:  Overruled.

14 Q    You can answer.

15 A    Would you repeat the question, please?

16 Q    Yes.  Based on your due diligence, what did it tell you

17 as a potential investor about the profitability of the fund

18 and its overall health, the fact that special distributions

19 had previously been paid out?

20 A    As GPB and Ascendant told us, that was because they were

21 earning more than the target distribution.  And, so, they

22 were paying out additional distributions, special

23 distributions.

24 Q    In the materials that you reviewed prior to investing,

25 did you understand that your monthly 8.7 percent targeted

Frederick - direct - McConnell                    405

1   distribution could include a return of your own capital?

2   A    No.  I was under the impression as I was told, that if

3   cash flows were not sufficient to support the 8.7 percent,

4   distributions would be reduced or suspended.

5            MR. COGAN:  Note my continuing objection.

6            MR. COLTON:  Object as well.

7            THE COURT:  Overruled.

8   BY MR. McCONNELL:

9   Q    So, did there come a time -- well, would that have

10  affected your decision about whether or not to invest, if you

11  thought that your monthly 8.7 percent distribution was coming

12  from your own capital or other investor's capital?

13  A    Yes, it would have had an effect.  There's no way we

14  would have invested.

15  Q    Why not?

16  A    It's entirely counter to the concept of what you're

17  trying to achieve.  You know, when you put your money into an

18  investment you're looking for return on your investment not a

19  return of your investment.

20  Q    Did there come a time when you decided to recommend the

21  GPB Automotive Portfolio to some of your clients?

22  A    Yes.

23  Q    Approximately when was that, if you remember?

24  A    It would have been after the first due diligence meeting

25  that I attended.

Frederick - direct - McConnell                    406

1    Q    I want to talk about that but do you remember about what
2    time your client started investing in the automotive --
3    A    The second half of 2016.
4    Q    And ultimately how many of your clients decided to invest
5    in the automotive portfolio?
6    A    Sixteen clients, I believe.
7    Q    And what was the total amount that those clients invested
8    in the automotive portfolio, approximately?
9    A    Approximately $2.1 million.
10   Q    And did you personally invest in the automotive
11   portfolio?
12   A    Yes.
13   Q    You mentioned that you attended a due diligence event in
14   Texas.  What was that event?
15   A    So, that was the event that Michael Mann had -- that's
16   what most of his communications with me were about was to get
17   me to attend.  And it was a presentation by David Gentile and
18   others about all of their different investment strategies.
19   Q    You mentioned Mr. Gentile twice.  Who did you understand
20   David Gentile to be?
21   A    The owner and founder of GPB Capital.
22   Q    And as part of the due diligence materials that you
23   reviewed, did those materials contain information about
24   Mr. Gentile's accounting background?
25   A    Yes, extensively.

1  Q    And was that significant to you when evaluating GPB as a

2  potential investment?

3          MR. COGAN:  Objection.

4  A    Yes.

5          THE COURT:  Sorry, one moment.

6          What's the relevance?

7          MR. McCONNELL:  If we can approach, Your Honor?

8          THE COURT:  Okay.

9          MR. McCONNELL:  Sorry.

10          (Sidebar held outside of the hearing of the jury.)

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                      408

1              (The following sidebar took place outside the
2    hearing of the jury.)
3              MR. McCONNELL:  So, as to relevance, my expectation
4    is that the witness is going to say that Mr. Gentile's
5    accounting background was significant to him when evaluating
6    the investment because it meant that he was able to evaluate
7    the underlying integrity and financial statements of the
8    portfolio companies, both at the time of purchase and while
9    they were operating and that gave him comfort that there was
10   someone with that sort of expertise.
11             THE COURT:  Okay.
12             And, so, what's your objection?
13             MR. COGAN:  Relevance.
14             MR. McCONNELL:  And I think it's worth noting -- I
15   didn't highlight it with the last witness but it's something
16   that's highlighted in the marketing materials that are already
17   in evidence.
18             MR. COGAN:  The issue is that and the reason for the
19   relevance objection is that those representations aren't
20   alleged to be false.  So we're now going to have a discussion
21   about representations that are made in marketing materials
22   about the person's background.
23             THE COURT:  I'll allow the question.
24             MR. DEARINGTON:  Your Honor, one question:  Do you
25   mind asking the witness to pause before responding because
```

Sidebar                                                      409

1    it's getting hard to squeeze an objection in before he starts

2    his long responses.

3              THE COURT:  Sure.

4              MR. DEARINGTON:  Thank you, Your Honor.

5              (Sidebar ends.)

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                      410

1   (Continuing.)

2        THE COURT:  Mr. Frederick, could you go slower and

3   pause after Mr. McConnell's question but before answering so

4   the attorneys can object?

5   Q    I'll reask the question, Your Honor.  Mr. Frederick in

6   conducting your due diligence were you aware that Mr. Gentile

7   had a background in accounting?

8   A    Yes.

9   Q    And was that significant to you when evaluating GPB as an

10  investment opportunity?

11  A    Well, yes.

12  Q    Can you tell the members of the jury why?

13  A    Well, you're investing in a private fund that's buying

14  lots of different companies and then integrating them into one

15  overall operation.  That is a very accounting heavy, math

16  heavy endeavor.  So the idea that the founder and several of

17  the others at the top of the company had accounting

18  backgrounds, were CPAs, is something that as an investor you

19  like to see.

20  Q    But why did you like to see it just to -- if you can

21  explain that.

22  A    Due to the complexity of private equity having guys --

23  you know, it's -- oftentimes if they have law degrees or

24  accounting degrees or sometimes they don't and they have

25  significant backgrounds in a particular industry and that's

Sidebar                                          411

1   where they're engaging in a private equity fund, but in

2   general at a company with a highly degree mathematical or

3   accounting complexity, you like the idea that the guys at the

4   top have CPA backgrounds.

5   Q    So you mentioned again this due diligence event that you

6   attended in Austin, Texas.  What was that event?

7   A    Oh, and I -- I will add to my answer there, they also

8   drove home the point that it was beneficial to have CPA

9   backgrounds running a business like this.

10  Q    So the event that you attended in Texas, who invited you

11  to that?

12  A    It was either Michael Mann or Mark Engelbrecht of

13  Ascendant Capital.

14  Q    Were they the two main people at Ascendant Capital who

15  you dealt with?

16  A    Yes.  I believe geographically I fell their region which

17  is why those were the two primary contacts.

18  Q    I want to show you what's marked for identification as

19  Government Exhibit 8189-A, I believe -- first, 8189, if we can

20  do that first.

21       (Exhibit published to witness, counsel and Court only.)

22  Q    Do you recognize this, Mr. Frederick?

23  A    I do.

24  Q    What do you recognize this to be?

25  A    This is the confirmation that I will be attending the due

Sidebar                                                          412

1  diligence meeting.

2  Q    Is this the due diligence meeting that you've been

3  testifying about?

4  A    Yes.

5          MR. McCONNELL:  I'm going to offer Government

6  Exhibit 8189 into evidence at this time, Your Honor.

7          MR. COGAN:  No objection.

8          THE COURT:  Admitted.

9          (Government Exhibit 8189 received in evidence.)

10         MR. McCONNELL:  If we can publish it for the members

11 of the jury with the Court's permission.

12         (Exhibit published.)

13 BY MR. McCONNELL:

14 Q    So, Mr. Frederick, who paid for you to go and attend this

15 event?

16 A    I believe travel costs were covered by Ascendant Capital.

17 Q    What about lodging?

18 A    Lodging as well.

19 Q    And attached to this e-mail there's an agenda.  Do you

20 see that?

21 A    Yes.

22 Q    I would like to show you --

23         MR. McCONNELL:  Will there be any objection to the

24 agenda?

25         MR. COGAN:  No objection.

```
                        Sidebar                          413
```

1      (Exhibit published to witness, counsel and Court only.)

2           MR. McCONNELL:  Government Exhibit 8189-A, the

3    attachment.

4    Q    Do you recognize this, Mr. Frederick?

5    A    I do.

6    Q    What do you recognize this to be?

7    A    This is the agenda of topics, how we will spend our time

8    while we're there.

9    Q    Is this for the event that you've been testifying about?

10   A    Yes.

11          MR. McCONNELL:  I'm going to offer Government

12   Exhibit 8189-A into evidence at this time.

13          THE COURT:  Admitted.

14          MR. COGAN:  I didn't object.

15          THE COURT:  I am sorry, what?

16          MR. COGAN:  I thought I already didn't object, but I

17   will say again I don't object.

18          THE COURT:  Okay.

19          (Government Exhibit 8189-A received in evidence.)

20   Q    So, Mr. Frederick, this was a two-day event, yes?

21   A    Yes.

22   Q    And there's different topics for the agenda.

23          MR. McCONNELL:  Can we zoom in on day one because

24   it's kind of hard for me to read.

25   Q    Just looking at day one, Mr. Gentile is participating in

Sidebar                                                          414

1   one, two, three different presentations.  Do you remember

2   that?

3   A    Yes.  He also attended dinner.

4   Q    Did you attend the dinner as well?

5   A    Yes.

6   Q    And you mentioned previously during your testimony Jeff

7   Schneider.  Who did you understand Jeff Schneider to be?

8   A    The owner and founder of Ascendant Capital.

9   Q    And, again, what was the relationship, as you understood

10  it, between GPB and Ascendant Capital?

11  A    GPB was the private equity fund that manages investments,

12  buy companies, puts the money that's raised to work.

13  Ascendant Capital was in charge of raising the money for GPB.

14          MR. McCONNELL:  And if we can just go to page two,

15  please, Ms. Bates.

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

*Frederick - direct - Mr. McConnell*                    415

1   (continuing.)

2   Q    On day two, we have two presentations by Mr. Gentile

3   and one that Mr. Schneider's participating in.

4         Do you see that?

5   A    Yes.

6   Q    Do you remember anything about Mr. Gentile's

7   presentations about the Automotive Portfolio specifically?

8   A    Yes.  He emphasized the operating cash flow and how

9   these businesses were -- made such great investments because

10  they generate steady predictable ongoing cash flow far in

11  excess of the target distribution.

12  Q    When you say "target distribution," just remind us what

13  you're talking about.

14  A    Again, that's 8.7 percent annually.

15  Q    And was that discussed during these presentations?

16  A    Yes.

17  Q    And do you recall --

18        Well, again, based on the presentations that you

19  attended, what was your understanding of what would happen

20  if the profits from the car dealerships were not enough to

21  cover that 8.7 percent distribution?

22  A    I understood, as we were told at this conference, that

23  the distributions would be reduced or suspended; that the

24  8.7 percent distribution, that 8.7 is a target, not a

25  guarantee, it's a target distribution.

*Frederick - direct - Mr. McConnell*                416

1   Q    Do you remember the subject of performance guarantees

2   being mentioned in the presentations about the Automotive

3   Portfolio?

4   A    Yes.

5   Q    Can you tell the members of the jury what you

6   understood these performance guarantees to be?

7   A    So when an individual or a family or a group sells a

8   business, they may engage with the buyer in essentially a

9   representations and warranties agreement.  In that agreement

10  it may include guarantees like, well, you know, we have

11  every reason to believe the car dealership is going to

12  continue to have monthly sales or annual sales consistent

13  with previous years.  And in the event that that does not

14  hold up, the seller of the business has to pay some of the

15  purchase price back to make up for the under performance.

16  Q    And how did you feel about performance guarantees in

17  your overall analysis of the investment?

18  A    Well, it helps --

19          MR. COLTON:  Objection.

20          THE COURT:  Let's not ask about how he feels.

21  Q    What was your -- what was your opinion of --

22          How did performance guarantees impact your

23  evaluation of GPB as a possible investment?

24  A    So guarantees like that from the previous

25  owner/operator of a business helps reduce some of the risk

1  for the next owner, because if, after they purchased the

2  business, it doesn't perform as expected, as represented and

3  warranted, then the seller returns some of the purchase

4  price and it's meant to make up for whatever shortfall

5  materializes.  So really what it does, as the investor, it

6  just, to some extent reduces the risk of the purchases of

7  the investment.

8  Q    How does it reduce the risk?

9  A    Well, it reduces the risk because any time you buy a

10 business based on its track record, that can change.  It

11 doesn't necessarily continue exactly as expected.  And so

12 this is somewhat of a hedge, for lack of a better term,

13 against it not performing as expected, not performing as it

14 has.  And so as the investor, you have whatever source of

15 funds coming in from the previous owner to make up for that

16 under performance.

17 Q    Did the existence of these performance guarantees

18 impact your view about the viability of the 8.7 percent

19 targeted distribution from profits?

20 A    Absolutely.

21 Q    Can you explain to the members of the jury why?

22 A    Well, again, if you buy a dealership at some expected

23 rate of return and it fails to achieve that rate of return,

24 the seller has to pay back part of the capital that makes up

25 for that shortfall.  So as an investor, it meant that our

*Frederick - direct - Mr. McConnell*                    418

1    8.7 percent was all the more secure.  That targeted -- that

2    targets going to be met because if the business fails to get

3    there, the previous owner has to make it up to us.  So it

4    makes the investment somewhat safer.

5    Q    Do you recall --

6              Well, did you meet Mr. Gentile and Mr. Schneider

7    at this event?

8    A    Yes, sir.

9    Q    Can you describe how you met them and interacted with

10   them?

11   A    Well, they both spoke, gave presentations.  They were

12   also very interactive, you know, friendly, glad-handers,

13   greet you, shake your hand, pat you on the back, introduce

14   you to other people, you know, make sure everyone else who's

15   there from GPB, everyone else who's there from Ascendant

16   Capital.  They're just kind of working the room being

17   social.

18   Q    And at any point during the two-day presentation, did

19   anyone from GPB or Ascendant Capital during the

20   presentations on this agenda tell you that the distributions

21   that had been paid had not been fully covered from profits?

22   A    No.

23   Q    Was it important to you that the distributions that you

24   received monthly come from income generated from the

25   portfolio companies?

1   A    Yes.  That's the entire purpose of investing in the

2   fund.

3   Q    Would you have wanted to know if distributions that had

4   been paid previously in the Automotive Portfolio had come

5   from investor capital rather than profits?

6   A    Absolutely.

7           MR. MENCHEL:  Objection.

8           THE COURT:  Overruled.

9   Q    Why?

10  A    Because it would be an indication that something was

11  very wrong.

12  Q    What do you mean by that?

13  A    Well, again, the purpose of the investment is the

14  8.7 percent targeted return that's paid out of operating

15  cash flows, profits from the car dealerships that our money

16  was going into.  I don't -- I don't want to invest in a car

17  dealership group and then send me back my own money instead

18  of sending me back the operating cash flows from the

19  underlying car dealerships.

20  Q    I want to show you some of the marketing materials that

21  you reviewed.  You mentioned you reviewed a number of

22  written materials in addition to attending this

23  presentation.

24          MR. McCONNELL:  Can I have the witness shown

25  what's in evidence as Government Exhibit 1434, please.

1               (Exhibit published.)

2    Q    Do you recall reviewing Government Exhibit 1434 prior

3    to investing, sir?

4    A    Yes.

5    Q    And what is Government Exhibit 1434?

6    A    It is an overview of the GPB Automotive Portfolio,

7    Limited Partnership.

8    Q    And it says Class B on it.  What's Class B mean?

9    A    So the investment was made available in at least two

10   varieties, it may have been exclusively two.  There was

11   Class A and Class B.  So as I mentioned earlier, I gave up

12   my Series 7 license.  I wanted to work for clients in a way

13   that was fee only and not -- does not involve commissions.

14   So the Class A shares had significant commissions to the

15   advisors.  So if they recommended to their client they got

16   paid, I don't even know because I am not in that world, but

17   it was like seven, eight or 10 percent, something like that.

18   Went straight to the advisor as a commission.

19               We were in Class B, which may also be referred to

20   as an institutional share class.  It doesn't have those

21   commissions built into it, which means an investor, when

22   they put their money in, they're not losing, you know, the

23   first 10 percent to comp.  All of, you know, their money's

24   going straight into the investment instead of coming to me.

25   Q    The cover page here says:  Income-producing private

*Frederick - direct - Mr. McConnell*                    421

 1   equity.

 2          What was income producing about GPB that's

 3   different than regular private equity?

 4   A    Sometimes private equity is not centered on income

 5   production.  Sometimes it's investing, say, in an

 6   early-stage company that's not terribly profitable yet.  The

 7   idea is that the private equity investment is meant to give

 8   them operating capital to achieve profitability.  At that

 9   point, maybe it pays income or maybe it retains that income

10   and invests in its own growth and the idea is that you just

11   sell it later when the company is larger and more

12   successful.

13          So not all private equity is income-producing

14   centric.  A lot of private equity is kind of on the other

15   side of the coin.  It's about building a business and

16   selling it.  Not buying existing profitable businesses and

17   distributing income.

18          MR. McCONNELL:  If we can just go to page 6,

19   please, of the exhibit, Ms. Bates.  And if we can just zoom

20   in on the chart.

21   Q    So Mr. Frederick, it says "offering highlights," here.

22   It says:  Targeted annual distribution, 8.7 percent.

23          Is that the distribution that you have been

24   talking about here?

25   A    Yes, sir.

1   Q    And, again, when was that distribution paid out and

2   with what frequency?

3   A    It was paid out on a monthly basis.

4   Q    And underneath that, it says:  Projected net IRR to

5   investors.

6          Can you tell the members of the jury what you

7   understand that to mean?

8   A    "IRR" stands for Internal Rate of Return, so that would

9   be your gross or total rate of return.

10         Another thing that was at the time appealing about

11  this, is the IRR, the Internal Rate of Return, was well in

12  excess of the stated distribution.

13  Q    What does that mean?

14  A    It means your stated distribution is -- you can very

15  reasonably expect it to be covered by the profitability of

16  the car dealerships.

17  Q    And underneath that it says:  Historical distribution.

18         Do you see that?

19  A    Yes.

20  Q    Can you just explain to the members of the jury what

21  you understand that to mean?

22  A    This part was covered extensively at the conference we

23  were at, from David Gentile to Jeff Schneider to others,

24  talking about how the 8.7 percent, again, falls well within

25  what the cash flow, the profits, the income of these car

*Frederick - direct - Mr. McConnell*                    423

1  dealerships generates.  Therefore, in previous years, we've

2  paid out even more than the target return.  If we earn less,

3  we pay less.  If we earn more, we pay more.

4  Q    And based on this marketing material where it says

5  "historical distribution," was the GPB Automotive Portfolio

6  paying more or less than the 8.7 percent?

7  A    Paying more.

8  Q    And what did that tell you as a potential investor

9  about the profitability of the investment?

10 A    That it's performing well in excess of the 8.7 percent

11 to the extent that they're making additional distributions

12 to investors.

13         MR. McCONNELL:  If we can just go to page 8,

14 please.

15 Q    Again, this is a page, it says:  Structure.  Again, it

16 says:  Distributions.

17         Can you just read what it says next to

18 "distributions," please, sir?

19 A    Minimum investment size:  $100,000.  Funds, commitment:

20 Funds immediately committed.  Deal sourcing:  Private

21 network and off-market transaction.  Investor qualification:

22 Accredited.  Distributions based off cash flow from

23 portfolio companies targeted at 8.7 percent.

24 Q    And what did you understand that to mean, sir?

25 A    That the distributions we received would be based on

1    the cash flow of the car dealerships.

2            MR. McCONNELL:  Can we go to page 18, please.

3    Q    So Mr. Frederick, here, it says "typical acquisition

4    structure," the second-to-last item says "personal

5    performance guarantees."

6            Is that a reference to the performance guarantees

7    that you were previously testifying about?

8    A    It is.

9            And such performance guarantees are not uncommon.

10   I've had clients sell their businesses, in fact, I had one

11   recently sell a business to a publicly-traded company and

12   they had to set aside a substantial sum of money to cover

13   the reps and warranties.

14   Q    What do you mean?

15   A    Sold to a publicly-traded company out of the sale of

16   the business, they had to put $10 million in escrow.  And

17   that money is in jeopardy for 18 months because if the

18   buyer, this publicly-traded company, if they find something

19   that doesn't fit, doesn't match what they were -- what was

20   represented and warranted, what they were told by the guys

21   who sold the business, if something doesn't fit, doesn't

22   match, something's wrong, whether it's intentional or

23   unintentional, the company that purchased gets to reach into

24   that $10 million bucket and pay themselves back whatever

25   damages they can illustrate from the misrepresentation.

*Frederick - direct - Mr. McConnell*          425

1            And so a personal performance guarantee, those are

2    not terribly uncommon.  And so in this situation, the family

3    has a car dealership, they've had it for a long time, they

4    would know how well it operates in the community, then know

5    the history of it.  So they go to sell it.  The buyer says,

6    hey, listen at our purchase price we're paying you, we

7    want -- we want you to have a little skin in the gain in our

8    continued success, continued operations.  So out of this

9    purchase price that we're paying you, you're going to set

10   aside "x" amount, and if this fails to perform as you've

11   told us it will perform, then you have to pay us back out of

12   "x" amount.

13           So it's not terribly uncommon.

14           MR. McCONNELL:  I want to show you Government

15   Exhibit 1435 which is in evidence.

16           (Exhibit published.)

17   Q    Mr. Frederick, do you recognize Government

18   Exhibit 1435?

19   A    I do.

20   Q    Is this one of the materials that you reviewed?

21   A    It is.

22           MR. McCONNELL:  If we can just go to the second

23   page and zoom in on the top, there.

24   Q    Mr. Frederick, when it says "portfolio company

25   acquisitions," what do you understand that to mean?

1   A    In private equity, any time the fund buys an individual

2   company it's called a portfolio company.  So since we were

3   invested in an automotive retail which just means car

4   dealerships, the portfolio company is a car dealership.

5           MR. McCONNELL:  If we can go to the next page of

6   the document, please.  And just zoom in on the right-hand

7   side.

8           (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION (Continued)

2   BY MR. McCONNELL:

3   Q    What's being relayed in this part of the document, sir?

4   A    Okay.  So you have the acquisition cost, that's price

5   paid and associated expenses.  Price paid.  You have revenue,

6   and then down here, this -- like, take the Buick GMC

7   dealership there that was purchased for $7.5 million, come

8   down to that last line, 2016 projected cash-on-cash yield,

9   15-plus percent.  As an investor, you see that and you think,

10  it won't be difficult for them to pay me my 8.7 percent.

11  Q    And each one of these dealerships has a different

12  projected cash-on-cash yield; is that correct?  Or two of

13  them --

14  A    Two are 15, one is 18.

15          MR. McCONNELL:  If we can go to the bottom of the

16  document.  No, no, I'm sorry, the last page.  No, I think this

17  is the first page.  Second to last page.  Yes.

18          Just if we can zoom in on what's there on the

19  left-hand side.

20  Q    Mr. Frederick, it says total portfolio here.

21          What do you understand that to mean?

22  A    All of the car dealerships for 2015.

23  Q    And what's the projected cash-on-cash yield for the total

24  automotive portfolio?

25  A    Sixteen-plus percent.  So double or more of our targeted

*FREDERICK - DIRECT - MR. McCONNELL*                          428

1   return.

2   Q    Double -- almost double of the 8.7 percent target?

3   A    Almost double, or there's a plus sign, even more.

4   Q    I want to show you Government Exhibit 1438 in evidence.

5          MR. McCONNELL:  If we could zoom in here.  If we can

6   get the title to.  I'm sorry Ms. Bates.  Actually, let's just

7   do the top title part first, and then we'll go down.

8   Q    So Mr. Frederick, do you recognize this document?

9   A    I do.

10  Q    And who did you receive this document from, if you

11  remember?

12  A    Either Michael Mann or Mark Engelbrecht.

13  Q    Is it fair to say that most or all of these marketing

14  materials you received from either of those two gentlemen?

15  A    Yes.

16  Q    This document in evidence, Government Exhibit 1438, what

17  does it say at the top there?

18  A    GPB Capital Holdings, LLC Fund-level Track Record.

19         MR. McCONNELL:  And if we could just zoom in on the

20  automotive portion.

21  Q    Tell the members of the jury what you understood this

22  information to mean.

23  A    Sure.  So start with the individual months.  I take the

24  January column.  You see 0.73 percent.  Okay.  That is

25  8.7 percent divided by 12.  So as you come across, let's look

1   at 2014.  You begin January through May, you have 0.7 percent.

2   You get to June, the distribution goes up to 1.23 percent.

3   That distribution that month would include a special

4   distribution.  As we were told, that was earnings from the car

5   dealerships.  Continue forward in 2014.  You get to December,

6   and they have a significantly higher payout for December,

7   3.73 percent.  Got to the end of the year, told us we'd had a

8   great year, we kicked out additional income to investors.

9   Q    Okay.  And based on this chart of, as it says, fund-level

10  track record, did the GPB Automotive portfolio ever fail to

11  meet its 8.7 percent target distribution rate?

12  A    No, it did not.

13  Q    In fact, it exceeded it?

14  A    Correct.

15  Q    Had the GPB Automotive portfolio not generated enough

16  profits to pay out that 8.7 percent distribution rate, what

17  would you expect this chart to depict?

18  A    Just as it depicts additional return if earnings are

19  greater than, I would expect a lower rate of return if

20  earnings were not high enough to sustain the targeted

21  8.7 percent distribution.

22  Q    Did you continue to receive e-mail communications from

23  Michael Mann and Mark Engelbrecht from Ascendant Capital after

24  you attended the due diligence event in Austin in February?

25  A    Yes.

1  Q    I'd like to show you what's marked for identification as

2  Government Exhibit 8190, please.

3        MR. McCONNELL:  And let's zoom in on the top.  I

4  don't know how clear it is for the witness.

5  Q    Do you recognize Government Exhibit 8190, sir?

6  A    I do.

7  Q    And what do you recognize it to be?

8  A    Oh, it's a link where we could begin accessing online

9  quarterly update.

10 Q    What's the document?  Before we get into the content,

11 what is it?

12 A    Oh, this is an e-mail.

13 Q    An e-mail to you, from?

14 A    From Michael Mann.

15       MR. McCONNELL:  Your Honor, at this time, I'd like

16 to offer Government Exhibit 8190 into evidence.

17       MR. DEARINGTON:  No objection.

18       THE COURT:  Admitted.

19       MR. COGAN:  Objection.

20       THE COURT:  Admitted.

21       (Government Exhibit 8190, was received in evidence.)

22 Q    So this is dated March 4th of 2016?

23 A    Correct.

24 Q    So it's about a week after you were in Austin for that

25 due diligence event?

1  A    Yes.

2  Q    It says, See below are links to register for our GPB

3  quarterly update webinars.

4         Do you see that?

5  A    Correct.  Yes.

6  Q    Did you register for that's webinars?

7  A    Yes, I believe I did.

8  Q    It says, We are deploying all dollars very fast and we

9  are likely to announce another special distribution soon.  I

10  just want to break that sentence down.

11         What did you understand we are deploying dollars

12  very fast to mean?

13  A    So in an income-producing private equity fund, deploying

14  capital is very important.  So deploying capital just means

15  spending the money on buying car dealerships that generate a

16  rate of run because that's imperative to cover the

17  distribution.  If the money's sitting in the bank earning less

18  than one percent, you got a problem covering your 8.7.  It's

19  very important that you're able to buy dealerships quickly in

20  order to ramp up and fund.

21  Q    And the second part of this sentence it says, We are

22  likely to announce another special distribution soon.

23         When you read that, what was your reaction?

24  A    Great, they're continuing to more than cover their 8.7

25  percent targeted distribution.

1          MR. McCONNELL:  If we could just see the whole

2  document, Ms. Bates.  I want to make sure I'm not missing

3  anything.

4          Okay.  I want to show you what's marked for

5  identification as Government Exhibit 1440.  If we could just

6  zoom in on the top parts so the witness can look at it.

7  Q    Do you recognize this exhibit, sir?

8  A    I do.

9  Q    What do you recognize it to be?

10  A    An e-mail.

11  Q    And is it an e-mail addressed to you?

12  A    It is.

13  Q    From whom?

14  A    Michael Mann of Ascendant Capital.

15          MR. McCONNELL:  Your Honor, at this time, I'd offer

16  Government Exhibit 1440 into evidence.

17          MR. COGAN:  Same objection.

18          THE COURT:  Admitted.

19          (Government Exhibit 1440, was received in evidence.)

20          MR. McCONNELL:  So if we could publish it to the

21  jury, Your Honor.  Thank you.

22          (Exhibit published.)

23  Q    So Mr. Frederick, this e-mail is dated March 29th of

24  2016.  So it's about a month after you attended the due

25  diligence presentation in Austin?

1    A    Yes.

2    Q    Had you invested at this point?

3    A    No.

4    Q    You were still looking into it?

5    A    Correct.

6    Q    So what's relayed here in the first half of this e-mail?

7    We can skip, I hope you had a great week.  The last chunk

8    there.

9    A    The GPB team as been very busy closing on acquisitions --

10    buying car dealerships -- deploying investor dollars, and

11    setting the remainder of the year up for new products to come.

12    Below, you'll find some updates related to GPB.

13           So we were -- Ascendant Capital, very frequently,

14    reached out trying to generate interest in other investments

15    of theirs, and I was never interested in anything other than

16    the car dealerships.

17           MR. McCONNELL:  Can we just go to the second part of

18    the e-mail, please, Ms. Bates.  Thank you.

19    Q    So the next part of this e-mail says, GPB Holdings 2.

20           What did you understand GPB Holdings 2 to be?

21    A    It was their diversified fund of funds.  So you could

22    invest in Holdings 2, and part of your money would go to car

23    dealerships, part would go to IT services, they had a debt

24    component in there, meaning, that they're making high-yield

25    loans to small and mid-sized businesses.  I believe that there

1   was a health care component to Holdings 2.

2   Q    So they bought lots of --

3   A    Yeah, cold storage, waste management, all their different

4   strategies.

5   Q    So the next -- you didn't invest in Holdings 2, right?

6   A    No, sir.

7   Q    For automotive portfolio, the header there, can you just

8   break down for the members of the jury, what information is

9   conveyed there and whether it was significant to you and why?

10  A    Again, it's significant that they're able to spend the

11  money quickly on car dealerships, and in that environment and

12  probably still true today, car dealerships are owned by

13  families all over the country.  And sometimes, families run

14  out of kids and grandkids who are interested in running the

15  family business, so they're looking for an outside buyer.  So

16  there's lots of car dealerships out there that are for sale.

17  So deploying the capital quickly isn't all too difficult.  So

18  what they're hitting on here is that they closed on seven new

19  car dealerships that have an expected gross revenue, top line

20  revenue sales of $385 million, a 15-plus percent yield, profit

21  divided by the purchase price, and that they had 85 percent

22  ownership.

23            May I talk about the 85 percent ownership for a

24  moment?

25  Q    I think I need to ask you a question about it.

1          What was your -- was the 85 percent -- well, I'll

2    withdraw that question.  I want to ask you about the

3    15 percent-plus yield.

4    A    Sure.

5    Q    What did you understand that to mean and what was its

6    significance to you in evaluating the investment in the

7    automotive portfolio?

8    A    Again, that the car dealerships are generating more than

9    enough profit to cover the targeted 8.7 percent distribution.

10   Q    Now, did you review other marketing materials in addition

11   to the ones that I've shown you here in court?

12   A    Yes.

13   Q    Did you also review quarterly financial reports that were

14   provided by GPB Capital?

15   A    Yes.

16   Q    Did you also review audited financial reports for the GPB

17   Automotive portfolio for prior years?

18   A    Yes.

19   Q    Can you just tell the members of the jury briefly what

20   the difference is between an audited and an unaudited

21   financial report?

22   A    So a typical financial statement is just put together by

23   the company that -- that you're looking at.  It's their own

24   internal documents, here's our sales, here's our expenses,

25   here's our profits, and then break everything out.  Sales in

 1  their different category, expenses into different categories.

 2  So financials and balance sheets where they outline what

 3  assets they own, what liabilities or debts they owe.  An

 4  audited financial statement doesn't come from the owner of the

 5  company.  It comes from a third party.  It comes from an

 6  accounting firm who will -- and the reason that's important is

 7  you want a disinterested outside party looking at the numbers

 8  that are being reported to you to confirm that they're true

 9  and accurate.

10          Publicly traded companies, for example, they have to

11  provide audited financial statements for their investors to

12  see.

13          MR. McCONNELL:  Your Honor, this might be a good

14  stopping point.

15          THE COURT:  All right.  So let's break here for the

16  day.  I think that our schedule next week is a little bit

17  complicated.  I know, at least, one juror asked a question

18  about it.  We've tried to put together a written schedule, but

19  I'll show it to the parties first, so I make sure that I have

20  it correct for next week.

21          And once you tell me you've got it right -- that's

22  right, right?

23          MR. AXELROD:  I think so.

24          THE COURT:  So let's give those to the jurors, the

25  people I'm really concerned about having it.  Okay.  So

1  hopefully, we've got enough copies.  It should be exactly just

2  what we told you, which is that we're done for the week, we're

3  off Monday, we're here half a day Tuesday, then we're off for

4  Juneteenth which is Wednesday, and then we're here Thursday,

5  Friday.  So that's next week, but it's all on the schedule.

6          Does that make sense?  Okay.  So I think we're done

7  for the day.  Just please, you can leave those exhibits

8  anywhere.  That's perfect.  And just remember, please don't do

9  any research, don't talk to anybody about the case, and keep

10  an open mind until you hear all the evidence.  Have a good

11  weekend.

12          THE COURTROOM DEPUTY:  All rise.

13          (Jury exits the courtroom.)

14          THE COURTROOM DEPUTY:  You may be seated.

15          THE COURT:  Okeydoke.  So let's talk about whatever

16  evidentiary issues we are foreseeing, including this exhibit.

17  So I took a quick look at it during the testimony.

18          Do you want to just tell me -- I guess it's the

19  theory is co-conspirator statement, as to Mr. Schneider, and

20  tell me about -- I think that the disagreement is probably

21  over whether the conspiracy is still ongoing and whether the

22  statement is in furtherance.  So do you want to tell me about

23  that?

24          MR. AXELROD:  So Your Honor, this is a

25  quintessential half truth --

1          So Your Honor, what you can see in this letter which

2    is signed by Mr. Gentile, so I don't think there's a dispute

3    from Mr. General's counsel that it's admissible as to him.

4    What you can see in this letter is it relates to the

5    automotive portfolio, and the first about page and a half,

6    discusses challenges presented in the performance of the

7    automotive portfolio in 2018.

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      439

1    (Continuing.)

2         MR. AXELROD:  It does not mention any performance

3    challenges earlier, to start with.  It talks about how they're

4    working to improve them and then if you go down to "Summary

5    and Next Steps" at the bottom of page 2, there is an

6    announcement of a change in policy which is that the

7    distributions will be dynamic; that they will vary based on

8    income, which obviously is what our witnesses say is supposed

9    to be happening all the time, but it's appearing here as a

10   change.

11        And then they say that in accordance with the

12   waterfall which I know we haven't heard a lot about yet, but I

13   expect we'll hear about it further on in the trial.  All of

14   your distributions have been returns of capital in the

15   Automotive Portfolio including investor capital.  That's at

16   the bottom of the letter.

17        It presents that as if is's just what the document

18   said the whole time.  Not, we told you X, Y and Z, but

19   actually the whole time this has been true.  And it comes

20   after a discussion of 2018 performance.  It doesn't say, well,

21   actually beginning in 2014 -- actually, beginning in 2014, we

22   had problems in performance and we started covering it up and

23   we've been dealing with these performance problems for years.

24        It presents as a relatively new issue based on a

25   very, very large acquisition that nobody disputes happened and

Proceedings                                                    440

1    that now we have to integrate that acquisition and that has

2    caused lags and delays and that is why we're underperforming

3    in 2018

4              So, in our view, it is misleading because it omits a

5    significant amount of information and presents this as a

6    recent challenge and then it puts the disclosure at very end.

7    So that's why we think it's a minimizing and rolling

8    statement.  Clearly the defense has made clear that they

9    disagree with that, and that's fine, but they can argue that

10   and that goes to the weight, not whether we've met the bare

11   minimum to admit it as a coconspirator statement.

12             THE COURT:  Just to be clear, it's by a

13   preponderance of the evidence that it's during the course of

14   and in furtherance of the conspiracy, right?

15             MR. AXELROD:  We've charged the conspiracy through

16   December of 2018 and I think the law is very, very clear that

17   we can charge a narrower period and we even allege that the

18   conspiracy continued for more than that period, but you don't

19   have to go there on this one here, Judge.

20             THE COURT:  When do you think the conspiracy ended?

21             MR. AXELROD:  I am not sure and I will need to

22   consult my team for the precise answer.  I don't think that

23   that question is germane to this letter because the conspiracy

24   is charged through December of 2018.

25             THE COURT:  I was looking at the indictment where it

Sophie Nolan, RPR - Official Court Reporter

Proceedings                                                    441

1    says just between 2015 and December of 2018, and this is

2    December 20th.  So I don't know if I should read the

3    indictment as encompassing all -- if that's what you're

4    relying on in the indictment.

5              MR. AXELROD:  We charged it as on or about December

6    2018.  My view is this is within the period of the indictment.

7              THE COURT:  What is the conspiracy doing -- the

8    conspiracy is ongoing in what way?

9              MR. AXELROD:  This is a lull in communication.  The

10   distributions are ending.  So, it's not the case that they're

11   still raising capital and it's not the case that after this

12   letter they're paying distributions.  But they do have to hide

13   the fact that they've been defrauding people for three years

14   and that requires steps to minimize the lull and that is what

15   we think this letter does.

16             THE COURT:  The conspiracy is ongoing because

17   there's a conspiracy; it's a conspiracy to cover up what has

18   occurred in the past?

19             MR. AXELROD:  That's correct, Your Honor, and that's

20   why I'm not sure sitting here right now without talking to the

21   team when I could tell you precisely the conspiracy ended

22   because a conspiracy can include a coverup and lull in

23   communications and minimize it and that's a rather complicated

24   question about when we would say it ended but this is clearly

25   encompassed within that.

Proceedings                                    442

1          THE COURT:  And I'm sorry if I'm just asking about

2    things you've already articulated, but the theory is it's

3    lulling because it presents the -- I mean there are various

4    things you say are not in the letter, but I'm not sure that's

5    the core of your theory.  It can't be that there's a lull in

6    communication because it doesn't say -- I don't know, because

7    it talks about events in this 2018 without talking about

8    earlier events.

9          So it has to be something about what it's saying

10   about its new approach to distributions or what it's saying

11   about its distribution policy.

12         MR. AXELROD:  Respectfully, Your Honor, I think if

13   you present an issue as having arisen in 2018 and as a

14   function of that, as good stewards of investor capital you're

15   changing your distribution policy in response to performance

16   problems in 2018, I think it's significant that you're

17   omitting that you had earlier performance problems and you did

18   not change your distribution policy in connection with those.

19         I think presenting the change in distribution policy

20   as a response to 2018, rather than a response to several

21   other issues and a response to the fact that this has been

22   going on for years since 2015, makes it both lulling and

23   minimizing.

24         THE COURT:  So just to focus on the language, what

25   I'm looking at is I think what you're focused on, but you

Proceedings                                                      443

1   should focus me on where you are.  Is this the first part of

2   the summary and next steps maybe that first paragraph and the

3   start of the second, it's saying "In establishing the

4   company's budget, the company's general partners carefully

5   considered the best course of action.  During this process, we

6   acted as wise stewards.  After much thoughtful analysis the

7   company's general partner has decided to transition from a

8   distribution policy to maintain the company's distribution

9   rate at stable levels notwithstanding extra performance --

10  distribution policy that's more reflective of cash flow and --

11  is that what you're focused on or --

12          MR. AXELROD:  So --

13          THE COURT:  Just point me to the heart of what's the

14  lull in communication there.

15          MR. AXELROD:  It's the stuff before that.  The page

16  and change -- the company overview section, is what presents

17  the under performance in 2018.

18          THE COURT:  Okay.  So here I read it kind of

19  quickly, but the gist is we acquired -- I think the start of

20  it probably is unobjectionable, we've closed a new investment

21  on such and such a date, we acquired an interest in these

22  things on these dates.

23          Here are the five regions.  We acquired Prime in

24  2017 that's a transformative moment.  We like the new person

25  who is running.

Proceedings                                                  444

1          MR. AXELROD:  Not to interrupt you --

2          THE COURT:  Please do.

3          MR. AXELROD:  If you go down to the paragraph that

4    begins "From a performance perspective," at the bottom they

5    talk about yes we did all of these good things; we did the

6    Prime acquisition and we have to integrate it and then they

7    start describing from a performance perspective the company's

8    underperformed expectations in 2018.

9          THE COURT:  Yes.

10         MR. AXELROD:  And from there it describes a series

11   of challenges and it presents them as in part due to the

12   integration of Prime and in part challenges in the portfolio

13   in 2018.  And then under Summary and Next Steps in -- in the

14   longer paragraph, Your Honor, in response to those challenges

15   we are changing our distribution policy.  And they -- and

16   buried in this --

17         THE COURT:  Just point me to the key language.  I'm

18   not seeing that exactly.

19         MR. AXELROD:  Well, it begins -- it begins, "In

20   establishing the company's budget for 2019, we've considered

21   the best course of action," right?  This is obviously linked

22   to the issues that they were talking about in 2018 because

23   you're making a budget for 2019 based on what happened in 2018

24   and based on that they describe a change in the distribution

25   policy.

Proceedings                                                445

1        THE COURT:  It's that the implication of the initial

2   paragraph there is that we're making these changes in response

3   to the events we described earlier.

4        MR. AXELROD:  Yes.  And can I point Your Honor to

5   the disclosure part of this letter.

6        THE COURT:  Sure.

7        MR. AXELROD:  So you can see how it relates to the

8   broader letter.  It's very small.

9        THE COURT:  Yes.

10        MR. AXELROD:  If you go to the paragraph at the

11   bottom of page two, beginning on the right, the source, "The

12   source of these returns of capital contributions have included

13   and may in the future may continue to include, cash flow from

14   operations and investor contributions."

15        So at the end of this long letter that begins with

16   this great acquisition that we did and then but we're having

17   performance problems and the performance problems are in 2018,

18   it continues and carries on.  Okay, for 2019 we're going to

19   switch in light of these performance challenges to a new

20   distribution policy and, oh, by the way, we've been returning

21   you your own capital at the end.

22        THE COURT:  Yes, but that's not exactly lulling if

23   your theory is the whole scheme was to represent to investors

24   that this was not happening.  Now we're saying actually this

25   is what was happening all along.

Proceedings                                      446

1        MR. AXELROD:  I agree that that line itself is not

2   lulling.  Our point is that it presents this all as a change

3   in response to performance in 2018 and my point in calling

4   your attention to that language is that that's obviously a big

5   deal and it's at the very end of the letter in the last

6   paragraph, the second-to-last paragraph at the bottom of the

7   page after you've talked about how great you are and after

8   you've talked about how you're changing your distribution

9   policy for 2019.

10        THE COURT:  Okay.

11        MR. AXELROD:  So that is the argument, Your Honor.

12        THE COURT:  Do you want to respond?

13        MR. DEARINGTON:  Your Honor, it's troubling that

14   we're in the middle of trial and the Government can't say when

15   conspiracy ended.  The grand jury said it was December 2018

16   and the last thing in the indictment I believe that's

17   referenced signaling the end of the conspiracy is this

18   allegation related to this letter where the Government took

19   half of this sentence, ignored the part about how the

20   waterfall works in the partnership agreement, but took half of

21   the sentence to try to allege that this is some sort of

22   confession.

23        THE COURT:  Both of you are focused on the language

24   of the indictment.  Do you think that the way to resolve this

25   issue is to parse the indictment.  I mean, I would think the

Proceedings                                    447

1   grand jury charges the conspiracy over a period of time.  The

2   grand jury isn't saying necessarily the conspiracy ended on

3   such and such a date.  That's not a finding I think the grand

4   jury would have to make.

5           But on the other hand I think I have to

6   independently find that this was during the course of the

7   conspiracy.  I'm just confused by both sides talking about

8   what the grand jury found, but if you all think it's

9   dispositive I want to know it.

10          MR. DEARINGTON:  Your Honor, I was getting there in

11  a long-winded way, but there's ten days left that I haven't

12  heard the Government say about what happened at the end of the

13  conspiracy.  To Your Honor's point, it has to be in

14  furtherance of the alleged conspiracy and Your Honor hit it

15  right on the head earlier:  What the Government is describing

16  as some sort of admission that there was a return of capital

17  in this letter, they can't have it both ways and say that that

18  is misleading in the support of a conspiracy to hide that very

19  fact from investors.

20          So while this is a clever ex post facto argument to

21  try to get this in against Mr. Schneider, it doesn't come

22  close to the preponderance standard and I haven't heard a

23  reason on how it does.

24          THE COURT:  So I am not really getting it.  I

25  appreciate the arguments, but I'm not seeing that this is in

Proceedings                                          448

1   furtherance of the conspiracy.  So I think the proper thing to

2   do is just give a limiting instruction that this is coming in

3   as to the author of the letter who is Mr. Gentile.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                              449

1    (continuing.)

2              MR. DEARINGTON:  So the instruction would also

3    say, and not against Mr. Schneider, just so the jury's clear

4    on that?

5              THE COURT:  I will figure out what it will say.

6    It will say only Mr. Gentile or it will say Mr. Gentile and

7    not Mr. Schneider.  We'll find some common text and we'll

8    use that.

9              MR. DEARINGTON:  Understood.  Thank you, Your

10   Honor.

11             THE COURT:  It seems like the most common issue

12   that's coming up is this issue of co-conspirator statements

13   or statements as an agent.

14             Are you anticipating -- I guess we've got a couple

15   days before we're back, so we don't necessarily need to talk

16   about it right now, but it would be lovely if we were

17   thinking there are going to be other exhibits like this that

18   are authored by one person and there is a dispute about

19   whether they are in furtherance of the conspiracy or other

20   evidentiary issues you can foresee with your next couple of

21   witnesses, I would be happy to set up a time to do that

22   before we are with the jury on Tuesday afternoon.

23             MR. AXELROD:  Your Honor, I do think there are

24   going to be more statements, that we believe are admissible

25   for the effect on listener principally and of course we have

*Proceedings*                                                          450

1    other theories.  That's definitely the case.

2           In terms of documents that we think are

3    co-conspirator statements like this, I'm not thinking --

4    it's not immediately apparent to me that there's something

5    quite like this document in December 2018.

6           THE COURT:  Okay.

7           MR. AXELROD:  But we'll go back and put our heads

8    together.  The same issue with effect on the listener, yes,

9    I think that that's going to carry.

10          THE COURT:  All right.  Anything else you want to

11   take up?

12          MR. DEARINGTON:  Yes, Your Honor, briefly.

13          I think our request that we provide that the

14   Government not only provide 48 hours at least of notice to

15   the identity of the witnesses coming up but also exhibits

16   remains with a little lack of clarity.  I think it's worked

17   really well.  We still have a few kinks so far as making

18   sure the Court is aware of the documents that the Government

19   may not see issues with the way that they're looking at

20   them, but clearly there is a great gulf here.

21          A great example is that 2018 letter we just talked

22   about.  I think it's worked really well.  I think it can

23   work even better if the parties can work together with a bit

24   a notice on the exhibits and which ones they're expecting to

25   introduce in the next couple days so that we can meet and

*Proceedings*                                                              451

 1   confer about that and raise it with the Court ahead of time.

 2          THE COURT:  Can we figure something out about

 3   that?  It does feel like if we don't have that, we are just

 4   going to be wasting a lot of time.

 5          MR. AXELROD:  Your Honor, would this be a

 6   reciprocal obligation?

 7          THE COURT:  Yes.

 8          MR. McCONNELL:  We will get together.

 9          MR. DEARINGTON:  That would be reciprocal for our

10   case-in-chief.

11          THE COURT:  I think if you all are anticipating,

12   with the Government's witnesses, you are going to show them

13   exhibits, why would it not be reciprocal.

14          MR. DEARINGTON:  You mean reciprocal?

15          THE COURT:  I think they're thinking they're going

16   to put in exhibits through Government witnesses, but you are

17   also going to put in witnesses, exhibits through Government

18   witnesses and they are asking for reciprocity on that.

19          MR. DEARINGTON:  Just as an initial matter, if the

20   Government provides exhibits at 10:00 p.m. like the other

21   night or 9:00 p.m., it's hard for us to say, okay, let's

22   look at all of these exhibits and decide what we're going to

23   put in and give them notice short of 5:00 in the morning.

24          So I think if we have a lot of notice, and I don't

25   want to speak for Mr. Gentile's Counsel either, then I

*Proceedings*                                                          452

1    think --

2           THE COURT:  All right.  I am hoping you all can

3    figure something out.  I take the Government's point that if

4    the point is to flag evidentiary issues in advance about the

5    exhibits, they need to know your exhibits, too.

6           MR. AXELROD:  Your Honor, we'll discuss.

7           THE COURT:  Okay, great.

8           I really hope that you can work something out.  I

9    just think it's better for everybody if we can talk about

10   these things outside the presence of the jury.  There is no

11   way I can rule on something like this, just getting handed

12   document on a five-minute break.  So please help me to get

13   to somewhere where we can talk about it in a rational way.

14          MR. AXELROD:  Understood, Your Honor.  We are

15   obviously still working out the kinks, but we'll get it

16   together.

17          THE COURT:  Great.  Appreciate it.

18          So we are back on Tuesday in the afternoon.  So

19   great.  And anything else?

20          Was that?

21          MR. COLTON:  That was a one o'clock.

22          THE COURT:  Great.  Have a nice weekend.

23   (Matter adjourned to Tuesday, June 18, 2024, 1 o'clock p.m.)

24               *         *         *         *

25

453

1                          **I N D E X**

2

3    **WITNESS**                                          **PAGE**

4    MARVIN JONES

5        (CTD) DIRECT EXAMINATION BY MR. McCONNELL      248

6        CROSS-EXAMINATION BY MR. COLTON                263

7        CROSS-EXAMINATION BY MR. COGAN                 330

8        REDIRECT EXAMINATION BY MR. McCONNELL          359

9        RECROSS-EXAMINATION BY MR. COLTON              373

10       RECROSS-EXAMINATION BY MR. COGAN               378

11

12   **JAY MICHAEL FREDERICK**

13       DIRECT EXAMINATION BY MR. McCONNELL            385

14

15

16

17

18

19

20

21

22

23

24

25

454

1                          **E X H I B I T S**

2

3    Government Exhibit 8205                    250

     Government Exhibit 1389                    255
4
     Government Exhibit QQQQI                   268
5
     Government Exhibit 2042                    293
6
     Government Exhibit 2051                    300
7
     Defendant Exhibit D-I                     319
8
     Defendant Exhibit D-S                     321
9
     Government Exhibit 2125                    350
10
     Government Exhibit 1443                    393
11
     Government Exhibit 8189                    412
12
     Government Exhibit 8189-A                  413
13
     Government Exhibit 8190                    430
14
     Government Exhibit 1440                    432
15

16

17

18

19

20

21

22

23

24

25

## $

**$1,050,000** [1] - 362:18
**$10** [6] - 283:8, 397:6, 401:11, 424:16, 424:24
**$100** [1] - 397:5
**$100,000** [1] - 423:19
**$150,000** [8] - 265:13, 302:11, 302:13, 303:8, 303:10, 320:9, 347:6, 377:9
**$20** [1] - 283:9
**$385** [1] - 434:20
**$4,729,096** [1] - 353:22
**$5,056,000** [1] - 297:8
**$5,091,918** [1] - 353:22
**$870,000** [1] - 401:13

## '

**'08** [1] - 317:7
**'09** [1] - 317:7
**'15** [3] - 312:13, 335:15, 349:25
**'16** [4] - 299:7, 312:13, 335:15, 335:16

## 0

**0.7** [1] - 429:1
**0.73** [1] - 428:24

## 1

**1** [6] - 246:9, 338:14, 395:9, 397:10, 398:12, 452:23
**1,050** [1] - 362:20
**1.23** [1] - 429:2
**1.5** [1] - 401:12
**10** [8] - 301:2, 331:25, 370:20, 371:10, 396:2, 397:6, 420:17, 420:23
**100** [3] - 285:12, 336:10, 386:14
**10019** [1] - 246:3
**10022** [1] - 245:19
**10:00** [1] - 451:20
**10:30** [1] - 245:7
**11** [1] - 277:9
**11201** [1] - 245:15
**118** [1] - 258:24
**12** [3] - 300:19, 364:2, 428:25
**12:25** [1] - 315:11
**13** [5] - 245:6, 267:22, 269:14, 269:16, 325:13
**1301** [1] - 246:2
**131,036** [1] - 321:20
**1334** [1] - 310:9
**1389** [4] - 254:21, 255:8, 255:10, 454:3
**139** [1] - 250:2
**1390** [3] - 248:11, 248:17, 249:11
**1391** [1] - 303:1
**1398** [2] - 369:3, 376:11
**14** [6] - 255:1, 268:3, 296:15, 297:10, 326:6, 369:3
**14,339,000** [1] - 294:22
**14.3** [2] - 294:13, 294:19
**1410** [1] - 302:3

**1434** [8] - 307:10, 307:25, 311:14, 363:14, 364:17, 419:25, 420:2, 420:5
**1435** [6] - 311:25, 312:8, 312:15, 313:4, 425:15, 425:18
**1438** [7] - 313:23, 366:22, 368:8, 375:9, 375:22, 428:4, 428:16
**1440** [4] - 423:5, 432:16, 432:19, 454:14
**1443** [6] - 393:7, 393:10, 393:17, 393:19, 394:5, 454:10
**148,830** [2] - 320:15, 321:17
**15** [10] - 308:13, 348:2, 359:18, 360:10, 362:5, 401:10, 402:7, 402:10, 427:14, 435:3
**15-plus** [4] - 401:5, 403:24, 427:9, 434:20
**150** [2] - 377:16
**150,000** [2] - 376:22, 377:12
**15th** [1] - 248:22
**16** [1] - 296:14
**16,115,000** [1] - 296:13
**17** [4] - 250:24, 308:14, 348:2, 360:11
**1717** [1] - 246:6
**17th** [4] - 249:10, 256:1, 256:8, 365:19
**18** [7] - 359:18, 402:7, 402:11, 424:2, 424:17, 427:14, 452:23
**188** [1] - 331:5
**1900** [1] - 245:23
**19th** [1] - 245:23
**1:45** [3] - 327:20, 329:12, 330:2
**1st** [1] - 391:13

## 2

**2** [11] - 307:18, 338:14, 348:24, 396:25, 398:14, 433:19, 433:20, 433:22, 434:1, 434:5, 439:5
**2,424,000** [1] - 296:11
**2.1** [1] - 406:9
**20** [7] - 264:19, 267:18, 267:20, 281:21, 326:8, 381:5, 402:11
**2000** [1] - 312:4
**20006** [1] - 246:6
**2001** [1] - 385:17
**2006** [1] - 326:17
**2008** [3] - 364:3, 364:9, 391:2
**2009** [3] - 364:3, 364:9, 391:2
**201** [1] - 245:22
**2013** [1] - 324:22
**2014** [4] - 429:1, 429:5, 439:21
**2015** [20] - 254:12, 312:9, 313:14, 334:20, 335:6, 350:3, 352:14, 353:21, 356:5, 359:24, 362:18, 373:20, 373:21, 374:10, 374:11, 391:13, 397:10, 427:22, 441:1, 442:22
**2016** [32] - 254:12, 262:11, 265:15, 271:3, 286:8, 287:6, 294:5, 294:22, 312:4, 312:10, 312:12, 315:3, 319:13, 330:18, 333:2, 335:13, 335:18, 335:19, 335:22, 336:1, 336:19, 346:15, 349:16, 351:13, 362:21, 374:12, 374:13, 378:7, 406:3, 427:8,

430:22, 432:24
**2017** [6] - 251:22, 252:23, 300:1, 312:6, 321:9, 443:24
**2018** [34] - 248:7, 248:22, 249:10, 250:24, 252:11, 255:1, 255:16, 258:12, 315:4, 346:17, 365:19, 370:11, 381:6, 438:7, 439:20, 440:3, 440:16, 440:24, 441:1, 441:6, 442:7, 442:13, 442:16, 442:20, 443:17, 444:8, 444:13, 444:22, 444:23, 445:17, 446:3, 446:15, 450:5, 450:21
**2019** [6] - 287:17, 287:20, 444:20, 444:23, 445:18, 446:9
**2024** [2] - 245:6, 452:23
**2042** [4] - 293:5, 293:18, 293:22, 454:5
**2051** [4] - 299:24, 300:12, 300:16, 454:6
**20th** [1] - 441:2
**21** [5] - 258:25, 259:3, 331:5, 342:12, 369:17
**21-CR-54(RPK** [1] - 245:3
**2125** [3] - 349:24, 350:8, 454:9
**24** [3] - 280:17, 337:1, 348:23
**248** [1] - 453:5
**250** [1] - 454:2
**255** [1] - 454:3
**26** [4] - 285:19, 342:11, 378:25, 379:1
**2600** [1] - 246:9
**263** [1] - 453:6
**268** [1] - 454:4
**26th** [1] - 286:8
**27,441,000** [2] - 300:24, 301:8
**27,957,000** [2] - 301:5, 301:7
**271-A** [1] - 245:14
**27th** [1] - 286:8
**29** [5] - 283:16, 325:8, 325:13, 326:6, 326:7
**293** [1] - 454:5
**29th** [1] - 432:23

## 3

**3** [3] - 298:19, 301:15, 348:25
**3,339,375** [2] - 352:24, 353:21
**3.73** [1] - 429:7
**30** [3] - 271:3, 281:21, 282:8
**300** [1] - 454:6
**300,000** [1] - 377:16
**30th** [2] - 262:11, 273:15
**31** [2] - 294:5, 362:18
**319** [1] - 454:7
**321** [1] - 454:8
**330** [1] - 453:7
**33131** [2] - 245:23, 246:9
**339** [1] - 294:19
**35** [1] - 304:25
**350** [1] - 454:9
**3500-MJ-1** [1] - 289:4
**359** [1] - 453:8
**373** [1] - 453:9
**378** [1] - 453:10
**385** [1] - 453:13

2

**393** [1] - 454:10
**3rd** [1] - 246:9

**4**

**4** [1] - 309:22
**4,729,096** [1] - 353:4, 356:10
**40** [1] - 257:15
**412** [1] - 454:11
**413** [1] - 454:12
**42nd** [1] - 246:3
**430** [1] - 454:13
**432** [1] - 454:14
**46** [2] - 366:1, 366:3
**48** [3] - 304:11, 304:17, 450:14
**4th** [1] - 430:22

**5**

**5** [4] - 265:21, 298:18, 351:13, 355:1
**5.4** [1] - 276:15
**50** [2] - 283:14, 377:17, 377:20, 377:21
**5:00** [1] - 451:23

**6**

**6** [3] - 271:6, 279:23, 421:18
**60** [1] - 386:10
**63** [2] - 273:2, 273:3
**65** [1] - 324:19
**6th** [1] - 245:19

**7**

**7** [8] - 271:5, 271:16, 271:17, 294:24, 351:23, 390:12, 390:19, 420:12
**7.5** [1] - 427:7
**70.6** [1] - 357:1
**75** [2] - 351:5, 357:7

**8**

**8** [1] - 423:13
**8.7** [60] - 253:23, 260:21, 260:24, 261:10, 344:16, 345:3, 345:6, 345:8, 345:9, 346:9, 346:12, 346:14, 347:20, 347:23, 348:3, 360:8, 361:25, 365:8, 367:23, 368:7, 368:11, 368:22, 369:20, 370:2, 379:12, 392:1, 399:17, 400:3, 400:8, 400:19, 401:3, 402:8, 402:10, 403:21, 403:22, 404:4, 404:25, 405:3, 405:11, 415:14, 415:21, 415:24, 417:18, 418:1, 419:14, 421:22, 422:24, 423:6, 423:10, 423:23, 427:10, 428:2, 428:25, 429:11, 429:16, 429:21, 431:18, 431:24, 435:9
**800** [1] - 245:19
**8030** [1] - 381:3
**81** [1] - 276:15
**8185-C** [1] - 371:20
**8189** [4] - 411:19, 412:6, 412:9, 454:11
**8189-A** [5] - 411:19, 413:2, 413:12,

413:19, 454:12
**8190** [5] - 430:2, 430:5, 430:16, 430:21, 454:13
**8205** [6] - 250:3, 250:12, 250:16, 254:4, 365:17, 454:2
**8258** [3] - 304:11, 304:17, 378:24
**8258-B** [1] - 258:14, 272:24, 276:14, 279:24, 280:18, 283:16, 342:7, 365:25, 369:16, 372:14, 378:25
**85** [3] - 434:21, 434:23, 435:1
**87** [1] - 273:19
**89** [1] - 331:7

**9**

**9** [4] - 293:16, 363:15, 364:17
**9.2** [1] - 273:19
**9:00** [1] - 451:21

**A**

**a.m** [1] - 245:7
**ability** [2] - 344:8, 365:1
**able** [17] - 259:20, 262:3, 268:19, 268:22, 283:20, 286:11, 328:14, 343:8, 344:13, 346:10, 352:9, 370:5, 374:20, 383:21, 408:6, 431:19, 434:10
**absolutely** [14] - 261:5, 261:20, 262:18, 289:11, 310:7, 311:7, 311:10, 325:25, 331:24, 333:17, 354:14, 371:16, 417:20, 419:6
**Absolutely** [1] - 374:2
**accelerate** [2] - 297:25, 361:22
**accelerated** [1] - 357:13
**access** [1] - 252:16
**accessing** [1] - 430:8
**accompanied** [1] - 321:9
**accomplish** [1] - 338:10
**accordance** [2] - 382:15, 439:11
**according** [2] - 371:25, 383:4
**account** [25] - 248:17, 248:21, 249:12, 251:2, 253:17, 254:24, 255:2, 255:25, 256:14, 257:1, 265:25, 301:23, 302:1, 303:4, 318:9, 318:18, 320:15, 320:17, 321:16, 321:19, 321:24, 334:13, 369:2, 369:7, 370:11
**accountant** [1] - 254:13
**accounting** [12] - 298:2, 322:17, 351:2, 406:24, 408:5, 410:7, 410:15, 410:17, 410:24, 411:3, 436:6
**accredited** [1] - 423:22
**accurate** [1] - 436:9
**achieve** [5] - 280:2, 396:20, 405:17, 417:23, 421:8
**acknowledged** [2] - 332:10, 363:19
**acquire** [4] - 260:2, 343:15, 344:3, 396:18
**acquired** [1] - 274:18, 338:9, 396:19, 443:19, 443:21, 443:23
**acquires** [1] - 274:10
**acquiring** [3] - 253:24, 259:18, 343:2

**acquisition** [8] - 333:13, 344:14, 424:3, 427:4, 439:25, 440:1, 444:6, 445:16
**acquisitions** [11] - 260:3, 284:3, 284:4, 331:20, 343:16, 344:4, 344:20, 345:23, 354:1, 425:25, 433:9
**acted** [1] - 443:6
**action** [2] - 443:5, 444:21
**activities** [1] - 399:25
**actual** [1] - 298:3
**add** [5] - 252:6, 277:21, 371:14, 384:7, 411:7
**adding** [1] - 354:3
**addition** [5] - 263:24, 396:13, 403:20, 419:22, 435:10
**additional** [13] - 292:4, 306:24, 338:17, 340:14, 342:18, 368:25, 390:23, 397:8, 403:25, 404:22, 423:11, 429:8, 429:18
**Additionally** [1] - 254:7
**address** [5] - 255:4, 321:4, 321:13, 383:10, 394:6
**addressed** [1] - 432:11
**adjourned** [1] - 452:23
**adjustments** [1] - 304:25
**administration** [1] - 386:4
**admissible** [3] - 381:10, 438:3, 449:24
**admission** [3] - 381:22, 383:4, 447:16
**admit** [2] - 382:8, 440:11
**admitted** [12] - 250:14, 255:9, 268:15, 274:5, 274:9, 289:5, 319:18, 350:7, 393:18, 393:24, 412:8, 413:13
**Admitted** [5] - 293:21, 300:15, 430:18, 430:20, 432:18
**ADRIANA** [1] - 245:24
**advance** [2] - 382:23, 452:4
**advantage** [1] - 298:3
**adversely** [1] - 281:3
**advisers** [2] - 286:13, 286:18
**Advisor** [4] - 263:25, 264:4, 264:14, 264:16
**advisor** [14] - 258:22, 264:13, 266:11, 286:12, 385:12, 385:19, 386:5, 386:13, 387:2, 387:10, 390:9, 390:10, 390:17, 420:18
**advisors** [2] - 387:9, 420:15
**advisory** [1] - 351:2
**affect** [1] - 281:3
**affected** [2] - 309:19, 405:10
**affirm** [1] - 384:17
**affirmed** [1] - 290:8
**afford** [1] - 308:2
**afternoon** [5] - 330:11, 385:7, 385:8, 449:22, 452:18
**afterwards** [1] - 292:2
**agency** [2] - 393:23, 401:19
**agenda** [7] - 371:17, 371:25, 412:19, 412:24, 413:7, 413:22, 418:20
**agent** [2] - 288:24, 449:13
**aging** [1] - 395:23
**ago** [4] - 288:23, 375:11, 378:6, 391:19

3

**agree** [22] - 265:24, 266:13, 266:18, 281:19, 282:3, 296:14, 298:13, 301:7, 311:4, 311:12, 312:23, 323:10, 339:16, 343:19, 355:13, 356:16, 358:2, 375:21, 375:25, 394:21, 446:1
**agreed** [1] - 358:17
**agreeing** [1] - 372:18
**Agreement** [6] - 270:10, 273:3, 273:11, 273:19, 276:12, 276:17
**agreement** [13] - 267:5, 269:18, 270:12, 270:21, 270:22, 274:22, 372:7, 373:10, 373:14, 398:25, 416:9, 446:20
**agreements** [2] - 362:15, 369:14
**agrees** [2] - 269:17, 271:25
**ahead** [13] - 263:8, 267:11, 269:12, 291:2, 293:24, 303:2, 316:1, 325:17, 330:7, 342:14, 364:7, 402:24, 451:1
**Aided** [1] - 246:15
**alert** [1] - 315:12
**ALEXANDRIA** [1] - 245:21
**aligned** [1] - 260:13
**allegation** [1] - 446:18
**allege** [2] - 440:17, 446:21
**alleged** [2] - 408:20, 447:14
**allow** [3] - 345:5, 365:14, 408:23
**alluded** [1] - 401:18
**alluding** [1] - 401:25
**almost** [1] - 428:2
**Almost** [1] - 428:3
**alone** [1] - 309:3
**altered** [1] - 357:14
**alternative** [2] - 266:5, 266:12
**AMERICA** [1] - 245:3
**American** [1] - 326:18
**Americas** [1] - 246:2
**amount** [33] - 249:1, 249:6, 255:18, 259:23, 260:2, 262:2, 280:4, 296:8, 309:14, 309:19, 314:22, 315:7, 320:11, 338:10, 343:11, 343:14, 344:2, 344:19, 345:22, 357:22, 359:25, 361:5, 361:14, 362:16, 362:17, 367:12, 370:8, 376:22, 397:4, 406:7, 425:10, 425:12, 440:5
**amounts** [2] - 260:1, 343:13
**analysis** [2] - 416:17, 443:6
**Andy** [14] - 331:4, 336:25, 337:17, 342:6, 342:11, 348:22, 348:23, 349:23, 350:11, 350:18, 351:8, 351:22, 353:2, 358:8
**Ann** [1] - 246:12
**announce** [2] - 431:9, 431:22
**announcement** [1] - 439:6
**annual** [11] - 300:2, 300:5, 300:9, 312:10, 313:1, 392:12, 392:13, 400:9, 400:20, 416:12, 421:22
**annualized** [1] - 368:21
**annually** [2] - 399:17, 415:14
**answer** [20] - 253:5, 257:13, 257:20, 261:14, 326:3, 326:16, 331:19, 332:24, 334:9, 335:10, 345:4, 354:21,

355:11, 357:23, 364:8, 378:17, 392:22, 404:14, 411:7, 440:22
**Answer** [5] - 326:19, 327:2, 331:24, 332:3, 332:6
**answer's** [1] - 277:24
**answered** [1] - 323:7
**answering** [1] - 410:3
**answers** [1] - 323:6
**anticipating** [2] - 449:14, 451:11
**anticlimactic** [1] - 357:5
**anyway** [1] - 384:3
**APEKSHA** [1] - 246:4
**apologies** [2] - 271:6, 317:9
**apologize** [10] - 271:13, 273:6, 288:5, 288:8, 304:15, 306:13, 325:11, 326:2, 351:8, 382:13
**apparent** [1] - 450:4
**appeal** [1] - 391:23
**appealing** [1] - 422:10
**appearances** [1] - 246:19
**appeared** [1] - 253:25
**appearing** [1] - 439:9
**Apple** [1] - 387:24
**applicable** [1] - 305:1
**applies** [1] - 274:22
**apply** [1] - 383:1
**appreciate** [4] - 322:23, 339:23, 373:6, 447:25
**Appreciate** [1] - 452:17
**approach** [5] - 267:25, 289:8, 372:10, 407:7, 442:10
**approval** [1] - 253:14
**approved** [2] - 399:5, 399:9
**April** [1] - 362:21
**area** [1] - 317:22
**areas** [1] - 282:21
**ARENTFOX** [2] - 246:2, 246:5
**argue** [1] - 440:9
**argument** [2] - 446:11, 447:20
**arguments** [1] - 447:25
**arisen** [1] - 442:13
**Arkansas** [4] - 324:22, 326:20, 385:10, 386:22
**arrive** [1] - 352:18
**articulated** [1] - 442:2
**ARTIE** [1] - 245:15
**Ascendant** [16] - 288:11, 336:7, 336:13, 391:15, 404:20, 411:13, 411:14, 412:16, 414:8, 414:10, 414:13, 418:15, 418:19, 429:23, 432:14, 433:13
**ascendantCap.com** [1] - 394:10
**aside** [2] - 424:12, 425:10
**aspects** [1] - 392:14
**aspirational** [1] - 311:21
**asset** [1] - 264:19
**assets** [4] - 282:23, 298:19, 346:10, 436:3
**Assistant** [1] - 245:17
**associated** [3] - 275:25, 279:20, 427:5

**associations** [1] - 304:22
**assumed** [3] - 333:23, 334:12, 334:15
**assumes** [1] - 371:4
**assumption** [1] - 334:19
**assurance** [11] - 259:11, 259:17, 259:20, 280:2, 308:12, 342:13, 342:23, 361:24, 362:3, 370:5, 400:11
**assurances** [1] - 343:8
**assure** [2] - 247:10, 335:3
**assured** [2] - 253:23, 258:4
**attached** [2] - 273:12, 412:19
**attachment** [1] - 413:3
**attempt** [2] - 291:14, 382:1
**attend** [4] - 286:11, 406:17, 412:14, 414:4
**attended** [4] - 286:8, 291:6, 330:19, 335:19, 335:23, 336:19, 405:25, 406:13, 411:6, 411:10, 414:3, 415:19, 429:24, 432:24
**attendees** [1] - 286:18
**attending** [2] - 411:25, 419:22
**attention** [6] - 251:15, 259:8, 286:7, 287:1, 352:7, 446:4
**attorney** [2] - 306:18, 328:13
**Attorney** [2] - 245:13, 287:8
**attorneys** [2] - 359:8, 367:3, 410:4
**Attorneys** [1] - 245:17
**attractive** [5] - 392:4, 392:12, 392:15, 398:22, 399:5
**audience** [8] - 288:13, 332:11, 332:21, 333:5, 335:6, 336:10, 336:13, 337:24
**audited** [34] - 251:22, 252:24, 252:25, 253:1, 253:9, 253:14, 254:1, 299:7, 299:8, 299:15, 299:16, 348:7, 349:11, 349:18, 349:19, 350:2, 350:13, 350:15, 351:12, 351:18, 352:1, 354:11, 354:14, 356:18, 359:21, 374:10, 374:16, 397:18, 397:24, 398:3, 435:16, 435:20, 436:4, 436:11
**auditor's** [1] - 350:22
**auditors** [3] - 350:14, 350:24, 397:24
**August** [10] - 248:17, 248:22, 249:10, 250:24, 253:17, 253:18, 256:1, 256:8, 365:19, 370:11
**Austin** [11] - 330:20, 333:2, 335:14, 335:19, 336:3, 348:8, 378:7, 411:6, 429:24, 430:24, 432:25
**author** [1] - 448:3
**authored** [1] - 449:18
**Auto** [20] - 267:2, 267:5, 279:3, 283:11, 284:16, 288:18, 291:21, 294:3, 295:6, 296:2, 296:4, 300:1, 307:14, 314:7, 319:11, 321:10, 350:24, 370:18, 377:1, 395:8
**auto** [12] - 270:14, 290:6, 294:21, 296:2, 317:5, 317:23, 332:12, 351:16, 352:14, 352:17, 356:5, 364:10
**automobile** [2] - 363:25, 364:2
**Automotive** [19] - 253:19, 256:13, 258:8, 260:12, 265:14, 350:3, 359:15,

4

372:3, 398:19, 405:21, 415:7, 416:2, 419:4, 420:6, 423:5, 429:10, 429:15, 435:17, 439:15

**automotive** [19] - 288:21, 288:22, 291:12, 293:7, 331:18, 398:8, 398:22, 402:13, 406:2, 406:5, 406:8, 406:10, 426:3, 427:24, 428:20, 434:7, 435:7, 438:5, 438:7

**autonomy** [1] - 348:4

**available** [9] - 249:21, 260:2, 301:18, 301:20, 343:15, 344:3, 388:21, 388:22, 420:9

**Avenue** [3] - 245:19, 246:2, 246:9

**average** [1] - 364:1

**avoid** [2] - 280:2, 346:11

**aware** [8] - 279:5, 306:8, 353:10, 353:14, 371:8, 402:13, 410:6, 450:18

**AXELROD** [28] - 245:16, 382:13, 383:9, 436:23, 437:24, 439:2, 440:15, 440:21, 441:5, 441:9, 441:19, 442:12, 443:12, 443:15, 444:1, 444:3, 444:10, 444:19, 445:4, 445:7, 445:10, 446:1, 446:11, 449:23, 450:7, 451:5, 452:6, 452:14

**axiom** [1] - 279:15

## B

**Bachelor's** [1] - 386:3

**back-dated** [1] - 363:3

**background** [7] - 386:2, 388:21, 388:22, 406:24, 408:5, 408:22, 410:7

**backgrounds** [4] - 410:18, 410:25, 411:4, 411:9

**bad** [1] - 269:1

**BADELL** [2] - 245:24, 357:4

**Baking** [1] - 326:18

**balance** [2] - 362:20, 436:2

**bank** [4] - 265:25, 391:1, 392:7, 431:17

**bankrupt** [1] - 399:2

**banks** [3] - 364:5, 364:9, 364:10

**bare** [1] - 440:10

**barriers** [2] - 396:3, 396:6

**Based** [1] - 308:11

**based** [27] - 266:10, 296:22, 298:13, 301:10, 315:2, 340:22, 354:10, 386:22, 397:9, 400:6, 400:19, 400:22, 402:17, 403:15, 403:17, 404:8, 404:16, 415:18, 417:10, 423:4, 423:22, 423:25, 429:9, 439:7, 439:24, 444:23, 444:24

**basis** [5] - 345:10, 347:13, 382:11, 399:14, 422:3

**Bates** [16] - 249:17, 250:20, 251:9, 251:13, 254:5, 259:2, 259:5, 271:11, 358:25, 394:3, 395:12, 414:15, 421:19, 428:6, 432:2, 433:18

**become** [1] - 383:24

**BEFORE** [1] - 245:10

**begin** [2] - 429:1, 430:8

**Beginning** [1] - 321:16

**beginning** [5] - 265:14, 347:7, 439:21, 445:11

**begins** [4] - 444:4, 444:19, 445:15

**behalf** [1] - 381:8

**below** [5] - 277:15, 310:18, 352:16, 357:7, 431:2

**Below** [1] - 433:12

**beneficial** [1] - 411:8

**best** [4] - 247:13, 387:22, 443:5, 444:21

**better** [6] - 283:22, 298:8, 357:10, 417:12, 450:23, 452:9

**between** [11] - 270:12, 303:15, 303:25, 304:5, 305:5, 322:17, 360:10, 383:16, 414:10, 435:20, 441:1

**bidder** [1] - 399:8

**big** [2] - 335:4, 446:4

**BINHAK** [2] - 246:8, 246:10

**Biscayne** [1] - 245:22

**bit** [9] - 328:18, 328:20, 351:24, 385:18, 386:1, 387:13, 400:24, 436:16, 450:23

**block** [1] - 251:9

**blow** [16] - 283:18, 294:1, 294:25, 302:3, 304:12, 319:5, 320:3, 342:12, 350:18, 351:10, 351:23, 358:8, 366:5, 369:4, 375:13, 379:1

**blown** [4] - 307:20, 313:8, 353:3

**blown-up** [1] - 313:8

**bold** [8] - 273:20, 276:18, 277:10, 280:19, 284:1, 296:12, 298:11, 313:19

**bolded** [1] - 280:23

**bond** [4] - 266:2, 266:19, 266:20, 267:3

**bonds** [2] - 392:7, 392:9

**borrow** [2] - 282:25, 283:8

**borrowing** [2] - 284:7, 284:9

**bottom** [22] - 259:1, 267:18, 267:19, 271:10, 271:17, 273:2, 277:10, 297:6, 304:12, 309:23, 310:2, 312:21, 314:9, 320:2, 321:12, 348:24, 427:15, 439:5, 439:16, 444:4, 445:11, 446:6

**bought** [5] - 276:2, 281:18, 281:22, 354:10, 434:2

**Boulevard** [1] - 245:22

**bound** [1] - 270:21

**box** [2] - 320:2, 321:13

**Bradbury** [1] - 324:24

**brand** [1] - 317:20

**break** [17] - 291:11, 315:24, 315:25, 327:19, 328:18, 329:1, 329:5, 329:8, 364:13, 380:5, 380:11, 382:20, 431:10, 434:8, 435:25, 436:15, 452:12

**breakdown** [1] - 306:11

**BREON** [1] - 245:13

**brief** [1] - 373:6

**briefly** [5] - 265:23, 353:1, 395:16, 435:19, 450:12

**bring** [5] - 330:3, 337:1, 349:23, 371:17, 396:15

**brings** [1] - 395:19

**broader** [1] - 445:8

**brochure** [1] - 379:11

**broken** [1] - 399:17

**broker/dealer** [1] - 390:13

**broker/dealers** [1] - 390:14

**Brooklyn** [2] - 245:5, 245:15

**brought** [1] - 292:1

**Bruton** [1] - 384:8

**bucket** [1] - 424:24

**BUCKLEY** [1] - 245:20

**budget** [3] - 443:4, 444:20, 444:23

**Buick** [1] - 427:6

**build** [1] - 354:2

**building** [1] - 421:15

**built** [1] - 420:21

**bunch** [3] - 272:4, 295:23, 301:23

**buried** [1] - 444:16

**business** [37] - 262:8, 281:16, 281:19, 282:15, 298:18, 308:10, 308:13, 317:5, 317:6, 317:23, 317:24, 318:6, 318:9, 318:14, 318:17, 322:11, 327:8, 331:19, 354:10, 364:14, 364:16, 386:3, 386:21, 387:25, 396:5, 411:9, 416:8, 416:14, 416:25, 417:2, 417:10, 418:2, 421:15, 424:11, 424:16, 424:21, 434:15

**businesses** [14] - 281:22, 295:13, 295:15, 299:14, 316:19, 317:2, 318:1, 397:13, 397:15, 401:1, 415:9, 421:16, 424:10, 433:25

**busy** [1] - 433:9

**buy** [12] - 283:9, 298:17, 308:12, 308:20, 317:10, 317:11, 318:2, 399:6, 414:12, 417:9, 417:22, 431:19

**buyer** [9] - 365:6, 365:7, 399:5, 399:8, 399:11, 416:8, 424:18, 425:5, 434:15

**buying** [7] - 392:7, 395:22, 396:9, 410:13, 421:16, 431:15, 433:10

**buys** [1] - 426:1

**BY** [37] - 245:15, 245:20, 245:24, 246:4, 246:7, 246:10, 246:12, 248:3, 263:10, 279:1, 291:5, 310:1, 316:3, 319:3, 319:21, 322:22, 325:18, 330:10, 331:11, 342:1, 359:6, 361:2, 373:5, 378:4, 385:6, 402:5, 403:14, 405:8, 412:13, 427:2, 453:5, 453:6, 453:7, 453:8, 453:9, 453:10, 453:13

## C

**Cadman** [1] - 245:14

**calamitous** [1] - 391:3

**calculate** [3] - 316:20, 353:16, 377:11

**calculated** [2] - 313:10, 377:12

**calculation** [4] - 314:20, 314:21, 355:18, 357:18

**calculations** [1] - 356:16

**calculator** [2] - 356:23, 356:25

**calculus** [1] - 269:6

**camera** [1] - 356:1

**candidly** [2] - 269:2, 336:13

**candor** [1] - 335:8

**cannot** [3] - 346:7, 381:22, 383:5

**capable** [1] - 275:17
**Capital** [38] - 264:1, 264:4, 264:10, 271:25, 282:12, 286:24, 288:11, 320:6, 324:11, 324:12, 324:13, 325:20, 325:22, 326:1, 327:2, 327:4, 347:14, 386:7, 391:9, 391:11, 391:14, 391:15, 392:25, 398:2, 406:21, 411:13, 411:14, 412:16, 414:8, 414:10, 414:13, 418:16, 418:19, 428:18, 429:23, 432:14, 433:13, 435:14
**capital** [99] - 249:6, 249:21, 252:8, 260:1, 260:2, 260:6, 260:19, 260:20, 260:21, 260:23, 261:3, 261:4, 261:11, 261:18, 276:18, 276:19, 276:25, 284:22, 284:24, 285:7, 285:10, 285:15, 285:18, 285:23, 285:24, 285:25, 286:5, 302:8, 302:21, 303:7, 305:18, 305:20, 308:11, 320:15, 320:17, 321:16, 321:19, 321:24, 322:2, 322:5, 322:9, 331:23, 334:1, 343:13, 343:14, 343:21, 343:25, 344:3, 344:7, 344:12, 344:13, 344:17, 344:19, 344:22, 345:2, 345:9, 345:15, 345:21, 345:22, 346:4, 346:6, 346:7, 346:11, 366:12, 367:12, 367:19, 367:21, 368:5, 368:19, 369:5, 369:10, 369:11, 370:12, 370:19, 371:9, 372:3, 373:24, 374:3, 376:15, 377:6, 378:20, 391:16, 405:1, 405:12, 417:24, 419:5, 421:8, 431:14, 434:17, 439:14, 439:15, 441:11, 442:14, 445:12, 445:21, 447:16
**Capital's** [1] - 279:2
**capitals** [2] - 280:19, 280:24
**car** [37] - 317:18, 395:7, 395:8, 395:19, 395:20, 398:24, 398:25, 399:1, 399:18, 400:1, 400:22, 400:25, 401:4, 401:11, 403:22, 415:20, 416:11, 419:15, 419:16, 419:19, 422:16, 422:25, 424:1, 425:3, 426:3, 426:4, 427:22, 429:4, 431:15, 433:10, 433:16, 433:22, 434:11, 434:12, 434:16, 434:19, 435:8
**care** [1] - 434:1
**career** [2] - 263:19, 400:16
**carefully** [5] - 269:18, 272:8, 308:3, 351:19, 443:4
**carries** [1] - 445:18
**carry** [1] - 450:9
**carrying** [1] - 348:25
**cars** [9] - 317:11, 317:20, 364:12, 364:14, 364:15, 395:22, 395:23, 399:23
**case** [19] - 252:17, 292:5, 311:9, 319:11, 324:21, 324:23, 325:1, 329:2, 353:10, 354:24, 378:11, 381:16, 381:19, 383:12, 437:9, 441:10, 441:11, 450:1, 451:10
**case-in-chief** [1] - 451:10
**cases** [1] - 362:15

**cash** [86] - 249:19, 249:20, 258:5, 259:21, 260:15, 262:4, 262:7, 276:9, 281:23, 284:7, 292:16, 292:20, 292:24, 295:9, 295:18, 295:24, 296:2, 296:6, 296:18, 296:21, 297:22, 297:23, 298:3, 298:7, 298:8, 298:14, 301:4, 301:10, 303:20, 309:14, 309:19, 310:20, 311:2, 314:16, 314:21, 314:25, 315:2, 315:6, 317:3, 317:8, 318:6, 334:6, 343:9, 354:25, 361:24, 369:21, 370:6, 376:2, 392:2, 392:11, 396:19, 396:22, 397:2, 399:4, 399:11, 399:18, 399:21, 400:12, 401:1, 401:2, 401:6, 401:7, 401:10, 401:14, 405:3, 415:8, 415:10, 419:15, 419:18, 422:25, 423:22, 424:1, 427:8, 427:12, 427:23, 443:10, 445:13
**cash-on-cash** [6] - 401:6, 401:10, 401:14, 427:8, 427:12, 427:23
**catch** [2] - 394:18, 394:20
**categories** [1] - 436:1
**categorized** [1] - 364:18
**category** [1] - 436:1
**CAUSE** [1] - 245:9
**caused** [1] - 440:2
**caveat** [2] - 250:11, 362:1
**CDs** [1] - 392:7
**centered** [2] - 385:25, 421:4
**central** [1] - 385:10
**centric** [1] - 421:14
**certain** [6] - 255:23, 276:10, 305:24, 338:10, 340:20, 362:16
**certainly** [2] - 252:20, 381:21
**certification** [3] - 271:2, 272:17, 272:21
**certified** [13] - 265:20, 270:8, 270:16, 275:8, 275:14, 276:24, 277:4, 279:21, 285:1, 285:13, 286:3, 309:7, 385:12
**certifies** [1] - 269:17
**certify** [2] - 270:1, 275:11
**CFO** [1] - 291:21
**CFP** [2] - 386:5, 387:10
**challenge** [1] - 440:6
**challenges** [6] - 438:6, 439:3, 444:11, 444:12, 444:14, 445:19
**chance** [1] - 330:15
**change** [11] - 249:6, 368:1, 369:7, 417:10, 439:6, 439:10, 442:18, 442:19, 443:16, 444:24, 446:2
**changed** [3] - 249:1, 249:3, 262:14
**changes** [2] - 269:6, 445:2
**changing** [4] - 399:24, 442:15, 444:15, 446:8
**charge** [2] - 414:13, 440:17
**charged** [5] - 306:3, 383:17, 440:15, 440:24, 441:5
**charges** [1] - 447:1
**chart** [7] - 310:18, 314:24, 368:15, 368:18, 421:20, 429:9, 429:17
**charters** [1] - 365:3
**cheerleading** [5] - 330:23, 332:4, 332:6,

335:2, 335:3
**chief** [1] - 451:10
**Chief** [1] - 253:8
**children** [1] - 385:21
**choose** [1] - 325:23
**chunk** [1] - 433:7
**circuit** [1] - 320:23
**circumstance** [1] - 361:13
**circumstances** [2] - 252:19, 277:15
**civil** [1] - 324:21
**claim** [1] - 253:11
**clarity** [3] - 335:24, 344:11, 450:16
**class** [1] - 420:20
**Class** [10] - 277:14, 280:10, 280:11, 281:5, 420:8, 420:11, 420:14, 420:19
**classified** [1] - 304:22
**clawed** [1] - 340:22
**clear** [22] - 276:24, 282:18, 285:9, 285:12, 291:6, 297:16, 297:23, 305:4, 312:20, 313:4, 326:23, 339:6, 355:19, 370:4, 373:11, 382:25, 402:6, 430:4, 440:8, 440:12, 440:16, 449:3
**clearer** [1] - 335:16
**clearly** [7] - 334:5, 344:11, 348:1, 381:25, 440:8, 441:24, 450:20
**clever** [1] - 447:20
**client** [5] - 324:1, 385:23, 390:24, 406:2, 420:15
**clients** [16] - 385:20, 385:24, 386:8, 386:14, 386:20, 386:22, 386:24, 387:4, 387:7, 390:21, 405:21, 406:4, 406:6, 406:7, 420:12, 424:10
**close** [2] - 295:5, 323:19, 447:22
**closed** [4] - 252:9, 365:13, 434:18, 443:20
**closing** [1] - 433:9
**co** [4] - 383:21, 437:19, 449:12, 450:3
**co-conspirator** [3] - 437:19, 449:12, 450:3
**co-counsel** [1] - 383:21
**coconspirator** [4] - 382:7, 382:19, 382:25, 440:11
**COGAN** [66] - 245:20, 253:3, 254:16, 256:5, 256:9, 256:16, 257:10, 261:12, 328:1, 328:16, 330:8, 330:10, 331:4, 331:8, 331:11, 336:25, 337:17, 342:1, 342:6, 342:11, 348:22, 349:23, 350:5, 350:9, 350:11, 350:18, 351:7, 351:22, 352:11, 352:22, 353:1, 355:5, 355:20, 355:23, 356:12, 357:5, 358:5, 358:7, 358:21, 359:1, 361:8, 377:25, 378:4, 378:23, 379:20, 393:20, 393:23, 398:1, 401:16, 401:22, 401:24, 402:4, 402:21, 403:11, 405:5, 407:3, 408:13, 408:18, 412:7, 412:25, 413:14, 413:16, 430:19, 432:17, 453:7, 453:10
**Cogan** [3] - 330:11, 330:14, 347:25, 359:21, 361:13
**cogan** [1] - 333:1
**Cogan's** [1] - 371:23

6

**cognizant** [1] - 272:12
**coin** [1] - 421:15
**cold** [2] - 398:10, 434:3
**collect** [1] - 396:19
**collected** [1] - 362:20
**college** [3] - 385:17, 385:21, 388:10
**colloquially** [1] - 319:7
**Colton** [6] - 263:13, 295:23, 332:9, 352:5, 353:7, 363:18
**COLTON** [96] - 246:4, 247:8, 256:17, 257:17, 261:6, 261:19, 261:21, 263:2, 263:7, 263:10, 267:7, 267:14, 267:25, 268:12, 268:17, 268:19, 268:21, 268:25, 269:7, 269:11, 271:13, 273:1, 279:1, 279:23, 280:17, 283:16, 285:19, 288:5, 288:8, 289:4, 289:11, 290:4, 290:10, 291:3, 291:5, 293:4, 293:16, 293:23, 294:1, 294:24, 299:23, 300:12, 300:17, 300:19, 301:2, 301:21, 302:1, 302:25, 304:10, 304:17, 307:9, 307:17, 310:1, 312:20, 315:10, 315:15, 315:18, 315:21, 316:2, 316:3, 318:21, 318:25, 319:3, 319:16, 319:21, 320:3, 320:20, 320:23, 322:20, 322:22, 325:11, 325:18, 325:21, 326:6, 326:8, 327:15, 327:17, 360:2, 369:24, 370:22, 371:3, 372:20, 373:2, 373:5, 375:8, 375:13, 376:9, 376:20, 377:24, 402:20, 404:12, 405:6, 416:19, 452:21, 453:6, 453:9
**column** [2] - 294:15, 428:24
**comfort** [1] - 408:9
**comfortable** [1] - 365:9
**coming** [21] - 258:3, 288:15, 301:4, 333:25, 334:14, 357:12, 360:8, 360:9, 361:6, 361:10, 361:16, 361:18, 361:20, 367:21, 370:2, 405:11, 417:15, 420:24, 448:2, 449:12, 450:15
**commission** [1] - 420:18
**commissions** [5] - 390:16, 391:6, 420:13, 420:14, 420:21
**commitment** [1] - 423:19
**committed** [1] - 423:20
**common** [19] - 260:25, 299:14, 303:24, 310:13, 310:14, 318:1, 318:17, 322:1, 322:2, 322:5, 322:10, 322:14, 344:17, 344:21, 344:22, 387:12, 388:10, 449:7, 449:11
**commonly** [3] - 303:22, 337:25, 389:15
**communicated** [2] - 323:21, 348:18
**communication** [4] - 348:5, 441:9, 442:6, 443:14
**communications** [5] - 381:16, 390:22, 406:16, 429:22, 441:23
**community** [2] - 387:10, 425:4
**comp** [1] - 420:23
**companies** [27] - 259:19, 295:19, 296:19, 297:24, 298:15, 301:4, 301:11, 309:16, 334:16, 343:2, 375:2, 375:6, 387:15, 390:15, 391:23, 392:2,

395:6, 395:7, 395:10, 396:9, 397:3, 408:8, 410:14, 414:12, 418:25, 423:23, 436:10
**company** [43] - 251:21, 251:22, 252:4, 253:8, 253:9, 253:24, 255:24, 262:20, 270:14, 271:25, 272:20, 281:20, 307:25, 310:25, 313:12, 316:5, 326:21, 326:25, 340:1, 348:7, 365:20, 367:24, 369:1, 388:17, 390:8, 391:15, 396:11, 397:4, 410:17, 411:2, 421:6, 421:11, 424:11, 424:15, 424:18, 424:23, 425:24, 426:2, 426:4, 435:23, 436:5, 443:16
**company's** [8] - 254:12, 313:11, 443:4, 443:7, 443:8, 444:7, 444:20
**company-related** [1] - 313:12
**compare** [1] - 358:18
**compared** [1] - 297:18
**compensated** [1] - 390:9
**compensation** [1] - 390:23
**complete** [1] - 274:14
**completed** [2] - 274:12, 274:16
**completely** [2] - 282:13
**complex** [1] - 385:24
**complexity** [2] - 410:22, 411:3
**complicated** [2] - 436:17, 441:23
**component** [3] - 399:14, 433:24, 434:1
**comprise** [1] - 389:4
**comprised** [1] - 389:1
**compute** [1] - 358:3
**Computer** [1] - 246:15
**Computer-Aided** [1] - 246:15
**computerized** [1] - 246:14
**concede** [1] - 357:9
**concentrate** [1] - 260:9
**concept** [1] - 405:16
**concepts** [1] - 304:1
**concerned** [2] - 348:17, 436:25
**concerns** [1] - 385:20
**conclusion** [2] - 282:3, 312:5
**conditions** [4] - 266:21, 271:7, 281:4, 389:22
**conduct** [1] - 275:20
**conducted** [1] - 336:1
**conducting** [3] - 402:12, 403:4, 410:6
**confer** [1] - 451:1
**conference** [4] - 289:15, 290:12, 415:22, 422:22
**confession** [1] - 446:22
**confidential** [1] - 308:4
**confirm** [2] - 401:17, 436:8
**confirmation** [1] - 411:25
**conflicts** [1] - 391:6
**confused** [1] - 447:7
**connection** [2] - 308:21, 442:18
**conscious** [1] - 391:3
**consider** [2] - 308:3, 383:13
**considered** [4] - 381:20, 381:22, 443:5, 444:20
**considering** [2] - 349:16, 390:1

**consistent** [3] - 290:2, 391:22, 416:12
**consistently** [2] - 317:12, 401:4
**conspiracy** [28] - 383:3, 383:6, 383:7, 383:17, 383:18, 437:21, 440:14, 440:15, 440:18, 440:20, 440:23, 441:7, 441:8, 441:16, 441:17, 441:21, 441:22, 446:15, 446:17, 447:1, 447:2, 447:7, 447:13, 447:14, 447:18, 448:1, 449:19
**conspirator** [3] - 437:19, 449:12, 450:3
**constitute** [1] - 308:19
**constitutes** [1] - 270:20
**consult** [2] - 383:20, 440:22
**consumer** [2] - 318:1, 326:24
**Cont'd** [1] - 246:1
**contacts** [2] - 324:15, 411:17
**contain** [2] - 314:12, 406:23
**contained** [2] - 274:13, 389:24
**contends** [1] - 353:11
**content** [2] - 312:17, 430:10
**context** [4] - 252:1, 333:13, 339:4, 339:21
**Continue** [1] - 429:5
**continue** [14] - 249:21, 259:20, 262:3, 331:20, 343:9, 344:9, 364:8, 370:5, 401:17, 401:19, 416:12, 417:11, 429:22, 445:13
**CONTINUED** [1] - 248:2
**Continued** [13] - 278:7, 289:14, 290:13, 309:24, 341:8, 360:12, 361:1, 407:11, 409:6, 414:17, 426:8, 427:1, 438:9
**continued** [5] - 396:7, 425:8, 440:18, 448:5
**continues** [2] - 364:20, 445:18
**Continuing** [3] - 310:1, 410:1, 439:1
**continuing** [7] - 333:14, 342:1, 381:1, 405:5, 415:1, 431:24, 449:1
**contract** [1] - 270:17
**contrary** [1] - 258:4
**contrast** [2] - 304:2, 304:7, 387:22
**Contributed** [1] - 320:6
**contributed** [1] - 320:11
**contribution** [1] - 367:13
**contributions** [5] - 249:22, 276:20, 294:16, 445:12, 445:14
**control** [1] - 331:9
**conversation** [1] - 378:10
**conversations** [4] - 323:23, 403:8
**conveyed** [2] - 249:24, 434:9
**copies** [5] - 268:22, 269:1, 271:12, 372:11, 437:1
**copy** [1] - 352:12
**core** [1] - 442:5
**corner** [3] - 267:18, 271:10, 309:23
**corporate** [1] - 392:9
**corporation** [2] - 266:3, 304:2, 304:22
**corporations** [3] - 303:22, 305:10, 388:11
**correct** [235] - 248:18, 248:24, 249:14, 250:24, 257:3, 262:11, 264:1, 264:7,

7

**Counsel** [2] - 267:8, 451:25
**counter** [1] - 405:16
**country** [3] - 364:11, 386:24, 434:13
**couple** [6] - 303:2, 359:7, 375:9, 449:14, 449:20, 450:25
**course** [16] - 263:20, 293:5, 313:23, 317:10, 317:24, 318:8, 374:12, 381:19, 383:18, 394:22, 400:16, 440:13, 443:5, 444:21, 447:6, 449:25
**COURT** [154] - 245:1, 246:18, 246:25, 247:7, 247:12, 247:18, 247:20, 250:14, 253:4, 254:17, 255:9, 256:6, 256:10, 256:18, 256:20, 257:11, 257:19, 257:25, 261:7, 261:13, 261:22, 263:1, 263:6, 263:8, 267:11, 268:2, 268:15, 268:23, 269:4, 269:10, 269:12, 271:11, 289:3, 289:9, 289:12, 290:2, 290:5, 291:2, 293:19, 293:21, 293:24, 300:15, 315:13, 315:16, 315:19, 315:23, 319:2, 319:18, 324:4, 325:15, 327:19, 327:24, 328:3, 328:6, 328:10, 328:21, 329:7, 329:11, 330:3, 330:6, 332:24, 340:17, 350:7, 353:13, 354:20, 355:10, 358:22, 359:4, 360:5, 361:9, 364:7, 369:25, 370:23, 371:5, 371:12, 372:12, 372:21, 373:1, 373:3, 378:2, 379:21, 379:23, 379:25, 380:2, 380:9, 381:2, 381:4, 382:2, 382:5, 382:10, 382:18, 384:5, 384:9, 384:11, 393:18, 393:22, 393:24, 401:20, 401:23, 402:2, 402:23, 403:12, 404:13, 405:7, 407:5, 407:8, 408:11, 408:23, 409:3, 410:2, 412:8, 413:13, 413:15, 413:18, 416:20, 419:8, 430:18, 430:20, 432:18, 436:15, 436:24, 437:15, 440:12, 440:20, 440:25, 441:7, 441:16, 442:1, 442:24, 443:13, 443:18, 444:2, 444:9, 444:17, 445:1, 445:6, 445:9, 445:22, 446:10, 446:12, 446:23, 447:24, 449:5, 449:11, 450:6, 450:10, 451:2, 451:7, 451:11, 451:15, 452:2, 452:7, 452:17, 452:22
**Court** [18] - 246:13, 293:5, 299:25, 315:12, 315:21, 318:22, 318:24, 320:21, 320:22, 325:13, 329:5, 337:4, 381:11, 393:8, 411:21, 413:1, 450:18, 451:1
**court** [3] - 246:17, 291:1, 435:11
**Court's** [2] - 394:1, 412:11
**Courthouse** [1] - 245:4
**COURTROOM** [9] - 248:12, 327:22, 380:6, 380:8, 384:15, 384:21, 384:25, 437:12, 437:14
**courtroom** [2] - 380:7, 437:13
**cover** [19] - 284:7, 288:12, 296:22, 332:20, 333:4, 349:6, 350:15, 353:23, 355:3, 357:17, 382:1, 402:7, 415:21, 420:25, 424:12, 431:16, 431:24, 435:9, 441:17
**coverage** [7] - 332:11, 334:2, 334:21,

264:20, 265:9, 266:8, 266:24, 267:2, 267:5, 268:10, 268:11, 269:24, 269:25, 270:5, 270:10, 270:14, 270:17, 270:18, 270:22, 270:25, 271:3, 271:8, 272:5, 272:9, 272:15, 272:16, 273:14, 273:16, 273:25, 274:14, 274:25, 275:5, 275:9, 275:12, 275:18, 275:21, 275:25, 276:3, 276:6, 276:9, 277:1, 277:16, 277:17, 277:20, 277:21, 277:25, 278:1, 279:4, 279:7, 279:10, 279:15, 279:18, 280:1, 280:5, 280:7, 280:15, 280:20, 280:24, 280:25, 281:6, 281:8, 281:17, 281:18, 282:2, 282:9, 282:11, 282:14, 282:20, 282:23, 283:1, 283:13, 284:9, 285:3, 285:8, 285:15, 285:16, 285:24, 286:5, 286:12, 286:19, 286:22, 286:24, 287:6, 287:18, 288:1, 288:16, 288:20, 291:15, 291:18, 292:11, 292:14, 292:25, 293:2, 293:8, 293:11, 293:14, 294:3, 294:6, 294:10, 294:13, 294:22, 295:2, 295:6, 295:13, 295:16, 295:25, 296:4, 296:7, 296:16, 296:19, 297:2, 297:6, 297:8, 297:11, 297:18, 298:15, 299:2, 299:11, 299:15, 299:17, 299:20, 299:22, 300:7, 300:25, 301:5, 301:8, 301:12, 302:11, 302:17, 302:19, 303:9, 303:13, 303:14, 303:16, 303:18, 303:21, 304:1, 304:6, 305:5, 305:14, 305:17, 305:20, 308:5, 309:3, 309:8, 309:16, 310:3, 310:4, 310:14, 310:21, 311:15, 312:2, 313:8, 313:16, 313:20, 314:13, 314:18, 314:22, 314:25, 315:1, 315:4, 315:8, 316:7, 316:13, 316:16, 317:13, 318:10, 318:15, 319:7, 319:11, 319:14, 320:12, 320:13, 320:15, 320:18, 321:10, 322:18, 323:1, 323:4, 323:6, 323:10, 323:14, 323:19, 323:22, 324:1, 324:22, 325:1, 325:4, 332:12, 332:22, 333:6, 333:18, 334:9, 335:20, 336:16, 338:11, 338:12, 339:12, 339:20, 340:4, 343:4, 347:8, 347:14, 352:24, 355:16, 358:3, 358:4, 359:15, 359:19, 359:25, 363:19, 367:24, 373:12, 373:15, 373:17, 373:19, 374:1, 374:3, 374:6, 374:7, 374:9, 376:16, 376:23, 377:5, 378:8, 402:10, 404:7, 427:12, 436:20, 441:19
**Correct** [6] - 281:12, 361:19, 429:14, 430:23, 431:5, 433:5
**correctly** [4] - 322:4, 358:1, 358:11, 364:21
**cost** [2] - 284:7, 427:4
**costs** [2] - 294:16, 412:16
**counsel** [24] - 247:6, 293:5, 299:25, 318:22, 318:24, 320:21, 320:22, 322:20, 323:8, 323:10, 323:12, 325:13, 330:7, 334:24, 336:25, 337:4, 366:24, 368:10, 383:21, 393:8, 411:21, 413:1, 438:3

335:6, 336:14, 356:24, 358:3
**covered** [11] - 353:17, 354:25, 358:19, 378:8, 378:13, 378:16, 401:14, 412:16, 418:21, 422:15, 422:22
**covering** [5] - 288:19, 291:8, 382:14, 431:18, 439:22
**coverup** [1] - 441:22
**CPA** [2] - 411:4, 411:8
**CPAs** [1] - 410:18
**creates** [1] - 391:6
**credentials** [1] - 386:4
**credited** [2] - 266:7, 275:4
**CRIMINAL** [1] - 245:9
**crisis** [1] - 391:2
**criteria** [3] - 344:14, 395:15, 395:17
**critical** [2] - 354:2, 396:20
**cross** [8] - 247:9, 263:1, 328:4, 328:8, 328:12, 328:16, 328:24, 332:9
**CROSS** [4] - 263:9, 330:9, 453:6, 453:7
**CROSS-EXAMINATION** [4] - 263:9, 330:9, 453:6, 453:7
**cross-examination** [2] - 328:8, 332:9
**CRR** [1] - 246:12
**CTD** [1] - 453:5
**current** [3] - 249:19, 249:20, 376:18
**cuts** [1] - 260:23
**cycles** [1] - 334:25
**cyclical** [5] - 317:3, 317:6, 317:24, 318:9, 318:19

**D**

**D-I** [1] - 318:23
**damages** [1] - 424:25
**dash** [1] - 267:21
**data** [1] - 354:7
**date** [11] - 250:23, 254:25, 274:4, 274:9, 274:15, 274:17, 287:19, 351:10, 368:21, 443:21, 447:3
**dated** [7] - 250:24, 262:10, 273:15, 363:3, 381:5, 430:22, 432:23
**dates** [1] - 443:22
**DAVID** [1] - 245:6
**David** [6] - 245:19, 251:11, 403:9, 406:17, 406:20, 422:23
**days** [6] - 250:7, 251:2, 371:23, 447:11, 449:15, 450:25
**DC** [1] - 246:6
**DDI** [1] - 367:9
**de** [1] - 347:2
**de-risks** [1] - 347:2
**deal** [2] - 423:20, 446:5
**dealer** [3] - 340:19, 354:6, 402:6
**dealers** [2] - 317:14, 340:19
**dealership** [24] - 298:17, 313:10, 313:14, 338:8, 338:9, 338:13, 339:2, 341:4, 348:1, 360:10, 362:17, 368:6, 395:23, 396:5, 396:6, 396:16, 401:9, 401:11, 416:11, 417:22, 419:17, 425:3, 426:4, 427:7
**dealership's** [1] - 396:4

**dealership-level** [1] - 362:17
**dealerships** [61] - 253:24, 260:3, 281:18, 283:12, 295:23, 295:24, 296:2, 332:2, 338:23, 339:11, 339:18, 340:3, 340:12, 342:3, 343:15, 344:3, 354:3, 359:14, 359:17, 364:10, 395:7, 395:8, 395:19, 395:20, 396:4, 396:15, 396:18, 396:20, 398:24, 398:25, 399:2, 399:6, 399:12, 399:19, 399:22, 400:1, 400:10, 400:23, 400:25, 401:5, 403:22, 415:20, 419:15, 419:19, 422:16, 423:1, 424:1, 426:4, 427:11, 427:22, 429:5, 431:15, 431:19, 433:10, 433:16, 433:23, 434:11, 434:12, 434:16, 434:19, 435:8
**dealing** [2] - 389:10, 439:23
**dealt** [1] - 411:15
**dear** [1] - 251:5
**Dearington** [1] - 383:15
**DEARINGTON** [15] - 246:7, 381:8, 382:24, 384:6, 408:24, 409:4, 430:17, 446:13, 447:10, 449:2, 449:9, 450:12, 451:9, 451:14, 451:19
**death** [1] - 383:6
**debt** [4] - 260:24, 283:14, 392:11, 433:23
**debts** [1] - 436:3
**December** [17] - 287:17, 294:5, 313:14, 315:3, 318:2, 318:5, 362:18, 381:5, 429:5, 429:6, 440:16, 440:24, 441:1, 441:2, 441:5, 446:15, 450:5
**decide** [1] - 451:22
**decided** [8] - 251:21, 327:5, 365:20, 391:4, 391:5, 405:20, 406:4, 443:7
**deciding** [1] - 353:15
**decision** [4] - 312:24, 313:5, 314:3, 405:10
**decline** [2] - 281:5, 354:4
**decrease** [1] - 309:14
**defendant** [2] - 315:18, 381:20
**Defendant** [5] - 245:18, 246:2, 263:4, 454:7, 454:8
**defendant's** [1] - 328:13
**Defendant's** [6] - 267:12, 318:22, 319:16, 319:19, 320:20, 321:3
**defendants** [1] - 245:7
**Defense** [2] - 267:7, 372:14
**defense** [12] - 247:5, 267:15, 268:12, 271:5, 323:8, 323:10, 323:12, 359:8, 366:24, 367:3, 368:10, 440:8
**defer** [1] - 383:13
**deferred** [1] - 361:20
**deficiency** [1] - 322:11
**define** [1] - 396:12
**defined** [2] - 334:5, 396:23
**definitely** [1] - 450:1
**definition** [1] - 315:8
**definitions** [1] - 314:13
**defrauding** [1] - 441:13
**degree** [4] - 308:1, 354:1, 386:3, 411:2

**degrees** [2] - 317:7, 410:23, 410:24
**delay** [2] - 288:8, 326:2
**delays** [1] - 440:2
**deliver** [1] - 362:1
**demand** [5] - 276:19, 277:19, 291:14, 291:15, 366:11
**department** [3] - 328:22, 328:23, 364:13
**Department** [1] - 287:11
**depict** [1] - 429:17
**depicted** [1] - 364:21
**depicts** [1] - 429:18
**deploy** [1] - 346:8
**deploying** [6] - 431:8, 431:11, 431:13, 431:14, 433:10, 434:17
**deposition** [2] - 325:1, 325:3
**depreciation** [4] - 298:1, 299:1, 357:13, 361:22
**DEPUTY** [9] - 248:12, 327:22, 380:6, 380:8, 384:15, 384:21, 384:25, 437:12, 437:14
**describe** [3] - 403:17, 418:9, 444:24
**described** [10] - 263:19, 263:21, 263:25, 277:15, 286:6, 286:8, 305:21, 349:13, 401:25, 445:3
**describes** [1] - 444:10
**describing** [2] - 444:7, 447:15
**design** [1] - 327:7
**desire** [1] - 365:15
**despite** [3] - 282:20, 313:15, 347:12
**detail** [1] - 248:20
**determination** [1] - 351:19
**determine** [3] - 292:15, 292:24, 354:17
**devise** [1] - 385:22
**DI** [3] - 319:16, 319:19, 454:7
**difference** [9] - 303:15, 303:25, 304:5, 305:4, 322:16, 338:16, 341:1, 383:16, 435:20
**different** [24] - 282:5, 295:21, 299:9, 303:4, 305:7, 305:8, 306:7, 316:6, 317:11, 339:7, 352:18, 353:7, 357:17, 375:19, 377:8, 406:18, 410:14, 413:22, 414:1, 421:3, 427:11, 434:3, 436:1
**Different** [1] - 282:21
**differently** [1] - 286:15
**difficult** [5] - 259:19, 343:3, 395:21, 427:10, 434:17
**digit** [2] - 317:8, 364:11
**diligence** [40] - 275:22, 275:23, 286:7, 307:3, 308:9, 330:19, 330:22, 336:1, 336:2, 336:5, 336:8, 336:11, 340:1, 371:18, 373:17, 388:21, 388:23, 388:25, 389:4, 389:11, 400:7, 400:19, 402:12, 402:18, 403:4, 403:15, 403:17, 404:9, 404:16, 405:24, 406:13, 406:22, 410:6, 411:5, 412:1, 412:2, 429:24, 430:25, 432:25
**dilute** [1] - 377:6
**dime** [1] - 326:1
**dinner** [2] - 414:3, 414:4

**dip** [1] - 349:5
**dipped** [5] - 332:12, 334:2, 334:21, 335:6, 336:14
**direct** [9] - 251:15, 259:8, 263:20, 311:24, 352:7, 383:25, 384:1, 387:11, 387:13
**DIRECT** [5] - 248:2, 385:5, 427:1, 453:5, 453:13
**directly** [4] - 258:3, 284:3, 285:13, 389:10
**disagree** [1] - 440:9
**disagreement** [1] - 437:20
**disclaimer** [1] - 372:18
**disclaimers** [1] - 372:6
**disclose** [2] - 308:7, 339:9
**disclosed** [9] - 282:13, 282:15, 284:11, 287:4, 291:11, 306:23, 306:25, 314:20, 343:20
**disclosing** [1] - 339:5
**disclosure** [5] - 291:7, 306:24, 339:17, 440:6, 445:5
**disclosures** [1] - 373:24
**disconnect** [1] - 383:16
**discretion** [4] - 260:17, 334:7, 348:4, 362:2
**discuss** [5] - 314:9, 374:23, 393:14, 394:17, 452:6
**discussed** [9] - 264:24, 273:13, 281:2, 293:10, 305:19, 314:6, 393:21, 393:23, 415:15
**discusses** [1] - 438:6
**discussing** [2] - 282:17, 284:14
**discussion** [2] - 284:17, 408:20, 439:20
**discussions** [2] - 250:10, 403:9
**disinterested** [1] - 436:7
**dismissed** [1] - 348:4
**displayed** [1] - 254:4
**dispositive** [1] - 447:9
**dispute** [8] - 299:4, 335:9, 335:11, 357:8, 376:25, 381:7, 438:2, 449:18
**disputes** [1] - 439:25
**disrupt** [1] - 396:4
**distort** [1] - 297:20
**distributable** [2] - 309:14, 309:19
**distribute** [6] - 260:1, 343:14, 345:10, 379:3, 379:6, 379:9
**distributed** [3] - 271:12, 355:2, 355:15
**distributing** [1] - 421:17
**distribution** [97] - 248:24, 253:23, 255:15, 255:23, 258:2, 258:6, 260:16, 261:2, 261:4, 261:10, 261:16, 262:9, 300:21, 302:16, 302:17, 302:19, 303:13, 303:16, 303:20, 304:1, 310:21, 332:20, 343:20, 345:6, 346:4, 346:14, 355:4, 356:17, 357:22, 360:8, 361:6, 361:16, 361:17, 367:16, 367:17, 367:18, 367:23, 369:21, 370:2, 370:13, 370:19, 371:10, 391:23, 391:24, 392:1, 392:10, 392:13, 396:13, 400:9, 400:11,

400:12, 400:13, 400:20, 401:3, 402:8, 403:21, 403:22, 404:5, 404:21, 405:1, 405:11, 415:11, 415:12, 415:21, 415:24, 415:25, 417:19, 421:22, 421:23, 422:1, 422:12, 422:14, 422:17, 423:5, 429:2, 429:3, 429:4, 429:11, 429:16, 429:21, 431:9, 431:17, 431:22, 431:25, 435:9, 442:11, 442:15, 442:18, 442:19, 443:8, 443:10, 444:15, 444:24, 445:20, 446:8

**distribution's** [1] - 294:12

**Distributions** [6] - 303:23, 303:25, 305:2, 305:12, 305:16, 310:19

**distributions** [108] - 249:19, 249:20, 258:8, 259:11, 259:17, 259:22, 259:24, 260:5, 262:2, 262:5, 284:14, 284:15, 284:21, 285:7, 285:14, 285:18, 285:23, 286:4, 291:8, 292:16, 292:21, 292:25, 294:10, 294:17, 294:21, 295:9, 296:16, 296:19, 296:22, 297:10, 297:18, 300:24, 301:12, 301:15, 304:5, 305:5, 305:11, 305:13, 305:19, 310:23, 311:1, 311:14, 314:16, 331:23, 333:24, 334:14, 334:15, 342:13, 342:23, 343:10, 343:11, 345:20, 347:13, 347:16, 349:7, 353:4, 353:22, 354:17, 356:9, 356:11, 358:18, 359:25, 361:5, 361:10, 361:14, 368:19, 370:6, 370:8, 374:23, 376:2, 377:3, 377:13, 377:19, 377:21, 378:7, 378:13, 378:16, 391:21, 399:18, 401:13, 402:14, 402:17, 403:5, 403:19, 403:20, 403:25, 404:2, 404:9, 404:18, 404:22, 404:23, 405:4, 415:23, 418:20, 418:23, 419:3, 423:11, 423:16, 423:18, 423:22, 423:25, 439:7, 439:14, 441:10, 441:12, 442:10

**DISTRICT** [3] - 245:1, 245:1, 245:10

**District** [2] - 245:14, 324:22

**diversified** [1] - 433:21

**divided** [7] - 314:22, 315:7, 397:4, 401:7, 401:8, 428:25, 434:21

**dividend** [14] - 260:16, 288:13, 292:6, 302:19, 303:12, 303:15, 303:18, 304:1, 333:5, 345:6, 355:3, 357:22, 361:25, 368:7

**dividends** [6] - 288:19, 292:4, 304:6, 305:3, 305:5, 305:10

**Dividends** [1] - 303:22

**Document** [1] - 312:11

**document** [63] - 268:10, 272:21, 273:6, 273:9, 276:24, 277:3, 277:6, 278:5, 280:18, 280:23, 281:7, 293:6, 293:17, 298:9, 298:24, 302:4, 305:4, 307:11, 307:24, 308:16, 308:18, 309:3, 309:18, 311:1, 311:12, 311:23, 312:2, 312:8, 312:16, 312:19, 313:4, 313:16, 313:22, 313:25, 314:2, 320:25, 321:7, 321:22, 337:19, 343:19, 358:8, 358:9,

359:11, 362:6, 368:2, 375:10, 375:23, 376:7, 376:13, 382:21, 390:3, 426:6, 427:3, 427:16, 428:8, 428:10, 428:16, 430:10, 432:2, 439:17, 450:5, 452:12

**documents** [11] - 274:11, 274:14, 274:16, 307:4, 308:8, 352:6, 372:17, 372:22, 435:24, 450:2, 450:18

**DOJ** [1] - 287:15

**dollars** [7] - 252:21, 338:17, 347:11, 386:21, 431:8, 431:11, 433:10

**done** [10] - 300:20, 305:23, 326:20, 337:9, 339:25, 360:4, 366:17, 400:7, 437:2, 437:6

**double** [5] - 317:8, 364:11, 427:25, 428:2, 428:3

**Double** [1] - 428:2

**double-digit** [1] - 364:11

**doubt** [1] - 289:1

**down** [34] - 249:15, 271:22, 288:25, 295:15, 298:11, 298:17, 298:20, 299:24, 300:22, 301:21, 302:25, 304:13, 309:10, 320:18, 321:24, 327:24, 327:25, 331:5, 331:25, 334:25, 335:19, 337:17, 364:13, 364:22, 376:9, 387:17, 396:18, 427:6, 427:8, 428:7, 431:10, 434:8, 439:4, 444:3

**drafted** [1] - 381:12

**draw** [1] - 391:23

**drove** [1] - 411:8

**DS** [1] - 320:21, 321:3, 454:8

**dual** [1] - 390:11

**due** [35] - 286:7, 330:18, 330:22, 336:8, 336:11, 340:1, 371:17, 373:17, 388:21, 388:23, 388:25, 389:4, 389:11, 400:7, 400:19, 402:12, 402:17, 403:4, 403:15, 403:17, 404:8, 404:16, 405:24, 406:13, 406:22, 410:6, 410:22, 411:5, 411:25, 412:2, 429:24, 430:25, 432:24, 444:11

**duly** [2] - 247:24, 385:3

**during** [23] - 263:20, 287:4, 311:24, 313:22, 317:10, 317:24, 318:8, 328:18, 329:4, 361:15, 364:5, 364:10, 378:6, 378:12, 384:4, 414:6, 415:15, 418:18, 418:19, 437:17, 440:13, 443:5, 447:6

**During** [1] - 320:6

**dynamic** [1] - 439:7

---

# E

**e-mail** [18] - 393:2, 393:4, 393:13, 394:5, 394:11, 394:15, 395:12, 397:9, 412:19, 429:22, 430:12, 430:13, 432:10, 432:11, 432:23, 433:6, 433:18, 433:19

**e-mails** [3] - 387:19, 403:6, 403:7

**early** [3] - 329:1, 329:8, 421:6

**early-stage** [1] - 421:6

**earn** [2] - 423:2, 423:3

**earned** [1] - 362:18

**earning** [3] - 392:9, 404:21, 431:17

**earnings** [3] - 429:4, 429:18, 429:20

**easily** [2] - 300:20, 388:1

**East** [1] - 245:14

**EASTERN** [1] - 245:1

**Eastern** [2] - 245:14, 324:22

**easy** [1] - 396:3

**economic** [1] - 395:21

**economics** [2] - 264:25, 326:19

**educational** [1] - 386:2

**effect** [3] - 405:13, 449:25, 450:8

**efficiency** [3] - 246:18, 322:2, 322:12

**eight** [3] - 311:13, 420:17

**either** [12] - 260:17, 266:3, 312:24, 372:2, 372:16, 374:4, 378:21, 389:6, 398:16, 411:12, 428:14, 451:25

**Either** [1] - 428:12

**elaboration** [1] - 348:9

**elements** [1] - 358:14

**elicit** [1] - 402:25

**eligible** [1] - 275:4

**eliminate** [6] - 260:17, 334:7, 348:5, 355:4, 362:3, 379:13

**eliminated** [1] - 311:3

**ELMO** [3] - 268:23, 355:20, 371:23

**ELVIRA** [1] - 245:21

**emphasis** [2] - 391:20, 396:14

**emphasized** [1] - 415:8

**employees** [1] - 388:11

**encompassed** [1] - 441:25

**encompassing** [1] - 441:3

**End** [1] - 290:12

**end** [24] - 251:8, 294:5, 324:11, 331:5, 340:9, 340:21, 345:4, 350:3, 364:23, 365:9, 374:13, 381:19, 383:7, 383:25, 384:3, 389:6, 396:8, 429:7, 440:6, 445:15, 445:21, 446:5, 446:17, 447:12

**endeavor** [1] - 410:16

**ended** [8] - 326:21, 362:18, 391:25, 440:20, 441:21, 441:24, 446:15, 447:2

**ending** [2] - 320:14, 441:10

**Ending** [1] - 321:19

**endowments** [1] - 388:10

**ends** [2] - 348:4, 409:5

**engage** [1] - 416:8

**engaged** [1] - 308:10

**engaging** [1] - 411:1

**Engelbrecht** [5] - 403:7, 403:9, 411:12, 428:12, 429:23

**enhance** [1] - 284:6

**ensure** [1] - 396:7

**entered** [2] - 267:4, 277:18

**enters** [3] - 247:19, 330:5, 384:10

**entire** [12] - 275:23, 279:3, 279:17, 280:4, 333:3, 349:6, 352:4, 373:12, 373:14, 376:25, 379:5, 419:1

**entirely** [1] - 405:16

**entity** [1] - 396:16

**entry** [2] - 396:3, 396:7

**environment** [1] - 434:11
**epicenter** [1] - 391:3
**equity** [50] - 252:18, 265:23, 265:24, 266:2, 266:7, 266:15, 266:19, 266:22, 295:12, 308:13, 322:7, 322:9, 344:23, 363:18, 363:21, 364:19, 365:3, 368:3, 387:18, 387:20, 387:21, 387:22, 387:23, 387:25, 388:3, 388:6, 388:17, 389:9, 389:19, 389:20, 391:8, 391:22, 395:5, 395:6, 396:3, 396:8, 396:11, 410:22, 411:1, 414:11, 421:1, 421:3, 421:4, 421:7, 421:13, 421:14, 426:1, 431:13
**escrow** [1] - 424:16
**especially** [2] - 260:5, 345:19
**ESQ** [15] - 245:13, 245:15, 245:16, 245:16, 245:17, 245:20, 245:20, 245:21, 245:24, 245:24, 246:4, 246:4, 246:7, 246:7, 246:10
**essence** [2] - 283:8, 292:23
**essentially** [3] - 247:3, 389:22, 416:8
**established** [2] - 324:15, 333:15
**establishing** [2] - 443:3, 444:20
**estimation** [1] - 328:19
**Ethos** [14] - 264:1, 264:4, 264:10, 286:24, 324:11, 324:13, 325:19, 325:22, 326:1, 327:2, 327:4, 386:7, 390:25, 391:1
**evaluate** [2] - 358:14, 408:6
**evaluated** [3] - 381:21, 400:15, 404:8
**evaluating** [8] - 275:17, 316:5, 354:13, 359:14, 407:1, 408:5, 410:9, 435:6
**evaluation** [1] - 416:23
**Evens** [1] - 350:25
**event** [32] - 276:20, 286:7, 286:13, 286:16, 286:17, 287:1, 291:6, 291:17, 291:19, 306:19, 330:19, 330:23, 335:19, 335:22, 336:8, 346:24, 371:18, 377:4, 391:4, 406:13, 406:14, 406:15, 411:5, 411:6, 411:10, 412:15, 413:9, 413:20, 416:13, 418:7, 429:24, 430:25
**events** [3] - 442:7, 442:8, 445:3
**evidence** [45] - 248:11, 250:12, 250:16, 255:10, 258:14, 268:13, 268:18, 272:23, 275:7, 280:18, 289:6, 293:18, 293:22, 300:16, 302:3, 303:3, 304:11, 307:10, 312:11, 319:19, 321:3, 342:7, 350:8, 363:14, 371:4, 372:15, 378:25, 381:18, 393:17, 393:19, 408:17, 412:6, 412:9, 413:12, 413:19, 419:25, 425:15, 428:4, 428:16, 430:16, 430:21, 432:16, 432:19, 437:10, 440:13
**evidentiary** [4] - 382:22, 437:16, 449:20, 452:4
**ex** [1] - 447:20
**exactly** [8] - 290:3, 322:14, 345:13, 362:4, 417:11, 437:1, 444:18, 445:22
**exam** [1] - 264:2
**EXAMINATION** [16] - 248:2, 263:9,

330:9, 359:5, 361:1, 373:4, 378:3, 385:5, 427:1, 453:5, 453:6, 453:7, 453:8, 453:9, 453:10, 453:13
**examination** [4] - 263:20, 311:24, 328:8, 332:9
**examined** [2] - 247:25, 316:7, 385:3
**example** [6] - 338:13, 364:2, 377:15, 391:25, 436:10, 450:21
**exceed** [1] - 340:20
**exceeded** [2] - 340:5, 340:7, 429:13
**exceeding** [2] - 368:23, 368:24
**except** [2] - 277:14, 348:7
**exception** [2] - 253:25, 382:6, 383:1
**excess** [10] - 260:23, 285:10, 344:19, 347:20, 355:1, 355:2, 368:6, 415:11, 422:12, 423:10
**exchange** [2] - 347:17, 388:1
**exclusively** [1] - 420:10
**excuse** [3] - 254:2, 328:5, 352:17
**excused** [2] - 379:23, 380:3
**executed** [2] - 274:12, 274:16
**execution** [2] - 270:19, 270:20
**executive** [2] - 265:2, 265:4
**Exhibit** [116] - 248:11, 248:15, 249:11, 250:2, 250:3, 250:12, 250:16, 250:19, 254:4, 254:21, 255:8, 255:10, 255:13, 258:14, 258:15, 267:7, 267:13, 268:18, 268:20, 269:13, 272:24, 272:25, 276:14, 279:24, 293:5, 293:18, 293:22, 293:25, 299:24, 300:12, 300:16, 300:18, 302:3, 303:1, 304:11, 307:10, 307:25, 311:14, 311:25, 312:1, 312:15, 313:4, 313:23, 313:24, 318:22, 318:24, 319:19, 319:20, 320:20, 320:22, 321:3, 321:6, 337:4, 342:7, 342:10, 349:24, 350:8, 350:10, 363:14, 364:17, 365:17, 365:25, 366:22, 368:8, 371:20, 372:14, 375:22, 376:11, 378:25, 393:7, 393:8, 393:10, 393:17, 393:19, 394:2, 394:5, 411:19, 411:21, 412:6, 412:9, 412:12, 413:1, 413:2, 413:12, 413:19, 419:25, 420:1, 420:2, 420:5, 425:15, 425:16, 425:18, 428:4, 428:16, 430:2, 430:5, 430:16, 430:21, 432:5, 432:16, 432:19, 432:22, 454:2, 454:3, 454:4, 454:5, 454:6, 454:7, 454:8, 454:9, 454:10, 454:11, 454:12, 454:13, 454:14
**exhibit** [20] - 249:5, 250:12, 254:23, 256:22, 269:2, 310:9, 342:12, 350:12, 351:9, 351:23, 353:2, 358:23, 358:25, 359:17, 367:8, 375:21, 381:2, 421:19, 432:7, 437:16
**exhibits** [11] - 437:7, 449:17, 450:15, 450:24, 451:13, 451:16, 451:17, 451:20, 451:22, 452:5
**existed** [1] - 374:18
**existence** [1] - 417:17
**existing** [6] - 281:18, 281:22, 308:13, 365:5, 396:4, 421:16

**exists** [1] - 389:18
**exit** [2] - 396:12, 396:24
**exited** [1] - 365:10
**exits** [3] - 327:23, 380:7, 437:13
**expand** [1] - 350:19
**expect** [10] - 260:18, 348:14, 362:4, 369:6, 382:18, 384:1, 422:15, 429:17, 429:19, 439:13
**expectation** [6] - 280:11, 339:20, 340:4, 348:16, 400:21, 408:3
**expectations** [9] - 291:13, 334:4, 334:23, 340:5, 340:7, 340:14, 389:3, 389:23, 444:8
**expected** [9] - 292:13, 292:17, 328:12, 375:15, 417:2, 417:11, 417:13, 417:22, 434:19
**expecting** [1] - 450:24
**expense** [1] - 354:4
**Expenses** [1] - 309:13
**expenses** [8] - 309:15, 309:20, 313:13, 352:16, 354:2, 427:5, 435:24, 436:1
**experience** [3] - 275:11, 314:11, 364:4
**experienced** [1] - 364:4
**expertise** [1] - 408:10
**explain** [10] - 260:10, 363:24, 390:14, 398:21, 399:20, 400:24, 402:16, 410:21, 417:21, 422:20
**explained** [4] - 343:22, 346:6, 387:22, 402:19
**explaining** [1] - 401:23
**explanations** [1] - 310:18
**explanatory** [1] - 395:1
**explore** [1] - 308:16
**expressed** [1] - 333:8
**extensively** [2] - 406:25, 422:22
**extent** [2] - 417:6, 423:11
**extenuating** [1] - 252:19
**extra** [1] - 443:9
**Exxon** [1] - 387:24
**eyesight** [1] - 283:22

## F

**F-R-E-D-E-R-I-C-K** [1] - 384:24
**face** [3] - 334:1, 334:8, 347:4
**fact** [18] - 264:6, 264:9, 266:5, 280:22, 282:12, 310:11, 313:15, 323:25, 336:2, 357:9, 374:5, 404:9, 404:18, 424:10, 429:13, 441:13, 442:21, 447:19
**facto** [1] - 447:20
**factor** [1] - 284:11
**factors** [6] - 272:13, 280:20, 280:23, 297:19, 308:4, 361:22
**facts** [1] - 371:4
**fail** [2] - 284:7, 429:10
**failed** [3] - 364:6, 364:9, 364:10
**fails** [5] - 348:3, 362:1, 417:23, 418:2, 425:10
**failure** [1] - 338:22
**fair** [18] - 247:8, 266:1, 266:14, 280:22,

292:8, 298:7, 298:14, 304:9, 306:8, 316:20, 327:4, 327:12, 328:14, 328:19, 356:23, 357:3, 400:17, 428:13

**fairly** [2] - 247:9, 392:9

**falls** [1] - 422:24

**false** [3] - 322:18, 372:19, 408:20

**familiar** [12] - 265:10, 293:2, 295:1, 319:4, 324:25, 376:12, 387:24, 388:12, 389:12, 391:8, 395:3, 395:5

**families** [3] - 388:5, 434:13

**family** [10] - 265:18, 265:21, 295:6, 305:24, 307:14, 363:25, 386:21, 416:7, 425:2, 434:15

**far** [3] - 303:7, 415:10, 450:17

**fast** [2] - 431:8, 431:12

**faster** [1] - 321:1

**fax** [1] - 271:14

**FBI** [10] - 287:8, 287:11, 287:15, 288:3, 288:9, 288:24, 292:3, 306:2, 337:6, 337:11

**feature** [3] - 382:16, 383:23, 392:4

**features** [1] - 398:22

**February** [1] - 429:24

**Federal** [1] - 304:24

**fee** [2] - 390:23, 420:13

**feed** [2] - 295:16, 295:19

**feelings** [2] - 256:3, 261:21

**fees** [9] - 306:2, 306:10, 306:11, 306:14, 306:16, 306:18, 306:24, 313:12, 390:21

**fell** [1] - 411:16

**few** [11] - 252:11, 258:17, 264:6, 268:22, 322:23, 349:3, 351:15, 375:10, 377:25, 378:5, 450:17

**fewer** [1] - 395:22

**Fidelity** [1] - 387:16

**fiduciary** [1] - 346:12

**FIFO** [1] - 368:3

**fifteen** [1] - 315:14

**Fifteen** [1] - 362:11

**fifth** [5] - 251:13, 254:6, 308:18, 344:2, 362:12

**figure** [8] - 328:20, 352:19, 356:4, 356:9, 356:19, 449:5, 451:2, 452:3

**filed** [2] - 251:23, 252:24

**finance** [5] - 264:25, 297:1, 365:7, 385:14, 400:1

**financial** [72] - 251:23, 252:24, 252:25, 253:1, 253:8, 254:1, 254:12, 264:17, 265:4, 265:7, 265:10, 275:12, 281:4, 286:19, 292:23, 293:2, 293:14, 294:2, 295:1, 295:4, 296:3, 296:23, 298:22, 298:25, 299:2, 299:4, 299:7, 299:8, 299:15, 299:16, 299:18, 301:10, 303:4, 310:5, 313:14, 314:11, 314:12, 316:5, 317:15, 322:17, 338:10, 338:23, 339:13, 339:16, 344:16, 348:8, 353:7, 354:7, 354:11, 357:21, 359:21, 365:7, 373:19, 373:20, 373:21, 374:8, 374:16, 385:13,

385:19, 386:15, 387:2, 397:16, 397:18, 397:23, 398:3, 408:7, 435:13, 435:16, 435:21, 435:22, 436:4, 436:11

**Financial** [1] - 253:8

**financially** [1] - 260:22

**financials** [14] - 253:15, 339:9, 349:11, 349:18, 350:2, 350:14, 350:15, 351:12, 351:18, 352:2, 356:18, 356:19, 374:10, 436:2

**fine** [7] - 268:25, 290:11, 293:20, 300:14, 300:21, 319:17, 440:9

**finish** [1] - 315:16

**finished** [2] - 252:8, 315:20

**firm** [8] - 324:16, 350:24, 385:16, 386:7, 386:12, 387:14, 391:5, 436:6

**firm's** [1] - 390:20

**firms** [8] - 351:3, 387:11, 387:18, 387:19, 388:16, 390:19

**first** [46] - 249:12, 249:23, 250:23, 251:16, 251:19, 252:1, 260:13, 263:3, 263:4, 263:5, 286:25, 307:24, 309:10, 322:2, 323:25, 330:15, 331:6, 334:20, 343:19, 347:22, 348:6, 350:13, 352:7, 359:13, 366:5, 368:4, 369:15, 385:3, 391:11, 392:15, 392:25, 394:4, 394:25, 405:24, 411:19, 411:20, 420:23, 427:17, 428:7, 433:6, 436:19, 438:5, 443:1, 443:2

**fiscal** [1] - 353:21

**fit** [3] - 331:6, 424:19, 424:21

**five** [7] - 380:5, 382:20, 395:13, 395:14, 395:17, 443:23, 452:12

**five-minute** [3] - 380:5, 382:20, 452:12

**FL** [1] - 246:9

**flag** [3] - 246:23, 247:5, 452:4

**flickering** [1] - 352:11

**Floor** [3] - 245:19, 245:23, 246:3

**Florida** [1] - 245:23

**flow** [36] - 259:21, 260:15, 262:4, 262:8, 296:2, 296:6, 296:18, 296:21, 297:22, 297:23, 298:7, 298:8, 298:14, 310:20, 311:2, 317:3, 318:6, 334:6, 343:9, 369:21, 370:6, 396:19, 396:22, 397:2, 399:4, 399:21, 401:1, 401:2, 415:8, 415:10, 422:25, 423:22, 424:1, 443:10, 445:13

**flow/profit** [1] - 258:5

**flowed** [1] - 296:8

**flowing** [1] - 297:24

**flows** [10] - 284:7, 317:8, 392:2, 392:11, 399:11, 399:18, 400:12, 405:3, 419:15, 419:18

**focus** [4] - 312:21, 350:19, 442:24, 443:1

**focused** [3] - 442:25, 443:11, 446:23

**follow** [6] - 291:17, 292:11, 326:11, 359:7, 366:14, 393:13

**follow-up** [2] - 291:17, 292:11

**following** [19] - 278:7, 290:1, 309:24, 326:3, 326:15, 326:16, 333:9, 333:11, 333:16, 341:8, 356:9, 360:12, 395:14,

408:1, 414:17, 426:8, 438:9, 448:5

**follows** [3] - 248:1, 272:1, 385:4

**followup** [2] - 348:11, 348:13

**food** [1] - 364:16

**foot** [1] - 249:13

**footnote** [7] - 249:16, 249:18, 257:7, 257:8, 257:22, 257:24, 314:15

**footnotes** [3] - 256:23, 257:2, 314:12

**FOR** [1] - 245:9

**Ford** [3] - 396:5, 396:6

**foresee** [1] - 449:20

**foreseeing** [1] - 437:16

**form** [10] - 261:19, 286:4, 297:2, 297:4, 319:9, 320:14, 321:9, 322:10, 325:9, 367:6

**formed** [1] - 320:17

**forms** [1] - 367:4

**forth** [1] - 308:3

**Forty** [2] - 366:3, 366:4

**Forty-one** [2] - 366:3, 366:4

**forward** [1] - 429:5

**founder** [4] - 389:10, 406:21, 410:16, 414:8

**four** [5] - 268:16, 275:7, 344:2, 355:2, 362:12

**Fourteen** [1] - 294:19

**fourth** [7] - 251:12, 251:13, 251:17, 300:21, 312:6, 351:9, 365:18

**framed** [1] - 383:2

**franchise** [1] - 398:25

**fraud** [1] - 382:1

**Frederick** [30] - 258:22, 264:11, 264:12, 286:22, 286:23, 323:19, 323:25, 324:6, 324:9, 384:13, 384:23, 385:7, 393:9, 393:15, 394:4, 402:6, 403:2, 410:2, 410:5, 411:22, 412:14, 413:4, 413:20, 421:21, 424:3, 425:17, 425:24, 427:20, 428:8, 432:23

**FREDERICK** [2] - 385:1, 453:12

**Free** [1] - 379:24

**free** [1] - 379:25

**frequency** [1] - 422:2

**frequently** [3] - 254:1, 260:19, 433:13

**Friday** [1] - 437:5

**friendly** [1] - 418:12

**front** [3] - 331:12, 333:3, 394:23

**full** [1] - 304:18

**fully** [13] - 272:12, 284:11, 297:17, 334:15, 345:8, 347:24, 353:17, 354:17, 358:18, 378:8, 378:13, 378:16, 418:21

**fun** [1] - 356:13

**function** [1] - 442:14

**fund** [49] - 283:11, 294:3, 295:16, 295:19, 295:22, 295:24, 295:25, 296:8, 296:18, 297:24, 301:5, 301:11, 306:3, 306:10, 307:14, 345:8, 347:18, 351:16, 352:14, 352:17, 353:17, 356:5, 368:21, 375:2, 376:18, 377:1, 377:2, 377:15, 388:2, 388:17, 389:9,

389:19, 390:7, 391:8, 391:22, 396:11, 398:18, 403:24, 404:11, 404:17, 410:13, 411:1, 414:11, 419:2, 426:1, 429:9, 431:13, 431:20, 433:21
**Fund** [4] - 368:16, 398:12, 398:14, 428:18
**fund-level** [1] - 429:9
**Fund-level** [2] - 368:16, 428:18
**fundamental** [1] - 383:16
**funded** [8] - 334:15, 345:8, 347:24, 354:18, 392:1, 392:10, 392:11, 399:18
**funds** [21] - 282:12, 288:22, 291:9, 295:18, 333:25, 349:5, 353:17, 353:23, 375:6, 387:17, 388:10, 388:11, 389:10, 392:1, 398:4, 398:6, 398:16, 417:15, 423:19, 423:20, 433:21
**furtherance** [8] - 381:25, 382:14, 383:5, 437:22, 440:14, 447:14, 448:1, 449:19
**furthermore** [2] - 259:24, 343:12
**future** [10] - 249:20, 310:3, 310:12, 311:9, 313:19, 316:18, 332:14, 354:9, 365:5, 445:13

**G**

**gain** [1] - 425:7
**gains** [1] - 298:25
**gamut** [1] - 387:15
**general** [7] - 259:10, 276:21, 290:8, 293:6, 411:2, 443:4, 443:7
**General's** [1] - 438:3
**generally** [13] - 252:20, 279:10, 279:13, 279:14, 299:16, 307:7, 363:1, 386:22, 386:23, 387:6, 389:24, 398:21, 403:18
**generate** [14] - 259:21, 262:4, 262:7, 295:19, 334:6, 343:9, 348:3, 360:10, 370:5, 379:12, 399:10, 415:10, 431:15, 433:14
**generated** [4] - 397:3, 401:7, 418:24, 429:15
**generates** [1] - 423:1
**generating** [7] - 359:18, 397:6, 399:3, 401:1, 401:5, 401:12, 435:8
**gentile** [3] - 323:12, 331:17, 406:19
**GENTILE** [1] - 245:6
**Gentile** [22] - 245:19, 251:11, 330:12, 331:15, 336:20, 337:20, 371:24, 378:7, 378:11, 381:5, 403:10, 406:17, 406:20, 410:6, 413:25, 415:2, 418:6, 422:23, 438:2, 448:3, 449:6
**gentile's** [1] - 406:24
**Gentile's** [3] - 408:4, 415:6, 451:25
**gentlemen** [2] - 378:15, 428:14
**geographically** [1] - 411:16
**germane** [1] - 440:23
**gesturing** [1] - 295:15
**gifts** [1] - 318:3
**gist** [1] - 443:19
**given** [10] - 250:10, 279:16, 298:1, 338:10, 339:6, 347:19, 370:12,

374:13, 382:23, 399:7
**glad** [1] - 418:12
**glad-handers** [1] - 418:12
**GLEN** [1] - 246:4
**Glenn** [1] - 263:13
**GMC** [1] - 427:6
**goal** [1] - 311:21
**goals** [1] - 267:1
**Goldman** [1] - 390:15
**goods** [2] - 318:2, 326:24
**govern** [1] - 390:3
**government** [1] - 381:13
**Government** [106] - 245:13, 247:9, 248:11, 248:17, 249:11, 250:2, 250:12, 254:3, 254:21, 255:7, 258:13, 266:3, 272:24, 276:14, 279:23, 287:22, 287:23, 291:23, 293:5, 293:17, 293:22, 299:24, 300:12, 300:16, 302:2, 303:1, 304:10, 307:9, 307:25, 310:9, 311:13, 311:24, 312:8, 312:15, 313:4, 313:23, 323:1, 323:22, 328:3, 328:7, 342:7, 349:24, 353:10, 363:13, 364:17, 365:17, 365:24, 366:22, 368:8, 371:20, 372:13, 375:9, 375:21, 376:10, 378:24, 383:2, 383:4, 384:12, 384:13, 385:2, 393:7, 393:9, 393:17, 393:19, 394:5, 411:19, 412:5, 412:9, 413:2, 413:11, 413:19, 419:25, 420:2, 420:5, 425:14, 425:17, 428:4, 428:16, 430:2, 430:5, 430:16, 430:21, 432:5, 432:16, 432:19, 446:14, 446:18, 447:12, 447:15, 450:14, 450:18, 451:16, 451:17, 451:20, 454:2, 454:3, 454:4, 454:5, 454:6, 454:9, 454:10, 454:11, 454:12, 454:13, 454:14
**Government's** [7] - 250:16, 255:10, 268:18, 350:8, 381:24, 451:12, 452:3
**GPB** [91] - 265:13, 267:2, 267:4, 271:25, 275:5, 276:2, 279:2, 279:3, 281:16, 281:19, 282:12, 283:11, 284:16, 287:15, 288:18, 291:7, 291:21, 294:3, 295:6, 296:2, 296:4, 300:1, 307:14, 314:7, 324:1, 324:9, 331:17, 336:7, 336:13, 337:24, 338:9, 338:16, 340:13, 344:6, 344:8, 344:20, 345:5, 345:7, 347:14, 349:16, 350:3, 350:24, 359:17, 363:21, 364:18, 365:11, 370:18, 371:8, 372:2, 377:1, 379:3, 379:6, 379:9, 391:8, 391:11, 391:14, 391:17, 392:25, 397:18, 398:2, 398:4, 398:6, 398:12, 398:14, 398:19, 399:14, 402:12, 404:20, 405:21, 406:21, 407:1, 410:9, 414:10, 414:11, 414:13, 416:23, 418:15, 418:19, 420:6, 421:2, 423:5, 428:18, 429:10, 429:15, 431:2, 433:9, 433:12, 433:19, 433:20, 435:14, 435:16
**GPB's** [3] - 337:21, 339:9, 366:19
**graduated** [1] - 304:25
**Grail** [3] - 253:15, 349:14, 354:12

**grail** [2] - 374:17
**grand** [5] - 446:15, 447:1, 447:2, 447:3, 447:8
**grandchildren** [1] - 385:22
**grandkids** [1] - 434:14
**granted** [1] - 379:19
**great** [17] - 247:7, 259:7, 269:7, 315:19, 327:19, 327:21, 415:9, 429:8, 433:7, 445:16, 446:7, 450:20, 450:21, 452:7, 452:17, 452:19, 452:22
**Great** [2] - 391:2, 431:24
**greater** [14] - 266:14, 266:15, 266:19, 282:1, 296:15, 296:19, 301:7, 301:11, 308:14, 348:3, 356:18, 357:14, 357:22, 359:18, 379:12, 429:19
**greet** [1] - 418:13
**gross** [4] - 314:17, 396:2, 422:9, 434:19
**group** [5] - 333:3, 387:10, 388:17, 416:7, 419:17
**Group** [2] - 386:7, 395:9
**grow** [1] - 331:20
**growth** [1] - 421:10
**guarantee** [25] - 259:23, 262:1, 279:18, 279:19, 311:4, 311:20, 333:19, 338:8, 338:15, 338:21, 339:1, 339:8, 340:2, 343:10, 362:16, 363:2, 363:6, 368:13, 370:7, 379:3, 379:6, 379:17, 415:25, 425:1
**guaranteed** [3] - 310:24, 379:8, 400:3
**guarantees** [22] - 333:18, 336:21, 337:21, 337:24, 339:6, 339:10, 339:17, 339:19, 362:7, 362:9, 362:23, 363:2, 416:1, 416:6, 416:10, 416:16, 416:22, 416:24, 417:17, 424:5, 424:6, 424:9
**guarantor** [2] - 340:8, 340:24
**guarantors** [1] - 340:14
**guess** [2] - 437:18, 449:14
**gulf** [1] - 450:20
**guys** [4] - 382:18, 410:22, 411:3, 424:20
**GX** [1] - 302:2

**H**

**half** [13] - 247:3, 260:13, 372:1, 378:12, 394:4, 395:12, 406:3, 433:6, 437:3, 437:25, 438:5, 446:19, 446:20
**hand** [8] - 268:5, 269:11, 369:6, 384:15, 418:13, 426:6, 427:19, 447:5
**handed** [1] - 452:11
**handers** [1] - 418:12
**handle** [2] - 328:25, 382:22
**handling** [1] - 328:16
**happy** [2] - 328:13, 449:21
**hard** [9] - 268:21, 269:3, 352:12, 372:11, 382:22, 394:3, 409:1, 413:24, 451:21
**harm** [1] - 307:21
**Harvey** [2] - 324:6, 324:8
**head** [1] - 447:15
**header** [2] - 259:10, 434:7

**heads** [1] - 450:7
**health** [6] - 255:23, 256:13, 322:11, 404:11, 404:18, 434:1
**healthcare** [1] - 398:10
**healthy** [2] - 331:19, 333:14
**hear** [6] - 263:15, 306:13, 345:4, 388:18, 437:10, 439:13
**heard** [9] - 291:14, 292:9, 322:4, 323:18, 338:5, 392:25, 439:12, 447:12, 447:22
**hearing** [3] - 336:13, 407:10, 408:2
**hearsay** [4] - 381:10, 382:6, 383:1, 384:8
**heart** [1] - 443:13
**heavy** [2] - 410:15, 410:16
**hedge** [3] - 387:17, 389:9, 417:12
**held** [2] - 263:21, 407:10
**help** [4] - 267:25, 324:17, 381:4, 452:12
**helped** [1] - 264:11
**helps** [2] - 416:18, 416:25
**hereby** [2] - 269:17, 274:2
**hid** [1] - 310:11
**hidden** [15] - 278:3, 280:23, 281:11, 281:14, 285:12, 297:13, 306:16, 306:21, 306:22, 307:2, 310:23, 374:1, 374:3, 374:4, 374:6
**hide** [2] - 441:12, 447:18
**hiding** [1] - 342:2
**high** [14] - 279:6, 279:8, 279:9, 308:1, 388:5, 391:22, 396:3, 396:6, 399:3, 400:25, 401:2, 429:20, 433:24
**high-income-producing** [1] - 391:22
**high-reward** [1] - 279:9
**high-risk** [1] - 279:8
**high-risk-high-reward** [1] - 279:6
**high-yield** [1] - 433:24
**higher** [10] - 279:13, 283:5, 283:6, 292:25, 304:14, 318:14, 354:1, 396:16, 429:6
**highest** [1] - 399:8
**highlight** [5] - 348:24, 350:21, 352:22, 366:2, 408:15
**highlighted** [3] - 285:20, 350:21, 408:16
**highlights** [1] - 421:21
**highly** [1] - 411:2
**historical** [5] - 316:18, 354:7, 354:13, 422:17, 423:5
**history** [6] - 252:10, 281:17, 281:20, 282:1, 282:2, 425:5
**hit** [2] - 311:17, 447:14
**hitting** [1] - 434:18
**hmm** [2] - 305:9, 363:8
**hold** [2] - 280:10, 416:14
**holding** [1] - 356:13
**Holdings** [9] - 271:25, 398:12, 398:14, 428:18, 433:19, 433:20, 433:22, 434:1, 434:5
**holiday** [1] - 318:3
**holy** [2] - 374:17
**Holy** [3] - 253:15, 349:14, 354:12

**home** [3] - 379:24, 379:25, 411:8
**homework** [2] - 373:21, 389:1
**honest** [1] - 394:19
**Honor** [84] - 246:23, 247:16, 247:22, 250:10, 255:7, 255:12, 257:17, 261:6, 261:19, 263:2, 263:7, 267:9, 267:14, 268:12, 268:21, 288:5, 289:4, 289:7, 293:18, 300:13, 300:17, 303:3, 315:10, 318:25, 319:16, 320:25, 322:20, 325:9, 325:11, 325:21, 326:5, 327:17, 328:1, 328:11, 329:1, 329:10, 330:8, 331:8, 355:8, 358:5, 360:2, 369:24, 372:10, 373:2, 376:20, 377:24, 379:22, 381:3, 381:15, 381:19, 382:13, 382:25, 383:8, 383:9, 383:12, 384:8, 384:14, 393:16, 401:16, 407:7, 408:24, 409:4, 410:5, 412:6, 430:15, 432:15, 432:21, 436:13, 437:24, 438:1, 441:19, 442:12, 444:14, 445:4, 446:11, 446:13, 447:10, 447:14, 449:10, 449:23, 450:12, 451:5, 452:6, 452:14
**Honor's** [1] - 447:13
**HONORABLE** [1] - 245:10
**hope** [5] - 311:21, 333:8, 335:7, 433:7, 452:8
**hoped** [4] - 285:25, 288:14, 332:22, 336:17
**hopeful** [1] - 333:15
**hopefully** [3] - 328:19, 378:24, 437:1
**hoping** [4] - 328:21, 329:2, 329:11, 452:2
**horizontal** [1] - 364:21
**hour** [2] - 372:1, 384:2
**hours** [2] - 371:24, 450:14
**Hundred** [1] - 364:9
**Hundred-year-old** [1] - 364:9
**hundreds** [2] - 252:21, 400:15
**hurry** [1] - 365:7

**I**

**idea** [6] - 396:15, 396:17, 410:16, 411:3, 421:7, 421:10
**identification** [4] - 250:1, 411:18, 430:1, 432:5
**identified** [2] - 366:25
**identifying** [3] - 259:18, 319:1, 343:1
**identity** [1] - 450:15
**ignored** [1] - 446:19
**ii** [1] - 270:24
**illiquid** [3] - 275:15, 276:3, 276:5
**illiquidity** [1] - 281:13
**illustrate** [1] - 424:25
**immediately** [2] - 423:20, 450:4
**impact** [8] - 260:4, 343:16, 344:8, 345:15, 345:25, 361:24, 416:22, 417:18
**imperative** [1] - 431:16
**implication** [1] - 445:1
**implies** [1] - 303:18

**importance** [2] - 287:25, 288:10
**important** [15] - 253:2, 293:13, 295:8, 308:9, 308:15, 310:14, 312:24, 314:12, 314:13, 359:14, 376:1, 418:23, 431:14, 431:19, 436:6
**impression** [1] - 405:2
**improve** [1] - 439:4
**inability** [1] - 281:13
**inadmissible** [1] - 381:14
**incentives** [1] - 317:15
**include** [8] - 259:25, 313:12, 343:13, 405:1, 416:10, 429:3, 441:22, 445:13
**included** [2] - 362:19, 445:12
**including** [5] - 249:22, 274:17, 280:3, 437:16, 439:15
**income** [65] - 280:12, 296:7, 296:12, 296:15, 297:6, 297:8, 297:16, 297:17, 297:18, 298:2, 298:6, 298:10, 298:14, 301:3, 301:14, 301:15, 304:24, 352:9, 352:13, 352:18, 352:19, 352:23, 352:24, 353:11, 353:21, 354:17, 355:1, 355:14, 355:16, 355:24, 356:4, 356:18, 356:19, 357:2, 357:9, 357:10, 357:13, 357:20, 357:22, 358:12, 358:17, 359:24, 361:3, 361:14, 361:17, 361:23, 362:17, 362:19, 391:21, 391:22, 399:13, 401:3, 403:25, 418:24, 420:25, 421:2, 421:4, 421:9, 421:13, 421:17, 422:25, 429:8, 431:13, 439:8
**Income** [1] - 304:24
**income-producing** [4] - 399:13, 420:25, 421:13, 431:13
**incorrect** [2] - 264:8, 277:24
**incorrectly** [1] - 288:25
**increased** [1] - 283:12
**incur** [1] - 354:1
**indeed** [3] - 270:4, 275:8, 327:12
**Indeed** [1] - 285:17
**indemnification** [1] - 306:18
**independent** [2] - 253:12, 254:13
**independently** [1] - 447:6
**indicated** [1] - 255:23
**indicates** [1] - 368:18
**indication** [1] - 419:10
**indicative** [3] - 310:3, 310:12, 313:19
**indicator** [1] - 249:19
**indictment** [9] - 383:2, 383:17, 440:25, 441:3, 441:4, 441:6, 446:16, 446:24, 446:25
**indirectly** [1] - 284:3
**individual** [5] - 318:7, 387:23, 416:7, 426:1, 428:23
**individuals** [2] - 388:5, 396:10
**industry** [3] - 266:17, 399:10, 410:25
**information** [26] - 249:23, 274:10, 287:11, 297:13, 298:24, 299:10, 299:12, 301:18, 308:3, 310:8, 314:13, 319:1, 323:9, 353:8, 372:19, 378:12, 388:22, 390:1, 397:8, 398:6, 403:1,

403:4, 406:23, 428:22, 434:8, 440:5
**informed** [5] - 262:15, 262:17, 297:18, 320:17, 370:10
**initial** [2] - 445:1, 451:19
**innumerable** [1] - 347:25
**inquire** [2] - 263:7, 359:3
**inspected** [1] - 253:10
**inspection** [1] - 308:11
**instead** [9] - 304:23, 305:20, 344:15, 346:8, 389:20, 392:11, 395:22, 419:17, 420:24
**institutional** [1] - 420:20
**institutions** [2] - 388:6, 388:8
**instruct** [1] - 381:19
**instruction** [6] - 381:9, 381:12, 381:18, 382:11, 448:2, 449:2
**insurance** [1] - 400:1
**integrate** [2] - 440:1, 444:6
**integrating** [1] - 410:14
**integration** [1] - 444:12
**integrity** [1] - 408:7
**intentional** [1] - 424:22
**interacted** [1] - 418:9
**interactive** [1] - 418:12
**interest** [10] - 246:18, 267:9, 324:17, 347:18, 365:8, 378:1, 392:6, 392:12, 433:14, 443:21
**interested** [7] - 253:18, 253:20, 317:5, 387:7, 388:19, 433:15, 434:14
**interesting** [1] - 399:4
**internal** [1] - 435:24
**Internal** [2] - 422:8, 422:11
**internally** [1] - 322:8
**international** [1] - 247:2
**interpret** [1] - 344:12
**interpreted** [1] - 345:2
**interrupt** [2] - 401:17, 444:1
**interrupted** [1] - 297:21
**interview** [6] - 287:10, 287:22, 287:23, 288:1, 291:24, 337:12
**interviews** [2] - 287:9, 337:6
**introduce** [3] - 324:6, 418:13, 450:25
**introduced** [2] - 323:25, 391:11
**invest** [14] - 262:20, 266:22, 317:6, 351:20, 353:16, 395:14, 398:16, 398:18, 405:10, 406:4, 406:10, 419:16, 433:22, 434:5
**invested** [47] - 248:23, 249:6, 260:23, 261:3, 261:17, 265:13, 279:2, 285:7, 291:7, 302:7, 302:13, 302:21, 302:22, 303:7, 303:10, 306:4, 306:9, 307:14, 312:4, 312:10, 314:22, 315:7, 319:10, 324:8, 334:2, 334:20, 335:18, 340:1, 343:13, 344:25, 345:20, 346:15, 347:23, 351:16, 374:12, 376:15, 376:23, 376:25, 377:1, 377:9, 388:2, 391:22, 398:9, 405:14, 406:7, 426:3, 433:2
**investigating** [1] - 394:21
**investigation** [1] - 275:21

**investing** [24] - 253:19, 258:20, 260:8, 267:1, 282:1, 288:18, 349:16, 354:8, 354:9, 356:7, 368:16, 374:11, 391:25, 394:23, 395:5, 395:7, 397:14, 397:21, 404:24, 406:2, 410:13, 419:1, 420:3, 421:5
**Investment** [4] - 263:25, 264:4, 264:13, 264:16
**investment** [147] - 252:2, 252:3, 252:18, 256:7, 256:11, 257:16, 258:3, 258:9, 259:10, 259:25, 260:6, 264:12, 265:17, 266:5, 266:11, 267:4, 272:11, 275:15, 275:18, 275:21, 277:1, 277:18, 277:19, 279:20, 280:10, 280:15, 281:6, 281:25, 282:1, 282:6, 282:7, 284:16, 284:20, 286:1, 286:3, 286:12, 286:13, 286:18, 287:15, 291:15, 292:10, 292:20, 294:8, 295:5, 296:7, 296:12, 296:15, 298:10, 298:14, 300:6, 301:3, 305:23, 307:6, 307:25, 308:2, 310:15, 312:3, 312:25, 313:5, 314:3, 314:17, 315:2, 316:6, 316:13, 316:21, 316:22, 321:10, 346:24, 347:2, 349:17, 352:9, 352:13, 352:18, 352:19, 352:23, 352:24, 353:11, 354:16, 355:14, 355:15, 355:24, 356:4, 356:19, 357:1, 357:20, 358:14, 359:15, 359:24, 361:3, 361:14, 363:19, 363:21, 365:2, 365:11, 365:13, 385:12, 385:14, 385:16, 385:22, 386:5, 387:3, 387:11, 387:14, 387:21, 388:16, 388:18, 389:1, 389:7, 389:8, 389:9, 390:2, 390:9, 390:10, 390:19, 390:24, 391:1, 391:21, 392:4, 398:2, 398:23, 399:14, 404:8, 405:18, 405:19, 406:18, 407:2, 408:6, 410:10, 416:17, 416:23, 417:7, 418:4, 419:13, 420:9, 420:24, 421:7, 423:9, 423:19, 435:6, 443:20
**investments** [22] - 260:4, 266:12, 266:16, 279:6, 279:8, 282:10, 343:17, 345:16, 362:20, 364:19, 385:25, 387:6, 388:6, 392:14, 395:6, 397:19, 400:15, 400:16, 401:1, 414:11, 415:9, 433:14
**investor** [38] - 249:22, 262:14, 266:8, 270:12, 270:13, 275:4, 275:9, 279:11, 280:9, 285:23, 286:5, 293:8, 294:3, 296:25, 300:6, 331:23, 346:4, 363:7, 368:19, 370:12, 370:19, 371:9, 372:3, 402:8, 404:17, 410:18, 417:5, 417:14, 417:25, 419:5, 420:21, 423:8, 423:21, 427:9, 433:10, 439:15, 442:14, 445:14
**investor's** [2] - 280:3, 405:12
**investors** [23] - 252:22, 253:15, 284:5, 284:6, 314:16, 333:3, 335:5, 338:19, 339:5, 339:11, 340:2, 353:8, 354:12, 369:1, 376:2, 422:5, 423:12, 429:8, 436:11, 445:23, 447:19
**investors'** [1] - 365:4

**invests** [2] - 388:3, 421:10
**invited** [1] - 411:10
**involve** [1] - 420:13
**involved** [5] - 272:12, 306:10, 324:14, 389:2, 390:16
**involves** [2] - 284:5, 308:1
**involving** [1] - 403:9
**IRA** [1] - 386:19
**IRR** [3] - 422:4, 422:8, 422:11
**is's** [1] - 439:17
**issue** [15] - 246:24, 261:21, 328:25, 382:24, 383:25, 384:3, 384:7, 393:23, 408:18, 439:24, 442:13, 446:25, 449:11, 449:12, 450:8
**issued** [4] - 251:22, 266:2, 319:9, 351:13
**issues** [8] - 382:22, 401:19, 437:16, 442:21, 444:22, 449:20, 450:19, 452:4
**IT** [4] - 331:8, 395:9, 398:10, 433:23
**item** [2] - 339:15, 424:4
**items** [2] - 352:5, 388:20
**itself** [2] - 298:4, 446:1

**J**

**JAMES** [2] - 246:8, 246:10
**Jamie** [1] - 246:12
**jamiestanton.edny@gmail.com** [1] - 246:13
**January** [2] - 428:24, 429:1
**Jay** [7] - 286:22, 286:23, 324:14, 327:8, 327:14, 384:13, 384:23
**JAY** [3] - 384:23, 385:1, 453:12
**Jeff** [4] - 403:10, 414:6, 414:7, 422:23
**JEFFRY** [1] - 245:6
**Jeffry** [2] - 246:2, 263:13
**jeopardy** [1] - 424:17
**JESSICA** [1] - 245:16
**jest** [1] - 331:13
**John** [1] - 330:11
**JONATHAN** [1] - 245:20
**JONES** [2] - 247:23, 453:4
**Jones** [52] - 248:4, 248:17, 250:6, 250:25, 251:10, 251:14, 251:24, 253:17, 254:8, 254:23, 255:15, 256:23, 257:1, 258:16, 259:8, 260:7, 261:1, 262:24, 263:11, 263:19, 267:12, 267:15, 268:5, 268:8, 269:14, 273:5, 283:20, 288:9, 291:6, 295:22, 304:19, 305:22, 307:4, 307:22, 311:10, 316:4, 319:4, 321:4, 321:15, 322:23, 325:19, 330:11, 359:7, 362:7, 362:14, 363:12, 369:5, 369:18, 372:16, 373:6, 376:13, 378:5
**judge** [1] - 356:12
**JUDGE** [1] - 245:10
**Judge** [3] - 359:3, 383:24, 440:19
**June** [7] - 245:6, 252:11, 262:11, 271:3, 273:15, 429:2, 452:23
**Juneteenth** [1] - 437:4
**juror** [1] - 436:17

**jurors** [3] - 246:20, 399:16, 436:24
**Jury** [7] - 247:19, 291:1, 327:23, 330:5, 380:7, 384:10, 437:13
**jury** [43] - 246:17, 250:18, 255:12, 259:14, 260:10, 268:22, 293:23, 330:3, 330:19, 331:14, 332:7, 338:5, 354:11, 363:24, 381:20, 384:5, 385:18, 386:1, 388:24, 395:17, 397:1, 398:21, 402:16, 403:18, 407:10, 408:2, 410:12, 412:11, 416:5, 417:21, 422:6, 422:20, 428:21, 432:21, 434:8, 435:19, 446:15, 447:1, 447:2, 447:4, 447:8, 449:22, 452:10
**JURY** [1] - 245:9
**jury's** [1] - 449:3
**Justice** [1] - 287:12
**justifies** [1] - 381:18

# K

**K-1** [5] - 319:7, 319:9, 319:13, 319:23, 321:9
**K1** [4] - 367:4, 367:6, 367:16, 368:1
**K1s** [2] - 366:25, 367:20
**KATE** [1] - 245:17
**keep** [1] - 437:9
**key** [1] - 444:17
**kick** [2] - 340:8, 341:1
**kicked** [1] - 429:8
**kid** [1] - 364:1
**kids** [1] - 434:14
**KIM** [2] - 245:18, 245:22
**kind** [6] - 382:21, 387:21, 413:24, 418:16, 421:14, 443:18
**kinds** [2] - 387:18, 392:21
**kinks** [2] - 450:17, 452:15
**knell** [1] - 383:6
**knowledge** [4] - 266:11, 275:11, 279:10, 324:8
**known** [8] - 261:2, 282:14, 285:22, 304:4, 305:24, 319:7, 395:20, 399:3
**KOBRE** [2] - 245:18, 245:22
**KOVNER** [1] - 245:10

# L

**labeled** [1] - 267:21
**lack** [2] - 417:12, 450:16
**ladies** [1] - 378:15
**lags** [1] - 440:2
**language** [15] - 310:13, 342:13, 342:19, 343:20, 345:14, 350:20, 350:21, 351:24, 378:24, 379:1, 381:12, 442:24, 444:17, 446:4, 446:23
**laptops** [1] - 248:13
**large** [5] - 252:8, 385:16, 390:19, 391:1, 439:25
**largely** [1] - 286:18
**larger** [4] - 298:24, 354:6, 385:23, 421:11
**largest** [1] - 351:2

**last** [17] - 254:8, 257:1, 304:18, 356:12, 378:23, 381:13, 394:25, 395:2, 408:15, 424:4, 427:8, 427:16, 427:17, 433:7, 446:5, 446:6, 446:16
**LAURA** [1] - 246:7
**law** [2] - 410:23, 440:16
**LAW** [1] - 246:8
**laws** [1] - 298:4
**lawsuits** [1] - 327:11
**lead** [2] - 369:25, 391:7
**leading** [2] - 360:2, 369:24
**learn** [1] - 387:6
**least** [10] - 264:14, 270:13, 300:6, 317:18, 334:20, 350:20, 366:7, 420:9, 436:17, 450:14
**leave** [6] - 325:23, 327:6, 327:8, 358:23, 380:2, 437:7
**Leave** [1] - 380:1
**left** [17] - 248:6, 249:5, 268:5, 302:17, 309:23, 320:2, 321:12, 324:15, 325:19, 325:22, 326:17, 327:4, 327:9, 356:22, 390:18, 427:19, 447:11
**left-hand** [2] - 268:5, 427:19
**lengthy** [1] - 247:9
**less** [12] - 281:2, 297:10, 301:15, 310:19, 316:15, 347:11, 357:14, 366:8, 423:2, 423:3, 423:6, 431:17
**letter** [45] - 249:9, 250:7, 250:21, 251:9, 251:10, 251:14, 251:17, 252:11, 253:18, 254:6, 256:1, 256:8, 256:14, 257:15, 257:18, 321:9, 350:14, 350:15, 351:8, 351:10, 365:19, 381:5, 381:14, 381:21, 381:25, 382:2, 382:3, 383:3, 383:5, 383:11, 438:1, 438:4, 439:16, 440:23, 441:12, 441:15, 442:4, 445:5, 445:8, 445:15, 446:5, 446:18, 447:17, 448:3, 450:21
**letterhead** [2] - 350:22, 350:23
**letters** [1] - 313:19
**letting** [1] - 247:11
**level** [7] - 295:15, 313:11, 338:19, 362:17, 368:16, 428:18, 429:9
**levels** [2] - 399:4, 443:9
**Leverage** [1] - 283:25
**leverage** [11] - 282:22, 282:25, 283:3, 283:5, 283:12, 283:14, 283:18, 284:1, 284:4, 284:6, 354:5
**leveraged** [1] - 284:4
**liabilities** [1] - 436:3
**liability** [1] - 303:23
**license** [1] - 420:12
**lie** [2] - 288:3, 372:23
**life** [2] - 316:13, 316:22
**lifetime** [1] - 364:5
**light** [1] - 445:19
**likely** [2] - 431:9, 431:22
**Limited** [16] - 259:22, 270:9, 273:3, 273:11, 273:18, 273:25, 274:4, 274:8, 274:11, 274:12, 274:16, 274:18, 276:11, 276:17, 277:13, 420:7

**limited** [20] - 249:22, 273:21, 274:2, 277:14, 281:17, 281:20, 281:25, 303:23, 304:3, 305:2, 305:10, 319:9, 319:10, 322:3, 322:5, 323:23, 366:2, 373:14, 399:11
**limiting** [1] - 382:11, 448:2
**line** [33] - 270:24, 271:15, 294:10, 294:15, 295:25, 296:3, 296:7, 297:4, 297:6, 298:10, 300:21, 301:14, 302:16, 308:18, 314:7, 320:6, 325:13, 326:6, 331:5, 331:25, 339:13, 339:15, 344:2, 348:8, 352:4, 364:21, 366:15, 367:1, 427:8, 434:19, 446:1
**lined** [1] - 329:4
**link** [1] - 430:8
**linked** [1] - 444:21
**links** [1] - 431:2
**liquidity** [1] - 277:11
**list** [3] - 306:14, 389:22, 395:7
**listed** [8] - 274:24, 282:19, 306:15, 314:6, 314:16, 376:2, 376:5, 388:1
**listen** [2] - 326:12, 425:6
**listened** [1] - 335:13
**listener** [2] - 449:25, 450:8
**lists** [1] - 271:7
**literature** [1] - 334:5
**living** [1] - 385:11
**LLC** [1] - 428:18
**LLP** [4] - 245:18, 245:22, 246:2, 246:5
**load** [1] - 260:24
**loan** [1] - 395:9
**loans** [1] - 433:25
**local** [1] - 305:1
**locked** [1] - 252:15
**lodging** [2] - 412:17, 412:18
**long-term** [1] - 277:19
**long-winded** [1] - 447:11
**look** [54] - 253:16, 254:3, 256:25, 271:14, 271:20, 273:18, 276:11, 279:23, 291:24, 292:23, 293:6, 295:1, 296:6, 298:2, 298:9, 301:3, 301:14, 304:10, 307:17, 307:19, 309:22, 310:17, 310:18, 311:12, 312:18, 313:7, 314:15, 316:11, 316:21, 318:6, 318:13, 318:17, 318:21, 320:2, 320:20, 321:12, 337:9, 337:13, 343:23, 349:21, 354:23, 356:24, 376:10, 378:23, 383:3, 387:16, 387:17, 393:2, 395:11, 398:20, 428:25, 432:6, 437:17, 451:22
**Looked** [1] - 297:3
**looked** [11] - 251:3, 255:5, 256:2, 260:7, 293:13, 297:1, 312:9, 312:13, 356:10, 359:17, 376:22
**looking** [39] - 249:5, 249:18, 252:10, 256:8, 269:14, 285:2, 294:14, 304:13, 311:13, 317:1, 318:7, 325:8, 337:2, 352:6, 354:7, 357:11, 359:12, 364:17, 366:6, 366:15, 367:16, 367:19, 368:1, 368:15, 370:1, 382:20, 389:5, 394:5, 398:6, 405:18, 413:25, 433:4, 434:15,

435:23, 436:7, 440:25, 442:25, 450:19
**looks** [2] - 350:4, 381:4
**lose** [3] - 279:3, 279:17, 281:5
**losing** [2] - 281:10, 420:22
**loss** [4] - 280:3, 298:1, 308:2, 318:12
**losses** [1] - 280:3
**lovely** [1] - 449:16
**low** [3] - 279:19, 392:8, 399:7
**lower** [13] - 284:8, 292:25, 298:3, 304:25, 318:14, 359:25, 361:4, 361:14, 361:17, 364:23, 367:13, 402:10, 429:19
**LP's** [4] - 343:13, 343:17, 345:16, 345:20
**LPA** [5] - 269:19, 270:8, 270:16, 270:22, 373:14
**LPO** [1] - 390:15
**LPs** [9] - 259:22, 259:25, 260:1, 284:8, 343:10, 343:14, 366:6, 366:11, 370:6
**LPs'** [2] - 260:4, 260:6
**lull** [5] - 441:9, 441:14, 441:22, 442:5, 443:14
**lulling** [4] - 442:3, 442:22, 445:22, 446:2
**lunch** [3] - 315:17, 327:19, 328:18
**Luncheon** [1] - 329:14
**Lynch** [2] - 324:16, 390:15

# M

**mail** [18] - 393:2, 393:4, 393:13, 394:5, 394:11, 394:15, 395:12, 397:9, 412:19, 429:22, 430:12, 430:13, 432:10, 432:11, 432:23, 433:6, 433:18, 433:19
**mails** [3] - 387:19, 403:6, 403:7
**main** [2] - 398:21, 411:14
**maintain** [1] - 443:8
**maintained** [1] - 377:2
**major** [2] - 266:3, 266:24
**managed** [1] - 395:9
**management** [2] - 362:2, 434:3
**Management** [1] - 398:11
**manager** [7] - 264:19, 279:11, 281:25, 282:2, 282:6, 282:7, 403:25
**manages** [1] - 414:11
**maneuvering** [1] - 320:4
**maneuvers** [1] - 298:2
**Mann** [13] - 391:13, 391:14, 392:24, 393:13, 397:8, 403:7, 403:8, 406:15, 411:12, 428:12, 429:23, 430:14, 432:14
**manufacturer** [4] - 317:14, 361:21, 399:1, 399:9
**March** [2] - 430:22, 432:23
**margins** [3] - 308:14, 348:2, 392:10
**Margolin** [1] - 350:25
**Mark** [5] - 403:7, 403:8, 411:12, 428:12, 429:23
**marked** [5] - 250:1, 267:12, 267:17, 393:9, 411:18, 430:1, 432:4
**market** [3] - 276:5, 399:11, 423:21

**marketing** [17] - 260:7, 310:15, 347:25, 379:7, 379:8, 387:11, 387:13, 388:15, 391:12, 391:16, 397:13, 408:16, 408:21, 419:20, 423:4, 428:13, 435:10
**marketplace** [2] - 396:17, 399:6
**marks** [1] - 271:11
**MARVIN** [2] - 247:23, 453:4
**Marvin** [1] - 268:8
**mass** [2] - 354:2, 396:20
**match** [2] - 424:19, 424:22
**material** [4] - 292:18, 308:19, 310:15, 423:4
**materializes** [1] - 417:5
**materials** [25] - 260:8, 260:14, 261:8, 262:6, 347:25, 379:4, 379:7, 379:8, 388:20, 389:5, 390:7, 394:22, 397:12, 398:20, 400:6, 404:24, 406:22, 406:23, 408:16, 408:21, 419:20, 419:22, 425:20, 428:14, 435:10
**math** [4] - 357:7, 371:22, 371:23, 410:15
**mathematical** [2] - 314:21, 411:2
**MATHEWS** [1] - 245:17
**matter** [11] - 325:24, 363:2, 363:5, 363:7, 377:3, 377:13, 377:19, 377:20, 379:18, 451:19, 452:23
**matters** [2] - 264:17, 275:12
**MATTHEW** [1] - 245:24
**MBA** [1] - 264:24
**McConnell** [130] - 245:15, 247:16, 247:22, 248:3, 248:10, 248:14, 248:16, 248:19, 249:15, 250:4, 250:10, 250:17, 250:20, 251:8, 251:12, 254:5, 254:18, 254:20, 255:7, 255:11, 255:14, 256:19, 256:21, 256:25, 258:13, 258:25, 262:23, 263:21, 268:14, 269:24, 273:8, 273:13, 276:13, 277:9, 289:2, 289:7, 293:20, 295:22, 300:14, 301:22, 319:17, 321:2, 324:3, 325:9, 325:14, 326:5, 326:7, 326:10, 332:23, 340:16, 350:6, 353:12, 354:19, 355:8, 358:23, 359:2, 359:6, 360:3, 360:6, 361:2, 361:12, 362:5, 362:11, 363:13, 364:8, 366:1, 366:3, 366:5, 367:10, 368:8, 369:2, 369:15, 371:8, 371:20, 372:10, 372:13, 372:25, 373:9, 378:5, 379:22, 381:3, 381:15, 382:4, 382:8, 383:23, 384:13, 385:6, 393:6, 393:16, 393:25, 394:3, 395:11, 402:5, 403:14, 405:8, 407:7, 407:9, 408:3, 408:14, 412:5, 412:10, 412:13, 412:23, 413:2, 413:11, 413:23, 414:14, 419:24, 421:18, 423:13, 424:2, 425:14, 425:22, 426:5, 427:2, 427:15, 428:5, 428:19, 430:3, 430:15, 432:1, 432:15, 432:20, 433:17, 436:13, 451:8, 453:5, 453:13
**McConnell's** [1] - 410:3
**mean** [27] - 252:14, 323:7, 343:22, 369:1, 386:17, 388:9, 388:24, 391:24, 395:17, 396:23, 399:22, 402:23,

419:12, 420:8, 422:7, 422:13, 422:21, 423:24, 424:14, 425:25, 427:21, 428:22, 431:12, 435:5, 442:3, 446:25, 451:14
**Meaning** [1] - 365:4
**meaning** [2] - 253:9, 433:24
**means** [16] - 252:15, 276:5, 276:8, 311:17, 339:18, 343:23, 345:13, 369:11, 390:20, 397:1, 397:3, 401:11, 420:21, 422:14, 426:3, 431:14
**meant** [4] - 408:6, 417:4, 417:25, 421:7
**measure** [3] - 297:17, 298:7, 298:14
**measurement** [2] - 298:8, 298:16
**meet** [13] - 311:3, 323:8, 323:10, 323:13, 323:14, 323:16, 323:17, 338:23, 340:7, 340:25, 418:6, 429:11, 450:25
**meeting** [5] - 287:8, 334:22, 405:24, 412:1, 412:2
**meetings** [5] - 287:14, 287:17, 323:1, 323:21, 389:6
**member** [1] - 288:10
**members** [21] - 259:14, 260:10, 287:22, 363:24, 385:18, 386:1, 386:11, 388:24, 395:16, 396:25, 402:16, 403:18, 410:12, 412:10, 416:5, 417:21, 422:6, 422:20, 428:21, 434:8, 435:19
**memoranda** [1] - 389:13
**memorandum** [18] - 269:18, 269:22, 281:2, 282:18, 282:20, 285:2, 285:5, 304:5, 306:10, 308:5, 308:7, 309:7, 389:12, 389:18, 389:21, 390:1, 390:5, 390:6
**Memorandum** [13] - 258:17, 258:19, 259:9, 260:12, 262:10, 269:23, 270:5, 271:1, 272:9, 273:12, 274:24, 275:24, 277:12
**memory** [1] - 393:1
**MENCHEL** [4] - 245:24, 268:16, 355:22, 419:7
**mention** [1] - 439:2
**mentioned** [14] - 247:5, 291:10, 367:6, 387:20, 389:24, 399:12, 403:16, 406:13, 406:19, 411:5, 414:6, 416:2, 419:21, 420:11
**merely** [1] - 399:8
**merits** [1] - 275:17
**Merrill** [2] - 324:16, 390:15
**message** [1] - 348:18
**met** [5] - 291:23, 330:12, 418:2, 418:9, 440:10
**metric** [3] - 355:14, 358:2, 358:11
**metrics** [2] - 357:17, 358:13
**Miami** [2] - 245:23, 246:9
**mic** [1] - 292:1
**Michael** [7] - 384:23, 391:13, 393:13, 403:7, 403:8, 406:15, 411:12, 428:12, 429:23, 430:14, 432:14
**MICHAEL** [4] - 246:7, 384:24, 385:1, 453:12

MichaelMann@AscendantCapital. com [1] - 394:8
Michelle [3] - 273:1, 312:22, 320:3
Microsoft [1] - 387:24
mid [1] - 433:25
mid-sized [1] - 433:25
middle [3] - 309:13, 346:17, 446:14
might [10] - 268:23, 311:6, 311:17, 329:5, 377:12, 380:4, 387:7, 394:21, 436:13
million [20] - 265:21, 294:13, 296:14, 296:15, 297:10, 298:18, 298:19, 301:15, 338:14, 338:17, 355:1, 401:11, 401:12, 406:9, 424:16, 424:24, 427:7, 434:20
millions [2] - 252:21, 386:21
Min [1] - 326:9
Min-U-Script [1] - 326:9
mind [2] - 408:25, 437:10
mine [1] - 254:24
minimize [2] - 441:14, 441:23
minimizing [4] - 381:25, 382:14, 440:7, 442:23
minimum [3] - 291:9, 423:19, 440:11
minute [5] - 358:5, 359:1, 380:5, 382:20, 452:12
minutes [5] - 315:14, 322:23, 375:10, 378:5, 393:1
miscellaneous [1] - 326:20
misleading [2] - 440:4, 447:18
misrepresentation [1] - 424:25
missing [1] - 432:2
mitigates [1] - 308:15
model [1] - 354:10
moment [12] - 262:23, 288:6, 304:15, 322:20, 327:15, 335:8, 337:8, 376:20, 393:15, 407:5, 434:24, 443:24
Monday [1] - 437:3
money [36] - 252:8, 252:9, 253:11, 253:12, 253:19, 262:21, 277:7, 277:20, 281:10, 281:13, 282:25, 335:4, 340:15, 346:10, 346:20, 347:1, 347:7, 347:19, 371:15, 386:20, 391:16, 395:9, 397:4, 405:17, 414:12, 414:13, 419:15, 419:17, 420:22, 424:12, 424:17, 431:15, 433:22, 434:11
money's [4] - 252:15, 357:12, 420:23, 431:17
moneys [1] - 365:4
monitoring [2] - 312:24, 314:3
month [22] - 288:18, 291:7, 292:10, 315:3, 317:12, 333:23, 334:2, 334:13, 334:14, 334:23, 346:17, 347:8, 347:22, 348:9, 348:17, 348:19, 349:5, 361:4, 429:3, 432:24
monthly [23] - 248:23, 258:8, 261:10, 333:24, 345:10, 347:13, 347:16, 360:8, 361:15, 367:23, 369:20, 370:2, 370:19, 371:9, 399:14, 399:17, 400:9,

400:20, 404:25, 405:11, 416:12, 418:24, 422:3
months [15] - 252:11, 294:8, 299:11, 299:13, 318:7, 318:15, 332:14, 334:4, 346:15, 349:3, 351:15, 370:20, 371:10, 424:17, 428:23
Morgan [1] - 390:14
morning [5] - 248:4, 248:5, 263:11, 263:12, 451:23
most [8] - 315:4, 335:3, 364:3, 365:3, 374:17, 406:16, 428:13, 449:11
move [4] - 250:12, 311:23, 328:13, 357:4
moving [1] - 267:9
MR [323] - 247:8, 247:16, 247:22, 248:3, 248:10, 248:14, 248:16, 248:19, 249:15, 250:4, 250:10, 250:17, 250:20, 251:8, 251:12, 253:3, 254:5, 254:16, 254:18, 254:20, 255:7, 255:11, 255:14, 256:5, 256:9, 256:16, 256:17, 256:19, 256:21, 256:25, 257:10, 257:17, 258:13, 258:25, 261:6, 261:12, 261:19, 261:21, 262:23, 263:2, 263:7, 263:10, 267:7, 267:14, 267:25, 268:12, 268:14, 268:16, 268:17, 268:19, 268:21, 268:25, 269:7, 269:11, 271:13, 273:1, 273:8, 276:13, 277:9, 279:1, 279:23, 280:17, 283:16, 285:19, 288:5, 288:8, 289:2, 289:4, 289:7, 289:11, 290:4, 290:10, 291:3, 291:5, 293:4, 293:16, 293:20, 293:23, 294:1, 294:24, 299:23, 300:12, 300:14, 300:17, 300:19, 301:2, 301:21, 302:1, 302:25, 304:10, 304:17, 307:9, 307:17, 310:1, 312:20, 315:10, 315:15, 315:18, 315:21, 316:2, 316:3, 318:21, 318:25, 319:3, 319:16, 319:17, 319:21, 320:3, 320:20, 320:23, 321:2, 322:20, 322:22, 324:3, 325:9, 325:11, 325:14, 325:18, 325:21, 326:5, 326:6, 326:7, 326:8, 326:10, 327:15, 327:17, 328:1, 328:16, 330:8, 330:10, 331:4, 331:8, 331:11, 332:23, 336:25, 337:17, 340:16, 342:1, 342:6, 342:11, 348:22, 349:23, 350:5, 350:6, 350:9, 350:11, 350:18, 351:7, 351:22, 352:11, 352:22, 353:1, 353:12, 354:19, 355:5, 355:8, 355:20, 355:22, 355:23, 356:12, 357:5, 358:5, 358:7, 358:21, 358:23, 359:1, 359:2, 359:6, 360:2, 360:3, 360:6, 361:2, 361:8, 362:5, 362:11, 363:13, 364:8, 366:1, 366:5, 367:10, 368:8, 369:2, 369:15, 369:24, 370:22, 371:3, 371:8, 371:20, 372:10, 372:13, 372:20, 372:25, 373:2, 373:5, 375:8, 375:13, 376:9, 376:20, 377:24, 377:25, 378:4, 378:23, 379:20, 379:22, 381:3, 381:8, 381:15, 382:4, 382:8, 382:13, 382:24, 383:9, 383:23, 384:6, 384:13, 385:6, 393:6, 393:16,

393:20, 393:23, 393:25, 394:3, 395:11, 398:1, 401:16, 401:22, 401:24, 402:4, 402:5, 402:20, 402:21, 403:11, 403:14, 404:12, 405:5, 405:6, 405:8, 407:3, 407:7, 407:9, 408:3, 408:13, 408:14, 408:18, 408:24, 409:4, 412:5, 412:7, 412:10, 412:13, 412:23, 412:25, 413:2, 413:11, 413:14, 413:16, 413:23, 414:14, 416:19, 419:7, 419:24, 421:18, 423:13, 424:2, 425:14, 425:22, 426:5, 427:2, 427:15, 428:5, 428:19, 430:3, 430:15, 430:17, 430:19, 432:1, 432:15, 432:17, 432:20, 433:17, 436:13, 436:23, 437:24, 439:2, 440:15, 440:21, 441:5, 441:9, 441:19, 442:12, 443:12, 443:15, 444:1, 444:3, 444:10, 444:19, 445:4, 445:7, 445:10, 446:1, 446:11, 446:13, 447:10, 449:2, 449:9, 449:23, 450:7, 450:12, 451:5, 451:8, 451:9, 451:14, 451:19, 452:6, 452:14, 452:21, 453:5, 453:6, 453:7, 453:8, 453:9, 453:10, 453:13
MS [7] - 246:23, 247:1, 309:22, 328:11, 329:1, 329:9, 357:4
multiple [5] - 278:5, 278:6, 322:25, 357:17, 403:6
must [2] - 354:14, 395:14
mutual [2] - 388:16, 389:19

# N

Nabisco [3] - 265:2, 265:4, 318:13
name [6] - 255:4, 263:13, 265:17, 268:8, 330:11, 384:21
named [1] - 391:13
narrative [1] - 401:24
narrower [1] - 440:17
Nation [1] - 395:9
nature [7] - 298:4, 317:15, 317:21, 318:9, 318:19, 321:14, 393:22
Naugle [3] - 291:19, 291:20, 291:21
near [1] - 392:6
necessarily [9] - 305:12, 305:13, 305:16, 305:17, 313:11, 383:19, 417:11, 447:2, 449:15
need [19] - 247:4, 283:21, 307:19, 307:20, 315:24, 328:19, 329:9, 359:1, 367:11, 381:4, 382:6, 385:24, 396:10, 434:25, 440:21, 449:15, 452:5
needed [1] - 339:18
needs [1] - 385:23
negative [9] - 325:23, 326:22, 327:5, 327:11, 331:1, 332:2, 332:3, 344:8, 361:23
negatively [4] - 260:4, 343:16, 345:15, 345:25
net [34] - 297:6, 297:16, 297:18, 298:2, 298:6, 298:10, 298:13, 301:14, 352:18, 352:19, 352:22, 352:24, 353:11, 353:21, 354:16, 355:1,

355:15, 355:24, 356:4, 356:18, 357:1, 357:13, 357:20, 357:22, 358:11, 358:17, 359:24, 361:13, 361:17, 361:23, 388:5, 422:4
**Net** [1] - 297:8
**network** [1] - 423:21
**Never** [1] - 370:14
**never** [17] - 249:1, 249:3, 249:8, 264:2, 264:8, 279:19, 298:21, 323:17, 325:25, 330:12, 333:19, 339:13, 378:11, 378:15, 378:20, 433:15
**new** [18] - 252:8, 252:9, 252:21, 282:15, 317:20, 340:18, 340:19, 364:13, 371:15, 377:6, 395:22, 433:11, 434:18, 439:24, 442:10, 443:20, 443:24, 445:19
**NEW** [1] - 245:1
**New** [7] - 245:5, 245:14, 245:15, 245:19, 246:3
**next** [23] - 289:14, 290:13, 319:22, 328:21, 353:2, 361:3, 366:11, 370:9, 383:25, 384:12, 407:11, 409:6, 417:1, 423:17, 426:5, 433:19, 434:5, 436:16, 436:20, 437:5, 443:2, 449:20, 450:25
**Next** [2] - 439:5, 444:13
**nice** [1] - 452:22
**NICHOLAS** [1] - 245:16
**night** [2] - 381:13, 451:21
**nobody** [4] - 310:11, 323:17, 374:20, 439:25
**Nobody** [1] - 371:2
**non** [2] - 266:12, 299:7
**non-alternative** [1] - 266:12
**non-audited** [1] - 299:7
**none** [1] - 306:16
**nonetheless** [1] - 340:14
**normal** [1] - 392:19
**North** [1] - 326:18
**northeast** [1] - 317:19
**northern** [1] - 351:3
**note** [8] - 252:10, 259:1, 314:9, 375:25, 376:1, 393:20, 403:12, 405:5
**noted** [1] - 330:2
**notes** [2] - 249:13, 376:1
**Nothing** [2] - 372:25, 377:24
**nothing** [9] - 322:8, 327:17, 331:1, 332:3, 340:8, 358:21, 379:20, 381:13, 384:19
**notice** [5] - 257:5, 450:14, 450:24, 451:23, 451:24
**notify** [1] - 252:4
**noting** [1] - 408:14
**notwithstanding** [1] - 443:9
**nowhere** [3] - 375:22, 379:2, 379:5
**number** [16] - 257:7, 257:8, 272:7, 294:18, 295:12, 296:10, 297:20, 347:13, 352:16, 352:23, 356:17, 367:8, 369:6, 396:1, 396:25, 419:21
**numbering** [1] - 271:19
**numbers** [3] - 273:2, 356:14, 436:7

**numerous** [2] - 361:21
**NW** [1] - 246:6

## O

**o'clock** [2] - 452:21, 452:23
**oath** [2] - 325:19, 326:4
**object** [9] - 261:19, 355:8, 401:19, 402:2, 405:6, 410:4, 413:14, 413:16, 413:17
**Objection** [9] - 289:2, 361:8, 369:24, 370:22, 371:3, 372:20, 402:20, 404:12, 430:19
**objection** [44] - 253:3, 254:16, 256:5, 256:9, 256:16, 256:17, 257:10, 257:17, 261:6, 261:12, 268:14, 289:7, 321:1, 321:2, 324:3, 325:9, 325:14, 332:23, 340:16, 350:6, 353:12, 354:19, 360:2, 393:21, 393:22, 398:1, 401:18, 401:20, 402:3, 402:21, 403:11, 403:12, 405:5, 407:3, 408:12, 408:19, 409:1, 412:7, 412:23, 412:25, 416:19, 419:7, 430:17, 432:17
**objections** [1] - 250:14
**objective** [4] - 280:2, 311:19, 311:20, 365:4
**objectives** [3] - 340:18, 340:21, 389:2
**obligation** [1] - 451:6
**obtained** [1] - 313:13
**obviously** [7] - 327:18, 329:11, 398:8, 439:8, 444:21, 446:4, 452:15
**occurred** [3] - 290:1, 391:2, 441:18
**October** [13] - 258:12, 286:8, 287:5, 330:18, 335:13, 335:19, 335:22, 336:1, 336:19, 347:22, 349:2, 349:3, 378:6
**OF** [4] - 245:1, 245:3, 245:9, 246:8
**off-market** [1] - 423:21
**offensive** [1] - 252:7
**offer** [17] - 255:7, 293:17, 300:12, 308:13, 308:19, 308:20, 308:21, 309:5, 317:14, 319:16, 320:25, 350:5, 393:17, 412:5, 413:11, 430:16, 432:15
**offered** [4] - 266:7, 268:12, 382:3, 382:5
**offering** [3] - 279:3, 294:16, 421:21
**offers** [1] - 317:14
**OFFICE** [1] - 246:8
**Officer** [1] - 253:9
**official** [1] - 390:3
**Official** [1] - 246:13
**often** [1] - 314:12
**oftentimes** [1] - 410:23
**oil** [1] - 399:24
**Okeydoke** [1] - 437:15
**old** [2] - 364:2, 364:9
**older** [1] - 324:15
**omits** [1] - 440:4
**omitting** [1] - 442:17
**once** [4] - 337:9, 388:18, 396:19, 436:21
**one** [98] - 246:23, 247:3, 249:18, 253:25, 254:5, 254:7, 257:2, 257:13,

259:3, 259:4, 262:23, 264:5, 265:20, 266:22, 267:1, 267:23, 269:2, 269:7, 269:11, 272:7, 273:15, 282:7, 282:8, 287:4, 287:13, 287:17, 291:8, 292:6, 292:10, 295:15, 297:16, 300:20, 301:14, 302:1, 304:15, 316:24, 322:20, 323:11, 325:21, 325:25, 327:7, 327:15, 329:7, 329:11, 331:7, 332:25, 335:24, 336:16, 342:14, 344:2, 348:17, 348:19, 349:5, 351:2, 353:20, 354:9, 354:23, 355:17, 358:2, 358:13, 362:12, 366:3, 366:4, 366:7, 369:2, 370:16, 378:12, 378:23, 381:17, 388:10, 391:12, 391:25, 392:8, 393:15, 396:15, 398:9, 398:24, 403:3, 407:5, 408:24, 410:14, 413:23, 413:25, 414:1, 415:3, 424:10, 425:20, 427:11, 427:14, 431:18, 436:17, 440:19, 449:18, 452:21
**One** [3] - 288:5, 375:4, 376:20
**one-and-a-half** [1] - 247:3
**one-and-a-half-day** [1] - 378:12
**one-month** [1] - 349:5
**one-time** [1] - 329:7
**ones** [3] - 282:20, 435:11, 450:24
**ongoing** [5] - 399:23, 415:10, 437:21, 441:8, 441:16
**online** [1] - 430:8
**open** [3] - 246:17, 291:1, 437:10
**operate** [9] - 260:3, 343:15, 344:3, 344:9, 364:20, 389:3, 390:18, 396:10, 396:18
**operates** [2] - 389:9, 425:4
**operating** [33] - 258:5, 259:19, 259:21, 260:14, 262:4, 262:7, 281:3, 281:17, 281:20, 281:21, 281:25, 282:2, 284:7, 324:17, 343:2, 343:9, 344:10, 362:2, 362:16, 369:21, 370:6, 371:16, 392:2, 392:11, 396:9, 396:21, 399:18, 399:21, 408:9, 415:8, 419:14, 419:18, 421:8
**operation** [3] - 360:9, 368:5, 410:15
**operations** [25] - 281:3, 288:12, 292:17, 292:20, 292:24, 295:9, 332:19, 333:4, 333:25, 334:6, 334:16, 345:8, 347:20, 347:24, 348:1, 348:2, 349:6, 352:1, 353:17, 355:3, 362:1, 396:20, 399:23, 425:8, 445:14
**operator** [5] - 338:8, 338:15, 348:16, 363:5, 365:6
**operators** [1] - 282:16
**opinion** [3] - 254:15, 363:22, 416:21
**opportunities** [3] - 346:8, 387:3, 388:4
**opportunity** [2] - 388:18, 410:10
**opposed** [1] - 297:17
**option** [1] - 315:22
**order** [4] - 292:15, 310:21, 352:18, 431:20
**organization** [2] - 260:22, 353:25
**orient** [1] - 337:2
**originally** [1] - 385:9

**outline** [1] - 436:2
**outlined** [2] - 308:12, 344:15
**outset** [1] - 334:20
**outside** [6] - 299:7, 407:10, 408:1, 434:15, 436:7, 452:10
**overall** [5] - 395:21, 404:11, 404:18, 410:15, 416:17
**overly** [1] - 348:17
**overnight** [1] - 257:16
**overruled** [12] - 253:4, 257:11, 261:7, 261:13, 324:4, 340:17, 354:20, 355:10, 403:13, 404:13, 405:7, 419:8
**Overruled** [2] - 370:23, 372:21
**oversized** [1] - 298:1
**overview** [2] - 420:6, 443:16
**owe** [1] - 436:3
**owed** [2] - 253:11
**owes** [2] - 253:11, 253:12
**own** [22] - 261:11, 261:18, 265:7, 275:20, 318:12, 367:19, 367:22, 369:5, 373:17, 373:21, 375:6, 386:7, 387:8, 403:23, 405:12, 419:17, 421:10, 435:23, 436:3, 445:21
**owned** [4] - 295:23, 347:12, 392:3, 434:12
**owner** [8] - 295:16, 297:24, 406:21, 414:8, 417:1, 417:15, 418:3, 436:4
**owner/operator** [1] - 416:25
**ownership** [7] - 340:19, 347:17, 377:2, 377:4, 377:7, 434:22, 434:23
**owns** [3] - 295:12, 375:2, 389:8

## P

**P&L** [1] - 265:7
**p.m** [4] - 330:2, 451:20, 451:21, 452:23
**package** [1] - 326:24
**page** [93] - 249:16, 256:21, 256:24, 258:25, 259:3, 267:18, 267:20, 267:22, 269:14, 269:16, 269:20, 270:20, 270:24, 271:5, 271:6, 271:9, 271:16, 271:17, 273:2, 273:3, 273:19, 276:15, 277:9, 277:10, 278:7, 280:19, 281:1, 289:14, 290:13, 294:2, 307:24, 309:10, 309:24, 310:17, 311:13, 312:19, 312:21, 319:22, 319:23, 321:12, 321:13, 325:8, 325:13, 326:6, 326:7, 326:8, 326:13, 331:5, 331:6, 335:18, 336:6, 341:8, 342:11, 342:12, 348:24, 348:25, 350:12, 350:13, 351:8, 351:9, 351:23, 352:8, 353:2, 356:10, 360:12, 369:17, 372:17, 380:1, 407:11, 409:6, 414:14, 414:17, 420:25, 421:18, 423:13, 423:15, 424:2, 425:23, 426:5, 426:8, 427:16, 427:17, 438:5, 438:9, 439:5, 443:15, 445:11, 446:7, 448:5
**PAGE** [1] - 453:3
**Page** [20] - 279:23, 280:17, 283:16, 285:19, 293:16, 294:24, 300:19, 301:2, 304:11, 304:17, 307:18, 309:22, 362:5, 363:15, 364:17, 366:1, 369:17, 378:25, 379:1
**pages** [1] - 258:24
**paid** [44] - 249:21, 255:15, 258:6, 260:6, 285:7, 287:1, 309:15, 311:2, 314:16, 325:25, 339:10, 339:18, 339:19, 340:3, 345:20, 346:4, 359:25, 361:5, 361:15, 363:5, 367:15, 367:18, 376:2, 377:19, 377:21, 390:21, 397:4, 397:5, 400:9, 400:20, 401:8, 401:11, 404:10, 404:19, 412:14, 418:21, 419:4, 419:14, 420:16, 422:1, 422:3, 423:2, 427:5
**paragraph** [35] - 250:23, 251:13, 251:16, 251:17, 254:3, 254:6, 254:9, 259:3, 259:6, 260:9, 260:11, 271:22, 304:18, 309:11, 348:24, 348:25, 362:13, 362:14, 362:22, 365:18, 369:18, 369:19, 370:1, 379:2, 379:4, 394:25, 443:2, 444:3, 444:14, 445:2, 445:10, 446:6
**paragraphs** [1] - 251:15
**parse** [1] - 446:25
**part** [38] - 252:3, 252:4, 266:10, 273:8, 281:6, 284:21, 307:3, 314:2, 335:2, 338:22, 344:17, 351:3, 352:1, 366:19, 368:25, 369:10, 370:12, 370:16, 371:9, 387:2, 389:11, 395:1, 395:2, 406:22, 417:24, 422:22, 427:3, 428:7, 431:21, 433:17, 433:19, 433:22, 433:23, 443:1, 444:11, 444:12, 445:5, 446:19
**participating** [2] - 413:25, 415:3
**particular** [14] - 259:23, 262:2, 263:3, 295:4, 339:15, 343:11, 350:20, 350:21, 357:21, 361:3, 365:11, 370:7, 390:24, 410:25
**particularly** [1] - 399:2
**parties** [2] - 436:19, 450:23
**partner** [5] - 251:5, 276:18, 276:21, 303:23, 443:7
**Partner** [6] - 273:25, 274:4, 274:11, 274:12, 274:17, 274:18
**partner's** [2] - 276:19, 285:7
**Partners** [3] - 259:22, 274:8, 277:13
**partners** [11] - 273:21, 274:2, 274:4, 286:24, 305:2, 305:11, 319:9, 346:13, 362:16, 396:9, 443:4
**Partnership** [7] - 270:9, 273:3, 273:11, 273:19, 276:11, 276:17, 420:7
**partnership** [14] - 274:3, 274:5, 274:9, 293:7, 293:14, 300:2, 300:5, 304:3, 304:23, 319:11, 362:15, 362:19, 373:14, 446:20
**partnerships** [2] - 322:3, 322:6
**parts** [3] - 317:11, 386:24, 432:6
**party** [6] - 253:10, 253:13, 335:4, 381:17, 436:5, 436:7
**pass** [1] - 329:7
**passed** [1] - 324:19
**past** [4] - 310:2, 310:11, 311:8, 441:18

**Past** [1] - 313:18
**pat** [1] - 418:13
**patience** [2] - 322:24, 373:7
**pause** [3] - 383:22, 408:25, 410:3
**Pause** [4] - 288:7, 304:16, 322:21, 327:16
**pay** [20] - 259:23, 260:21, 262:1, 298:18, 305:10, 305:11, 338:16, 343:11, 345:5, 346:8, 346:12, 370:7, 416:14, 417:24, 423:3, 424:24, 425:11, 427:10, 429:16
**payback** [1] - 340:21
**paying** [13] - 344:15, 347:1, 370:19, 371:9, 371:15, 395:23, 401:12, 404:22, 423:6, 423:7, 425:6, 425:9, 441:12
**payments** [2] - 310:21, 346:20
**payout** [1] - 429:6
**pays** [1] - 421:9
**PDF** [1] - 362:11
**PEACE** [1] - 245:13
**pen** [1] - 356:13
**penalty** [1] - 340:10
**pending** [2] - 257:21, 371:7
**pension** [2] - 388:10, 388:11
**people** [16] - 260:23, 266:8, 286:20, 317:10, 317:19, 318:2, 336:10, 341:3, 351:24, 364:1, 364:15, 386:18, 411:14, 418:14, 436:25, 441:13
**people's** [1] - 364:12
**per** [2] - 339:22, 396:16
**percent** [95] - 253:23, 257:15, 260:21, 260:24, 261:10, 283:14, 285:12, 304:25, 306:11, 306:14, 308:13, 308:14, 344:16, 345:3, 345:6, 345:8, 345:9, 346:9, 346:12, 346:14, 347:20, 347:23, 348:2, 348:3, 357:1, 357:7, 360:8, 360:11, 361:25, 367:23, 368:7, 368:11, 368:22, 369:20, 370:2, 377:17, 377:20, 377:21, 379:12, 392:1, 392:9, 396:2, 397:7, 399:17, 400:3, 400:9, 400:20, 401:3, 401:6, 401:10, 402:7, 402:8, 402:10, 402:11, 403:21, 403:24, 404:4, 404:25, 405:3, 405:11, 415:14, 415:21, 415:24, 417:18, 418:1, 419:14, 420:17, 420:23, 421:22, 422:24, 423:6, 423:10, 423:23, 427:9, 427:10, 427:25, 428:2, 428:24, 429:1, 429:2, 429:7, 429:11, 429:16, 429:21, 431:18, 431:25, 434:20, 434:21, 434:23, 435:1, 435:3, 435:9
**percent-plus** [1] - 435:3
**percentage** [8] - 314:17, 315:8, 354:4, 377:2, 377:3, 377:4, 377:7, 377:11
**percentages** [1] - 314:6
**perfect** [2] - 273:9, 437:8
**Perfect** [2] - 309:12, 379:1
**perform** [5] - 340:4, 341:4, 417:2, 425:10, 425:11
**performance** [59] - 249:19, 255:24,

310:2, 310:11, 310:12, 311:8, 313:12, 313:18, 316:5, 336:21, 337:21, 337:24, 338:7, 338:15, 338:21, 339:1, 339:5, 339:7, 339:9, 339:13, 339:17, 339:19, 340:2, 340:5, 340:20, 342:2, 362:7, 362:9, 362:23, 363:1, 363:2, 363:6, 397:14, 416:1, 416:6, 416:15, 416:16, 416:22, 417:16, 417:17, 424:5, 424:6, 424:9, 425:1, 438:6, 439:2, 439:20, 439:22, 439:23, 442:15, 442:17, 443:9, 443:17, 444:4, 444:7, 445:17, 445:19, 446:3

**performed** [2] - 339:20, 340:13
**performing** [3] - 417:13, 423:10
**perhaps** [2] - 269:1, 320:23
**period** [13] - 264:14, 276:10, 316:15, 318:8, 318:13, 338:11, 361:3, 361:5, 361:15, 440:17, 440:18, 441:6, 447:1
**periods** [3] - 316:6, 316:8, 318:18
**permission** [4] - 267:25, 269:11, 394:1, 412:11
**permitted** [3] - 260:3, 343:16, 344:4
**person** [3] - 297:1, 443:24, 449:18
**person's** [1] - 408:22
**personal** [3] - 319:1, 424:4, 425:1
**personally** [3] - 386:9, 386:10, 406:10
**perspective** [3] - 381:15, 444:4, 444:7
**Phase** [1] - 389:6
**phone** [12] - 287:10, 337:11, 356:22, 391:12, 391:18, 392:15, 392:16, 392:17, 392:21, 392:24, 394:12, 397:9
**phrase** [2] - 347:2, 376:15
**phrased** [1] - 325:12
**pick** [1] - 358:6
**picture** [1] - 354:8
**piece** [1] - 381:17
**pieces** [3] - 297:13, 301:18, 397:13
**place** [6] - 260:20, 277:6, 336:2, 349:3, 362:15, 408:1
**placement** [14] - 282:18, 285:2, 285:5, 304:4, 306:9, 308:4, 308:7, 309:6, 389:12, 389:18, 389:21, 389:25, 390:5, 390:6
**Placement** [13] - 258:17, 258:19, 259:9, 260:11, 262:10, 269:23, 270:5, 271:1, 272:9, 273:12, 274:24, 275:24, 277:12
**places** [2] - 278:5, 278:6
**plain** [1] - 343:20
**plan** [3] - 267:10, 269:8, 328:11
**plane** [1] - 328:22
**planner** [1] - 385:13
**planning** [3] - 385:21, 385:24, 385:25
**plans** [6] - 259:25, 262:13, 262:14, 343:12, 369:16, 370:10
**platforms** [1] - 387:17
**Plaza** [1] - 245:14
**plenty** [1] - 327:9
**PLLC** [1] - 246:8
**plus** [4] - 294:8, 427:25, 428:3, 435:3
**pocket** [1] - 346:21

**point** [27] - 292:8, 315:10, 315:19, 329:3, 335:24, 357:16, 371:6, 372:2, 372:4, 376:12, 378:6, 378:12, 383:12, 399:4, 411:8, 418:18, 421:9, 433:2, 436:14, 443:13, 444:17, 445:4, 446:2, 446:3, 447:13, 452:3, 452:4
**policy** [12] - 366:19, 439:6, 442:11, 442:15, 442:18, 442:19, 443:8, 443:10, 444:15, 444:25, 445:20, 446:9
**poorly** [1] - 325:11
**pop** [1] - 251:17
**pop-out** [1] - 251:17
**popped** [1] - 254:6
**portal** [3] - 255:6, 293:10, 300:8
**portfolio** [42] - 270:14, 293:8, 294:22, 295:19, 296:18, 297:24, 298:15, 300:1, 301:4, 301:11, 310:20, 331:18, 332:12, 334:16, 370:18, 372:3, 375:2, 375:5, 375:6, 398:9, 398:19, 398:22, 402:13, 406:5, 406:8, 406:11, 408:8, 418:25, 423:23, 425:24, 426:2, 426:4, 427:20, 427:24, 429:10, 429:15, 434:7, 435:7, 435:17, 438:5, 438:7, 444:12
**Portfolio** [17] - 253:19, 256:14, 258:8, 260:12, 265:14, 312:12, 319:11, 321:10, 350:3, 359:15, 405:21, 415:7, 416:3, 419:4, 420:6, 423:5, 439:15
**portion** [21] - 248:20, 249:16, 250:5, 259:9, 260:5, 262:21, 285:6, 285:17, 285:20, 285:22, 304:12, 304:13, 304:19, 312:22, 313:8, 335:12, 336:18, 345:20, 346:3, 350:22, 428:20
**position** [2] - 247:13, 381:24
**positions** [2] - 263:21, 263:24
**positive** [4] - 281:23, 331:1, 331:21, 332:14
**possibility** [2] - 283:11, 333:11
**possible** [4] - 288:19, 329:6, 399:21, 416:23
**possibly** [1] - 374:13
**post** [1] - 447:20
**posted** [2] - 293:10, 300:10
**potential** [21] - 266:14, 266:18, 266:23, 267:1, 279:14, 283:6, 283:13, 291:8, 292:9, 292:11, 306:24, 327:18, 335:5, 345:25, 387:3, 387:6, 388:18, 398:23, 404:17, 407:2, 423:8
**potentially** [2] - 282:22, 346:23
**PPM** [25] - 258:17, 260:9, 271:1, 271:3, 285:13, 286:1, 304:21, 306:14, 306:23, 342:8, 342:12, 342:16, 365:24, 366:19, 366:19, 370:20, 371:10, 372:7, 372:14, 373:12, 378:24, 379:5, 382:16, 389:17
**PPMs** [2] - 369:13, 389:15
**practice** [9] - 260:25, 318:17, 322:1, 322:3, 322:5, 322:15, 344:17, 344:21, 344:22
**practiced** [1] - 323:6
**practitioner** [1] - 386:12

**precise** [1] - 440:22
**precisely** [1] - 441:21
**predictable** [1] - 415:10
**preference** [1] - 383:14
**premise** [1] - 282:4
**preponderance** [2] - 440:13, 447:22
**presence** [1] - 452:10
**present** [9] - 246:17, 259:25, 262:13, 291:1, 316:18, 343:12, 369:16, 370:10, 442:13
**presentation** [7] - 287:5, 288:11, 378:6, 406:17, 418:18, 419:23, 432:25
**presentations** [11] - 335:13, 371:24, 403:9, 414:1, 415:2, 415:7, 415:15, 415:18, 416:2, 418:11, 418:20
**presented** [3] - 336:21, 337:20, 438:6
**presenting** [1] - 442:19
**presents** [7] - 439:17, 439:24, 440:5, 442:3, 443:16, 444:11, 446:2
**preserved** [1] - 250:15
**pressured** [1] - 374:20
**presume** [2] - 336:15, 357:7
**pretty** [2] - 264:18, 331:3
**prevailing** [1] - 392:12
**preview** [1] - 329:5
**previous** [6] - 334:24, 416:13, 416:24, 417:15, 418:3, 423:1
**previously** [9] - 247:24, 255:22, 324:21, 344:9, 404:10, 404:19, 414:6, 419:4, 447:7
**Price** [1] - 427:5
**price** [8] - 396:18, 396:22, 416:15, 417:4, 425:6, 425:9, 427:4, 434:21
**prices** [2] - 399:7, 401:2
**primarily** [2] - 385:24, 391:20
**primary** [1] - 411:17
**Prime** [3] - 443:23, 444:6, 444:12
**principal** [1] - 389:8
**principally** [1] - 449:25
**principals** [1] - 389:7
**priority** [1] - 310:21
**private** [65] - 252:17, 259:19, 265:23, 265:24, 266:2, 266:7, 266:15, 266:19, 266:22, 282:18, 285:2, 285:5, 295:12, 304:4, 306:9, 308:4, 308:7, 309:6, 322:7, 322:9, 343:2, 344:22, 363:18, 363:21, 364:19, 365:3, 368:3, 387:18, 387:20, 387:22, 387:25, 388:2, 388:3, 388:6, 388:17, 389:9, 389:12, 389:18, 389:19, 389:20, 389:21, 389:25, 390:5, 390:6, 391:8, 391:21, 395:6, 395:10, 396:8, 396:11, 410:13, 410:22, 411:1, 414:11, 420:25, 421:3, 421:4, 421:7, 421:13, 421:14, 423:20, 426:1, 431:13
**Private** [13] - 258:17, 258:19, 259:9, 260:11, 262:10, 269:23, 270:4, 271:1, 272:9, 273:12, 274:24, 275:24, 277:12
**problem** [5] - 247:3, 247:10, 283:22, 345:1, 431:18

**problems** [6] - 439:22, 439:23, 442:16, 442:17, 445:17
**proceedings** [5] - 288:7, 304:16, 322:21, 327:16, 383:22
**Proceedings** [1] - 246:14
**process** [4] - 259:17, 343:1, 370:17, 443:5
**produced** [1] - 246:14
**producing** [6] - 391:22, 399:13, 420:25, 421:2, 421:13, 431:13
**product** [5] - 390:16, 390:17, 390:21, 391:6, 394:24
**production** [1] - 421:5
**products** [2] - 387:16, 433:11
**professional** [4] - 310:5, 314:11, 333:3, 386:4
**professionals** [1] - 286:19
**professor** [1] - 326:19
**profile** [1] - 386:15
**profit** [16] - 279:19, 303:18, 303:21, 318:12, 361:18, 362:2, 368:23, 368:24, 371:16, 375:22, 399:25, 400:10, 401:7, 401:12, 434:20, 435:9
**profitability** [16] - 260:15, 288:12, 332:1, 332:19, 333:4, 354:5, 359:13, 369:1, 379:12, 396:7, 400:22, 404:10, 404:17, 421:8, 422:15, 423:9
**profitable** [6] - 396:12, 396:23, 399:7, 399:12, 421:6, 421:16
**profits** [36] - 279:18, 305:12, 305:16, 305:20, 359:19, 361:7, 361:11, 361:16, 367:16, 367:17, 367:19, 367:21, 367:23, 368:13, 374:24, 375:2, 375:5, 375:16, 376:5, 379:3, 379:6, 379:9, 392:2, 396:21, 397:2, 400:12, 401:8, 402:7, 415:20, 417:19, 418:21, 419:5, 419:15, 422:25, 429:16, 435:25
**projected** [6] - 338:13, 341:5, 422:4, 427:8, 427:12, 427:23
**projection** [1] - 368:24
**projections** [3] - 338:24, 340:25, 368:23
**prominently** [1] - 382:16
**promise** [1] - 311:20
**promised** [1] - 258:4
**proper** [2] - 354:16, 448:1
**proposed** [1] - 381:12
**prosecution** [1] - 331:16
**prospects** [1] - 281:4
**prospectus** [2] - 389:20, 389:21
**protection** [1] - 338:19
**proven** [1] - 281:22
**provide** [9] - 259:20, 287:11, 343:8, 353:8, 370:4, 381:11, 436:11, 450:13, 450:14
**provided** [6] - 274:10, 299:11, 374:8, 390:7, 400:7, 435:14
**provides** [1] - 451:20
**providing** [2] - 297:25, 340:13
**provision** [2] - 342:15, 342:22

**provisions** [1] - 270:21
**public** [6] - 321:5, 387:23, 388:2, 388:11, 395:5
**publicity** [4] - 325:23, 326:22, 327:5, 327:11
**Publicly** [1] - 436:10
**publicly** [5] - 387:25, 395:8, 424:11, 424:15, 424:18
**publicly-traded** [3] - 424:11, 424:15, 424:18
**publish** [8] - 255:11, 268:19, 293:23, 300:17, 350:9, 393:25, 412:10, 432:20
**published** [30] - 248:11, 248:15, 250:17, 250:19, 255:13, 258:15, 268:20, 269:13, 272:25, 293:25, 300:18, 312:1, 313:24, 318:24, 319:20, 320:22, 321:6, 331:10, 337:4, 342:10, 350:10, 371:11, 393:8, 394:2, 411:21, 412:12, 413:1, 420:1, 425:16, 432:22
**pull** [13] - 259:5, 276:13, 276:14, 285:19, 302:1, 331:4, 342:6, 348:22, 358:25, 363:13, 367:10, 367:11, 369:15
**purchase** [10] - 282:23, 282:25, 283:12, 308:1, 408:8, 416:15, 417:3, 425:6, 425:9, 434:21
**purchased** [6] - 359:18, 396:11, 401:5, 417:1, 424:23, 427:7
**purchases** [3] - 272:13, 275:5, 417:6
**purpose** [3] - 394:16, 419:1, 419:13
**purposes** [3] - 305:6, 305:18, 368:3
**pursuant** [1] - 274:11
**pursuing** [1] - 331:19
**put** [29] - 247:13, 253:14, 254:20, 260:20, 272:24, 273:6, 279:25, 282:5, 295:21, 316:18, 321:5, 321:15, 324:1, 333:13, 340:14, 346:10, 353:22, 377:8, 377:13, 396:5, 405:17, 420:22, 424:16, 435:22, 436:18, 450:7, 451:16, 451:17, 451:23
**puts** [2] - 414:12, 440:6
**putting** [2] - 247:6, 386:20

## Q

**Q-I** [1] - 275:7
**QI** [1] - 267:8, 268:17
**QQQI** [1] - 268:12
**QQQQI** [9] - 267:8, 267:13, 267:15, 267:18, 268:18, 271:5, 275:7, 372:14, 454:4
**QQQQI-006** [1] - 271:10
**Qs** [1] - 268:16
**quad** [2] - 267:8, 268:17
**qualification** [1] - 423:21
**quality** [1] - 269:8
**quantify** [1] - 392:23
**quarter** [3] - 312:6, 316:11, 361:4
**quarterly** [3] - 430:9, 431:3, 435:13
**quarters** [1] - 318:15
**questioned** [1] - 287:14

**questioning** [2] - 367:1, 384:4
**questions** [23] - 258:17, 262:25, 263:14, 291:17, 291:19, 291:20, 291:25, 292:1, 292:4, 292:7, 292:11, 323:3, 323:4, 323:7, 331:16, 342:8, 342:18, 362:8, 367:3, 368:10, 375:9, 376:21
**quick** [2] - 376:10, 437:17
**quickly** [8] - 316:4, 374:21, 375:8, 383:10, 431:19, 434:11, 434:17, 443:19
**quintessential** [1] - 437:25
**quite** [2] - 382:24, 450:5
**quote** [1] - 375:16

## R

**RACHEL** [1] - 245:10
**raise** [5] - 252:8, 371:15, 384:7, 384:15, 451:1
**raised** [3] - 252:21, 322:13, 414:12
**raising** [6] - 335:4, 377:6, 391:16, 391:17, 414:13, 441:11
**ramp** [1] - 431:20
**Rate** [2] - 422:8, 422:11
**rate** [12] - 249:3, 255:20, 404:1, 404:3, 417:23, 422:9, 429:11, 429:16, 429:19, 431:16, 442:5
**rates** [4] - 304:24, 305:1, 392:6, 392:12
**rather** [5] - 347:6, 392:12, 419:5, 441:23, 442:20
**ratio** [1] - 356:24
**rational** [1] - 452:13
**re** [1] - 317:9
**re-ask** [1] - 317:9
**reach** [1] - 424:23
**reached** [1] - 433:14
**reaction** [1] - 431:23
**read** [56] - 251:14, 251:16, 251:18, 251:24, 252:14, 254:8, 254:15, 257:12, 259:14, 268:22, 269:3, 269:18, 270:4, 270:7, 270:8, 270:16, 271:2, 272:8, 275:23, 276:1, 276:16, 276:25, 277:12, 283:20, 285:1, 285:14, 286:1, 289:5, 304:21, 307:19, 308:25, 309:7, 337:8, 337:14, 337:16, 342:22, 344:11, 354:25, 355:5, 355:7, 356:2, 362:14, 373:11, 373:14, 373:23, 388:20, 394:3, 394:21, 394:25, 395:3, 413:24, 423:17, 431:23, 441:2, 443:18
**reading** [7] - 261:9, 261:16, 271:21, 306:9, 325:10, 337:9, 364:20
**ready** [4] - 246:21, 247:21, 276:5, 291:4
**realistically** [1] - 382:18
**really** [12] - 252:7, 328:22, 371:5, 382:22, 383:24, 403:23, 417:5, 436:25, 447:24, 450:17, 450:22, 452:8
**realty** [1] - 297:20
**reask** [1] - 410:5
**reason** [16] - 254:2, 266:10, 266:22, 266:24, 286:11, 288:24, 289:1, 300:9,

338:5, 338:7, 397:22, 400:9, 408:18, 416:11, 436:6, 447:23
**reasonable** [2] - 316:25, 400:20
**reasonably** [1] - 422:15
**rebates** [2] - 317:15, 361:21
**recalled** [2] - 250:6, 290:9
**recapture** [1] - 304:25
**receivable** [1] - 362:19
**receivables** [1] - 361:20
**receive** [11] - 255:2, 257:15, 258:2, 276:19, 300:5, 303:20, 393:4, 397:12, 402:9, 428:10, 429:22
**received** [40] - 248:23, 249:10, 249:12, 250:7, 250:16, 251:2, 255:10, 268:18, 272:8, 284:15, 293:7, 293:22, 294:3, 300:16, 303:5, 307:5, 308:8, 314:22, 315:2, 315:6, 319:13, 319:19, 321:3, 321:22, 350:8, 365:19, 391:12, 393:13, 393:19, 397:9, 403:4, 403:6, 403:7, 412:9, 413:19, 418:24, 423:25, 428:14, 430:21, 432:19
**receiving** [11] - 248:21, 250:7, 253:17, 255:22, 255:25, 256:1, 256:7, 258:7, 261:17, 369:5, 370:11
**recent** [2] - 374:17, 440:6
**recently** [1] - 424:11
**recess** [2] - 329:14, 380:12
**recession** [8] - 364:3, 364:12, 364:15, 395:18, 395:20, 395:24, 399:2, 399:13
**Recession** [1] - 391:2
**recession-resistant** [2] - 364:12, 364:15
**recessions** [1] - 317:7
**reciprocal** [4] - 451:6, 451:9, 451:13, 451:14
**reciprocity** [1] - 451:18
**recognize** [20] - 254:23, 267:15, 300:1, 300:3, 319:23, 321:7, 350:2, 350:13, 393:9, 411:22, 411:24, 413:4, 413:6, 425:17, 428:8, 430:5, 430:7, 432:7, 432:9
**recognized** [1] - 272:11
**recollection** [4] - 289:6, 289:9, 336:24, 337:20
**recommend** [1] - 405:20
**recommended** [1] - 420:15
**recommending** [1] - 390:24
**record** [11] - 247:6, 268:17, 281:23, 285:11, 290:10, 313:3, 384:6, 384:22, 393:20, 417:10, 429:10
**Record** [3] - 355:7, 368:16, 428:18
**recorded** [3] - 246:14, 289:6, 289:10
**recover** [6] - 332:22, 333:9, 333:11, 333:16, 333:18, 335:7
**RECROSS** [4] - 373:4, 378:3, 453:9, 453:10
**recross** [2] - 327:18, 373:2
**RECROSS-EXAMINATION** [4] - 373:4, 378:3, 453:9, 453:10
**recruited** [1] - 252:9

**redaction** [3] - 250:11, 318:25, 321:4
**redactions** [1] - 321:13
**redeem** [5] - 277:1, 277:14, 365:1, 365:12, 374:5
**redemption** [4] - 277:7, 277:11, 365:8, 365:14, 366:2
**redemptions** [9] - 251:21, 252:1, 252:3, 252:5, 252:13, 252:23, 364:25, 365:21, 366:20
**redirect** [1] - 358:22
**REDIRECT** [3] - 359:5, 361:1, 453:8
**reduce** [17] - 260:2, 260:17, 262:8, 334:7, 343:14, 344:2, 344:18, 344:19, 345:22, 348:4, 355:4, 362:3, 379:13, 379:14, 379:17, 416:25, 417:8
**reduced** [6] - 311:3, 347:10, 369:11, 400:13, 405:4, 415:23
**reduces** [1] - 347:4, 417:6, 417:9
**reducing** [1] - 345:3
**refer** [2] - 336:5, 362:22
**reference** [2] - 297:25, 424:6
**referenced** [2] - 271:2, 446:17
**referencing** [2] - 273:4, 306:18, 306:20
**referred** [3] - 336:7, 389:15, 420:19
**referring** [4] - 289:4, 335:22, 351:9, 375:5
**refers** [1] - 270:9
**reflect** [1] - 375:16
**reflective** [1] - 443:10
**reflects** [1] - 356:24
**refresh** [3] - 336:23, 337:19, 367:2
**regarded** [1] - 338:2
**regardless** [1] - 309:15
**region** [1] - 411:16
**regions** [1] - 443:23
**register** [2] - 431:2, 431:6
**Registered** [4] - 263:25, 264:3, 264:13, 264:16
**registered** [8] - 264:6, 264:9, 286:12, 309:6, 385:12, 385:19, 386:4, 390:10
**registration** [2] - 251:23, 390:11
**regular** [3] - 358:7, 358:9, 421:3
**regularly** [1] - 253:25
**related** [3] - 313:12, 433:12, 446:18
**relates** [2] - 438:4, 445:7
**relation** [1] - 364:18
**relationship** [2] - 390:13, 414:9
**relative** [1] - 401:2
**relatively** [3] - 281:16, 399:7, 439:24
**relayed** [2] - 427:3, 433:6
**relevance** [4] - 407:6, 408:3, 408:13, 408:19
**reliable** [1] - 316:15
**relied** [6] - 254:14, 308:21, 312:3, 312:15, 313:5, 313:15, 313:16
**rely** [3] - 272:20, 309:2, 312:7
**relying** [1] - 441:4
**remainder** [1] - 433:11
**remains** [3] - 303:10, 401:18, 450:16
**remember** [31] - 248:8, 258:16, 284:16,

286:9, 287:19, 287:20, 291:11, 301:24, 302:4, 305:25, 306:5, 306:6, 312:16, 312:17, 313:25, 362:8, 367:1, 367:12, 372:8, 374:25, 375:17, 375:18, 391:18, 398:6, 405:23, 406:1, 414:1, 415:6, 416:1, 428:11, 437:8
**remind** [1] - 415:12
**renewed** [2] - 264:2, 264:8
**repair** [1] - 399:24
**repaired** [1] - 395:24
**repeat** [4] - 261:15, 332:25, 334:10, 404:15
**repeatedly** [2] - 355:2, 361:24
**report** [7] - 254:13, 300:2, 300:9, 312:10, 313:1, 313:14, 435:21
**reported** [5] - 352:14, 356:5, 356:17, 356:19, 436:8
**REPORTED** [1] - 246:12
**reporter** [1] - 291:3
**Reporter** [1] - 246:13
**reporting** [1] - 322:12
**reports** [5] - 293:7, 293:14, 300:5, 435:13, 435:16
**represent** [6] - 263:13, 313:11, 330:12, 386:8, 386:10, 445:23
**representation** [1] - 314:24
**representations** [6] - 273:20, 274:13, 274:21, 408:19, 408:21, 416:9
**representative** [2] - 270:13, 273:25
**representatives** [3] - 388:16, 389:7, 391:13
**represented** [4] - 274:23, 296:21, 417:2, 424:20
**represents** [3] - 269:17, 271:24, 274:3
**reps** [1] - 424:13
**repurchase** [1] - 366:7
**request** [5] - 366:7, 381:9, 388:20, 397:8, 450:13
**requests** [1] - 393:14
**required** [1] - 340:19
**requires** [1] - 441:14
**research** [3] - 387:9, 388:20, 437:9
**reserve** [3] - 260:16, 379:13, 379:14
**reserving** [1] - 327:18
**resign** [1] - 326:22
**resigning** [1] - 324:11
**resiliency** [1] - 395:19
**resilient** [4] - 395:20, 395:24, 399:3, 399:13
**resistant** [2] - 364:12, 364:15
**resolve** [1] - 446:24
**respect** [4] - 302:21, 363:1, 383:15, 384:7
**respectfully** [1] - 442:12
**respond** [1] - 446:12
**responding** [1] - 408:25
**response** [8] - 378:17, 442:15, 442:20, 442:21, 444:14, 445:2, 446:3
**responses** [1] - 409:2
**responsibilities** [1] - 265:5

**responsibility** [1] - 346:13
**responsible** [2] - 253:13, 260:22
**rest** [2] - 297:1, 297:4
**result** [4] - 256:14, 344:7, 344:15, 347:19
**results** [4] - 281:3, 310:3, 313:19, 316:16
**resume** [1] - 247:21
**retail** [1] - 426:3
**Retail** [1] - 398:19
**retains** [1] - 421:9
**retirement** [1] - 385:21
**return** [53] - 260:22, 261:2, 261:11, 261:18, 266:15, 266:18, 266:23, 267:3, 276:18, 276:19, 276:25, 284:21, 284:24, 285:10, 285:15, 285:18, 285:23, 305:18, 308:13, 315:8, 316:21, 322:2, 322:5, 322:8, 331:23, 334:1, 343:25, 344:7, 344:12, 344:17, 345:9, 345:15, 366:11, 368:19, 368:22, 373:24, 374:3, 392:13, 396:2, 400:3, 400:5, 405:1, 405:18, 405:19, 417:23, 419:14, 422:9, 423:2, 428:1, 429:18, 429:19, 447:16
**Return** [2] - 422:8, 422:11
**returned** [2] - 316:22, 368:4
**returning** [8] - 260:18, 344:22, 345:2, 346:11, 369:10, 372:3, 378:20, 445:20
**returns** [15] - 284:6, 284:8, 305:20, 314:16, 343:21, 347:12, 347:20, 360:11, 364:11, 376:2, 376:5, 392:8, 417:3, 439:14, 445:12
**revelation** [1] - 335:1
**revenue** [9] - 295:18, 296:15, 301:4, 301:10, 313:13, 390:20, 427:5, 434:19, 434:20
**review** [15] - 258:19, 258:22, 337:14, 374:20, 387:3, 390:5, 390:6, 397:12, 397:16, 397:18, 398:3, 400:6, 435:10, 435:13, 435:16
**reviewed** [28] - 260:8, 295:4, 299:6, 307:13, 310:8, 312:15, 312:23, 313:4, 314:2, 323:3, 337:19, 349:17, 349:19, 349:25, 350:4, 351:19, 352:2, 356:7, 368:15, 373:19, 374:10, 398:21, 404:24, 406:23, 419:21, 425:20
**reviewing** [2] - 314:11, 420:2
**Reviewing** [1] - 337:15
**revoked** [1] - 397:24
**reward** [7] - 279:6, 279:9, 279:14, 282:22, 283:6, 283:13, 340:10
**RIA** [1] - 390:20
**RIA-only** [1] - 390:20
**right-hand** [2] - 369:6, 426:6
**rights** [1] - 366:2
**rise** [3] - 327:22, 380:6, 437:12
**Risk** [1] - 281:13
**risk** [31] - 266:14, 272:12, 272:13, 279:6, 279:8, 279:13, 279:20, 280:19, 280:22, 281:10, 281:20, 282:1,

282:21, 283:5, 283:12, 284:5, 284:11, 308:1, 308:4, 308:8, 308:15, 347:4, 347:6, 347:10, 347:11, 364:22, 364:23, 416:25, 417:6, 417:8, 417:9
**riskier** [5] - 265:25, 266:2, 266:11, 282:9, 282:10
**risks** [17] - 259:10, 272:18, 274:24, 275:18, 275:24, 279:22, 280:22, 281:2, 282:17, 282:19, 306:23, 306:24, 343:6, 347:2, 373:23, 374:1, 389:3
**risky** [6] - 259:19, 282:22, 343:3, 346:24, 363:19, 363:21
**RIVIERE** [2] - 245:24, 357:4
**RIVIERE-BADELL** [2] - 245:24, 357:4
**RMR** [1] - 246:12
**rolling** [1] - 440:7
**room** [3] - 286:20, 364:4, 418:16
**roughly** [1] - 386:14
**rounded** [1] - 294:19
**row** [1] - 269:11
**RPR** [1] - 246:12
**ruin** [1] - 317:20
**rule** [1] - 452:11
**rules** [1] - 383:1
**run** [2] - 431:16, 434:13
**running** [5] - 282:12, 318:12, 411:9, 434:14, 443:25
**runs** [1] - 387:15

**S**

**Sachs** [1] - 390:15
**safe** [1] - 399:1
**safer** [1] - 418:4
**sale** [6] - 308:21, 309:1, 377:5, 377:11, 424:15, 434:16
**sales** [8] - 317:18, 318:5, 318:15, 354:4, 416:12, 434:20, 435:24
**Sales** [1] - 435:25
**salt** [1] - 317:21
**sat** [1] - 337:5
**savings** [1] - 385:21
**saw** [2] - 257:2, 280:13
**scenario** [4] - 344:1, 345:1, 357:11, 379:9
**schedule** [5] - 315:11, 395:1, 436:16, 436:18, 437:5
**scheduling** [1] - 246:24
**scheme** [1] - 445:23
**SCHIFF** [2] - 246:2, 246:5
**SCHNEIDER** [1] - 245:6
**Schneider** [17] - 246:2, 263:13, 323:13, 371:25, 381:8, 381:11, 381:21, 382:8, 403:10, 414:7, 418:6, 422:23, 437:19, 447:21, 449:3, 449:7
**Schneider's** [2] - 381:23, 415:3
**Scott** [3] - 291:19, 291:20, 291:21
**screen** [20] - 269:5, 272:24, 273:5, 279:25, 300:3, 300:4, 319:5, 320:24, 321:5, 331:6, 331:12, 337:9, 337:13,

350:20, 351:25, 352:11, 352:12, 353:3, 394:19, 395:2
**screening** [2] - 259:18, 343:1
**Script** [1] - 326:9
**SE** [1] - 246:9
**se** [1] - 339:22
**seal** [1] - 253:14
**SEAN** [1] - 245:20
**seasonality** [2] - 317:22, 318:19
**seat** [1] - 384:25
**seated** [5] - 247:20, 330:6, 380:8, 384:11, 437:14
**Second** [1] - 427:17
**second** [36] - 247:1, 249:16, 254:3, 254:9, 256:21, 256:23, 259:3, 259:10, 267:20, 270:24, 281:2, 282:7, 288:5, 302:16, 304:18, 309:11, 310:19, 321:12, 325:21, 328:13, 337:3, 343:18, 351:7, 351:9, 370:4, 383:11, 383:20, 395:12, 406:3, 424:4, 425:22, 431:21, 433:17, 443:3, 446:6
**second-to-last** [2] - 424:4, 446:6
**Section** [2] - 273:19, 276:15
**section** [4] - 259:6, 283:18, 308:4, 443:16
**secure** [1] - 418:1
**securities** [4] - 308:20, 308:22, 309:1, 309:5
**Security** [1] - 321:14
**security** [1] - 390:4
**see** [65] - 250:21, 259:12, 269:20, 271:14, 272:2, 273:9, 273:22, 274:6, 274:19, 276:22, 282:5, 282:7, 283:24, 285:20, 290:2, 292:24, 294:14, 294:15, 294:17, 294:20, 298:10, 302:9, 304:19, 307:22, 308:23, 317:18, 319:4, 319:25, 321:16, 321:19, 329:12, 336:23, 345:17, 351:11, 351:12, 351:24, 352:8, 352:9, 352:20, 353:3, 353:4, 353:5, 355:25, 356:14, 363:16, 363:23, 365:22, 366:9, 366:13, 369:2, 383:11, 410:19, 410:20, 412:20, 415:4, 422:18, 427:9, 428:24, 431:4, 432:1, 436:12, 438:1, 438:4, 445:7, 450:19
**See** [1] - 431:2
**seeing** [3] - 312:16, 444:18, 447:25
**seek** [1] - 323:9
**seem** [1] - 328:23
**self** [1] - 395:1
**self-explanatory** [1] - 395:1
**sell** [14] - 276:5, 308:19, 309:5, 365:5, 365:6, 396:16, 396:22, 399:6, 399:8, 401:2, 421:11, 424:10, 424:11, 425:5
**seller** [3] - 416:14, 417:3, 417:24
**selling** [3] - 390:17, 399:23, 421:16
**sells** [1] - 416:7
**send** [3] - 394:22, 401:4, 419:17
**sending** [1] - 419:18
**sense** [1] - 437:6

**sent** [2] - 320:14, 394:11
**sentence** [13] - 251:19, 254:8, 281:2, 310:19, 345:11, 345:13, 345:14, 370:4, 370:9, 431:10, 431:21, 446:19, 446:21
**separately** [2] - 296:25, 381:21
**September** [9] - 254:19, 255:16, 265:15, 312:4, 335:18, 346:15, 374:12, 391:13, 397:10
**series** [1] - 444:10
**Series** [4] - 324:19, 390:12, 390:19, 420:12
**seriously** [2] - 270:2, 272:18
**service** [3] - 260:24, 260:25, 364:13
**serviced** [1] - 395:23
**services** [3] - 395:9, 398:10, 433:23
**session** [12] - 291:25, 330:23, 332:4, 332:6, 332:10, 335:2, 336:19, 336:20, 337:20, 349:2, 349:4, 378:13
**set** [9] - 247:17, 265:13, 271:7, 308:3, 340:18, 424:12, 425:9, 449:21
**setting** [2] - 386:19, 433:11
**settlement** [1] - 255:1
**seven** [2] - 420:17, 434:18
**several** [5] - 393:1, 397:13, 398:8, 410:16, 442:20
**shake** [1] - 418:13
**shall** [1] - 316:2
**share** [3] - 262:21, 377:7, 420:20
**shares** [1] - 420:14
**sharing** [1] - 368:25
**sheet** [1] - 362:20
**sheets** [1] - 436:2
**sheltering** [1] - 280:12
**short** [2] - 320:23, 451:23
**shorter** [1] - 316:15
**shortfall** [18] - 287:6, 288:14, 288:19, 290:9, 291:8, 292:5, 292:9, 292:11, 332:21, 333:6, 334:22, 335:1, 348:9, 348:12, 349:8, 417:4, 417:25
**show** [25] - 250:1, 254:19, 267:7, 267:12, 272:23, 293:4, 298:1, 298:25, 304:7, 304:14, 355:25, 361:23, 365:17, 365:24, 368:4, 393:6, 411:18, 412:22, 419:20, 425:14, 428:4, 430:1, 432:4, 436:19, 451:12
**showed** [6] - 301:22, 320:14, 334:14, 359:21, 361:13, 367:4
**showing** [3] - 313:2, 350:22, 369:12
**shown** [12] - 249:9, 254:22, 269:23, 302:2, 307:4, 310:17, 311:24, 313:22, 355:15, 366:24, 419:24, 435:11
**shows** [1] - 252:11
**sic)** [1] - 276:7
**side** [8] - 249:5, 249:8, 268:6, 273:6, 369:6, 421:15, 426:7, 427:19
**sidebar** [4] - 289:13, 290:1, 290:12, 408:1
**Sidebar** [3] - 289:15, 407:10, 409:5
**sides** [2] - 340:10, 447:7

**sign** [2] - 373:10, 428:3
**signaling** [1] - 446:17
**signature** [5] - 251:9, 268:5, 268:9, 269:15, 270:20
**signed** [10] - 251:10, 267:5, 268:10, 272:21, 372:6, 372:18, 373:9, 373:11, 381:5, 438:2
**significance** [2] - 389:25, 435:6
**significant** [14] - 257:6, 257:8, 257:22, 309:13, 396:21, 407:1, 408:5, 410:9, 410:25, 420:14, 434:9, 434:10, 440:5, 442:16
**significantly** [2] - 402:10, 429:6
**similar** [2] - 295:2, 352:6
**similar-looking** [1] - 352:6
**simple** [3] - 364:14, 377:15, 382:25
**simplest** [1] - 399:20
**simplicity** [1] - 398:24
**simply** [3] - 303:20, 314:21, 395:6
**single** [2] - 346:17, 347:8
**sit** [1] - 312:14
**sitting** [2] - 431:17, 441:20
**situation** [2] - 361:11, 425:2
**six** [1] - 310:17
**Sixteen** [1] - 427:25
**sixteen** [1] - 406:6
**Sixteen-plus** [1] - 427:25
**size** [1] - 423:19
**sized** [1] - 433:25
**skin** [1] - 425:7
**skip** [1] - 433:7
**skipping** [2] - 303:1, 331:25
**slash** [1] - 283:14
**slightly** [1] - 375:13
**slower** [1] - 410:2
**small** [4] - 270:19, 283:20, 433:25, 445:8
**snapshot** [1] - 298:5
**Snapshot** [1] - 312:12
**snow** [1] - 317:20
**Social** [1] - 321:14
**social** [1] - 418:17
**sold** [5] - 313:13, 340:13, 386:21, 424:15, 424:21
**sole** [3] - 334:7, 362:2, 386:12
**solely** [1] - 318:25
**solemnly** [1] - 384:17
**solicitation** [1] - 308:20
**solicited** [1] - 392:16
**solution** [1] - 381:18
**someone** [5] - 329:4, 363:5, 377:16, 394:20, 408:10
**something's** [1] - 424:22
**sometimes** [9] - 359:18, 386:18, 387:8, 387:9, 389:10, 410:24, 421:4, 421:5, 434:13
**somewhat** [3] - 318:18, 417:12, 418:4
**somewhere** [3] - 361:16, 361:18, 452:13
**soon** [2] - 431:9, 431:22
**sophisticated** [5] - 264:17, 266:8,

275:8, 296:25, 297:1
**sorry** [36] - 250:2, 251:18, 254:5, 256:19, 259:5, 261:15, 262:16, 267:23, 271:6, 271:9, 271:19, 273:5, 297:21, 297:22, 304:12, 306:13, 313:2, 325:21, 326:5, 351:8, 355:12, 355:17, 361:12, 362:11, 363:9, 363:11, 366:4, 373:2, 383:23, 401:16, 407:5, 407:9, 413:15, 427:16, 428:6, 442:1
**Sorry** [2] - 364:7, 366:16
**sort** [6] - 295:21, 298:11, 383:4, 408:10, 446:21, 447:16
**sorts** [2] - 389:4, 397:12
**sounds** [1] - 287:21
**source** [9] - 303:21, 314:25, 377:20, 390:20, 402:25, 403:2, 417:14, 445:11, 445:12
**sources** [3] - 292:4, 403:3, 403:6
**sourcing** [1] - 423:20
**South** [1] - 245:22
**sparingly** [2] - 283:15
**speakers** [1] - 383:24
**speaking** [2] - 252:20, 339:22
**special** [13] - 402:14, 402:17, 403:5, 403:18, 403:20, 404:1, 404:5, 404:9, 404:18, 404:22, 429:3, 431:9, 431:22
**specific** [6] - 256:10, 281:24, 288:22, 291:20, 362:17, 378:17
**specifically** [9] - 273:1, 273:18, 276:14, 290:6, 292:8, 304:11, 307:17, 314:21, 415:7
**specifics** [1] - 403:16
**spectrum** [1] - 385:23
**speculative** [1] - 284:5
**spell** [1] - 384:21
**spend** [3] - 327:7, 413:7, 434:10
**spending** [1] - 431:15
**spent** [1] - 369:18
**squeeze** [1] - 409:1
**stable** [1] - 443:9
**stage** [5] - 265:13, 291:11, 292:12, 371:25, 421:6
**stake** [1] - 340:20
**stand** [5] - 247:14, 247:15, 290:3, 330:4, 332:15
**Standard** [1] - 280:25
**standard** [2] - 354:13, 447:22
**standing** [2] - 393:20, 401:18
**stands** [1] - 422:8
**Stanley** [1] - 390:15
**Stanton** [1] - 246:12
**start** [11] - 324:16, 331:15, 331:17, 353:25, 359:11, 391:5, 428:23, 439:3, 443:3, 443:19, 444:7
**started** [14] - 246:21, 247:13, 264:9, 264:11, 264:12, 286:25, 324:17, 326:21, 327:1, 327:8, 386:19, 390:25, 406:2, 439:22
**starting** [4] - 254:10, 308:18, 315:3,

346:14
**starts** [3] - 254:7, 273:3, 409:1
**state** [5] - 288:21, 305:1, 369:19, 384:21, 404:1
**State** [1] - 326:20
**statement** [51] - 248:18, 248:21, 249:7, 249:13, 249:16, 250:8, 251:3, 251:23, 253:18, 254:24, 255:2, 256:1, 256:8, 256:15, 257:2, 265:8, 266:1, 285:10, 289:5, 292:24, 294:2, 295:4, 296:3, 296:6, 296:23, 299:18, 299:20, 301:10, 302:13, 302:22, 303:4, 303:10, 327:12, 332:15, 339:14, 339:16, 352:1, 353:8, 357:21, 369:7, 370:11, 374:25, 381:25, 382:7, 382:19, 435:22, 436:4, 437:19, 437:22, 440:8, 440:11
**statements** [46] - 251:23, 252:24, 252:25, 253:1, 253:8, 254:1, 254:13, 265:10, 293:2, 293:14, 295:1, 298:8, 298:22, 298:25, 299:2, 299:4, 299:7, 299:9, 299:15, 299:16, 299:17, 301:23, 302:2, 305:22, 314:12, 333:24, 334:13, 348:8, 359:22, 369:3, 373:19, 373:20, 373:21, 374:8, 374:16, 381:10, 397:16, 397:18, 397:23, 398:3, 408:7, 436:11, 449:12, 449:13, 449:24, 450:3
**states** [3] - 274:2, 302:22, 348:1
**STATES** [3] - 245:1, 245:3, 245:10
**States** [4] - 245:4, 245:13, 245:17, 351:3
**stating** [1] - 344:12
**status** [1] - 397:23
**stay** [1] - 377:25
**steady** [2] - 399:3, 415:10
**stenography** [1] - 246:14
**step** [5] - 257:13, 313:3, 316:4, 327:24, 342:14
**STEPHEN** [2] - 246:8, 246:10
**steps** [3] - 327:25, 441:14, 443:2
**Steps** [2] - 439:5, 444:13
**steward** [1] - 344:16
**stewards** [2] - 442:14, 443:6
**still** [12] - 253:24, 347:12, 361:10, 377:4, 377:19, 377:21, 433:4, 434:12, 437:21, 441:11, 450:17, 452:15
**stipulate** [1] - 322:11
**stock** [1] - 390:24
**stocks** [1] - 387:23
**stop** [2] - 343:18, 366:23
**stopped** [1] - 258:7
**stopping** [3] - 315:10, 315:19, 436:14
**storage** [2] - 398:10, 434:3
**straight** [2] - 420:18, 420:24
**strategic** [1] - 365:6
**strategies** [3] - 385:23, 406:18, 434:4
**strategy** [2] - 396:12, 396:24
**Street** [2] - 246:6, 364:5
**strength** [1] - 368:5
**strict** [1] - 344:14

**structure** [3] - 354:4, 423:15, 424:4
**stuff** [5] - 283:9, 290:8, 326:21, 327:9, 443:15
**subject** [3] - 299:9, 304:23, 416:1
**subscriber** [2] - 271:24, 272:11
**subscription** [8] - 267:5, 274:11, 274:14, 274:15, 274:22, 369:13, 372:7, 373:10
**substantial** [11] - 260:5, 266:23, 272:12, 280:3, 282:2, 285:6, 285:17, 285:22, 345:19, 346:3, 424:12
**substantially** [1] - 286:5
**succeed** [1] - 339:11
**success** [3] - 309:15, 338:10, 425:8
**successful** [1] - 421:12
**successfully** [4] - 259:18, 343:2, 396:10
**sufficient** [8] - 259:21, 260:15, 262:4, 296:22, 343:9, 349:6, 370:6, 405:3
**Suite** [2] - 245:23, 246:9
**sum** [2] - 281:10, 424:12
**summary** [1] - 443:2
**Summary** [2] - 439:4, 444:13
**summer** [2] - 247:7, 317:19
**sunset** [1] - 365:3
**support** [4] - 260:15, 400:13, 405:3, 447:18
**supposed** [3] - 326:11, 374:24, 439:8
**surface** [1] - 253:25
**surplus** [4] - 260:20, 344:13, 346:7, 354:25
**suspend** [4] - 251:21, 252:13, 262:8, 365:20
**suspended** [4] - 252:23, 400:14, 405:4, 415:23
**sustain** [1] - 429:20
**Sustained** [2] - 289:3, 361:9
**sustained** [5] - 254:17, 256:6, 256:18, 256:20, 353:13
**swear** [1] - 384:17
**SWETTE** [1] - 245:21
**switch** [3] - 331:8, 358:24, 445:19
**switched** [1] - 355:21
**switching** [1] - 383:24
**sworn** [1] - 325:3, 385:3
**sworn/affirmed** [1] - 247:25
**symbols** [1] - 395:8
**syndication** [1] - 294:16

**T**

**tab** [2] - 337:1, 348:23
**table** [2] - 356:22, 371:22
**talks** [6] - 311:14, 313:8, 366:19, 396:8, 439:3, 442:7
**target** [17] - 311:17, 368:11, 368:22, 400:4, 402:8, 403:21, 403:22, 404:1, 404:3, 404:21, 415:11, 415:12, 415:24, 415:25, 423:2, 428:2, 429:11
**targeted** [14] - 311:14, 369:20, 370:2, 400:5, 404:25, 417:19, 418:1, 419:14, 421:22, 423:23, 427:25, 429:20,

431:25, 435:9
**targets** [1] - 418:2
**tarnish** [1] - 327:13
**tax** [11] - 298:3, 304:24, 305:18, 319:9, 322:2, 322:10, 322:12, 322:17, 367:6, 368:2
**taxable** [6] - 304:22, 304:24, 305:2, 305:13, 305:15, 305:17
**taxation** [2] - 305:6, 322:12
**taxes** [1] - 305:1
**team** [4] - 433:9, 440:22, 441:21
**technical** [1] - 368:4
**technically** [1] - 284:14
**technique** [1] - 284:5
**telephone** [2] - 287:22, 287:23
**ten** [1] - 447:11
**tend** [8] - 317:10, 317:14, 317:18, 395:20, 396:16, 399:1, 399:6, 400:25
**tends** [3] - 318:14, 391:7, 399:10
**tens** [1] - 386:21
**term** [7] - 277:19, 280:11, 387:20, 388:12, 388:15, 388:23, 417:12
**terms** [8] - 271:7, 285:6, 305:23, 347:22, 383:10, 389:22, 399:20, 450:2
**terribly** [2] - 421:6, 425:2, 425:13
**testified** [12] - 248:1, 261:1, 284:19, 307:5, 324:21, 330:22, 346:18, 349:10, 358:10, 359:13, 376:1, 385:3
**testifying** [8] - 286:9, 307:13, 322:25, 337:5, 342:15, 412:3, 413:9, 424:7
**testimony** [19] - 292:14, 298:6, 298:13, 299:8, 302:5, 312:7, 313:23, 328:4, 334:17, 342:19, 345:7, 354:15, 358:1, 378:9, 379:10, 382:17, 384:17, 414:6, 437:17
**Texas** [5] - 330:20, 333:2, 406:14, 411:6, 411:10
**text** [1] - 449:7
**THE** [173] - 245:10, 246:18, 246:25, 247:7, 247:12, 247:18, 247:20, 248:12, 250:14, 253:4, 253:6, 254:17, 255:9, 256:6, 256:10, 256:18, 256:20, 257:11, 257:19, 257:24, 257:25, 258:1, 261:7, 261:13, 261:22, 263:1, 263:6, 263:8, 267:11, 268:2, 268:15, 268:23, 269:4, 269:10, 269:12, 271:11, 289:3, 289:9, 289:12, 290:2, 290:5, 291:2, 293:19, 293:21, 293:24, 300:15, 315:13, 315:16, 315:19, 315:23, 319:2, 319:18, 324:4, 325:15, 327:19, 327:22, 327:24, 328:3, 328:5, 328:6, 328:9, 328:10, 328:21, 329:7, 329:11, 330:3, 330:6, 332:24, 340:17, 350:7, 353:13, 354:20, 354:22, 355:10, 358:22, 359:4, 360:5, 361:9, 364:7, 369:25, 370:23, 371:5, 371:12, 372:12, 372:21, 373:1, 373:3, 378:2, 379:21, 379:23, 379:24, 379:25, 380:1, 380:2, 380:6, 380:8, 380:9, 381:2, 381:4, 382:2, 382:5, 382:10, 382:18, 384:5, 384:9, 384:11, 384:15,

384:20, 384:21, 384:23, 384:25, 393:18, 393:22, 393:24, 401:20, 401:23, 402:2, 402:23, 403:12, 404:13, 405:7, 407:5, 407:8, 408:11, 408:23, 409:3, 410:2, 412:8, 413:13, 413:15, 413:18, 416:20, 419:8, 430:18, 430:20, 432:18, 436:15, 436:24, 437:12, 437:14, 437:15, 440:12, 440:20, 440:25, 441:7, 441:16, 442:1, 442:24, 443:13, 443:18, 444:2, 444:9, 444:17, 445:1, 445:6, 445:9, 445:22, 446:10, 446:12, 446:23, 447:24, 449:5, 449:11, 450:6, 450:10, 451:2, 451:7, 451:11, 451:15, 452:2, 452:7, 452:17, 452:22

**the..** [1] - 369:4

**theirs** [1] - 433:15

**themselves** [1] - 424:24

**theories** [1] - 450:1

**theory** [4] - 437:19, 442:2, 442:5, 445:23

**Therefore** [1] - 254:10

**therefore** [3] - 254:12, 305:17, 423:1

**thereon** [1] - 254:13

**they've** [3] - 346:10, 425:3, 441:13

**thin** [1] - 392:10

**thinking** [3] - 449:17, 450:3, 451:15

**third** [9] - 253:10, 253:13, 271:22, 312:6, 312:18, 312:21, 315:3, 350:11, 436:5

**Third** [1] - 245:19

**thirds** [2] - 298:11, 331:6

**thirteen** [1] - 267:24

**thoughtful** [1] - 443:6

**thousands** [1] - 400:16

**three** [15] - 256:23, 257:2, 257:7, 257:8, 294:8, 299:11, 299:13, 344:2, 346:15, 362:12, 371:23, 371:24, 376:21, 414:1, 441:13

**throughout** [1] - 348:6

**throw** [1] - 348:1

**throwing** [5] - 281:23, 347:23, 368:6, 396:21, 403:23

**Thursday** [1] - 437:4

**ticker** [1] - 395:8

**ties** [1] - 262:6

**title** [4] - 259:6, 368:16, 428:6, 428:7

**today** [17] - 247:4, 273:13, 301:22, 312:14, 322:25, 327:13, 328:24, 332:9, 332:19, 337:5, 342:9, 342:16, 349:10, 349:13, 353:6, 383:11, 434:12

**together** [10] - 264:13, 342:22, 343:24, 396:15, 435:22, 436:18, 450:8, 450:23, 451:8, 452:16

**tomorrow** [1] - 247:2

**took** [13] - 264:2, 272:17, 291:10, 315:6, 324:19, 325:25, 336:2, 349:2, 377:16, 408:1, 437:17, 446:18, 446:20

**top** [32] - 250:4, 250:22, 269:16, 269:20, 270:24, 271:14, 273:8, 280:19, 281:1, 295:25, 296:3, 296:7, 297:4, 301:3,

307:19, 314:22, 315:6, 319:23, 348:25, 350:22, 352:8, 394:4, 403:25, 404:5, 410:17, 411:4, 425:23, 428:7, 428:17, 430:3, 432:6, 434:19

**topics** [2] - 413:7, 413:22

**total** [25] - 249:5, 258:3, 284:6, 294:15, 296:7, 296:12, 296:14, 297:17, 298:4, 301:3, 302:7, 302:21, 303:7, 352:8, 352:13, 353:20, 357:9, 357:10, 367:12, 376:15, 406:7, 422:9, 427:20, 427:23

**totality** [1] - 403:15

**totalled** [1] - 371:24

**totally** [1] - 326:12

**towards** [1] - 366:19

**town** [1] - 247:2

**Track** [2] - 368:16, 428:18

**track** [3] - 281:22, 417:10, 429:10

**traded** [6] - 388:1, 395:8, 424:11, 424:15, 424:18, 436:10

**traditional** [1] - 266:15

**traditionally** [1] - 253:15

**Transaction** [1] - 302:17

**transaction** [2] - 303:12, 423:21

**TRANSCRIPT** [1] - 245:9

**transcript** [5] - 325:8, 325:10, 326:7, 326:8, 331:4

**Transcript** [1] - 246:14

**Transcription** [1] - 246:15

**transformative** [1] - 443:24

**transition** [1] - 443:7

**travel** [1] - 412:16

**treasurer** [1] - 266:19

**treasury** [2] - 266:20, 392:7

**TRIAL** [1] - 245:9

**trial** [3] - 356:12, 439:13, 446:14

**tricky** [2] - 397:20, 397:22

**tried** [1] - 436:18

**trigger** [1] - 338:21

**triggered** [5] - 339:2, 339:6, 339:10, 339:17, 339:19

**trip** [1] - 247:2

**troubling** [1] - 446:13

**true** [20] - 274:14, 288:9, 292:3, 296:23, 302:13, 303:10, 310:14, 322:17, 325:19, 325:22, 326:2, 326:15, 327:3, 336:20, 339:3, 354:8, 379:2, 434:12, 436:8, 439:19

**truly** [1] - 302:22

**trust** [14] - 261:18, 265:21, 270:13, 273:24, 275:4, 276:2, 284:15, 295:6, 300:6, 305:24, 307:15, 319:10, 320:12, 377:1

**trustee** [1] - 300:6

**truth** [11] - 287:25, 288:10, 325:3, 325:6, 325:7, 382:3, 382:5, 384:18, 384:19, 437:25

**truthful** [1] - 323:9

**try** [9] - 328:7, 329:4, 335:16, 355:18, 369:25, 373:6, 394:19, 446:21, 447:21

**trying** [8] - 288:21, 316:20, 319:5, 358:16, 366:14, 395:1, 405:17, 433:14

**Tuesday** [5] - 383:13, 437:3, 449:22, 452:18, 452:23

**turn** [6] - 267:17, 286:7, 342:11, 351:7, 353:1, 372:17

**twenty** [1] - 315:14

**twice** [1] - 406:19

**Two** [1] - 427:14

**two** [39] - 249:13, 250:7, 251:2, 251:15, 257:2, 267:21, 270:19, 298:11, 298:19, 303:25, 306:11, 306:14, 323:21, 326:17, 329:3, 331:6, 340:10, 344:2, 348:6, 362:12, 372:16, 376:21, 383:9, 383:18, 392:8, 396:1, 411:14, 411:17, 413:20, 414:1, 414:14, 415:2, 418:18, 420:9, 420:10, 427:12, 428:14, 445:11

**two-day** [2] - 413:20, 418:18

**two-foot** [1] - 249:13

**two-thirds** [1] - 331:6

**type** [3] - 302:17, 303:12, 309:7

**types** [1] - 364:18

**typical** [7] - 266:12, 279:6, 279:8, 317:2, 317:6, 424:3, 435:22

**typically** [5] - 252:17, 263:4, 386:15, 388:3, 394:19

---

## U

**U.S** [2] - 287:8, 304:24

**ultimately** [2] - 398:18, 406:4

**unaudited** [6] - 299:15, 299:18, 299:21, 313:14, 313:15, 435:20

**uncertain** [2] - 285:6, 347:22

**uncommon** [4] - 403:24, 424:9, 425:2, 425:13

**under** [13] - 266:20, 276:18, 315:8, 325:19, 326:3, 345:1, 384:8, 396:15, 405:2, 416:15, 417:16, 443:17, 444:13

**Underlying** [1] - 304:2

**underlying** [16] - 262:8, 282:15, 322:11, 334:16, 338:23, 339:11, 339:18, 340:3, 341:4, 342:2, 360:10, 368:5, 400:22, 403:22, 408:7, 419:19

**underneath** [2] - 422:4, 422:17

**underperformance** [1] - 340:22

**underperformed** [2] - 339:3, 444:8

**underperforming** [1] - 440:2

**undersigned** [2] - 269:16, 269:17

**understood** [33] - 260:11, 270:16, 272:8, 272:17, 272:20, 274:23, 275:2, 275:14, 276:16, 276:17, 277:4, 277:13, 279:2, 279:21, 280:7, 285:1, 285:14, 287:25, 288:10, 309:8, 309:18, 333:20, 333:21, 338:22, 358:10, 402:17, 403:18, 414:9, 415:22, 416:6, 428:21, 449:9, 452:14

**unintentional** [1] - 424:23

**unit** [3] - 265:8, 272:14, 274:10

**UNITED** [3] - 245:1, 245:3, 245:10

**United** [4] - 245:4, 245:13, 245:17, 351:3
**units** [12] - 272:12, 274:18, 275:5, 276:2, 276:6, 277:14, 280:10, 280:11, 281:5, 347:13, 366:7, 366:8
**University** [1] - 326:20
**unless** [5] - 253:9, 280:10, 291:24, 315:23, 380:10
**unlikely** [1] - 328:23
**unobjectionable** [1] - 443:20
**unproductive** [1] - 346:9
**unsolicited** [2] - 392:17, 392:18
**Up** [1] - 283:14
**up** [118] - 247:17, 248:21, 252:11, 252:15, 253:22, 254:20, 257:13, 276:13, 276:15, 279:25, 281:10, 283:18, 285:19, 288:14, 291:13, 291:17, 292:11, 292:13, 292:21, 294:1, 294:25, 295:16, 295:19, 295:24, 302:1, 302:3, 302:4, 304:14, 304:24, 307:9, 307:20, 312:20, 312:21, 313:8, 319:5, 320:3, 320:24, 321:5, 321:15, 324:11, 326:12, 326:21, 328:10, 329:4, 331:4, 332:13, 334:4, 334:25, 336:17, 337:1, 337:10, 338:16, 339:2, 339:20, 340:3, 340:13, 340:22, 342:6, 342:12, 345:9, 348:14, 348:17, 348:22, 349:8, 349:23, 351:10, 351:24, 353:3, 353:25, 354:5, 355:25, 356:14, 358:6, 358:8, 358:25, 359:7, 363:13, 366:5, 367:10, 367:11, 369:4, 369:12, 369:15, 371:17, 375:8, 375:13, 379:1, 380:9, 380:10, 382:1, 382:14, 384:4, 386:19, 389:6, 390:19, 391:25, 393:13, 394:6, 395:2, 396:8, 396:22, 416:14, 416:15, 417:4, 417:15, 417:24, 418:3, 420:11, 429:2, 431:20, 433:11, 439:22, 441:17, 449:12, 449:21, 450:11, 450:15
**upcoming** [4] - 349:1, 349:8, 349:9
**update** [2] - 430:9, 431:3
**updates** [2] - 401:4, 433:12
**usage** [2] - 337:21, 345:3
**useful** [1] - 318:7
**Utilization** [1] - 284:4

## V

**value** [7] - 260:4, 281:4, 334:8, 343:17, 345:15, 376:18, 396:16
**valued** [1] - 251:5
**Vanguard** [1] - 387:15
**vaporized** [2] - 257:16, 257:18
**variable** [3] - 316:24, 316:25, 354:23
**variables** [3] - 298:20, 354:6, 354:24
**varies** [1] - 386:16
**varieties** [1] - 420:10
**various** [3] - 353:7, 387:19, 442:3
**vary** [1] - 439:7
**vehicles** [1] - 313:13
**verbiage** [2] - 278:1, 278:3

**verified** [1] - 253:10
**verify** [1] - 253:12
**vernacular** [1] - 303:24
**versus** [2] - 304:2, 316:18
**viability** [1] - 417:18
**view** [12] - 255:25, 256:7, 256:11, 256:13, 353:15, 353:18, 353:24, 354:16, 368:1, 417:18, 440:4, 441:6
**virtue** [2] - 284:15, 306:9
**visited** [1] - 292:2
**VORA** [1] - 246:4

## W

**wait** [1] - 267:20
**waiting** [2] - 326:23, 328:15
**walked** [2] - 324:19, 352:5
**Wall** [1] - 364:5
**warrant** [2] - 272:4, 272:7
**warranted** [4] - 274:23, 276:16, 417:3, 424:20
**warranties** [5] - 273:21, 274:13, 274:21, 416:9, 424:13
**warrants** [2] - 271:24, 274:3
**warranty** [1] - 399:24
**Washington** [1] - 246:6
**waste** [1] - 434:3
**Waste** [1] - 398:11
**wasting** [1] - 451:4
**waterfall** [3] - 382:15, 439:12, 446:20
**ways** [4] - 340:23, 353:7, 383:7, 447:17
**webinars** [2] - 431:3, 431:6
**Wednesday** [1] - 437:4
**week** [7] - 323:2, 430:24, 433:7, 436:16, 436:20, 437:2, 437:5
**weekend** [2] - 437:11, 452:22
**weeks** [1] - 329:3
**WEIGEL** [7] - 245:16, 246:23, 247:1, 309:22, 328:11, 329:1, 329:9
**weight** [2] - 316:17, 440:10
**whereas** [1] - 389:19
**whispered** [1] - 336:16
**whole** [11] - 250:21, 251:14, 271:7, 272:4, 284:21, 295:23, 384:18, 432:1, 439:18, 439:19, 445:23
**wholesaler** [2] - 388:14, 388:15
**wholesalers** [1] - 388:12
**widely** [1] - 386:16
**winded** [1] - 447:11
**window** [1] - 251:17
**winds** [2] - 339:1, 340:3
**Winer** [1] - 350:25
**winter** [2] - 317:19, 317:20
**wise** [1] - 443:6
**wish** [2] - 271:21, 351:20
**withdraw** [4] - 254:18, 334:11, 363:10, 435:2
**withdrawal** [1] - 276:20
**withdrawn** [2] - 339:7, 339:8
**Witness** [3] - 247:15, 327:25, 330:4

**WITNESS** [11] - 253:6, 257:24, 258:1, 328:5, 328:9, 354:22, 379:24, 380:1, 384:20, 384:23, 453:3
**witness** [42] - 247:1, 247:14, 247:24, 254:22, 257:19, 263:3, 267:8, 268:1, 293:4, 299:25, 315:17, 318:22, 318:24, 320:21, 320:22, 325:16, 328:2, 328:14, 328:17, 328:21, 328:24, 329:2, 336:25, 337:4, 348:23, 348:24, 349:24, 372:11, 380:3, 384:1, 384:2, 384:12, 393:6, 393:8, 408:4, 408:15, 408:25, 411:21, 413:1, 419:24, 430:4, 432:6
**witness's** [1] - 383:25
**witnesses** [8] - 247:4, 439:8, 449:21, 450:15, 451:12, 451:16, 451:17, 451:18
**wondering** [1] - 328:12
**word** [4] - 253:7, 283:14, 297:22, 375:22
**wording** [1] - 270:23
**words** [1] - 344:6
**works** [2] - 386:13, 446:20
**world** [3] - 385:15, 389:19, 420:16
**worst** [1] - 364:3
**worth** [6] - 265:21, 283:9, 377:15, 388:5, 394:21, 408:14
**write** [2] - 298:20, 355:24
**writing** [7] - 258:5, 298:17, 307:24, 308:12, 334:6, 360:9, 364:2
**written** [3] - 389:5, 419:22, 436:18
**wrote** [1] - 288:25

## Y

**year** [47] - 264:5, 264:15, 286:25, 288:13, 288:15, 294:5, 294:22, 298:1, 301:16, 304:23, 312:5, 316:11, 317:10, 317:11, 317:24, 318:8, 319:13, 324:20, 327:7, 332:20, 333:5, 333:9, 333:11, 333:16, 339:6, 340:9, 349:1, 349:2, 349:6, 349:9, 349:20, 350:3, 359:24, 361:4, 362:18, 364:2, 364:9, 366:7, 368:22, 372:4, 374:13, 397:6, 401:12, 429:7, 429:8, 433:11
**Year** [1] - 320:6
**years** [15] - 264:6, 264:19, 281:21, 282:8, 286:14, 288:23, 332:14, 348:6, 351:5, 416:13, 423:1, 435:17, 439:23, 441:13, 442:22
**yesterday** [26] - 246:19, 248:6, 248:22, 249:9, 250:6, 253:1, 253:7, 258:16, 261:1, 264:24, 273:13, 293:11, 301:22, 307:5, 312:13, 313:23, 330:22, 331:5, 331:14, 332:7, 333:22, 334:12, 338:6, 349:10, 349:13, 393:21
**yield** [15] - 396:2, 397:1, 397:2, 397:3, 397:5, 397:7, 401:6, 401:7, 401:10, 427:8, 427:12, 427:23, 433:24, 434:20, 435:3
**yields** [3] - 313:8, 401:14, 403:24
**Yields** [1] - 313:10

**YORK** [1] - 245:1
**York** [7] - 245:5, 245:14, 245:15, 245:19, 246:3
**young** [2] - 281:16, 282:16
**younger** [1] - 386:18
**yourself** [1] - 337:9
**Yup** [1] - 379:1

## Z

**ZELL** [1] - 246:7
**zero** [3] - 267:21, 392:6
**zero-two-zero** [1] - 267:21
**zoom** [18] - 248:19, 250:4, 250:20, 250:22, 259:2, 273:7, 281:1, 283:21, 362:12, 413:23, 421:19, 425:23, 426:6, 427:18, 428:5, 428:19, 430:3, 432:6