1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,    : 21-CR-0054(RPK)
:
:
:
:
: United States Courthouse
-against-                : Brooklyn, New York
:
:
:
: Friday, May 9, 2025
DAVID GENTILE and        : 11:00 a.m.
JEFFRY SCHNEIDER,        :
:
Defendants.    :

- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: NICHOLAS AXELROD, ESQ.
KATE MATHEWS, ESQ.
Assistant United States Attorneys

For the Defendant:    KOBRE & KIM, LLP
Attorneys for the Defendant -
David Gentile
800 Third Avenue
New York, New York 10022
BY: SEAN S. BUCKLEY, ESQ.
MATTHEW MENCHEL, ESQ.
ADRIANA RIVIERE-BADELL, ESQ.

*Proceedings*                                                        2

1            A P P E A R A N C E S:  (Continued.)

2

3                         ARENT FOX SCHIFF, LLP
                         Attorneys for the Defendant -
                         Jeffry Schneider
4                              1301 Avenue of the Americas
                              42nd Floor
5                              New York, New York 10019
                         BY: GLENN C. COLTON, ESQ.
6                            APEKSHA VORA, ESQ.

7                         ARENT FOX SCHIFF, LLP
                         Attorneys for the Defendant -
8                         Jeffry Schneider
                              1717 K Street, NW
9                              Washington, DC 20006
                         BY: MICHAEL DEARINGTON, ESQ.

10

11   Court Reporter:  Nicole Sesta, RPR, RMR, CRR
                      Official Court Reporter
12

     Proceedings recorded by computerized stenography.  Transcript
13   produced by Computer-aided Transcription.

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                              3

1          THE COURTROOM DEPUTY:  United States of America

2    versus David Gentile and Jeffry Schneider.  Counsel, please

3    state your name for the record.

4          MR. AXELROD:  Good morning, Your Honor.  Nick

5    Axelrod and Kate Mathews, and we're joined by Paralegal

6    Specialist Madison Bates on behalf of the United States.

7          THE COURT:  Good morning.

8          MR. BUCKLEY:  Good morning, Your Honor.  Sean

9    Buckley, Matt Menchel, Adriana Riviere, Benjamin Cooper on

10   behalf of Mr. David Gentile, who joins us at counsel table.

11         THE COURT:  Good morning.

12         MR. COLTON:  Good morning, Your Honor.  Glenn

13   Colton, Apeksha Vora, and Michael Dearington for Jeffry

14   Schneider, who is at counsel table.  We're also joined by our

15   paralegal specialist, Michelle Cascante.

16         THE COURT:  Good morning, everybody.  So we're here

17   for sentencing.  Generally I start by going over everything

18   I've reviewed in connection with the sentencing.  There have

19   been a lot of filings in this case.  I'm going to hit the

20   highlights.  There was a presentence investigation report and

21   sentencing recommendation for Mr. Gentile.  There's a

22   presentence investigation report and sentencing recommendation

23   for Mr. Schneider.  These are at 516 and 517.  Mr. Gentile and

24   Mr. Schneider both filed objections to the PSR.  That's 525

25   and 544.

*Proceedings*                                                                    4

1          Mr. Schneider filed a sentencing memorandum and
2    letters of support and other exhibits.  Those are at docket
3    524 and 525.  Mr. Schneider filed a sentencing memorandum at
4    523 and letters of support at 522 and 523.

5          The government responded to the objections the
6    defendants filed to the PSR.  Those responses are at 533 and
7    534.  The government filed a sentencing recommendation, a
8    sentencing memorandum as to Mr. Gentile at 540 and filed a
9    sentencing memorandum as to Mr. Schneider at 542, and both of
10   those included some attachments.  Defendants each filed a
11   reply to the PSR, 543 and 544.  Defendants filed a reply to
12   the government's sentencing memorandum at 543 and 544 also.

13         The government filed a second log of victim letters
14   at 551.  It filed some general forfeiture orders at 552, one
15   and two.  There's a PSR addendum at 560 with a revised
16   sentencing recommendation at 560-1 for Mr. Gentile, a PSR
17   addendum for Mr. Schneider at 562 with a revised sentencing
18   recommendation at 562-1.  There are probation logs and victim
19   statements at 566 and 567, and there are some additional
20   letters about loss calculations.  Those are at 573, 574, 575,
21   582, 583, 586, 589.

22         Those are the main submissions I received that
23   relate to sentencing.  Does anybody want to call my attention
24   to something they haven't seen or tell me about something I
25   missed?  MR. AXELROD:  Not from the government, Your Honor.

*Proceedings*                                                                    5

1              MR. BUCKLEY:  Not on behalf of Mr. Gentile.

2              MR. COLTON:  No, Your Honor.

3              THE COURT:  So generally I start with the PSR and

4    objections to the PSR, and the guidelines calculations, and

5    then I turn to the parties to hear what they want to say about

6    sentencing more generally.  I know there are also folks who

7    have submitted victim affidavits and want to speak in that

8    capacity.

9              My inclination would be to do that around the time

10   the government speaks at sentencing.  The caveat is that I

11   think it may take us a little while to talk about the

12   objections to the PSR and the guidelines calculations.  So if

13   you want to tell me that you want to do it in a different

14   order because of that, I would be open to it.

15             MR. AXELROD:  No, Your Honor.  I think the typical

16   order makes sense.

17             THE COURT:  Okay.  So let's start with the PSR and

18   the guidelines calculations.  Mr. Buckley and Mr. Colton, have

19   you each reviewed those with your client or your teams have

20   done that?

21             MR. BUCKLEY:  Yes, we have, Your Honor.

22             MR. COLTON:  Yes, Your Honor.

23             THE COURT:  And I guess, Mr. Gentile and Mr.

24   Schneider, you've reviewed the PSRs?

25             DEFENDANT GENTILE:  Yes.

*Proceedings*                                                                        6

1        DEFENDANT SCHNEIDER:  Yes.

2        THE COURT:  I take it the government has reviewed

3   the PSR in this case?

4        MR. AXELROD:  We have.

5        THE COURT:  It may make sense to start by talking

6   about the guidelines, because some of the factual disputes

7   relate to loss and other guidelines issues.  That may be a

8   more relevant place to start than just going through one by

9   one lines in the PSR that folks have objections to.

10        Does that make sense to you all?

11        MR. BUCKLEY:  It does, Judge.

12        THE COURT:  The biggest dispute under the

13   guidelines, I think, is about the loss amount.  My inclination

14   is to tell you my initial reaction, and then I'd welcome your

15   thoughts on it.  My initial reaction is that some version of

16   the fees that were received by the defendants during the

17   conspiracy period is an appropriate measure of either intended

18   loss to the victims or gain as an alternative, if loss can't

19   be established.

20        Here is my basic thinking about it.  This is money

21   that I think the victims or the folks who invested in GPB --

22   well, and as to intended loss, I think the record indicates

23   that the defendants thought the misrepresentations that were

24   being made in this case were essential to keeping the funds

25   going, getting people to continue to invest, that the evidence

*Proceedings*                                                                 7

1    suggests that when folks proposed to the defendants either cut

2    down on the distributions that you're paying or change the

3    disclosures about those distributions so that they accurately

4    reflect what's going on here is a return of capital, the

5    defendants very actively resisted that based on their

6    understanding that doing so would severely, severely undermine

7    the fund's availability raise capital and continue operating.

8          What that suggests to me is that the defendants'

9    understanding was that the investors were continuing to pay

10   these fees or paying these fees during the conspiracy period

11   because of these representations about how the funds were

12   doing.

13         So it suggests they intended for the investors to

14   pay those funds because of the misrepresentations.  That would

15   be the basis for formulating it as an intended loss theory.

16   The alternative would be as a gain theory, that this is money

17   defendants gain because of the fraud servicing basic idea.

18         There's the question I think that the defendants

19   have raised about whether there's an offset that should happen

20   because of the value of the services.  I think there are some

21   dispute about whether the fair market value offset applies, at

22   least when talking about a gain theory.  It's not obvious that

23   it does, but if it does, I guess I'm struggling with the idea

24   that you could take sort of what's the market rate that a fund

25   operating without any fraud would be able to charge and

1   transport that to what defendants should have been paid.

2          The whole point I think I've been arguing is

3   defendants' understanding comports with common sense is

4   investors were paying this amount of money because they

5   thought this fund was operating in a completely different way

6   then it was.  It was earning eight percent returns that it was

7   paying out.  That was a predicate for why investors were

8   willing to pay these fees and they wouldn't have been willing

9   to pay like the fees that they would have paid to another

10  company operating in the marketplace if they had understood

11  what was going on here.  That's why I don't think the

12  defendants have established their entitlement to an offset,

13  assuming that an offset provision applies to these mechanisms

14  of calculating loss.

15         So that's my kind of initial reaction to what I

16  read.  I welcome objections from either party.

17         MR. AXELROD:  Your Honor, this is kind of a theory

18  of loss or gain in this case that the government has proposed.

19  We think it's appropriate and reasonable.

20         THE COURT:  You all calculated this as a gain rather

21  than intended loss.  Is there a reason for that?

22         MR. AXELROD:  No, Your Honor.  And I will confess,

23  when I was preparing for this and thinking about it a couple

24  of days ago, this crossed my mind, as well.  I think it's

25  appropriate and you could think about it that way.

*Proceedings*                                                            9

1          THE COURT:  Okay.

2          MS. RIVIERE-BADELL:  Your Honor, on behalf of Mr.

3   Gentile, we feel that neither intended loss nor gain is

4   appropriate.  So with respect to Your Honor's statements about

5   the money that was being paid by investors continuing the

6   fraud, in fact we have proffered significant evidence that

7   there was continued investment in the funds even knowing

8   specifically full disclosure to some of the biggest brokers

9   that the funds were not being fully covered.

10          THE COURT:  I'm going to give you an opportunity to

11   say everything you want to say, but sometimes it's helpful if

12   I ask you directly about something you're saying.  I get that

13   argument.  It's one reason why I've framed this in terms of

14   intended loss or gain.  So an intended loss, I guess I pointed

15   you to evidence that I think suggests the defendants'

16   understanding is this is going to be really important to

17   investors.

18          And you're telling me to some investors it actually

19   wasn't that important.  I'm trying to bracket that issue

20   because I think the evidence showed what the defendants'

21   understanding was, yes, this is really critical to our ability

22   to raise funds.

23          MS. RIVIERE-BADELL:  I understand that, Your Honor.

24   And as to that specific point of intended loss, we would point

25   to the numerous times that the defendants themselves were

*Proceedings*                                                                                    10

1   aware that others were being told the truth about the

2   coverage, including witnesses at trial who said that they

3   heard the defendants say at the due diligence seminars that

4   the funds were not fully covered.

5           So that contradicts the testimony from witnesses who

6   were thoroughly impeached at trial who said otherwise.  So

7   you're relying on people like Mr. Lash, who is completely

8   discredited, and you're relying on people like Mr. Jacoby,

9   also is completely discredited.  So there's plenty of evidence

10  that the defendants did not intend, Mr. Gentile specifically,

11  did not intend victims to lose money as a result of the

12  offense conduct.

13          That's really what's important here is the actual

14  offense conduct that Mr. Gentile was convicted of was false

15  statements about the source of the distributions.  There's

16  plenty of evidence that Mr. Gentile, himself, personally was

17  saying the truth about those statements to the brokers and

18  knew that the organization itself was also doing so.

19          There was plenty of evidence that Mr. Gentile,

20  himself, also hired all of the best professionals that he

21  could hire to make sure that disclosures to investors were

22  accurate.  That rebuts any presumption that the government

23  has -- through the testimony that Your Honor is citing about

24  the evidence at trial with respect to what Mr. Gentile's

25  specific intention was with respect to how the funds were

*Proceedings*                                                                11

1   operated.

2           THE COURT:  I get that argument.  I respect it.  I

3   think in some ways there's a different view of the trial

4   evidence here.  This is kind of shading into an argument that

5   the jury got it wrong or arguments that maybe the jury was

6   relying on certain pieces of evidence and not others.  I'm

7   just drawing my best inferences from trial.

8           MS. RIVIERE-BADELL:  I understand, Your Honor.  And

9   we have to respect the jury's verdict, and we're not

10  suggesting that -- my argument is not intended to suggest that

11  the jury got it wrong.  We don't know why the jury voted the

12  way it did because there was no specific interrogatory as to

13  the verdict.  What we know is what Mr. Gentile was charged

14  with, what the government's closing arguments were, and we

15  believe that the government -- sorry, the jury could have

16  voted to convict separate and apart from, consistent with the

17  argument that I just made and not crediting some of the

18  testimony.

19          In fact, the government's closing argument, the

20  rebuttal closing argument, was that he could be convicted on

21  one lie alone, which the government even walked away from the

22  entire theory of its case for the eight weeks that it tried

23  the case.  And if the jury believed that, that is not

24  inconsistent with what I'm saying.

25          But for purposes of sentencing and for purposes of

Proceedings                                              12

1    the government's burden to sentence Mr. Gentile on intended

2    loss, we believe the Court should consider and that it's

3    overcome.

4          With respect to gain, Your Honor, I think that there

5    is a basis for crediting gain, but even before we get there --

6    sorry, crediting fair market value services.  Before we get

7    there, the government's theory on gain, which as Your Honor

8    correctly pointed out, they never even treated it as intended

9    loss.  In the gain what they've proffered includes management

10   fees that cannot be traceable to the offense.  They're just

11   not a result of the offense conduct.  Specifically there were

12   investors, huge number of investors, who invested before any

13   single misrepresentation was made.  And the law is clear that

14   you cannot treat as a victim, you cannot attribute loss or

15   gain to investors who invested before the offense conduct and

16   simply held onto their investments.

17         THE COURT:  Can you help me quantify?  I feel like

18   I've seen something about it, and I'm going to go look through

19   my papers to find it, what percentage of investors are we

20   talking about?  I have a number in my head but it might be

21   wrong.  You tell me.

22         MS. RIVIERE-BADELL:  I can tell you, Your Honor, by

23   one measure, for Holdings 1, for example, GPB raised

24   $194 million before any allegation of a misstatement.

25         THE COURT:  But just --

*Proceedings*                                                                    13

1          MS. RIVIERE-BADELL:  And that's only 3.8 million

2     after.

3          THE COURT:  That's the first fund.

4          MS. RIVIERE-BADELL:  As to Holdings 2, as an

5     example, almost half of the total capital that was raised was

6     done before any alleged misrep, and auto is the least.  But

7     the problem, Your Honor, with respect to the government's gain

8     calculation is -- so the absolute last minute, not even the

9     eleventh hour, literally last minute, we get a purported

10    tracing analysis by Mr. Petron.

11          First of all, we don't have the actual analysis.  We

12    have a PowerPoint slide and a one paragraph description.  The

13    problem with that is is that we don't know anything about the

14    assumptions that Mr. Petron made in actually tracing the

15    so-called money that went from the funds into various entities

16    and then ultimately out to Mr. Gentile.

17          So the government claims that it's a lowest

18    intermediary balance rule analysis.  What that would require,

19    and what Mr. Petron has done, because he's testified for the

20    government over 100 times and has done this, it would require

21    a chart that had for each day that there's a deposit or

22    withdrawal, whether it was a tainted fund, a clean fund, and

23    then what's the balance.  We don't have that.  So we can't

24    even tell what the government is tracing into, tracing

25    supposedly into Mr. Gentile.

1          But what we do know is from the chart itself, that,

2     again, we know that there were of the $74 million they claim

3     went from GPB Funds, the three relevant funds, into GPB

4     Capital Holdings, that includes a significant amount of fees

5     that relates to these investors who invested prior to any

6     alleged misrepresentation.  That cannot be counted.

7          The other thing that we know is with respect to the

8     funds that went from -- Your Honor -- hold on one second.

9          THE COURT:  I just want to tell you one way I'm

10    dividing this up in my head.  I think you're raising fair

11    points.  There's a question of if I'm using the metric that

12    I'm using what numbers to plug in.  And so I think we're going

13    to need to talk more about that and I'll give you the

14    opportunity to talk about that again.  I'm at the first

15    conception station.

16         MS. RIVIERE-BADELL:  And then the second thing we

17    pointed Your Honor to was the fact that there were acquisition

18    fees that were included, and that was for sort of the second

19    part of the chart that goes from GPB Capital Holdings to an

20    entity known Ascendant Alternative Strategies.

21         Those are not fees that were entered as a result of

22    the offense conduct.  So the fact that those companies fully

23    disclosed to all of the investors that they were going to get

24    a fee for acquiring portfolio companies, which, in fact,

25    happened is not a result of the offense conduct.  It cannot

1   be.  And then the other thing that we pointed to Your Honor's

2   point on the fair market value of the services, the case law

3   is very clear that it should be credited.  Case law on fair

4   market value of the services, the government even points to

5   it.  The case law the government relies on is completely in

6   opposite to our facts.  It's where there is a complete Ponzi

7   scheme, a total sham, a fraud from top to bottom.  That has

8   never been this case.  It has never been this case and the

9   government is saying so now is not supported by the facts.

10  The government, itself, has said that there were years that

11  these funds operated before a single alleged misrepresentation

12  was made.  That is not a fraud top to bottom.  What Mr.

13  Gentile was convicted for, two things, the source of the

14  distributions and the performance guarantees, one of the

15  performance guarantees.

16          The performance guarantees, the 2015 auto

17  performance guaranty, was the substantive wire fraud count.

18  Didn't even harm the fund.  Essentially, what the government

19  said is that Mr. Gentile lied about the fact that instead of

20  Lash paying the performance guaranty, Mr. Gentile paid the

21  performance guaranty, which he could have done.  That is not a

22  lie, by the way, about the performance of the fund because a

23  performance guaranty by its very nature means that the

24  portfolio company did not perform.  So the fund was telling

25  the truth.  The portfolio didn't perform.  We sought to

1    collect on a guaranty.  By the way, the cash went into the

2    fund.  So there was never any harm as a result of that.

3          So those are the major points with respect to the

4    government's gain analysis, and we do have specific evidence

5    that we can point to on the fair market value of the

6    legitimate services from Mr. Gentile's compensation as a CEO

7    of a major hedge fund.  We can compare it to other CEOs at

8    similarly sized hedge funds, with either less or slightly more

9    assets under management.  There was testimony about what his

10   compensation was.

11         We have in the record also what the actual monthly

12   compensation was for the entire period, both before the

13   alleged conspiracy period and after.  So we can certainly

14   provide that information to the Court, as well.

15         THE COURT:  Thank you.

16         MR. COLTON:  Thank you, Your Honor.  I will tell

17   you, Your Honor, the thing that troubles me the most about

18   what's going on right now is we're now talking about an eighth

19   theory of either gain or loss to enhance the guidelines.  The

20   theory of management fees as intended loss is brand new this

21   morning.  I understand the Court has done a lot of work to go

22   through a lot of papers, but this is the first time we are

23   getting an opportunity even to think about that.

24         And the fact that we are talking about eight

25   different alleged theories of loss tells me that there really

*Proceedings*                                                    17

1    isn't a way to know and calculate or prove that there was a

2    loss.  Why are we doing all of this?  We're doing all of this

3    in eight theories because it very well may be that everybody

4    gets their money back.  Who was an alleged victim of this

5    crime?  We don't know what the jury convicted for.

6          It could have been Mr. McConnell stood there in

7    rebuttal and said could have been one statement about one fund

8    at any period of time.  So to give the jury's verdict more

9    credit than that, I think we can't do.  The other major

10   problem I'm having, Your Honor, from just the ability to

11   address the concerns is if we go to the gain side, and I'll

12   address whether it's appropriate to do that, which gain theory

13   of the three the government have put out, which numbers, which

14   methodology are we even talking about because the government

15   has presented three different ways to do that.  Each time they

16   present a theory we demonstrate the problems with that theory,

17   and they come up with another theory.

18         And I am now in the unenviable position of having to

19   scribble notes on post-its to figure out which arguments now

20   apply to management fees as intended loss, which is brand

21   knew.  I understand that this is complicated, but we have not

22   had an opportunity to actually think that through or address

23   it.

24         So I'm doing my best but I don't think it's the

25   proper way.  And if the first seven theories can't work, the

*Proceedings*                                                                    18

1    eighth theory shouldn't be credited.  That's our position

2    here, Your Honor.  As far as just dividing it up, intended

3    loss has a requirement.  It has a very specific requirement

4    that the government must prove that the pecuniary harm was

5    what the defendant purposefully sought to inflict,

6    purposefully sought to inflict.  The government has put no

7    evidence in, and we have had no evidence or time to counter

8    it.

9            The question, the legal question, that Mr. Schneider

10   purposefully sought to inflict, still an unknown number on

11   unknown victims, and I think that's an inappropriate standard.

12   I think where all this comes out is if you have eight theories

13   of loss or gain, you have none that are cognizable.

14           THE COURT:  I get the atmospheric argument.  To me,

15   these are all variations on the same argument.  The government

16   has argued a couple of different metrics throughout in the

17   alternative, and one of them is fees.  This is not a

18   surprising theory.

19           MR. COLTON:  Intended loss is a different angle

20   under the guidelines from actual loss, which is different from

21   gain.

22           They have different rules, different laws, different

23   case law that supports them, different factual showings that

24   have to be made.

25           THE COURT:  I feel like there's a mix and match.

Proceedings                                                        19

1  They argued intended loss for other pieces, right?

2          MR. COLTON:  The only intended loss that the

3  government argued was the patently absurd notion that the

4  $98 million put into investors' pockets was the amount that

5  the investors were intended to lose.  That was the only

6  intended loss argument that's been made before we got to court

7  this morning.  That was such a preposterous argument that the

8  government has dropped it.  So no other intended loss

9  argument.

10         THE COURT:  So on the substance, so I take your

11 point that there's a need to show the intent to cause loss to

12 the investors.  I think I argued or gave you what I was

13 finding persuasive on that score, which I think is basically

14 what the government has argued in substance, even if they

15 didn't invoke the concept of intended loss.  I don't think I'm

16 all that creative.

17         So they argued the defendants operating from the

18 understanding that these misrepresentations were essential to

19 their ability to raise funds, keep the funds in operation.  So

20 they intended that this money be paid as a result of the

21 misrepresentations.  Tell me what's wrong with that.

22         MR. COLTON:  There are a couple of things that are

23 wrong with that.  First of all, Your Honor, all of the

24 financial statements were published.  All of them were out

25 there.  So it is clear that that information was put out

1    there.  So if this was a cook the books case, and I understand

2    the guaranty argument and I can come back to that in a moment,

3    other than that if it was a cooks the books case where the

4    books out there was fake, that argument I would understand.

5              But this is not a cook the books case.  The books

6    were there and, by the way, the fees were fully disclosed and

7    every investor knew, because it was in the documents, that

8    they had no say in the management of the funds, they'd have to

9    pay the management fees, and that was not a secret.  And the

10   results of the funds were put out there.  And we don't know,

11   we have no idea, whether the jury convicted on guaranty one

12   statement about Holdings 2 in March of 2018, I'm making that

13   up, we don't know.

14             The government invited that by saying in summation

15   you can convict on one statement and one statement only.  We

16   don't know.  We do not know.

17             THE COURT:  I think it's a fair point you're making

18   and your colleague also made.  I think where that leaves me is

19   I need to make a judgment about what the evidence at trial

20   showed about that.  Right?

21             MR. COLTON:  It depends on which version of the loss

22   guidelines we're talking about, intended loss, actual loss,

23   gain.  There are different findings the Court would have to

24   make and different proof the Court would have to put the

25   government to in order to make those findings.

1           If we are talking about the management fees, first,

2    there are three versions the government put in figures.  I

3    would ask the Court to at least not consider or strike the one

4    that was first presented to us merely ten days ago.  We've

5    been asking and we have objected to Mr. Petron being a

6    non-expert.  The Court ruled on that.

7           We objected to the notion of getting things at the

8    last minute.  Well, now they converted Petron to an expert.

9    They did a whole expert tracing analysis.  We have no

10   background for it.  We had no opportunity to review it.  And

11   what they're seriously asking is Mr. Petron, who missed

12   $14 million worth of transactions when he took the stand

13   during the trial, and we should just trust him.  So one of

14   those three gain analyses should be thrown out, or we get the

15   proper discovery that we should be entitled to and then we can

16   address it with the Court.

17          So that's my argument as to one of the gain

18   analysis.  The second is there are massive problems with what

19   Mr. Petron did in his other analyses.  Because he counts funds

20   that flow through from AAS, that other businesses, funds that

21   were related to verdicts, a whole set of funds that had

22   nothing do did with GPB.  AAS had other businesses.

23          Mr. Petron did nothing to segregate all of that.

24   That's why the other gain analysis and charts he put in are

25   not reliable.  So when we're looking at the gain analysis, we

*Proceedings*                                                              22

1    get down to the general notion of certain amount of fees being

2    paid.  Well, what metrics are we using to figure it out?

3    Obviously, if somebody invested in the funds before there was

4    even an alleged misrepresentation, how are they defrauded?

5    They can't be.  And there was no right to redeem.

6              There was no false statement about the information

7    that was put out in the fund.  So you have a situation where

8    if you got into the fund when no one is alleging there were

9    false statements, then the management fees you paid are not

10   a -- were not caused by the false statements the government

11   has alleged in this case.  They simply were not because you

12   invested before that.

13             Moreover, how are we figuring out when the false

14   statements started?  Because the government in putting forward

15   one of its seven theories of loss, argued this back of the

16   envelope what were the assets worth at the end of December.

17   That was one of their arguments.  In so doing, they're

18   adopting what Mr. Petron adopted, in part.

19             They're adopting what the indictment adopted, which

20   was that income method with unrealized and realized gains.

21   That changes when the alleged false statements might have been

22   made or not.  So this is all extremely hard for the government

23   to meet its burden of what the number is.

24             And if we're talking about intended loss, they have

25   to prove that Jeffry Schneider intended for people to lose

*Proceedings* 23

that money.  It's hard to argue that he intended people to
lose this money when he personally put the money in.  Not only
did he personally put it in, he put it in on the very last day
before anybody could get in, before it closed, because he
didn't intend for people to lose money.  He didn't have that
specific intent.

We could have argued the specific intent issue as to
the management fees under the guidelines, but we didn't know
that was one of the issues that was being presented.

Now, I'm still unclear, and I'll wrap this up for
now, if the Court is talking about loss or gain, if the Court
is unclear whether loss has been proven, then it can't go
together.  That's just the basic law.  The Court would have to
find that there was a loss caused, under Second Circuit case
law, by the crimes of conviction.  And only then say that you
can't figure out what the amount of the loss is.  That's the
only time you can go to gain.

So if the Court is inclined to say you can calculate
loss, well, then, you can't go to gain.  We should only be
talking about loss and it's not clear to me where we are.

THE COURT:  I think, just to clarify, I think you're
right about that.  And so I think the appropriate way of
thinking about this is to me this does fit under an intended
loss rubric.  But if it didn't, then I would go to gain as an
alternative metric.  I do think the record establishes that

*Proceedings*                                                    24

1    there was an actual loss.

2         But if my intended loss calculations are not viable

3    for some reason, then I'm persuaded that I can't determine

4    with reasonable certainty on the record what the amount of

5    loss is and, therefore, gain is an appropriate metric.

6         MR. COLTON:  If we're going forward, I just want to

7    make sure the record is clear, if we're going forward on

8    management fees as an intended loss, I would ask that the

9    Court adjourn the sentencing and give us an opportunity to

10   actually address that legal question, which has not been

11   raised before this morning.

12        THE COURT:  Do you have a thought?  It seems like

13   not a great use of time.  I'm seeing a full courtroom of

14   people.  I know that the defendants, among others, have

15   traveled from quite some distance and that we've given

16   notification to folks who have submitted victim notifications

17   to set today's date.

18        What do you want to do?  So if I grant you an

19   adjournment, what's going to happen?  I'm not asking you.  I'm

20   asking the folks suggesting they want an adjournment.

21        MR. COLTON:  I'm sorry, Your Honor.  I was

22   collaborating.  I didn't hear what you said.

23        THE COURT:  You would like some more time.  What do

24   you want to do in that time?

25        MR. COLTON:  We would like to understand what the

*Proceedings*                                                    25

1    precise measure that is being proffered is, how much, how the

2    number is calculated, what period of time is being proffered

3    as what the loss amount is, and then we can look at the record

4    and understand if there is evidence, at least from my

5    perspective as Mr. Schneider's lawyer, there is evidence that

6    Mr. Schneider purposefully sought to inflict the particular

7    amounts that are being proffered as loss on victims because

8    that is the legal standard that the government must meet the

9    burden of proof in order to get the enhancement.

10          THE COURT:  I'm not envisioning considering any

11   different amounts than the government has put forward.  I

12   think we need to have a discussion about the objections you

13   raised to those calculations.  So the government has offered

14   various metrics for calculating the fees that either

15   defendants were paid or the fund were paid from victims.  It's

16   framed those in terms of gain, but I think that I would be

17   considering the same as the metrics of intended loss.  There

18   are fees that the defendants intended the victims to pay as a

19   result of the fraud.

20          MR. COLTON:  So there are two different, vastly

21   different, buckets the government has presented in that

22   regard.  That 56 million allegedly paid between 2013 and 2018,

23   even though there was no alleged crime before the middle of

24   2015, and second, two different versions of either pseudo

25   transactions and actual transactions got to 25 million with

*Proceedings*                                                            26

1    very different methodologies, very different calculations,

2    very different periods of time.

3             THE COURT:  You've raised objections to those and I

4    have not ruled on those objections.  I'm hoping to talk

5    through those objections, but it seems like the objections

6    that you've raised are the objections you would have.  Right?

7             MR. COLTON:  Sitting here today, I can't represent

8    to the Court that I have thought through the question of

9    purposefully sought to inflict an intended loss with respect

10   to the gain calculations that the government's presented,

11   because that was not one of the seven versions that was

12   presented to us.  That's my problem.

13            I understand the Court is saying some of the issues

14   overlap.  They surely do.  It may very well be that when I sit

15   back in my office and have the opportunity to do the research

16   and look through the record, we wouldn't have additional

17   arguments but I don't know.

18            MR. AXELROD:  Judge, we're not here today to redo

19   the closing arguments, which is part of what we heard.  The

20   rest of what we heard today is thoroughly briefed in the

21   defendant's papers.  Every argument that they have raised just

22   now is in the papers that Your Honor considered.  We went

23   through I don't know if it's a dozen rounds of briefings.  It

24   feels like a dozen rounds of briefings.  All the numbers, to

25   your point, are the same.

1         We have victims who have been waiting years for

2    justice in this case.  They are on the line.  We are all here.

3    It is time to move on to sentencing these defendants.  I'm

4    happy to address any of what they said, which I think we have

5    in our papers, or the details of the calculations.  I'm happy

6    to answer the Court's questions.  I see no basis to adjourn

7    the sentencing.

8         I think the Court has done a reasonable -- has come

9    up with reasonable ways of estimating gain or loss in this

10   case.  I think it's time to move on to the specific numbers.

11        THE COURT:  Okay.  I guess my frontline reaction is

12   all of these arguments, everything I've heard from every side

13   and everything I can conceive of in relation to this is

14   something that has been briefed and now discussed at great

15   length.  And so that's my frontline reaction to this.

16        At a minimum, I want to keep going with the

17   sentencing and then we'll see where we are.  I think one thing

18   we can certainly do is hear from victims, figure out what the

19   concrete right number to use would be, figure out other

20   guidelines disputes.  I think we should definitely do all

21   those things now.

22        So I guess I'll just say as to the arguments I've

23   heard, I'm not persuaded that I'm incorrect in my analysis of

24   the loss issue.  Mostly, I think we each have a different view

25   of the trial record.  I get that it's not that the jury's

*Proceedings*                                                                 28

1    verdict necessarily compels my view of the trial record, but

2    on the intended loss point, I do think there was pretty

3    compelling evidence that the defendants didn't want a full and

4    accurate disclosure of the source of the money that was being

5    paid out to investors because they thought doing so would

6    really impair their ability to raise capital.

7              And then there is this phony performance guarantees

8    issue.  I'm really -- that seems like the more striking fraud

9    in this case.  It seems so clearly fraudulent, and I guess I'm

10   just really not persuaded by the idea that it's immaterial.

11   The whole point of the guarantees was to make it seem that

12   these funds were more covered than they were through revenue,

13   through revenue from Mr. Lash.  And it does seem like the

14   fabrication of those guarantees reflects on the real

15   understanding on the part of the defendants that it's

16   important to make the coverage ratio seem better than they

17   actually were.

18             I guess we can disagree about what the evidence at

19   trial showed, but it did seem to me there was pretty

20   compelling evidence that the defendants thought it was

21   important for the coverage ratios to seem better than they

22   were, that they thought they wouldn't be able to raise capital

23   to continue to operate the funds if those misrepresentations

24   weren't made.  We can disagree about that.  But that's where I

25   am on the evidence.

*Proceedings*                                                    29

1          MR. COLTON:  If I may be heard on that point.

2          THE COURT:  Yes.

3          MR. COLTON:  With respect to the 2015 guaranty, the

4    government stood up in its second summation and said that

5    investment income is the measure.  Period, full stop.  That is

6    the measure of coverage.  That is the government's position.

7    With respect to the 2015 guaranty, with or without the

8    guaranty, the net investment income did not change.  Period.

9    Didn't change.  So the government's theory simply doesn't

10   work.

11         THE COURT:  I don't really get -- tell me more about

12   your argument.

13         MR. COLTON:  So if the government's theory is you're

14   covering, we heard eight weeks of testimony about coverage,

15   you're covering your distributions, and there was a lot of

16   debate about how we define covering, but the government's

17   position was there's only one way to define coverage.  They

18   said it in summation.  It's net investment income compared to

19   distributions, but recognizing that the 2015 guaranty

20   portfolio did not change.

21         THE COURT:  Just because of where it was ultimately

22   placed on the books, so to speak.

23         MR. COLTON:  Yes.  So the financial statements were

24   no different.

25         THE COURT:  What's your view?  What's your

*Proceedings*                                                                    30

1    alternative theory?  So I'll tell you my -- I think the trial

2    evidence pretty compellingly showed the performance guarantees

3    were fabricated.  What's your theory?  I guess I have a theory

4    in my mind about what the defendants were trying to do by

5    fabricating those guarantees.

6           It may be that ultimately accountants put it on a

7    different line and it didn't have that effect.  What is your

8    alternative theory, if I were to start from my premise about

9    what the trial evidence showed from Mr. Lash's testimony, from

10   the way that these deals, the auto deals, were initially

11   papered, and then the way that the funds were transferred

12   later on?  To me it's a pretty compelling case if you accept

13   that premise.  What's your alternative theory?

14          MR. COLTON:  I would largely defer to Mr. Gentile's

15   counsel on this for the major reason that the evidence was

16   different as to the two of them, and for Mr. Schneider he

17   wasn't in any of those deals.  His name is not on any of those

18   papers.  When Mr. Lash in this building pled guilty and said

19   what he did, he didn't mention Mr. Schneider.

20          It was only from the stand that he said my lawyers

21   told me to say something different, and add Mr. Schneider in

22   the testimony at trial that he did so.  So in our view we

23   can't just lump the defendants together in that regard.  I'm

24   in no way saying anything that's unwrong.  I'm merely saying

25   that I object to the notion that the trial evidence is

*Proceedings*                                                                          31

1    actually same as the quote the defendants.  The government

2    recognizes this, of course, because they charged the case

3    differently.

4             So in my mind the question is, can you find a loss

5    different than guilt or innocence at the trial, can you find a

6    loss based on the guarantees.  My answer is no because it

7    didn't change the financial metrics.

8             THE COURT:  Intended loss.

9             MR. COLTON:  Yes, for intended loss.  If you're

10   trying to trick somebody to get them to lose money, why would

11   you do a transaction that doesn't change the very metric that

12   supposedly people are looking at.

13            THE COURT:  Who decided how the guarantee was

14   booked?

15            MR. COLTON:  I assume it's the accountants.  But the

16   government's theory throughout the case is that the

17   defendants, which I object to the notion it would be put

18   together, they have different issues or whatever, but to me,

19   if your theory is the false statement about coverage caused a

20   loss, a false statement about coverage or a false statement

21   and guaranty doesn't change coverage, couldn't have caused the

22   loss.

23            As to Holdings 1, the financial statement that was

24   supposedly no good that came out in May of 2015, comes out

25   weeks before the fund stops taking money.  So the amount of

Proceedings                                                                32

1    loss as to Holdings 1, the amount of people that could have

2    seen that financial statement, that the guaranty and invested

3    is infinitesimally small.

4              THE COURT:  So I think I am where I am on this

5    question, and then the question is what is the appropriate

6    amount to use for intended gain or loss.  I guess maybe I'll

7    put this to the government in the first instance.  I have some

8    inclination to use a number that's substantially lower than

9    some of the higher numbers that the government had proffered.

10   There's the expense reimbursements.

11             We have 7,668,000 in expense reimbursements, and

12   then we've got $13,441,996 allegedly returned by the

13   defendants.

14             MR. AXELROD:  Got it.  So, Judge, are we talking

15   about intended loss or gain?

16             THE COURT:  Does it matter?

17             MR. AXELROD:  I think it does matter.  I don't think

18   whatever these fees were used for, if you're talking about

19   intended loss I don't think you need to do this analysis.  I

20   think the analysis you're doing really pertains to tracing.

21   So it would apply to gain if you're going down the route of

22   what they made, as opposed to the fees.

23             On the fees point, and this is in our papers so I

24   know Your Honor is aware of it, the management fee is one of

25   many, many, many fees paid by these investors on the premise

*Proceedings*                                                            33

1    that they were investing in a fund that was returning eight

2    percent in income.  That 56 number is, in truth, conservative.

3            I think there's 174 million in additional fees, and

4    a lot of those other fees are used for things like overhead,

5    right, employee expenses, 24 million in employee expenses.  As

6    I understand the question, it's the specific issues that were

7    pointed out in Mr. Schneider's reply.  So let me address

8    those.

9            The 7 million in reimbursement, our issue with that

10   is it's not at all clear from what they provided that these

11   are reimbursements to Mr. Schneider and Mr. Gentile.  It's

12   going to AAS.  That doesn't close the loop on whether it's

13   flowing through to Mr. Schneider.  There are flows between AAS

14   and Ascendant.  So you can't really say with any confidence

15   that that reimbursement is intended for Mr. Schneider to

16   offset his gain from the offense.  That's our problem with the

17   7 million number.

18           MR. COLTON:  I'm sorry.  I don't mean to interrupt.

19   I just want to know if we should do them one by one.

20           THE COURT:  I want to stay with the government for a

21   minute.  I'll give you the opportunity to respond.

22           MR. AXELROD:  More generally, Your Honor, this goes

23   to the $13 million question.  There's this idea that money

24   going back they claim needs to be credited.  When you're in

25   the gain world I don't think you get credits for what you do

*Proceedings*                                                        34

1   with the money generally.

2            I don't think the guidelines say that.  I think the

3   text of the application note is clear and it leads to

4   nonsensical results as we lay out in our papers.  More

5   fundamentally, if you look at what you're talking about as to

6   Mr. Schneider, you're talking about money going back to his

7   businesses.  That's not money going back to -- and it's money

8   he chose to put into his businesses.  What he's choosing to do

9   with his gain, and the money is going back into a business

10  that frankly was operated as a part of this fraud to show

11  investors.

12           And there's plenty of case law that the cost of

13  running your fraud are in no circumstances to be credited.  I

14  think the money that goes -- and there's no flow that we have

15  found from those businesses back to the investors.

16           That money is staying at AAS and Ascendant Capital,

17  as far as we know.  We don't see it going back to the

18  investors.  If you're thinking about in terms of a credit and

19  offset, the reason we didn't credit that is because even in

20  the generous world where the credits apply, it shouldn't apply

21  to money that Schneider is sending to his business that's used

22  to then recruit more investors into this fraudulent investment

23  scheme.  That's why we didn't credit the 13.  I think there

24  are -- it's a slightly different analysis as to Mr. Gentile,

25  but it was particularly clear to us as to Mr. Schneider.

1          As to Mr. Gentile, the money that goes back to GPB

2    Capital Holdings, again, there's really no evidence that that

3    should be credited in any traditional sense.  There's no

4    evidence that that money is being used to benefit the victims.

5    It's not property returned to the victims, which is what the

6    guidelines talk about in the application note.  So we didn't

7    apply credits for those reasons.

8          I think the only one that's a close call is the

9    1.9 million that Mr. Gentile sent actually back to the fund.

10   And on that one, we just don't have any evidence that that

11   money was -- why he did that, what it was being used for,

12   whether it was going back to investors.  So we didn't credit

13   it but that's 1.9 million.

14         As we laid out in our submission, even if you

15   accepted the reimbursements, which I think is 6.9, I think

16   that's right, that doesn't change materially where we are.  I

17   think that that would drop you down to the 9.5 to $25 million

18   band instead of the 25 million to $65 million band.  So based

19   on my sense of where we're going to be in the sentencing, if

20   it short circuits it, I would say apply the 20 point

21   enhancement, that's extremely conservative, and we should move

22   on to the sentencing, as opposed to the 22 point enhancement.

23         To briefly address something from the reply, because

24   we chose not to file a sur reply, I thought the Court might

25   appreciate that, the change in the numbers that Mr.

Proceedings                                                              36

1    Schneider's counsel called your attention to, reflects Mr.

2    Petron's correcting the analysis as to the checks.  If you

3    look at the numbers, you'll see that it adds up that money, so

4    the checks that were signed over don't hit Mr. Schneider

5    account.

6           When you're doing a tracing analysis it's not

7    appropriate to count that as funds received by Mr. Schneider's

8    account.  Instead, they were deposited in Ascendant's account.

9    So if you look at our flows, you'll see that the number

10   between AAS and Ascendant Capital has gone up by that amount.

11   So it's simply moved.  It's not some mystery.  I'm sure Mr.

12   Colton, who has told us repeatedly he's an accountant, can

13   figure this out.  But the $21 million number, the flow between

14   AAS and Ascendant, that reflects those checks.  That's the

15   difference.  That's why the numbers changed, and I frankly

16   think that that's appropriate.  We were accounting for the

17   error in the analysis that he pointed out in trial.

18          THE COURT:  I, too, have had the thought that I

19   would like to use a conservative number.  I'd like to think in

20   terms of brackets, because while calculating the guidelines is

21   something I have to do, it's not the central part of the

22   sentencing.

23          You all have raised, I think, particularly on the

24   defense side, but the government's arguments on this point are

25   consistent with it, that people criticize the 2B1.1 guideline

*Proceedings*                                                    37

1    as inappropriately weighing this factor.  I will say I've

2    tried to make my best calculation of this, but I don't think

3    any of these disputes about the appropriate number to use

4    under 2B1.1 will be material to the sentence.

5           I've also had the thought of let's think about

6    brackets, and I would like to adopt a conservative view of the

7    brackets.  I will tell you that my most conservative

8    calculation, and it could be that I'm being too conservative,

9    was one lower than the government's.  So I came up with an 18

10   level enhancement, and that bracket, I will tell you, is the

11   one that's --

12          MR. AXELROD:  Three and a half million, Your Honor.

13          THE COURT:  It's anywhere from 1.5 to 3.5 million.

14   I'm going to give the government the opportunity to push back

15   on my doing that, but I guess I would also invite the

16   defendants to tell me why they think we're below 1.5.  You

17   want to push back first?

18          MR. AXELROD:  Your Honor, I just want to clarify,

19   the 1.5 million guideline is 16 points.  There is the

20   3.5 million.  I wasn't sure which one you were talking about.

21          THE COURT:  I was in the more than 3.5.

22          MR. AXELROD:  The 18 point enhancement.

23          THE COURT:  Right.  So it's 3.5 to 9.5.

24          MR. AXELROD:  Candidly, Your Honor, I would need to

25   see the math to know if I want to push back.

*Proceedings*                                                          38

1          THE COURT:  I would be cutting out about

2   $7.6 million in expense reimbursements, and cutting out that

3   $13 million in apparent returns.

4          MR. AXELROD:  So you've heard our argument on the

5   seven.  I don't think they get -- that analysis accepts that

6   credits apply to gain.  It accepts that their choice to put

7   money back into a business like Ascendant is deserving of a

8   credit.  I think it's clear under the law that it's not.  So I

9   think you have our argument on the 13.

10         THE COURT:  Yes.  I guess maybe the way I want to

11  frame it is that I don't think that a reading the realm of

12  we're disagreeing about two points, you know, that is really

13  not going to affect my sentence.  So I would really like to

14  not have an argument about that, even though I would have to

15  think more about this.

16         And I take the points you're making and I haven't

17  entirely thought them through.  I'm just proposing to bypass

18  that and then I guess I would turn it over to you all.

19         MR. AXELROD:  Your Honor, if I could have -- I hear

20  you.  If I could have a minute to discuss with my colleague,

21  I'm sure we could just short circuit it.  To be clear, you're

22  setting aside the fee based theory of this?

23         THE COURT:  You're now talking about gain.  Is that

24  what you mean?

25         MR. AXELROD:  There are two ways of thinking about

1    the gain.  One is the fees, or intended loss for that matter,

2    one is the fees and we're talking about the flow of funds in

3    the tracing analysis.  That's what we've been talking about.

4            I just want to understand when we're thinking about

5    this whether I should understand Your Honor to be saying we're

6    just going to deal with the personal gains.

7            THE COURT:  Yes.  I'm talking about personal gain to

8    them is the most conservative metric.

9            MR. AXELROD:  Just give me a split second.

10           (Pause.)

11           THE COURT:  I'm happy to hear your thoughts.  I will

12   just tell you honestly, what I'm seeing is there's a dispute

13   that I don't think I need to resolve because it would not be

14   material to my sentence and I'm not really sure what the

15   counterargument is on that.

16           MR. AXELROD:  Yes.  I think, and this is in -- this

17   is true in the Second Circuit case law where you're dealing

18   with close ranges like this that probably overlap, and you're

19   talking about are you in the 18 point or 20 point pocket.  I

20   think you're on very firm ground, Your Honor, in saying you

21   don't need to resolve the dispute.  We agree with you and

22   we're fine with that, and we would be more than happy to move

23   on.

24           THE COURT:  Okay.  Great.

25           MR. COLTON:  So -- I'm sorry, Your Honor.

*Proceedings*                                                     40

1        THE COURT:  How I'm thinking of it is you don't need

2   to respond to the government's arguments that those additional

3   sums of money should be included because I'm just assuming

4   away that dispute.

5        MR. COLTON:  I appreciate that, Your Honor.  The

6   bigger issue is the question of going from the government

7   meeting a burden of zero enhancements all the way up to an 18

8   point enhancement, which obviously has a dramatic effect on

9   the advisory guidelines recommendation.

10       The Court is correct that there are many other

11  factors the Court is going to take into consideration.  I

12  understand that.  But guidelines are one of the factors, so we

13  talk about it.

14       To me, I think what you heard is basically trust us.

15  Petron got it right.  We don't have to test.  We don't have to

16  have the backup.  We don't have to put him on the stand this

17  time.  Even though he got it magnificently wrong last time, he

18  got it right this time and it shouldn't be tested and the

19  numbers should just be credited.  The numbers are not -- we

20  pointed out various problems with the numbers of the quote 25

21  million that supposedly flowed to the two defendants.

22       What I heard the government say, basically, is the

23  defense hasn't proven we're wrong.  That's not how it works.

24  They have to prove that they need the burden of proof.  They

25  have a witness now.  They have two $25 million gain theories.

*Proceedings*                                                                41

1    The second one came in ten days ago, a tracing analysis that

2    we have not seen the backup for, have not had an opportunity

3    to contest.  So I think it's just patently unfair.  I

4    understand the Court ruled how the Court ruled, but I want to

5    have a record that I think it's patently unfair to have to

6    respond to something we don't get the background for that was

7    thrown at us ten days later.

8             THE COURT:  You guys didn't ask to adjourn this

9    sentencing.  So I guess the we want more stuff or it came to

10   us too late is frustrating to me, because we've adjourned the

11   sentencing a million times.  I've given you all the

12   opportunity to submit a lot of stuff.

13            It feels particularly unfair to say in the middle of

14   sentencing oh, we needed to get this additional stuff if you

15   didn't tell me earlier, hey, wait a minute, we need additional

16   stuff.

17            MR. COLTON:  What I'm asking the Court to do is the

18   same thing we asked in the one page reply that the Court

19   accepted, which is to not consider the eleventh hour seventh

20   version of loss analysis, the Petron tracing analysis.  If the

21   Court is saying I'm only going to look at the previous Petron

22   analysis that was just a flow of funds, not a cash tracing

23   analysis, and that one we've had for a while, that's a

24   different argument.

25            If the Court is going to consider the new version,

*Proceedings*                                                          42

1    we did make that request.  I don't know which of the two

2    analyses the Court is using as the starting point for the

3    government's purportedly meeting the burden of proof.  I just

4    don't know.  If it's not the tracing analysis, great, then we

5    know that.  If we don't know, it's sort of hard to know what

6    we, as defense counsel, need to put the government to their

7    burden that they're trying to prove.

8              I agree with the Court, and understand that I would

9    not be sitting here having a long discussion over two points.

10   It's 18 points now that we're talking about and that's a

11   discussion, of course, that could be worth having.

12             THE COURT:  Can I ask you, to be in the 18 point

13   world, the defendants have to have received more than

14   $3.5 million in compensation.  So is there a dispute about

15   that?

16             MR. COLTON:  As a result of the fraud?

17             THE COURT:  Yes.

18             MR. COLTON:  I think there is a dispute about

19   whether the government has proven that through a very

20   questionable Petron analysis, Petron one, I'll call it, the

21   one we got more than ten days ago, which includes all kinds of

22   payments that have nothing to do with this case, Burdis and

23   other things that have nothing to do with the case that if you

24   actually do the math, and we put this in papers, because if

25   you do the math leads to absurd results.

*Proceedings*                                                               43

1          THE COURT:  I think I've responded to this issue by

2     taking off the table the amounts that are in dispute.  That's

3     how I tried to respond to it.  This seems like not really a

4     very high or disputed amount of money given even just the

5     evidence at trial about the amount of money the defendants

6     were receiving on a month to month basis.

7          MR. COLTON:  There's a difference between amount of

8     money that people received, amount that is actually a gain, or

9     amount that is an intended loss or an amount that actually is

10    caused by the offense conduct.  And the latter is the biggest

11    question and a burden the government has to meet, whether it's

12    gain or not.  Now intended loss is a different burden of proof

13    that Mr. Schneider and Mr. Gentile purposefully intended to

14    inflict.

15         THE COURT:  I understand there's some overarching

16    arguments you have.  I think we already talked about those,

17    about like is there -- was this money that was paid as a

18    result of the fraud or paid as a result of something else.

19    That's sort of a categorical argument that I feel like I've

20    ruled on.

21         There's sort of the argument about what the numbers

22    are that I'm focused on right now, and I'm not -- I'm trying

23    to figure out if there's anything else there.

24         MS. RIVIERE-BADELL:  Your Honor, just two points.

25    First of all, Your Honor said earlier that you're trying to

Proceedings                                                         44

1    understand, right, evaluate what the trial evidence showed to

2    determine what you should consider for intended loss.

3            That's not the Court's job.  The Court's job here is

4    to determine whether the government met its burden.  And the

5    fact that we're having this discussion about what's the right

6    number and what's not the right number, should lead the Court

7    to conclude after nine months of the government's attempts to

8    get it right that they just haven't met the burden.

9            And it's perfectly appropriate under the case law

10   for the Court to determine the government hasn't met its

11   burden, despite that there could be loss.  But the government

12   has to earn those 18 points.  They haven't earned them.

13   That's appropriate for the Court to say you haven't earned

14   them, therefore, I cannot award the government those extra

15   18 points for loss.

16           And to Your Honor's statement, as well, about that

17   it's not the central factor for sentencing today, Your Honor,

18   under the case law we've previously cited under *Crosby,* you

19   don't have to actually find that there's a loss because you

20   can find that it doesn't actually materially impact the

21   sentence you're going to give today.

22           We can argue a lot about the numbers and we have

23   significant evidence that we've offered as to why the numbers

24   are totally wrong and not reliable because, again, while it's

25   true that Your Honor only has to find a reasonable estimate of

*Proceedings*                                                        45

1   loss, it has to be based on a reliable principle, which the

2   government can't even offer.  That's the government's burden

3   and they haven't met it.  Your Honor, for those reasons, we,

4   again, we would reiterate it is not appropriate to award any

5   level of loss in this case.

6           MR. COLTON:  Can I just have 30 more seconds, Your

7   Honor?  I apologize.  One of the other major problems with

8   Petron one, I'll call it, the one that we got more than ten

9   days ago is it makes no attempt to distinguish between fees

10  that even if you buy the rest of the arguments are related to

11  auto or Holdings 2 versus things that have nothing to do with

12  the case and aren't crimes of conviction; waste, cold storage,

13  Holdings 3, things like that.  So in addition to Burdis and

14  other entities and cash flows and fees that were received that

15  have nothing to do with this case, Mr. Petron didn't attempt

16  even in Petron one --

17          THE COURT:  He did his analysis.  So let's assume

18  that I'm not discounting the later analysis on the grounds

19  that it was produced at the time it was produced when you

20  haven't asked to adjourn the sentencing for that reason.

21          MR. COLTON:  We'd ask the Court to not consider it

22  and the Court is rejecting that, and I understand that.

23          THE COURT:  All right.  I think where I am is I get

24  the categorical arguments and I'm not persuaded by the

25  categorical arguments.  And I haven't heard kind of number

*Proceedings*                                                                46

1    specific arguments why the amount of money the defendants, the

2    intended loss calculation or the gain calculation wouldn't be

3    at least $3.5 million.  I've come at that number by taking out

4    everything as to which I think the defendants have established

5    a reasonable dispute.  I'm just not resolving those disputes.

6    Once I take those out, that's where I am with the analysis

7    that I've reviewed.  So that's where I am on that guidelines

8    point.

9          Do you want to go on to the other guidelines

10   disputes in this case?

11         MR. AXELROD:  Yes, Your Honor.  For the government,

12   Ms. Mathews is going to address the remaining guidelines

13   issues.  I do think it may make sense if we could talk briefly

14   about scheduling, what we're going to accomplish here today

15   just because there are people on the phone, and if there's

16   some way we can figure out roughly how long it's going to take

17   us to work through the guidelines calculations and then ask

18   them to call back in afterwards and turn to the sentencing at

19   a particular time.  I'm getting the impression we're going to

20   be here for a while, which I probably should have had already,

21   but I think we should talk planning.

22         THE COURT:  That's fine with me.  One thought I had

23   is that we may reach a certain point where it makes sense to

24   take a short break and that may make it easier for us to plan.

25   So I do think the other guidelines disputes are just a lot

*Proceedings*                                                                47

1   more straightforward and I'm hoping we'll spend a lot less

2   time on that.

3           MS. RIVIERE-BADELL:  Your Honor, one point, just

4   because it's relevant to this, we were intending to request a

5   sidebar outside the presence of those who intend to speak

6   about the objections we have.

7           THE COURT:  Haven't I ruled on those issues?

8           MS. RIVIERE-BADELL:  No, Your Honor.

9           THE COURT:  Is the idea that you want to have that

10  sidebar now rather than having those folks call back in later?

11          MS. RIVIERE-BADELL:  At the Court's pleasure.

12          THE COURT:  I guess one scheduling thought is we

13  could tell folks we won't get to anything other than

14  guidelines for an hour.  So then we would talk for what I'm

15  hoping is going to be substantially less than an hour about

16  the remaining guidelines issues, we would take a break and

17  people would be able to get lunch, and then we would start

18  back up no earlier than 1:30 so folks can go off and do what

19  they wanted if they didn't want to be on the phone.

20          MR. AXELROD:  So, Judge, that is very close to what

21  I was thinking.  It sounds like an hour for the guidelines, we

22  take five minutes now, we do the rest of the guidelines, we

23  take 30 minutes for lunch, I think that brings us to 2:00

24  instead of 1:30.

25          THE COURT:  That's fine.

48

1          MR. AXELROD:  We can address the sidebar.  I don't

2     know what this is about, but I think we should address that

3     with the sentencing, as opposed to the guidelines, because it

4     just clearly pertains to that.  But that would be my

5     suggestion.

6          THE COURT:  Your point is you want to tell people

7     don't come back until 2:00?

8          MR. AXELROD:  Exactly.

9          THE COURT:  Seems fine to me.  Do you want to talk

10    at the sidebar now?  I don't know what it's about.

11         MR. AXELROD:  Me either.

12         THE COURT:  This is going to be short, right?  So we

13    might as well do it now.

14         (Sidebar conference.)

15         MS. RIVIERE-BADELL:  Your Honor, so the addendum to

16    the PSR has statements by people who are under no version of

17    the law or the facts are they victims, and they are here in

18    the courtroom today, and there may be others who are the

19    phone.  Specifically, the addendum submits statements by

20    victim three, which is Mr. Rosenberg, and victim four is Mr.

21    Silberman.

22         Your Honor exercised her discretion not to hear from

23    the family of Mr. Gentile, and we respect that, but I want to

24    just explain why their statements, which are in the PSR,

25    should not be considered and they should not allowed to speak

49

1   today.

2          THE COURT:  Let's break this up.  One is should they

3   be in the PSR and the other is should they be allowed to

4   speak.  The PSR contains plenty of statements from Mr. Gentile

5   and Mr. Schneider's family.  There's no victim qualification

6   to be in the PSR.  I guess I'm not that sympathetic to the

7   idea that they're not supposed to be in the PSR.  If you're

8   taking issue with the label of victim, I take your point and

9   we can talk about whether it should be changed.

10         MR. AXELROD:  Your Honor, I can short circuit the

11  other issue.  I have told them that -- I have made clear to

12  them, because we have not taken a position of whether they're

13  victims, I've told them and I don't think they intend to speak

14  today.

15         MS. RIVIERE-BADELL:  They said they wouldn't.

16         MR. AXELROD:  No.

17         MS. RIVIERE-BADELL:  I'm saying the PSR says they

18  intended to make a statement.

19         MR. AXELROD:  I've taken the view that we're not

20  getting involved with the other victims.  We're not sure, but

21  we're not arguing that they have a right to speak in this

22  proceeding.  I have made that clear to your lawyers, as well.

23  This is the first time I'm hearing about this.  I told them

24  that, obviously.

25         THE COURT:  Does it make sense to figure out if they

50

1    intend to speak?

2         MR. AXELROD:  I can ask them.  I think that my guess

3    is they would like to, but I don't know under the CBRA they

4    have any right to.

5         THE COURT:  My thought on this has been if a person

6    is an arguable victim --

7         MS. RIVIERE-BADELL:  But Your Honor, they're not --

8         THE COURT:  If you let me speak to that it would be

9    better.

10        MS. RIVIERE-BADELL:  I apologize.

11        THE COURT:  When we talk about victims, it doesn't

12   make sense to do a threshold inquiry, would you have invested

13   for this.  This is a different category of folks.  I would be

14   more inclined, and I'm not going to have an open forum, but

15   I'm more inclined to dig into this if it's relevant.  It may

16   be a helpful conversation to tell those folks that I have this

17   concern their statements are reflected in the PSR and it's

18   going to be a legal discussion.

19        MR. AXELROD:  I propose we take a five-minute break

20   anyway.  I will use that five-minute break and I can make this

21   go away.

22        MR. MENCHEL:  I understand the Court's point about

23   the PSR addendum, but we'll ask for this later -- I just

24   wanted to give you a heads up -- but we're going to ask,

25   though, that you don't put your imprimatur on those

51

1  allegations because they may affect, actually, how the Bureau

2  of Prisons designates should you impose an incarceration

3  sentence.

4         THE COURT:  Are they expected to say anything other

5  than here's what this guy said?

6         MS. RIVIERE-BADELL:  No, Your Honor.  That's the

7  problem.  For example, Mr. Silberman's statement, which is in

8  the PSR, says that Mr. Gentile and Mr. Schneider caused so

9  much stress that his wife had a stroke.  That is preposterous

10  on its face.

11         THE COURT:  My point is they just phrased it like

12  here's what this guy said.  It's in the PSR.  The PSR isn't

13  making a fact-finding determination.

14         MS. RIVIERE-BADELL:  It's characterizing them as

15  victims.  They didn't invest.  They never invested.

16         MR. AXELROD:  Which is why we have not taken the

17  position that they are victims.

18         THE COURT:  We shouldn't be.  I'm fine with

19  modifying is he a victim or not for wording.

20         MR. MENCHEL:  Fair enough.  Thank you.

21         (Sidebar concluded; recess taken.)

22         THE COURT:  Can you represent we resolved that issue

23  or do you want to talk at sidebar?

24         MR. AXELROD:  I'm waiting on a call.  We'll figure

25  it out.

52

1          THE COURT:  Is everybody here?

2          MR. BUCKLEY:  One moment, Your Honor.

3          THE COURT:  I'm going to try to go through some of

4    these quickly.

5          MR. AXELROD:  To be clear, Ms. Mathews is going to

6    handle this portion of the proceeding.

7          THE COURT:  Okay.  So the base offense level we all

8    agree is seven.  There's the question of how 2X1.1 applies

9    under these circumstances.  I guess I'm persuaded by the

10   government's view that specific intent with reasonable

11   certainty is required only when specific offense

12   characteristics have not actually occurred.

13          The relevant guidelines note bars the application of

14   speculative specific offense characteristics by limiting the

15   offense characteristics that can apply to "those that are

16   determinate to have been specifically intended or actually

17   occurred."  This is 2X1.1 comment note two.  And in *United

18   States versus Downing*, 297 F.3d 5265, Second Circuit 2002, the

19   Second Circuit seems to have been proceeding from that view

20   when it said when specific events' characteristics have not

21   actually occurred.  They should be applied only if the

22   district court determines that they were specifically

23   intended.

24          So that's my view on that.  I think we've already

25   talked about the loss amount, which I'm calculating as being

53

1   at plus 18 based on intended loss.  If intended loss did not

2   apply, I would be applying gain as an alternative measure

3   because there clearly was actual loss in this case based on

4   the testimony we heard at trial.  And in the absence of the

5   intended loss calculation, I would find that it can't be

6   reasonably calculated.

7           Do you want to talk about more than ten victims?

8   I'm happy to hear from you all as to why there weren't more

9   than ten victims.  We heard from witnesses at trial about how

10  these misrepresentations were material to their investment

11  decisionmaking.  We haven't heard from everybody, but it seems

12  fair to infer that there were more than ten victims.  What am

13  I missing?

14          MS. RIVIERE-BADELL:  Your Honor, materiality is not

15  the standard for victims.  It has to be, again, the causation

16  which we've extensively briefed.  And the government has not

17  shown even with the witnesses that testified at this trial

18  that they reasonably relied.  Jay Frederick himself actually

19  said that he had invested and had advised others to invest,

20  even after hearing at the due diligence seminars that the

21  funds were not fully covered.

22          That cannot be but for and proximate cause that's

23  required to find them victims.  So even with the government's

24  handful of cherry picked witnesses at the trial, they still

25  haven't established that those who testified themselves are

54

1    victims, let alone that the thousands, which are a vague

2    statement that's in the PSR, that they are victims.  There's

3    simply no showing of what, for example, any of the actual

4    investors were specifically told.

5              So what we have at best are the brokers who

6    testified at trial who, again, with their own testimony it

7    showed that they weren't relying.  And we have offered plenty

8    of evidence of what the brokers were told.  The government has

9    not proffered any evidence of what the actual investors who

10   would be the victims here were told.

11             THE COURT:  Some of the folks who testified at trial

12   were investors, right?

13             MS. RIVIERE-BADELL:  They were professional

14   investors, meaning they were brokers, and they would have had

15   access to and were obligated to actually do the due diligence

16   and did hear that the funds were not covered, and despite

17   hearing that and admitting they did, actually invested.

18             So they could not have been harmed by the actual

19   offense conduct here.  There is no but for or proximate cause,

20   which is required for victims.

21             THE COURT:  Okay.

22             MR. COLTON:  Your Honor, if I may.  As I understand

23   the Court's ruling, it's either intended loss or gain, not

24   actual loss.  In order to have victims for the purpose of this

25   enhancement, the victim has to suffer an actual loss.  So even

55

in the hypothetical that the victim paid management fees they wouldn't have paid, and I don't credit that, I assume that for purposes of the argument, it doesn't mean they lost money.

Somebody could have made a fortune on the investment and paid management fees they wouldn't have paid but for the alleged fraud. So to me, given that we are proceeding on intended loss or gain, there's no proof of actual loss and no proof that ten people lost money as a result of the alleged wrongs here.

You can't just assume that because of the three professional investors who testified, one who I believe invested before there was any alleged wrongdoing in the case, that somehow there are eight more people, we don't know who they are, that they actually lost money.

And in this case, one of the reasons we've had so much difficulty talking about these issues is because there's a ton of assets being distributed by the receiver. There are other sources of money that may very well go to investors, so we don't know. But for ten victims, you have to have ten people who suffered an actual loss. We don't have proof of that on this record because we're proceeding on an intended loss and gain.

So I understand it's just the two points. I understand that the Court is putting greater weight on the other 3553(a) factors, which I understand, but since we have

56

1   to calculate it, I think this one should be two points

2   reduced.

3           THE COURT:  I agree that the facts, a finding that

4   there was a gain or intended loss does not necessarily mean

5   that there was actual loss.  I do have to find actual loss in

6   order to get the gain.  Why doesn't the evidence at trial

7   support a finding of actual loss where you had the testimony

8   we had about how these misrepresentations influenced

9   investment decisions and then a jury finding about

10  materiality, which I think goes to how a reasonable investor

11  would have thought about these.

12          I get that not every investor is going to fall into

13  that bucket and I don't really know what percentage, and

14  that's the reason why I'm not making an actual loss finding in

15  this case.  I don't think I can reasonably calculate an actual

16  loss amount.  But as to whether ten people suffered an actual

17  loss, that doesn't seem as disputed.

18          I guess I take the point that folks may get money

19  back.  I'm trying to figure out how to think about that

20  because we don't know at this point to what extent folks will

21  be made whole.  Isn't the burden on you if we're talking about

22  an offset to the loss people have suffered to establish that

23  they're going to be made whole by funds in the future?

24          MR. COLTON:  Three points, Your Honor.  First, the

25  trial record has zero, absolute dead set zero evidence, about

1   whether any investor suffered a loss because we as defense

2   were precluded from putting in evidence about the value of the

3   funds and the increase in value of the assets in the trial.

4   That was at the government's request.  The Court granted that

5   motion.  So there was absolutely no evidence, and the

6   government stood up on three or four separate occasions and

7   said during the course of the trial we are not alleging loss

8   in the trial.  So the trial record has no evidence that

9   anybody lost money.

10          Second, the case law that we cited in our briefs

11  demonstrate that there's a difference between what a victim

12  pays to an alleged fraudster and what a victim lost.  So the

13  Court is referring to what somebody paid in management fees.

14  That doesn't mean they lost because you can pay,

15  hypothetically, a million dollars in management fees but your

16  investment went up by 10 million.  You're not a victim who

17  suffered a loss.

18          You may be a victim who somehow parted with money

19  that they wouldn't have parted with maybe, but you didn't

20  suffer a loss.  You need to prove -- the government bears the

21  burden of proving that ten people suffered a loss.  They could

22  have put in evidence here that ten people suffered a loss and

23  they didn't do it.

24          THE COURT:  I agree that an issue at trial was not

25  had the jury find whether or not a loss was suffered.  So I

58

1    take that point.  But if investors invested based on

2    misrepresentations made investments that they wouldn't have

3    otherwise made, don't they lose money at that moment and then

4    maybe you get an offset from the fair market value of what

5    they got in return?

6                MR. COLTON:  No, Your Honor.  The case law is that

7    the amount of money you paid -- and I'm not saying our clients

8    are fraudsters -- the amount of money you pay to a fraudster

9    is not the way you measure.  It's what you lost.  So if in a

10   ridiculous hypothetical you paid someone based on lie and the

11   next day they came back, maybe you were defrauded but you

12   didn't lose anything.

13               THE COURT:  I guess isn't there sort of a burden

14   issue here where you can establish that money was returned to

15   an investor, or that they otherwise received some -- I mean

16   it's effectively what you would be establishing, but isn't the

17   burden on you to establish that?

18               MR. COLTON:  No, Your Honor.  The burden is on the

19   government to establish the appropriateness of any enhancement

20   to the guidelines.  If the government came forward and said

21   here are the ten investors, investors one through ten who lost

22   money, then we can come back and say here is how you know they

23   didn't lose money.  But they didn't do that.

24               The trial evidence has no evidence of loss and we

25   don't know if somebody lost money because that's why the Court

1    decided after argument to go with intended loss or gain.

2    Again, I understand it's just two points and I understand the

3    Court has a lot of factors, but this should be minus two.

4              THE COURT:  Do you want to respond?

5              MS. MATHEWS:  Sure, Your Honor.  I think based on

6    the trial evidence alone, as you've indicated, there is

7    certainly a reasonable basis to conclude that there are at

8    least ten victims here, the six investors and an advisor to be

9    called for at least 67 individual investors and that accounted

10   for over $12 million in investments that those individuals

11   handed over, as they testified to at trial, based on the

12   misrepresentations made by the defendants.

13             We also have hundreds of loss affidavit victim

14   impact statements here.  Your Honor is right.  The burden is

15   on the defendants to establish that they're entitled to an

16   offset, which they haven't done.  They're now saying that the

17   burden is us, which is not what the law requires.  I'm happy

18   to answer any specific questions.

19             THE COURT:  It seems like that's where the big

20   disagreement seems to be at the moment.  So I guess there's

21   disagreements at every stage.  My inclination is to say I can

22   conclude from the trial testimony that there were at least ten

23   folks who invested.  And I guess I should say the trial

24   testimony and the evidence in connection with sentencing that

25   there were at least ten folks who invested based on the

60

1    misrepresentations who wouldn't have invested otherwise.

2          And then the question is did they suffer a loss at

3    that moment for which you will bear the burden of establishing

4    an offset, or does the government have the burden to establish

5    kind of a net loss when the ultimate value of the assets is

6    taken into account.

7          MS. RIVIERE-BADELL:  Your Honor, just briefly on

8    that point.  I think that's a conflation by the government.

9    It is the government's burden to establish what is the fair

10   market value of what was taken, what is the actual pecuniary

11   loss.  It's not the defense's burden to establish that.

12         THE COURT:  Of what was taken?

13         MS. RIVIERE-BADELL:  Of what the actual loss was, so

14   the property that was taken, the pecuniary harm to the victim

15   here, to the investors.

16         That's the government's burden to show.  They

17   haven't established that it's anything other than that it

18   won't be a loss.  We have pointed to extensive evidence, even

19   from the receiver, that these investors, many of them, will be

20   made whole.

21         MS. MATHEWS:  Your Honor, that's just not true.

22   There's no indication that all those investors will be made

23   whole.  The law makes clear that the amount of the investment

24   at the time of the investment is what the investor is handing

25   over.  That is the loss in that moment.  You can then decide

whether there's an offset based on fair market value at some later point in time, but here you really only need to consider the investment at the time.

THE COURT:  Yes.  Can you help me understand the contra view by sort of walking me through the language you're relying on?  I guess what I've been looking at is the credit against loss section, which seems to contemplate the analysis that you're talking about but it treats it as a credit against loss.

So if money is returned to the investor or there's property return, fair market value, services rendered by the defendant, those can be credited against loss.

MS. RIVIERE-BADELL:  Your Honor, the issue is -- so today, still today, all of these investors own units in GPB. They never lost them.  So the question is, what is the value of what they still hold today versus what it was before the fraud.  And that's the government's burden to establish, what is that loss.  They haven't established it.  They still, today, these investors still own that unit of value.

MS. MATHEWS:  Your Honor, we're very focused on the value of the investment but also forgetting about the fees that we've discussed as a theory of loss, as well.  These investors absolutely paid fees.

THE COURT:  Go ahead.

MR. COLTON:  We cited to the Court *U.S. versus Skys*,

62

1    a Second Circuit case, in which the Court noted that it was,

2    the district court, inappropriately applied to the enhancement

3    to the number of victims.  There was no determinate amount of

4    an actual loss to the alleged victims.  We can't determine the

5    amount of victims' loss.  We can't use those victims under the

6    two point enhancement.

7              This makes logical sense, Your Honor.  Because if

8    somebody is a victim who lost, it's not a victim who wrote a

9    check.  It's a victim who suffered a loss.  And the

10   government, if this was so easy, they would say here is the

11   ten people, here's how much they lost, that's why they're

12   victims.  They can't do that.  It shows that it doesn't meet

13   the test.

14            THE COURT:  I think the additional argument I heard

15   from you is I need to be able to put a number on the actual

16   loss in order to find they're victims.  That doesn't seem

17   right to me.  I need to find that they suffered an actual loss

18   for sure, but not that I'm able to calculate the amount of

19   that.

20            MR. COLTON:  I don't think we have to go that far.

21   There are plenty of people out there that clearly didn't

22   suffer a loss as a result of this conduct.  And so, the burden

23   isn't on us to prove that there were.  The burden is on them

24   to prove that people are out of pocket, and we don't know

25   that.  We just don't know.  The receiver is giving out money.

63

1    According to the latest receiver report it's $1.1 billion in

2    cash.  There are assets.  People got distributions.  People

3    bought at different times.  There's a settlement and a

4    proposed settlement in Texas, $46 million from the

5    accountants, there's a subset of accountants, there's a

6    settlement from GPB in Texas.

7              There is enumerable settlements from the brokers for

8    wrongdoing by the brokers that paid people back.  We don't

9    know if people suffered actual losses.  That's why the two

10   points is inappropriate.  I understand the issue is not huge

11   in the context.  So that's my last point on it.

12             THE COURT:  I agree it's not used in the context.

13   It's not going to affect my ultimate sentencing determination.

14   My best judgment is that it does apply for the reasons I've

15   just stated.  I think there's a loss at the moment that you

16   invest money based on misrepresentations that you wouldn't

17   have otherwise invested.  There's the possibility of an offset

18   based on returns that you're going to get, but it's just too

19   speculative at this point to say whether those investors are

20   going to be made whole.

21             I don't think it's the government's burden to

22   establish -- to negate the possibility to be made whole at

23   this stage.  I think Ms. Mathews' point about fees is also a

24   fair point.  I've already gone down the road.  I've explained

25   why I think the fees are effectively a loss.

1           You want to talk about sophisticated means.  I'll

2    tell you my initial reaction is maybe a little different for

3    the two defendants.  So as to Mr. -- so the question is, does

4    the scheme employ especially complex or especially intricate

5    offense conduct pertaining to the execution or concealment of

6    the offense.  With respect to the performance guaranty scheme,

7    I think the answer as to Mr. Gentile is pretty clearly yes.

8    With respect to Mr. Schneider's role, I'm less persuaded and

9    would not be inclined to apply the enhancement.

10          The enhancement requires that the defendant

11   intentionally engaged in or caused the conduct causing

12   sophisticated means, and I'm not sure I can say that as to Mr.

13   Schneider.  Do you want to respond?

14          MS. MATHEWS:  Can I have one moment, Your Honor?

15   The overall scheme itself was sophisticated, and I don't know

16   that the requirement is that narrow that Mr. Schneider himself

17   had to have been engaged in each specific sophisticated means

18   of carrying out the scheme.  I think the performance guaranty

19   scheme itself broadly was sophisticated, as was the

20   distribution scheme, and he was part and parcel with that

21   sophisticated scheme.

22          THE COURT:  Okay.

23          MS. VORA:  If I may respond.  Around 2015 the

24   sentencing guidelines were amended to actually narrow the

25   focus of the sophisticated means enhancement to focus on the

1  defendants' own intentional conduct.  Prior to that amendment,

2  the overall scheme --

3           THE COURT:  Just to cut this off a little bit,

4  you're responding to Ms. Mathews' argument.  I respectfully

5  listened to them but I'm not persuaded by them.

6           MS. VORA:  Understood.

7           MR. BUCKLEY:  Judge, if I could just speak briefly

8  on Mr. Gentile.  I'm not going to belabor the points we made

9  about the sophistication of the overall scheme based on Your

10  Honor's rulings.  With regard to the performance guarantees as

11  evidence of sophisticated means, in large part we'll rest on

12  our papers, as we've briefed this at length.

13           I just want to make one additional point, which is,

14  again, something that Ms. Riviere alluded to earlier.  The

15  very purpose of a performance guaranty is a concession that

16  the fund is not performing as it was supposed to.  So to

17  suggest the performance guaranty somehow was a means to

18  conceal bad conduct or conceal the fact that the funds were

19  not performing in the manner in which the defendants had

20  represented them, according to the government's evidence at

21  trial, I don't think makes sense and I don't think carries the

22  day to establish the sophisticated means enhancement in order

23  to conceal the purpose of the fraud here, the fraud under the

24  government's theory, which was under performance of the funds.

25           So for that reason, and all the reasons we

66

1    previously noted, we don't think a sophisticated means

2    enhancement is appropriate.

3            THE COURT:  I take the point.  I just have a

4    different view of how the performance guaranty is operated

5    than you all.  I do think the performance guaranty has the

6    effect of shoring up the books of the company, even if the

7    income isn't coming from the operation of the dealership.

8    It's coming from another source associated with the

9    dealership.  So there's a fine distinction there.  It's just

10   not persuasive to me but I appreciate the argument.  I think

11   the enhancement applies.

12           Association with investment advisor.  This doesn't

13   seem that unclear to me.  The question is was the defendant at

14   the time of violating securities law an investment advisor or

15   a person associated with an investment advisor.  GPB is a

16   registered investment advisor.  Mr. Gentile is the CEO of the

17   investment advisor.

18           So I guess it seems to me it clearly applies to Mr.

19   Gentile.  As to Mr. Schneider, I guess I'm happy to hear from

20   you.  The evidence at trial, I think, was that Mr. Schneider

21   and Mr. Gentile were working very closely together in the

22   operation of the two companies.  So I take it that Mr.

23   Schneider is in charge of Ascendant and Mr. Gentile is in

24   charge of GPB.  If we're talking about a person associated

25   with an investment advisor, I'm wondering why Mr. Schneider

1    doesn't qualify.

2         MS. VORA:  Yes, Your Honor.  The question turns on

3    control, and the government's evidence of control really

4    focuses on Mr. Schneider's alleged control over these

5    marketing materials.  And what the government's evidence that

6    they've cited doesn't account for is the evidence that the

7    defense put on through cross-examination that showed that time

8    after time compliance individuals were reviewing and revising

9    these materials.  And so to say that he had complete control

10   is really belied by the facts.

11        On top of that, a business record of a marketing

12   approval log was admitted as a business record for its truth.

13   That's DXKKKV-1.  And that showed definitively for its truth

14   that other people had control over these marketing materials,

15   not Mr. Schneider.

16        And so what we have here is really the fact that his

17   company operated as a placement agent.  And so that

18   association -- it's really just this tangential association.

19   It's not this level of control that the enhancement is

20   designed to reflect.

21        The enhancement is -- the purpose of it is to

22   reflect culpability of those who have a heightened fiduciary

23   duty.  That's Amendment 654.  And Mr. Schneider just didn't

24   have that heightened fiduciary duty in his capacity as CEO of

25   Ascendant.

68

1          THE COURT:  I forgot to ask you about another part

2     of the government's argument, which is the same enhancement

3     would apply if you were a person associated with a broker or

4     dealer.  And he's minority owner of Ascendant Alternative

5     Strategies and that company is a broker dealer.

6          MS. VORA:  Again, I think that comes down to a mere

7     association argument and doesn't come down to a control

8     argument.  AAS was a separate entity.  It's not really -- I

9     just don't think that -- that association doesn't reflect the

10     kind of control that is required for the purposes of

11     enhancement.

12          THE COURT:  So there are two ways to qualify.

13     Right?  One is the one I think we're talking about initially.

14     He's an investment advisor or a person associated with an

15     investment advisor.  That's B20-A3.  And B20-A2 is a person

16     associated with a broker dealer.

17          MS. VORA:  The definition under 15 U.S.C.

18     Section 80(b)(2)(A)(17), that's the section that defines

19     person associated with an investment advisor, characterizing

20     it in the context of a person who is directly or indirectly

21     controlling or controlled by an investment advisor.  That's

22     just not the case here.  It still comes down to control, Your

23     Honor.

24          THE COURT:  I guess you're citing a statute.  But I

25     wouldn't think this is a statutory question.  It's language in

1  a guideline.  Right?

2           MS. VORA:  That statute is incorporated by a

3  reference in B20-A3, which is, I believe, the section that

4  refers to association by a person associated with an

5  investment advisor.

6           THE COURT:  Where am I going to get that point that

7  you're making?

8           MS. VORA:  It's under application of subsection B20.

9  It's commentary note 16.  It defines investment advisor as

10 having meaning given that term in Section 202(a)(11) of the

11 Investment Advisor's Act of 1940.

12          THE COURT:  That's the definition of investment law.

13          MS. VORA:  I'm sorry.  If you go two down, it's a

14 person associated with an investment advisor has --

15          THE COURT:  Got it.  I see that.  So that's fair.

16          MS. MATHEWS:  Your Honor, I don't think we're

17 suggesting a complete control is required.  It's indirect and

18 there's no question that Mr. Schneider was at least a minority

19 owner of Ascendant Alternative Strategies.  And as the

20 evidence indicated at trial was certainly the CEO of Ascendant

21 and did, in fact, have control over the marketing materials.

22          THE COURT:  I think that's fair.  I think that

23 enhancement applies.

24          MR. COOPER:  Your Honor, Mr. Gentile wanted to be

25 heard on the investment advisor application.

70

1          THE COURT:  Sure.

2          MR. COOPER:  So Your Honor mentioned that GPB's

3    registration as an investment advisor and his work as a CEO

4    was enough under the enhancement.  And, again, looking to the

5    definition of investment advisor under the Investment

6    Advisor's Act, the Second Circuit takes a functional approach

7    to the definition of investment advisor.

8          And under this functional approach registration is

9    not dispositive as to whether one is an actual advisor.  The

10   critical question under the plain text of the statute is

11   whether a person or a company is acting as one.  And here none

12   of the indicia the Courts consider in evaluating whether one

13   actually acted as an investment advisor are present.  GPB and

14   Mr. Gentile did not promote themselves as an investment

15   advisor.  They didn't generate documents purporting to provide

16   investment advice.  There's no witness testimony in this case

17   or other record evidence that they ever provided investment

18   advice regarding the suitability in any of the three GPB Funds

19   at issue.

20          They weren't compensated for providing investment

21   advice.  In fact, there's an entire intermediary layer of

22   financial advisors between GPB and the end user investor whose

23   entire function was to provide advice regarding the

24   suitability of investments in the GPB Funds.

25          The spirit of this enhancement is not designed to

71

1     capture someone like him and a company like GPB.  It's

2     designed to capture people like broker dealers or others who

3     are directly working with their clients to observe their

4     investment profile and make a suitability determination and

5     make a recommendation as to the advisability of that

6     particular investment.

7              THE COURT:  Do you want to respond?

8              MS. MATHEWS:  So, Your Honor, the standard is that

9     the individual has to be associated with an investment

10    advisor.  And as Your Honor noted, GPB was a registered

11    investment advisor.  If you want to look at the definition of

12    investment advisor, it includes anyone engaged in the business

13    directly or through publications or writing as to the

14    advisability of investing in a particular security.  Here we

15    had GPB marketing widely, its investment offerings, and

16    Gentile was undoubtedly associated with that entity.

17             MR. COOPER:  Again, offering an opportunity to

18    invest in a product such as a unit in the GPB Fund is a

19    different thing than sitting down with an investor evaluating

20    their profile, evaluating their future needs, their economic

21    needs, and saying this is a suitable investment advisor as

22    applied to you.  It's a different thing to hold yourself out

23    to the market with just a particular thought.

24             MS. VORA:  And if I may, on behalf of Mr. Schneider,

25    we join this argument.

72

1          THE COURT:  Sure.  Let me pull up the statutory

2    language.

3          MR. BUCKLEY:  Judge, just one record thing, so we

4    don't have to belabor it.  Can we treat any objection by one

5    defendant as applied to both?

6          THE COURT:  Yes.

7          MR. BUCKLEY:  Thank you.

8          THE COURT:  It seems to me that GPB qualifies as an

9    investment advisor under the statutory definition.  Any person

10   who for compensation engages in the business of advising

11   others I think directly or through publications or writings as

12   to the value of securities or the advisability of investing

13   in, purchasing, or selling securities, or for compensation in

14   this part of a regular business issues or promulgates analyses

15   or reports concerning securities.  And there's some enumerated

16   exceptions that I don't think we're arguing over.  It seems to

17   me GPB qualifies and Mr. Gentile, obviously, had the requisite

18   connection to GPB.

19          Organizer or leader, so I think the questions for

20   me, you can tell me if you think I'm wrong, are did the

21   offense involve five or more participants, or alternatively

22   was it otherwise extensive, and then does the evidence support

23   a determination that either defendant was a leader.

24          Certainly the trial evidence suggested, I think,

25   both these things but happy to hear from you about why that's

1    not the case.

2          MR. BUCKLEY:  Yes, Judge.  On behalf of Mr. Gentile,

3    with regard to the five or more participants, respectfully we

4    don't think that's been satisfied.  The participants have to

5    be knowingly involved in the criminal activity at issue.

6          So it's not sufficient merely that there be an

7    agency that has five or more participants.  It's the alleged

8    criminal conduct must involve knowingly five or more

9    participants.  We don't think that's been satisfied here at

10   all.

11         As far as the question of whether it is overall

12   extensive, the probation office in its presentence

13   investigation report based its conclusion in that regard on

14   the fact that this was a sophisticated enterprise.

15         THE COURT:  My inclination is to think that's not

16   where they should have gone with it, so the government is not

17   going to go there.

18         MR. BUCKLEY:  Okay.  For my purposes, are you

19   thinking of extensive in a different sense than the

20   sophisticated nature of the investment?

21         THE COURT:  Maybe we should turn it over to the

22   government to see how they want to defend the application of

23   this enhancement.

24         MR. BUCKLEY:  Okay.

25         MS. MATHEWS:  Sure, Your Honor.  We're not defending

74

1    it on the basis that it was sophisticated as the

2    justification.  Otherwise extensive I think is absolutely met

3    here.  There were hundreds of employees at these companies.

4    Schneider was controlling all the materials and directing the

5    marketing team.

6              Obviously, Gentile was on the GPB side running that

7    company that also had hundreds of employees.  I don't know how

8    you can say it's not extensive.  We're not saying it's because

9    it's not sophisticated.

10             MR. BUCKLEY:  Judge, the response to that would be

11   this was a legitimate enterprise.  I think the trial evidence

12   established that.  So the mere fact that the enterprise

13   involved hundreds of employees or marketing materials or

14   otherwise does not render it extensive for purposes of the

15   application of this enhancement.

16             To the extent there was a fraud, as the jury found,

17   that related to a subset of information that was relayed and

18   it certainly was not extensive, as far as the overall

19   enterprise was concerned, but related to the representation

20   about coverage ratio during a set period of time.

21             So, again, I don't want to belabor points that we've

22   already briefed for the Court.  But for that reason I don't

23   think the government's argument holds here, and we would

24   suggest that this enhancement should not apply.

25             THE COURT:  Can I ask about that?  I take your point

1    that you can work at a big company that was doing all kinds of

2    legitimate business and have a fraud that occurred at that

3    company, and it wouldn't be extensive because it was at a big

4    company where there was a lot of stuff going on.

5           Wasn't the trial evidence that there was a pretty

6    large operation devoted to disseminating information about

7    coverage that was not accurate?  There were these pitch

8    meetings.  There were a lot of people involved, resources

9    involved, in these pitch meetings.  There were large volumes

10   of documents that were being circulated to investors, a lot of

11   folks were involved in the circulation of those documents.

12          I take your point that maybe not all those folks

13   were knowing participants, but it does sound like an extensive

14   operation to me that defendants were operating.

15          MR. BUCKLEY:  Yes, Judge.  There's no doubt that it

16   was an extensive operation.  The question of how this applies

17   to the fraud, and I think the way the Court started that

18   analogy is the right way to think about it, which is there

19   were multiple funds at issue here, many of which were not

20   involved or even suggested to be involved in the fraud.

21          There were significant periods of time where these

22   self same marketing materials, many of the marketing materials

23   that the government relied on and offered at trial at the time

24   that they were issued were accurate and that subsequently some

25   of the evidence demonstrated that there were failures, whether

1   knowing or intentional failures to update those materials.

2          But the fact that it appeared in many, many

3   materials I don't think, again, renders this extensive for

4   that purpose.  The fraud that's alleged here is a very simple

5   fraud, to use the government's term during rebuttal, and did

6   not utilize the entire mechanism or infect the entire

7   mechanism such that we think that the leadership enhancement

8   based solely upon the extensive nature of a pre-existing

9   business that everyone agrees the majority function of which

10  was entirely legitimate should trigger a four point

11  enhancement, or any leadership enhancement under that theory.

12          THE COURT:  Do you want to respond?  You don't have

13  to.

14          MS. MATHEWS:  That's fine.  Thank you, Your Honor.

15  We're not alleging that the entire company, right, was

16  necessarily -- maybe my colleague disagrees with me -- but I

17  think there's no question based on the evidence at trial that

18  the defendants were using the employees, whether they were

19  knowing participants or not.

20          There were thousands of communications that were

21  sent out to investment advisors and brokers containing

22  miscommunications, and the defendants relied on them and

23  pushed their misrepresentations through these individuals in a

24  way that undoubtedly makes it an extensive scheme.

25          THE COURT:  I mean, this does not seem to be a case

77

where there's a large scale lawful operation and then a small
scale for folks who are involved in the dissemination of
misleading statements.  It seems like the larger operation was
used to disseminate misleading statements to perpetrate the
fraud.  It does seem this enhancement applies.

MR. DEARINGTON:  Your Honor, may I speak on behalf
of Mr. Schneider on this?

THE COURT:  Sure.

MR. DEARINGTON:  So a few points.  The first, if you
recall, 2X1.1 applies.  And so if we're talking about conduct,
there has to be a higher burden here for the conspiracy counts
and there has to be reasonable certainty.  The government has
not come close to establishing that with respect to the
enhancement because it hasn't even identified who these --
first of all, it's conceded that there aren't additional
participants that meet the threshold.

So it's relying on extensive, the otherwise
extensive language.  It hasn't been identified who those at
Ascendant Capital are that it's claiming were led by Mr.
Schneider into making false misrepresentations during the
alleged scheme.  It called only one Ascendant Capital sales
representative, Mr. Teeters, and that is telling.

And so it cannot now say, oh, there were others, we
just didn't call them to make the link between Mr. Schneider
and those others.  And particularly within the lens of 2X1.1,

1    I would also add that Mr. Schneider once he determined that

2    there may not be coverage, there was evidence that he

3    controlled to make sure that the proper language was being

4    used and, in fact, there was also evidence that Mr. Schneider

5    wasn't involved in the marketing approval process in the first

6    place.  We have that whole procedure that didn't include Mr.

7    Schneider.

8              So for the government to speculate or make the

9    conclusory statement that he controlled it all is not

10   supported by the evidence.  And finally, just the commentary

11   on otherwise extensive reads as permissive.  The Court is not

12   required to apply an otherwise extensive finding based on

13   commentary note three.  It's just permissive the commentary

14   note is satisfied.  It says, thus, a fraud that involved only

15   three participants but used the services of many outsiders

16   could be considered extensive.  It does not say shall be

17   considered extensive.

18             THE COURT:  With respect to Mr. Teeters, Mr. Teeters

19   testified about how Ascendant was operating.  I think he gave

20   a view of not just his own rule, but how the company operated

21   in general.  I think we heard from others about pitch

22   meetings, about occasions when defendants spoke, when others

23   spoke on behalf of these entities that indicated that the

24   operations that were being used to convey these statements

25   were more extensive.

1          MR. DEARINGTON:  If I may, Your Honor.  The

2    generalization, which as the government has used repeatedly

3    throughout trial and this case, that Mr. Teeters said at some

4    level that Mr. Schneider controlled something about the pitch.

5    That's not evidence, let alone with reasonable certainty that

6    the specific alleged misrepresentations was caused to be made

7    by someone at Ascendant Capital because Mr. Schneider told

8    them to do that.  They're putting a lot of emphasis on

9    something that is not established.

10         THE COURT:  I think we disagree about what the trial

11   evidence showed about Mr. Schneider's role in Ascendant.

12         MR. BUCKLEY:  One final point, Your Honor.  I just

13   want to point out that a ruling for the plus four leadership

14   point here is effectively a six point swing.  So as Mr.

15   Dearington noted, to the extent it's permissive I just want

16   the Court to understand that because it potentially

17   disqualifies us for the --

18         THE COURT:  From zero points, yes.  I guess the

19   permissive thing, what is it that you think I should be doing

20   there?  There has to be some kind of metric for whether the

21   enhancement applies or not, and I'm not sure that focusing on

22   that language is giving me much.

23         MR. BUCKLEY:  Judge, the enhancement itself contains

24   a range from two points up to four points.  So given the

25   permissive nature of it and the impact that it has of

80

disqualifying Mr. Gentile from the zero point, or zero offender reduction, given that it is a permissive enhancement, you can either reject it outright or you can reduce the four points to account for the two points that he's otherwise losing from the application.

MS. MATHEWS:  Your Honor, the subsection A right here is the defendant was an organizer or leader.  I think there's no question the trial evidence established that, and that the four points are appropriate to reflect the sheer size of this fraud and its extensiveness.

I guess Mr. Buckley is suggesting that you might categorize the defendant as a manager or a supervisor but that is just not the role that either of these individuals played in this scheme.

THE COURT:  I'm not reading this language as you might or might not do it.  The language says based on the defendant's role in the offense, increase the offense level as follows.  If the defendant was an organizer or leader of criminal activity that involved five or more participants, or was otherwise extensive, increase by four levels.

I think I have to make a finding of is this otherwise extensive.  And then in the note that you're pointing to, Mr. Dearington is pointing to, I guess I'm reading that as providing some color about assessing what it means to be otherwise extensive.

1          Maybe there could be other facts that would suggest

2    not withstanding the use of many outsiders, an offense for

3    some reason wasn't otherwise extensive.  Maybe that's the case

4    I've talked about with Mr. Buckley.  Maybe it's something

5    else.  I think it's indicating it's not dispositive that many

6    people were involved.  I don't think it's entirely optional

7    for me to apply this.  I think I have to figure out is it

8    otherwise extensive or not for the reasons I've explained, and

9    I think we should probably move on.  The enhancement applies.

10         I think Mr. Buckley is right, that that resolves the

11   zero point offender enhancement.  I take the point that look,

12   I don't think this is a case where the guidelines should

13   control the sentence, and the reasons why a zero point

14   offender enhancement exists or, in part, folks who don't have

15   a criminal history should be treated differently from the

16   folks who do.  So you're free to make those arguments.

17         MR. DEARINGTON:  Your Honor, I think now that all

18   these enhancement are being put together, there is a risk and

19   a substantial one of double counting, because we have alleged

20   numbers of victims, we have extensiveness, and a lot of these

21   are overlapping and would constitute double counting.

22         THE COURT:  I think that is a 3553(a) argument.  I

23   think I'm required to determine whether these enhancements

24   apply based on facts, and that's what I've done.  But I take

25   your point that these enhancements are getting at similar

82

things.  Let me do the math so that you can tell me if I'm
getting the math wrong.

  I think we started at base offense level seven.  I'm
adding 18 for loss.  I'm adding two for more than ten victims,
I'm adding two for sophisticated means, but not with respect
to Mr. Schneider.  I'm adding four for association with an
investment advisor, and four for organizer or leader.

  Does that put us at 37 and 35?

  MS. RIVIERE-BADELL:  Yes.

  MS. MATHEWS:  Yes, Your Honor.

  THE COURT:  And I think there's no dispute that
everybody is in Criminal History Category I.

  MR. COLTON:  I'm sorry.  I just didn't hear the last
one.

  THE COURT:  There's no dispute that everybody is in
Criminal History Category I.  I think those are the guideline
calculations.  Do you want to talk about the PSR and other --

  MR. AXELROD:  We were just doing math.

  THE COURT:  Do you want to talk about other changes
to the PSR, and I guess what I would ask you all to do is
let's just apply a little bit of overlay of materiality
because otherwise I think we'll be here all day.  But happy to
hear whatever you want to hear about changes I should make to
the PSR.

  MR. COLTON:  My problem with the PSR is that there

1   are just so many manifests factual errors.  And we pointed

2   them all out to the probation office, and they rejected every

3   single one.

4           THE COURT:  They made some changes, I think.

5           MR. COLTON:  Changes of a word here or there, but

6   there are errors throughout.  I take the Court's point very

7   seriously that it has to be some material relevance.  But the

8   problem that I have is if there's a sentence of incarceration,

9   the PSR follows the defendant around.

10          THE COURT:  To short circuit this, I take your

11  point.  I'm not going to prevent you from objecting to

12  anything you want to object to.  Let's go through whatever you

13  want.  How do you want me to approach this?

14          MR. COLTON:  There's another possibility, which is

15  for the Court to say the Court is not crediting the factual

16  findings of the PSR because it doesn't need to reach its

17  sentence.

18          THE COURT:  I think it's probably not a great idea

19  for me to say I'm not going to pay attention to the PSR.  I

20  think you all are entitled to know some sense of what the

21  facts in this case that I'm relying on are.  I'm sure you all

22  will.  This is not the last stop for this case, and I want you

23  to be able to say I was relying on facts that were wrong if I

24  reject your objections, or conversely, I want the government

25  to be able to say here are the facts that I adopted and here

1    is why those facts are right.  I don't think it's a good idea

2    to go forward with no factual basis.  I've never done that

3    before.

4             MR. COLTON:  I'd ask the Court then to allow us to

5    go through and minimize the ones.  We're at 1:30, so maybe

6    that's a useful use of the lunch break.

7             THE COURT:  I'm inclined to do whatever you want.

8    You want to come back at 2:00?  I will tell you all I have all

9    day except that I have something at 3:00 to 3:30.  So if we're

10   still going at 3:00, I'm going to need to take a break then.

11            MR. AXELROD:  Judge, after talking with counsel for

12   one of the victims, we understand that one of the victims

13   needs to speak between 2:00 and 3:00.  That's just her

14   schedule.  If we can slot that in at some point.

15            THE COURT:  We can slot those folks in whenever.  I

16   don't think there needs to be an order as to all the things

17   we're doing at sentencing.  We can go to those folks when we

18   get back at 2:00.  That's when we told those folks to come

19   back.  We could just have that be the window for folks who

20   want to speak.

21            MR. AXELROD:  Candidly, Your Honor, I would prefer

22   that the victims speak at the same time or around when the

23   parties are making their sentencing submissions.  I think

24   that's how it's typically done.  I'm hopeful that Mr. Colton

25   will be able to cut down the number of factual issues he

1    presents for the offense conduct that the Court can rule on

2    based on the trial record and the Court's extensive Rule 29

3    opinion.

4              THE COURT:  Let's come back at 2:00.

5              (Recess taken.)

6              THE COURT:  Where I think we were is that we were

7    going to talk about objections to the PSR.  Are we comfortable

8    in proceeding in that order and doing that right now?

9              MR. AXELROD:  We are.  As an update, the issue from

10   sidebar has been resolved.

11             THE COURT:  Great.  So the floor is yours, whoever

12   wants to go first.

13             MR. COLTON:  Thank you, Your Honor.  There may be a

14   number of things that are, in our view, pretty obvious errors

15   in the PSR that the Court can say I'm not relying on it and

16   then we can move on.  I don't really need to tell the Court

17   what the Court has the power to do, but I'm trying to move it

18   along.

19             I'm going to start with paragraph eight of the PSR,

20   which makes the claim that basically private equity companies

21   didn't pay distributions or income until liquidated.  There is

22   no evidence in the record that GPB was different from other

23   entities.

24             THE COURT:  Is that true?  Why are we getting into

25   this?  Private equity, I think the traditional model was I

1    feel like you guys argued this at trial.  The innovation, I

2    don't think any of this is material, but I feel like I heard a

3    lot about it at trial.  The innovation of GPB was that its

4    income producing private equity, which is distinct from

5    non-income private equity and that's their innovation.

6              MR. COLTON:  It's different than paying

7    distributions.  If it's not material from the sentence we can

8    move on.

9              THE COURT:  What is it you want me to say?  You just

10   want me to cut in which investors typically do not receive

11   periodic distributions or income until the funds are

12   liquidated.

13             MR. COLTON:  Yes.

14             THE COURT:  I mean, I guess I would be cutting it

15   because I don't think this matters.  Do you want it?

16             MR. AXELROD:  I was going to suggest just cut the

17   distributions point, which is what he seems to be arguing

18   about.  But I also would respect that the Court wants to move

19   on.

20             THE COURT:  I'm going to cut that phrase, in which

21   as to typically, blah, blah, blah.  It's a phrase about how

22   private equity operates.  I'm cutting it not because I'm

23   determining it's wrong.  I just don't think that it's

24   important.  Go ahead, next.

25             MR. COLTON:  In paragraph nine, the claim is made

1    that Ascendant Capital sold investments to financial advisors,

2    broker dealers, and individual investors.  Ascendant Capital

3    didn't do that.

4            THE COURT:  Do you want it to be marketed?

5            MR. COLTON:  Not to individual investors, but

6    financial advisors and broker dealers, yes.

7            MS. MATHEWS:  Your Honor, we had agreed to actually

8    revise this to say marketing, which I think is the point you

9    just raised.  But we disagree with the removal of individual

10   investors.  Mr. Schneider seems to be trying to argue that

11   none of the investors were individual investors who testified

12   because they were also professional investors in some regard.

13   Maury Goldberg was pitched in his personal capacity.  They're

14   arguing --

15           THE COURT:  Remind me of the rules.  Is Ascendant

16   allowed to pitch to folks who are not broker dealers or

17   financial advisors?

18           MS. MATHEWS:  I'm not aware of any rule that they

19   were not allowed to, and certainly Mr. Schneider in his role

20   as CEO of Ascendant did, at least with respect to Maury

21   Goldberg.  As an example, pitched to him in his individual

22   personal capacity.

23           THE COURT:  Was Maury Goldberg an investment advisor

24   of some kind?

25           MS. MATHEWS:  He was not at that time, no.  He was

88

1    introduced to the fund through a friend.  He was a friend of

2    someone and made the connection that way.

3            MR. COLTON:  I don't think we need to get into the

4    weeds of this.  There was a whole motion in limine about Mr.

5    Goldberg being a financial advisor and being punished by FINRA

6    and the Court issued an order saying we couldn't get into

7    that.  He was clearly a financial advisor.

8            THE COURT:  This doesn't matter to me either.  So

9    I'm just going to take it out, individual investors.

10           MR. COLTON:  With respect to paragraph ten, it says

11   that Mr. Gentile and Mr. Schneider essentially ran GPB and

12   Ascendant as a partnership.  It's simply inconsistent with the

13   testimony under oath of Mr. Gill and Mr. Jacoby, two critical

14   government witnesses.

15           THE COURT:  I feel like that was the thrust of the

16   testimony at trial, that they were very closely collaborating

17   to effectively run these two companies together as a joint

18   enterprise.

19           MR. COLTON:  I apologize.  I just need --

20           THE COURT:  I'm sorry.  I'm losing my voice a little

21   bit.  I think the testimony at trial was that they basically

22   ran these companies together.  They were separate companies

23   but they were very, very closely involved with each other and

24   running them effectively and jointly.  You just don't think

25   that's what the trial testimony was?

89

1          MR. COLTON:  The trial testimony was that they were

2     partner companies but they didn't run the companies as a

3     partnership.  Schneider didn't run GPB and Gentile didn't run

4     Ascendant.

5          THE COURT:  This is wordsmithing.  It might be that

6     there's slightly different words that could be used here if

7     you want to give me the words, but I think the general concept

8     that these are very closely affiliated enterprises it seems

9     like very grounded in the trial evidence.

10         MR. COLTON:  We don't dispute they were closely --

11    they worked closely together.  I mean running it as a

12    partnership implies that somebody has control over the

13    companies.

14         THE COURT:  Any objection to they worked closely

15    together to run GPB and Ascendant?

16         MR. AXELROD:  Yes, Your Honor.  If we're going to go

17    line by line in this fashion, I do have an objection to this.

18    Roger Anscher testified at length that ultimately it was

19    Schneider making decisions about the GPB marketing materials,

20    and Jeff Lash also described the fact that they treated each

21    other and said to each other that they were partners.  I think

22    this is their dispute over the trial evidence, which the Court

23    has already heard.  These things were all briefed and rejected

24    by the probation department.  I think that language is

25    appropriate.

90

1           MS. RIVIERE-BADELL:  Your Honor, there is no

2     evidence that Mr. Gentile played any role whatsoever in

3     Ascendant Capital.  There's zero evidence of that.

4           THE COURT:  I think what Mr. Axelrod just described

5     does correspond to what I remember from the trial.  If the

6     issue is the word partnership as a special legal word, I guess

7     we can use a different word.  This seems immaterial to me.

8     I'm not really sure.

9           MR. COLTON:  There are concerns I have about where

10    this document can be used.  There's civil litigations, there's

11    SEC litigation, there's state enforcement litigations.  A

12    finding by the Court could have a substantial effect and I

13    don't think we've had this level of debate that would be

14    necessary to make that kind of finding.  Mr. Axelrod cites two

15    other witnesses.  I cite two other witnesses.  Mr. Jacoby, as

16    the government's witness, is the government admitting he

17    committed perjury?  If that's what they're admitting --

18          THE COURT:  I'm giving you my overall recollection

19    of the testimony, which is pretty strongly weighted in favor

20    of Mr. Axelrod's view.  I don't remember other witnesses as

21    presenting a view of these companies as operating as truly

22    distinct entities.  Part of the difficulty is if you object to

23    every sentence in the PSR it's very hard to know what you

24    really want me to go back on.

25          If the word partnership is causing you trouble, and

1    you want some other word that captures that these folks worked

2    together very closely to operate these two organizations that

3    were working together hand in glove, I'm open to it.

4                 MR. COLTON:  That's fine.

5                 THE COURT:  All right.  That imprecise language is

6    what we'll use in the PSR.  Next.

7                 MS. RIVIERE-BADELL:  Your Honor, just to be clear,

8    the changes are to be made to both for Mr. Gentile and Mr.

9    Schneider.

10                THE COURT:  Yes.

11                MS. RIVIERE-BADELL:  For paragraph 11, the PSR says

12   that Mr. Gentile and Mr. Schneider misrepresented the

13   performance of the three relevant funds to induce investors to

14   invest in other funds, including waste management and GPB cold

15   storage.

16                The government originally had said they were going

17   to proffer this at trial, ultimately did not offer that

18   evidence in support and, in fact, if you recall, Your Honor,

19   during the trial most of the exhibits that were used actually

20   redacted anything related to cold storage and waste

21   management.

22                It's simply not accurate in the PSR to say that

23   those three funds, the misrepresentations of those specific

24   funds invest in -- sorry, induced investment in the others.

25   We do also have trial testimony from witnesses like Mr.

92

1   Lagiglia who said that those funds be it waste or auto were

2   treated very differently.

3          THE COURT:  My recollection is we basically cabined

4   these funds off from trial.  They weren't the focus of the

5   trial.

6          MR. AXELROD:  That's fine.

7          THE COURT:  I'm going to cut that to induce

8   investors to invest in other funds, including GPB, blah, blah,

9   blah.

10         MS. RIVIERE-BADELL:  Your Honor, with respect to

11  paragraph 12, it's the same issue because paragraph 12 also

12  includes $64 million in management schemes that included fees

13  paid in connection with the uncharged funds, waste management

14  and cold storage.

15         MR. AXELROD:  Your Honor, we can take the management

16  fees 56 million and take the number from these three funds.

17         THE COURT:  Fine.  56 million and I'm cutting waste

18  management and cold storage.

19         MR. COLTON:  One of the problems I have and maybe we

20  can talk about it a little more holistically is there are a

21  number of paragraphs in which the probation department makes

22  these allegations about very precise terms, paying income from

23  the portfolio companies, things of that nature.

24         The simpler plan, I would submit, would be not to

25  actually have to go through some of the factual assertions

1    that aren't necessarily right.  There's imprecise, again, use

2    of different accounting terms, things of that nature.  I can

3    explain all of it, but I'm hoping the Court will be open to

4    the notion of I'm not relying on the probation department's

5    view of the evidence.  The Court sat through the trial and

6    we'd end up sort of retrying some of the points, which I don't

7    think is useful.

8              THE COURT:  Okay.  I guess I do find it useful to

9    have some kind of document that reflects factual findings made

10   in connection with sentencing, and that's what I think the PSR

11   is intended to provide.  It gives a draft of those and it

12   gives the opportunity to comment on those.  And I adopt some

13   version of them.  Let's talk about your issues more

14   specifically.

15             MR. COLTON:  In paragraph 14 the PSR alleges Mr.

16   Schneider was aware GPB Funds did not have sufficient income

17   to cover distributions as he was sent reports that GPB Funds

18   were not making sufficient returns exclusively from the income

19   portfolio.

20             The reality is, and I'm sure that this is not

21   something that the probation department could have dug into,

22   is the reports he was sent absolutely showed that the income

23   from the portfolio companies was greater than the

24   distributions.

25             THE COURT:  Look at some point the distributions

1    were not fully covered.  Right?

2           MR. COLTON:  Fully covered, and that's part of the

3    debate that we have, of course, in the whole trial.

4           THE COURT:  I guess my recollection of the trial

5    evidence is that defendants received reports indicating that

6    the distributions were not fully covered.  I'm a little

7    surprised that there's a dispute about that.  I know there are

8    all these different metrics.  It seems like principally the

9    metric that defendants were using was net investment income.

10   They were undercover using that metric.  I don't recall

11   evidence of another metric they were using under which the

12   investments were always covered.  That's my recollection.  Is

13   that fair?

14          MR. AXELROD:  It is, Your Honor.  But I think taking

15   a step back for just a split second, when the Court adopts the

16   PSR and the offense conduct that's in it, the Court is

17   speaking through these facts.  And it is up to the defendants

18   to argue in a subsequent proceeding where these facts are

19   presented that the Court was ambiguous in its language and the

20   Court spoke in plain English and described the facts as the

21   Court understands them, and I think that that's sufficient.

22          It does not need to be a technical document where

23   you're hyper specific about each thing.  It's rather likely

24   due with opinions where it can be open to interpretation and

25   people argue about what the Court actually meant by that.

95

1          THE COURT:  I'm going to try to get it as right as I

2    can.  I'm not seeing the inaccuracy here.  I'm just confused

3    as to what we're really arguing here.  You think that the

4    defendants didn't receive --

5          MR. COLTON:  This is the sentence I'm particularly

6    bothered by.  GPB Funds were not making sufficient returns to

7    pay distributions exclusively from income from the portfolio

8    companies.  That sentence, they were receiving income from the

9    portfolio companies that were greater than the distributions.

10   That's actually not a disputed fact.  What is disputed is

11   whether there was a misrepresentation or not.

12         THE COURT:  You're talking about the information

13   that's being conveyed to investors?

14         MR. COLTON:  No, this is information conveyed to Mr.

15   Schneider.

16         THE COURT:  What about the investment dashboards?

17         MR. COLTON:  The dashboards show that the income

18   from the portfolio companies, which is defined as total

19   investment income or total income, was greater than

20   distributions.  So this is just wrong.

21         THE COURT:  I think the sentence is completely

22   accurate.  I feel like we heard so much evidence about this at

23   the trial, and I didn't even really take this to be in dispute

24   from defendants.  But I guess this is an accurate description

25   of the evidence at trial.  What's the next objection?

1          MR. COLTON:  As to 15, I have no idea how the

2   probation department got these percentages.  So I'd very much

3   ask the Court to say I'm not relying on the probation

4   department's calculation of what percentage is funded by

5   investor capital.  I can't for the life of me re-engineer how

6   probation got those numbers.  Without a backup I don't know

7   how to do that.

8          THE COURT:  What can you all tell me about where

9   these numbers came from?

10         MR. AXELROD:  Which paragraph?

11         MR. COLTON:  15.

12         MR. AXELROD:  This is basic math from the Petron

13  analysis of how much money was used to pay investor

14  distributions and then how much money in total was paid in

15  distributions.

16         MR. COLTON:  I don't think the Court has any

17  information on which to pass on this.  I really would ask the

18  Court to say I don't need to do the math and decide these

19  percentages for the purpose of the PSR.

20         THE COURT:  Do you think this isn't an accurate

21  recollection of the Petron testimony?

22         MR. COLTON:  I have no way to figure that out on the

23  fly, and I don't know how the government did it.  We objected.

24  We asked the probation for backup and they refused to provide

25  it.  So I don't know.

1          MS. MATHEWS:  Your Honor, in our responses to Mr.

2     Schneider's PSR objections, we specifically cite to Mr.

3     Petron's summary exhibit that we used at trial in support of

4     this, these calculations.  So it's not --

5          THE COURT:  So they've told you what their basis

6     was.  Are you going to give me something to think that's

7     wrong?

8          MR. COLTON:  We had a whole debate at trial of what

9     investor capital is.  Ms. Gill testified that investor capital

10    is both money they invested plus the gains that are increased.

11    She said that's how you do it.  So I don't know if Mr. Petron

12    or the probation department or anyone else used the entirety

13    of what investor capital is to do their mathematics.  I don't

14    think there's a basis to make this decision, and I doubt it's

15    necessary to the sentencing, but it could have more lasting

16    effects because it's so precise.  And I'd just ask the Court

17    to say, not passing on these percentages.

18         THE COURT:  My inclination is this is useful

19    information to have.  I'm happy to source it to the Petron

20    report based on the testimony of Steven Petron, if that's an

21    addition that's useful for you.  What's next?

22         MS. RIVIERE-BADELL:  Paragraph 16, Your Honor.  The

23    PSR alleges that Mr. Gentile and Mr. Schneider quote unquote

24    concealed the poor performance of the GPB Funds.  In fact,

25    that is not accurate.  What they were convicted of was

1    misrepresenting the source of the distributions, not the funds

2    themselves were not performing.

3        There were plenty of financial statements that

4    showed all of the performance of the funds, what the revenues

5    were, what the income was.  It's just what the question was

6    whether the distributions were being covered by the income.

7    That's a different issue.

8        THE COURT:  I'm rejecting that.  These things are

9    part and parcel.  If you're representing that you're paying

10   eight percent distributions because those are the operating

11   profits of the companies, you're making representations about

12   how well the companies are doing.  What's the next objection?

13       MS. RIVIERE-BADELL:  The other objection in that

14   same paragraph, Your Honor, is that investors were never

15   advised that the monthly distribution contained investor

16   capital.  In fact, there's evidence that we specifically

17   pointed to.

18       THE COURT:  I'm inclined to take this sentence out.

19   The evidence at trial has -- there are various caveats and

20   disclaimers.  I'm taking this sentence out.

21       MR. COLTON:  I'm still on 16.  The last sentence

22   says, in total, Gentile and Schneider transported

23   approximately $97 million from the investment accounts to the

24   distribution accounts.  Not saying there's anything wrong with

25   that, but absolutely zero evidence that Mr. Schneider had any

99

1   control of the accounting systems at GPB.

2          THE COURT:  Okay.  I'm not sure what you're telling

3   me.

4          MR. COLTON:  The first thing I'd like to do is take

5   out and Schneider.  And there's a second objection.

6          THE COURT:  How about taking out and Schneider?

7          MR. AXELROD:  Your Honor, these are conspirators who

8   orchestrated a scheme, and Mr. Jacoby described this, to move

9   money from the investment accounts to the distribution

10  accounts.  That's what --

11         THE COURT:  I'm taking out and Schneider.  Sorry.

12  We're going to be here all day.

13         MS. RIVIERE-BADELL:  Paragraph 17, Your Honor, we

14  object to the characterization that the marketing materials

15  continue to describe the distributions as funded from

16  operations because we did cite to specific examples later in

17  the period, including in May 2017, that the marketing

18  materials were changed to say that the distributions were

19  based primarily, but not exclusively, on cash flow from the

20  portfolio companies.

21         THE COURT:  I think this will be accurate if I

22  insert some materials before stated.

23         MS. RIVIERE-BADELL:  Yes, Your Honor.

24         THE COURT:  We're having some phone issues.  I like

25  to be able to have a dial-in line when we can, but there are

1  problems with them sometimes.  I want to be able to keep

2  having a dial-in line today, but we're getting issues with

3  folks not being muted and so we're hearing birds.  If

4  everybody could mute, please.  If you've called in, mute your

5  phone because I want to be able to have the dial-in line up

6  and also continue with this proceeding.  What do we have next?

7          MR. COLTON:  I'm on paragraph 18.  In the last

8  sentence it says, in December 2015 the point five percent

9  special distributions paid to Automotive Portfolio investors

10  that was "almost entirely funded from other investor capital."

11  There's just no evidence, almost entirely funded.  Now we

12  debated this.  Are we looking at a month?  Are we looking at a

13  quarter?  Are we looking at from inception?  And almost

14  entirely is simply inaccurate and there's no way to know

15  because we don't know the time frame or the measure.

16          THE COURT:  This one seems like I'm not going to

17  care about.  It's almost entirely accurate.  Can we say that

18  it was funded in part?

19          MR. COLTON:  We would object to that generally, but

20  that's at least better language.

21          THE COURT:  Okay.  So I'm changing it to say funded

22  in part.  What's next?

23          MR. COLTON:  On 19 it says Gentile, Schneider, and

24  Lash executed three inaccurate performance guarantees.

25  Schneider executed nothing with respect to guarantees.  That

1    is absolutely uncontested.

2            THE COURT:  This language is probably not precise.

3    I could just take out Schneider, or do you want something

4    else?

5            MR. AXELROD:  Gentile, Schneider, and Lash conspired

6    to execute three performance guarantees.

7            THE COURT:  That seems accurate based on the trial

8    testimony.  What's up next?

9            MS. RIVIERE-BADELL:  Your Honor, paragraph 21, the

10   PSR alleges that the 2015 performance guaranty was created to

11   "make up for the shortfall" income to support the monthly

12   distributions.  It's not true because even with the

13   performance guaranty it actually did not make up for the

14   shortfall we had.  The evidence at trial did show that the

15   coverage was 70 percent and never got to 100 percent, even

16   with the performance guaranty.

17           THE COURT:  You want to say make up in part?

18           MS. RIVIERE-BADELL:  That's fine, Your Honor.

19           THE COURT:  Okay.

20           MS. RIVIERE-BADELL:  With respect to paragraph 22,

21   the PSR alleges that Mr. Lash "never guaranteed the

22   performance of the car dealerships."  In fact, we would like

23   this to be amended to reflect that there was -- that Mr. Lash

24   did, in fact, signed the performance guaranty.  He ultimately

25   paid the performance guaranty, and the money actually did go

1  to the funds for the benefit of investors.

2      THE COURT:  So I'm open to changing the wording on

3  this in some way.  Right?  The gist of the trial testimony was

4  he was basically told these are sham documents and you're not

5  going to be on the hook for the money.  So it's true that he

6  signed them, and in that sense I guess we could -- I don't

7  know what the legal affect.  Maybe he did, in fact, put

8  himself on the hook by signing the document after the fact.

9      MS. RIVIERE-BADELL:  He did, in fact, pay it.

10 That's the other part.  In fact, dollars out of Mr. Lash's

11 account actually went to the benefit of the investors and the

12 portfolio.  That is what happened in the fund.

13     THE COURT:  What do you want it to say?

14     MS. RIVIERE-BADELL:  Just that, Your Honor.  That

15 Mr. Lash did, in fact, signed the guaranty and he ultimately

16 paid it.  And those funds went to the -- that the payment went

17 to the funds for the benefit of the investors.

18     MR. AXELROD:  Judge, this is inconsistent with the

19 evidence that the money came from Mr. Gentile.

20     THE COURT:  I'm trying to remember.  There was

21 definitely some money involved in the performance guarantees

22 that clearly did not come from Mr. Lash.  I think there may

23 have been some money that did come from Mr. Lash.

24     MR. AXELROD:  I think that's right, about 300,000.

25 I think they split it one third, one third, one third.

1        THE COURT:  Again, I don't think this is material,

2   but I want everybody to have the facts they think are

3   critical.  So if these are facts that are true that the

4   defense thinks are critical, I'm happy to have them in the

5   PSR.  However, Mr. Lash did ultimately sign the guaranty and

6   paid a portion of the guaranty.

7        MS. RIVIERE-BADELL:  Yes, Your Honor.  Thank you.

8        MR. COLTON:  Paragraph 23, I think it's probably

9   written badly.  It says, after being approached by the FBI,

10  Gentile, Mr. Schneider, and Lash had a meeting.  There's no

11  evidence that either Gentile or Schneider were approached by

12  the FBI.  The testimony, if one were to believe Lash --

13       THE COURT:  Approached Lash, is that the point?

14       MS. MATHEWS:  Your Honor, we addressed some of these

15  and we already agreed to make revisions that probation has

16  agreed to.

17       THE COURT:  On those, if you all have -- if

18  probation and the government and the defense have agreed on a

19  modification of the PSR, I would like to deem those adopted.

20  Do we know what those are?  You can give a high sign if you

21  think we're treading into that territory.  If you all agree on

22  it, I'm going to adopt it.

23       MR. COLTON:  Yes, they changed it to immediately.  I

24  don't know why probation -- how probation has any basis to say

25  that we find Mr. Lash credible that he told this story for the

1    first time after 20 debriefings.  How is probation competent

2    to make that determination?

3              THE COURT:  Ultimately I guess I'm making that

4    determination.  Right?  So the question is whether there was a

5    meeting at which they agreed on their stories.  Is that the

6    question here?

7              MR. COLTON:  The question is whether this meeting

8    that Lash testified to and first discussed five years after

9    starting to talk.

10             THE COURT:  I found Mr. Lash's testimony credible.

11             MR. COLTON:  With respect to paragraph 24, 15,460

12   victims.  That's patently wrong.

13             MS. RIVIERE-BADELL:  Your Honor, it was in the

14   addendum to the PSR.  It still says thousands, quote unquote

15   thousands of investors who invested in the funds are the

16   victims of the fraud and suffered a loss totalling

17   approximately $98 million.  Even the government has walked

18   away from that.

19             THE COURT:  Let's say something different, which is

20   there were a total of 15,460 responses who allege the total

21   loss of approximately $97,000.

22             MS. RIVIERE-BADELL:  I don't think that's correct.

23   There were not that many who actually responded.

24             THE COURT:  That's a separate problem.

25             MR. AXELROD:  I think we could just leave it at

1   there were thousands of victims, and then the 97 million

2   number is obviously one of the theories of loss.

3           MS. RIVIERE-BADELL:  No, Your Honor.  Thousands of

4   victims.

5           THE COURT:  I'm not going to make a finding about

6   thousands of victims.

7           MS. MATHEWS:  I think it's in the sentence prior,

8   isn't it?

9           MS. RIVIERE-BADELL:  No.  It says that there are

10  4,300 people who expressed an interest in being notified.

11          MR. AXELROD:  There are, at minimum, hundreds of

12  victim impact statements.

13          THE COURT:  Yes.  I'm describing this as people who

14  submitted victim impact statements.  Is there any dispute that

15  there are thousands of those?

16          MS. RIVIERE-BADELL:  The spreadsheet, Your Honor,

17  was 1,165.

18          THE COURT:  Over a thousand people submitted victim

19  impact statements.  Is that fair?

20          MS. RIVIERE-BADELL:  One second, Your Honor.  So the

21  spreadsheet has 1,160 rows but that could be more than -- the

22  same victim, multiple rows.

23          THE COURT:  That's fine.  The exact number is not

24  going to be important.  So I'll say hundreds.

25          MS. RIVIERE-BADELL:  With respect to the addendum to

1 paragraph 24, to what we discussed at sidebar, we object to

2 the characterization of victims three and four.  They are not

3 victims under any sense of the word.

4          THE COURT:  Tell me where we are exactly.

5          MS. RIVIERE-BADELL:  So paragraph 24 of the addendum

6 to the PSR lists additional victims.

7          THE COURT:  Okay.  We're talking about three and

8 four.  I'll make this individual three and individual four.

9          MS. RIVIERE-BADELL:  Yes.  We didn't have an

10 opportunity to object to the addendum before today, so we

11 object to the others who are characterized as victims for the

12 reasons we've previously briefed.  And we understand Your

13 Honor's ruling that they would be allowed to speak, but they

14 are not, in fact, victims because they didn't actually show

15 that they suffered losses as a result of the offense conduct.

16          THE COURT:  I'm happy to call these folks individual

17 one and individual two, as well.  I don't think that's

18 important.

19          MR. COLTON:  I believe the Court said that the

20 record is going to be clear that this is just what these

21 people said, not that it's right.

22          THE COURT:  That's correct and I think that's how

23 it's written.

24          MR. COLTON:  With respect to paragraph 46, which is

25 just a legal issue with respect to acceptance of

1    responsibility and the trial penalty, I don't think the Court

2    needs to resolve it.  I just want to make clear, we're

3    maintaining that objection.

4            THE COURT:  Sure.

5            MR. COLTON:  And then with respect to paragraph 69,

6    67, excuse me.  There's just a factual disagreement about what

7    happened with this case that was dropped with respect to a

8    driving incident.  I urge the Court not to --

9            THE COURT:  It's not material to me.  I guess I

10   generally don't like line it at these because I think it's

11   really just reporting according to an affidavit prepared by a

12   police officer.  To be honest with you, my general thing is

13   not to have people go back and like that's not really what

14   happened.  To save time, on this one I'll delete the

15   affidavit.  It doesn't matter to me in this case.

16           MR. COLTON:  Thank you, Your Honor.

17           THE COURT:  Sure.

18           MR. COLTON:  We had a few issues about some matters

19   of finances.  I assume those are not critical.

20           THE COURT:  They don't sound like they would be.  So

21   do you have anything that you would like to address in the

22   PSR?

23           MR. AXELROD:  We do not, Your Honor.  I think at

24   this point you could adopt it as amended, and I think it would

25   make sense to hear from Ms. Harris now because it's her --

1    we're getting close.

2            THE COURT:  Okay.  So I'm adopting the PSR with the

3    modifications that we just made on the record.  Now is the

4    time I would hear from the parties in this case.  I generally

5    recognize the government and then defense counsel, and then

6    defendants.  And in this case since we have individuals who

7    have submitted victim impact statements and want to speak, I'm

8    happy to hear from them.

9            I guess I'm going to let the government tell me how

10   it wants to handle them.  Are you going to have all the folks

11   who fit into that category and then you're going to speak, is

12   that your plan?

13           MR. AXELROD:  Yes.  I think it's probably efficient

14   to do them all.

15           THE COURT:  So I'll turn the floor to you and tell

16   me who you want to recognize.

17           MS. MATHEWS:  Okay, Your Honor.  I understand that

18   Virginia Harris is on the line and she has expressed an

19   intention to speak.

20           THE COURT:  Sure.

21           THE COURTROOM DEPUTY:  Ms. Harris, hello.  It's

22   unmuted.  She should be on the line.

23           MS. MATHEWS:  I believe so.  I apologize.  One

24   minute.

25           THE COURT:  No problem.

1          MS. MATHEWS:  Your Honor, we'd like to see if

2     someone else can unmute on their end.  I believe Cheryl

3     Mizrachi, I'm not sure if I'm pronouncing her last name

4     correctly, may be on the line and would like to speak today.

5          THE COURTROOM DEPUTY:  Ms. Mizrachi, hello?  Ms.

6     Mizrachi?

7          THE COURT:  I can't rule out that we're the source

8     of the technical difficulties.  Is there anybody who is on the

9     line who is able to unmute and confirm that you can hear us

10    and we haven't muted ourselves?

11         MR. DAVIS:  This is Robert Davis.  I'm on the line.

12         THE COURT:  The line is working.  Thank you.  That

13    was very helpful.  So now I think we're going to go back to

14    either of the initial folks.  Are they on the line?  No luck

15    with them.

16         MS. MATHEWS:  We could have Mr. Robert Davis, who

17    introduced himself.

18         THE COURT:  Sure.

19         THE COURTROOM DEPUTY:  Mr. Davis, you can speak.

20         MR. DAVIS:  Thank you very much.  Judge Kovner, my

21    name is Robert Davis.  The activity perpetrated by David

22    Gentile and Jeffry Schneider -- first of all, can you hear me?

23         THE COURT:  We can hear you.  Thanks.

24         MR. DAVIS:  Thank you.  I wanted to express my

25    appreciation to the Department of Justice and the FBI for

110

1    their investigation and for representing victims of these

2    schemes.  Judge, I was one of those victims.  I invested in

3    four of the GPB Funds, and as a direct consequence I suffered

4    a significant financial loss of $380,000, a significant

5    portion of my retirement savings.

6            Mr. Gentile and Mr. Schneider had orchestrated an

7    extensive Ponzi scheme featuring numerous individuals, like

8    myself.  It is my firm belief that they should be prosecuted

9    to the fullest extent of the law.  My relationship with GPB

10   Capital at the end of 2015 I made an initial investment of

11   $100,000 in GPB Holdings on their promise of distributions was

12   the primary reason for that investment.  GPB offered an eight

13   percent preferred return as a performance guaranty fully

14   covered by the distributions from their portfolio companies.

15           So in 2018 based on this initial experience, I

16   decided to invest another $280,000 in GPB Automotive and GPB

17   Waste Management.  My total investments were $380,000, and as

18   before, GPB offered an 80 percent preferred return that is

19   covered by the cash flow from those operations.

20           THE COURT:  Just so you know, sorry to interrupt

21   you, we have a court reporter here who is taking down

22   everything.  She's indicated you're speaking just a little

23   fast.  So if you wouldn't mind slowing down a little bit, I'd

24   appreciate it.

25           MR. DAVIS:  Happy to do so, yes.  I was initially

1    very optimistic about GPB Capital, and this was based on the

2    prospectuses that I read that portrayed GPB Capital as a sound

3    organization with a track record.  I later discovered, among

4    other things, that there was an eight percent commission paid

5    to the broker dealers, including my broker, Scissor Street

6    Securities, and I trusted them to do due diligence.

7         I now understand this commission was unduly

8    influenced by those brokers to invest in these fraudulent

9    funds.  Like many others, my concerns escalated.  So in 2020 I

10   wanted to take some clarification.  So I was able to have a

11   conference call with GPB's director of communications Brian

12   Weisenberger.  On the call there were a series of misleading

13   assurances, claims that GPB was in the process of SEC

14   registration, that audits were delayed and that investments

15   remained secure.  In fact, I was informed that the eight

16   percent preferred return was beginning to accrue and that

17   investors would be made whole.

18        So those were clearly false.  They were just

19   pacifying investors to conceal the fraud from others and the

20   audit was never completed.

21        So the repercussions on my life were substantial.  I

22   detailed this in my affidavit that I submitted to the DOJ.

23   That loss of $380,000 constituted 35 percent of my retirement

24   plan.  If you factor in an eight percent return, that should

25   have yielded over $550,000 today.  Brace yourself because as

1  of now I have only $42,000 in the initial distributions to

2  show for this investment and nothing since.

3           So this is not an intended as one of the defendants

4  alleged earlier.  This is actual loss for me and countless

5  other investors.  To make up for the financial loss, I've had

6  to hold off -- put off, I'm sorry, my full retirement.  I had

7  planned to start last year, but I am continuing to work now.

8  I can't begin to tell you the frustration and anger I've had

9  knowing I was working several more years while these

10  individuals used my hard money to support their lifestyle.

11  I'm kicking myself to be deceived by these two men.  The

12  initial trust I once held is replaced by a profound sense of

13  loss and betrayal.  I spent time in corporate myself and I can

14  see now the calculated, the deliberate nature of the tactics

15  employed by GPB of lengthy percentages, personal reassurances

16  from the leadership team, and miscellaneous financial

17  statements.  They were all designed with one thing in mind, to

18  manipulate investors in concealing their scheme.

19           I trusted GPB.  I believed in their promise in

20  capital preservation.  That trust is irrevocable by the

21  criminal actions of Mr. Gentile and Mr. Schneider.  Your

22  Honor, I implore you to consider the profound emotional and

23  devastation on me and many others.  Many of us are seniors,

24  like myself.  In determining the appropriate sentence for

25  these men, it is my sincere hope that the sentence will

1  reflect the gravity of their offenses, serve as justice for

2  the extensive harm they've caused.

3          And finally, Your Honor, I would like to address the

4  matter of GPB Capital portfolios.  I read that Gentile and

5  Schneider have requested what's left of our investment dollars

6  to cover legal costs.  To me this is just appalling.  It just

7  demonstrates the blatant disregard for the investors,

8  investors, who trusted GPB only to have it tied up for so many

9  years.  I respectfully implore you to close this case,

10 sentence the defendants, and please, please expedite the

11 disbursement of all remaining assets to the receiver so we

12 could recover from this ordeal.  Thank you for your time and

13 consideration.

14          THE COURT:  Thank you, sir.

15          MS. MATHEWS:  Your Honor, I understand Ms. Virginia

16 Harris is on the line and is able to speak now.

17          THE COURT:  Great.

18          MS. HARRIS:  This is Virginia.

19          THE COURT:  We can hear you.

20          MS. HARRIS:  Wonderful.  I called back in.  If

21 anyone else is having trouble, maybe trying to go back in

22 would be helpful to them.

23          THE COURT:  Good call.  Thanks.

24          MS. HARRIS:  My name is Virginia Harris and I've

25 been involved with GPB Investments since 2016.  GPB's fraud

1    impacted me both personally and professionally.  We have

2    1.4 million invested in GPB in fund two, and auto on behalf of

3    the non-profit trust of which I'm president of the board.

4          I also have 50,000 of my own funds in fund two.

5    Prior to that investing over a ten-year period, I worked to

6    ensure that a large request made to our church could be used

7    in ways to help people.  The ultimate goal was to get the bulk

8    of the request to a non-profit care facility.

9          I was raised in a family that believed our purpose

10   in life is to help others.  My efforts was a church request

11   became a driving force in my life.  We worked with experts to

12   do everything right, including due diligence at every step.

13   We set up a trust based on projections of what the funds would

14   do for the chosen care institution.  But because of GPB, we

15   failed.

16         The care facility could not do the hiring we had

17   anticipated.  Patients continued to be turned away, and many

18   individual lives were impacted.  The financial projections

19   based on our having the GPB Funds were no longer accurate.

20         GPB was good at what it did.  One of the most

21   difficult things is realizing how carefully we were

22   manipulated.  We were shown the auto dealerships, the waste

23   disposal site, the Chelsea offices, and had the fancy dinner.

24   It was very slick and very well done.  They pulled us in.

25         And in a way, at least in the early years, I was

1   complicit with GPB because I kept going back to the church and

2   the trust to explain that things at first were great, and then

3   time after time telling my people it still looked like things

4   would work out.  At one meeting in October of 2019 in GPB's

5   Chelsea's office, Michael Cohen suddenly left the meeting.  It

6   was very strange and we were told he had a family matter to

7   attend to.  David Gentile continued to explain how everything

8   was fine, right down to the good-bye hugs as we left their

9   office.  We learned the next morning by reading the newspaper

10  that Michael Cohen had actually been reported to the Eastern

11  District courthouse to face arrest while we were still sitting

12  there being lied to in that meeting.

13          When David Gentile was arrested in 2021, it seemed

14  maybe something was finally going to happen and, again, we

15  reported to our people there was hope.  But September of that

16  year when auto dealerships sold for 880 million, nothing was

17  distributed.  In mid 2022 we began to have hope because there

18  was talk of winding down, but it was over a year and a half

19  later before a distribution plan was approved.  Then what

20  happened, it was appealed.  Nothing happened.

21          In a way we were continuing our roles as victims

22  because of each hopeful sign we thought we were going to get

23  our money.  Getting word in August this last year that there

24  was actually a conviction was the first time it seemed maybe

25  this would be resolved.  But in December, the proposed plan

1    for distribution was appealed.  It is wonderful that we

2    received 40 percent of the net capital owed, but these people

3    still have 60 percent of our money.  So the nightmare that has

4    gone on for almost ten years continues.

5              Listening this morning I'm appalled at the idea that

6    there should be even more delay.  Whatever we receive will not

7    account for the fact this money was tied up for ten years and

8    for all the good that could not be done with it.

9              No matter how many times I tell myself nothing can

10   protect you from someone who lies and steals and doesn't abide

11   by the rules, I still feel guilty that I could not protect the

12   funds I was entrusted with.  The church, the trust, the care

13   facility and I, are all victims of this crime.  But even more

14   important are the victims I will never know.  They are all

15   those people we should have been helping with this money for

16   the last ten years, but who are harmed by being turned away

17   from the care institution.  This should never be allowed to

18   happen to anyone else.

19             This morning I heard defendants claiming everyone

20   may get their money back.  Receiving our original outlay

21   almost ten years after making the investment will never make

22   us whole, and that was an eloquent account from the previous

23   speaker.  I approve of everything he said.  That was our

24   experience too.  Thank you.

25             THE COURT:  Thank you very much.  I think I

1   previewed I have a matter I need to handle at 3:00.  I think

2   we're at 2:59.  Can we take a 15-minute break.  I think that

3   will be enough for me.

4           MS. MATHEWS:  Sounds good, Your Honor.  Thank you.

5           (Recess taken.)

6           THE COURT:  Does everybody have whoever they need at

7   their table?  So do you have additional folks who submitted

8   impact statements?

9           MS. MATHEWS:  Yes, Your Honor.  I believe Ms. Cheryl

10  Mizrachi is on the line.

11          MS. MIZRACHI:  Hello.

12          THE COURT:  We can hear you.  Please go ahead.

13          MS. MIZRACHI:  My name is Cheryl Mizrachi.  I'm a

14  victim of GPB Holdings.  I just want to say to the Court,

15  Judge Kovner, the lawyers and everybody, I'm emotional.  I'm

16  70 years old.  Part of my retirement, like I said, I invested

17  $100,000.  I'm single and this has made a huge difference in

18  my ability to live.  It's taken a significant toll on me

19  emotionally and having to deal with the stress of not having

20  that income and to have someone behave in such a criminal way.

21          And just the anxiety has caused anger and sadness,

22  and for me at this point in my life having to think about

23  getting a job or creating a new career, I still have to worry

24  about how because of this loss of the $100,000.

25          So whatever sentence is severe and that there's some

1   form of restitution or way that I can somehow be compensated

2   for my loss.  I want to thank you for allowing me to speak

3   today, and I apologize for the emotions.  Is there any other

4   information you need from me?

5           THE COURT:  It's fine.  It's fine to come as you

6   are.  Thank you for your time.

7           MS. MATHEWS:  Thank you.  Your Honor, I think we

8   have two final victims on the line, Barbara and Louis DeLuca.

9           MS. DELUCA:  This is Barbara DeLuca.

10          THE COURT:  We can hear you.  The floor is yours.

11          MS. DELUCA:  Thank you for letting me speak, as

12  well.  In 2015 my husband and I took a final step to our

13  retirement by selling our home on Long Island where we lived

14  for many years.  After we sold we invested a significant part

15  of the money to GPB Automotive.  It was presented to us as a

16  solid and conservative investment.  We chose it as the auto

17  business was quite lucrative and auto dealerships are

18  financially successful.

19          The investment sounded reasonable, which is all we

20  were looking for.  We just planned on what was promised in the

21  prospectus, a consistent monthly return to help fund our

22  retirement.  After our monthly distribution abruptly stopped

23  and inexplicably stopped and given no ability to retrieve our

24  money back, we learned that the principals of the company had

25  deceived us and actually had been treating themselves to

1   outrageous and lavish lifestyles from investor money without a

2   shred of ethics.  It's dishonesty and greed.

3        They had been stealing from the investors with gross

4   misconduct.  I, too, would like a life of buying Ferraris and

5   flying on private jets and parties after parties and have

6   diamond watches, et cetera.  But the difference is I never

7   considered taking from people to do so.  It's been almost ten

8   years now that we have been made whole in some fashion.  We're

9   still not there.  Actually, it's not possible between losing

10  the interest we lost, which we will never recover.

11        It's dishonesty and corruption and we are the

12  victims of a very wealthy man who had no qualms about stealing

13  from investors.  It's sad to know people like this exist who

14  are once again unethical.  I thank the court and the judge and

15  whoever prosecuted the case.  I think my husband also wanted

16  to say something.  I'm not sure if he's on the list.

17        THE COURT:  He's welcome to.  The floor is yours,

18  sir.  If you're on the line, we can sort of hear you, Mr.

19  DeLuca, but I think you might need to speak into the receiver

20  to pick you up.

21        MR. DELUCA:  Like Barbara said, the part of our

22  retirement and the investment was supposed in 2015 by a

23  trusted broker and a conservative return, a steady return,

24  made sense.  I said sounds like a good idea because having

25  experience in car dealerships, it wasn't a big gamble because

1    car dealerships at the time were a huge investment.  So it

2    seemed like a great effort.  We didn't know they were stealing

3    money in a Ponzi scheme buying Ferraris.  We were notified in

4    January of '19 that the distributions would stop.

5           I called, I wrote, I've asked for a return on my

6    money.  I saw some negative stories on the internet.  I

7    immediately called a lawyer and here we are.  Out of hundred

8    thousand we invested, we have been returned from GPB about

9    31,000 so far.  It's nice to know we still go after criminals,

10    at least for now.  I want to thank the prosecutors of the

11    Eastern District of New York, the FBI, and Your Honor, and our

12    lawyers and also the distribution lawyers as well.  Hopefully

13    we can be made whole.  Thank you.

14           THE COURT:  Thank you, sir.  I appreciate that.

15           MS. MATHEWS:  That's it for the victims who have

16    expressed an interest, Your Honor.

17           THE COURT:  I think maybe this would be a good time

18    for you to speak, if the government is going to speak today.

19           MR. AXELROD:  Thank you, Your Honor.  I'll be brief

20    because you've sat through an eight plus week trial here and I

21    think you've seen the evidence.  The offense conduct in this

22    case was serious and, in our view, warrants a significant

23    punishment.  The defendants created a product that was truly

24    tailor made to appeal to retail investors, as you've heard

25    from the victims who spoke and as you've seen in the victim

1    impact statements.

2         The marketing materials marketed GPB as less risky

3    than traditional private equity.  It advertised income that's

4    so important when you're reaching retirement, and the truth is

5    that these were lies.  And the defendants essentially took the

6    premise of this investment, which was that it was a safe

7    version of private equity that could be offered to retail

8    investors and they turned it on its head.

9         THE COURT:  We have to ask the folks on the line to

10   mute again, otherwise we can hear you.

11        MR. AXELROD:  Your Honor, this was done out of greed

12   because the way they were compensated every dollar in

13   fund-raising meant more fees, and it was done out of ego for

14   men who were already successful.  And in the middle of this

15   fraud, when they knew they were lying and when they were

16   seeing the performance reports that showed they were failing

17   their investors, they threw themselves essentially a party to

18   celebrate their own brilliance.

19        These men, Mr. Schneider, Mr. Gentile, they are not

20   champions of the investors, as Mr. Gentile would have it.

21   They did not rely heavily on subject matter experts, and they

22   were not ensnared in a rapidly changing regulatory

23   environment.  The anti-fraud laws are older than almost

24   everybody or I think everybody in this courtroom.

25        This was calculated fraud.  It was orchestrated by

1    two sophisticated men.  They were the CEOs of this company.

2    There's nobody to blame but these two men.  And in fashioning

3    an appropriate sentence, I submit the Court has to account for

4    the scale of the fraud.  There are thousands of GPB investors

5    in just the three funds at issue here, and they involve more

6    than a billion dollars.  And at very best for these people,

7    that money, because of this fraud, has been locked up for

8    years and years and years with real world consequences for

9    victims who spent their entire life savings for their

10   retirement, and unlike the defendants, do not have millions of

11   dollars to wait out this case.  They're suffering real

12   consequences.

13          This fraud began early in the life of the GPB Funds.

14   The first performance guaranty is concocted in March of 2015,

15   and fund-raising took off after that and went on for years.

16   And in our view this fraud was also sophisticated.  The

17   defendants used significant resources and expertise to commit

18   this fraud to be sure Mr. Gentile used his accounting

19   experience and expertise.

20          They used lawyers to paper the fraud like the

21   fraudulent performance guarantees, and they used their dozens,

22   if not hundreds of employees, to keep the fraud running.  As

23   the victim impact statements submitted to the Court and as

24   we've heard today show, this is a fraud that caused very

25   significant harm.  These victims, for the most part, these are

123

1   not sophisticated and wealthy investors who are not going to

2   notice the absence of this money for a decade.

3            There's a single mother with teenage children.

4   There's a 75 year old who is now using her 401K to care for

5   his wife who is suffering from Alzheimer's.  There's a couple

6   who planned to use the money they invested to pay for their

7   children's college.  There's a 75 year old disabled veteran

8   who is now living on social security checks.  A 76 year old

9   single woman who wants to retire and can't because of the

10  fraud, and a 77 year old widow who had to sell her house.

11           Compounding this pecuniary harm, all of these

12  victims, and we heard a little about it today, are dealing

13  with the incredible stress and emotional turmoil of being

14  victims.  They've dealt with failing marriages, family members

15  who feel betrayed.  All laid out in the victim impact

16  statements.  The stress and anxiety of proceedings that have

17  gone on for years with uncertain recovery.

18           What we heard today is that fraud, and we know this,

19  fraud has a ripple affect through the community because it

20  disrupts people's lives and there are consequences, so people

21  can't contribute to charity anymore.  They can't contribute to

22  their grandchild's college fund like they had planned.  The

23  number of victims multiplies as harm like this ripples

24  outward.

25           We've considered the history and characteristics of

124

1  the defendants in fashioning our recommendations for a

2  sentence, and we recognize that the history and

3  characteristics of these defendants point in both directions.

4  These men are or were leaders in their community, and they

5  built successful and productive lives.  But that success also

6  shows that this was just entirely not a crime of necessity.

7  There was no reason to do this.  They were successful.  They

8  had money.  They chose to use those resources and their

9  leadership to build these companies to commit a fraud.

10  It was not in any way an aberrant incident.  This is

11  not a case of one bad decision, one bad night in an otherwise

12  spotless life.  This fraud went on for years.  It's not a

13  function of addiction.  It's not some casual decision.  It

14  went on for years.

15  And, in part, because of that we think the interest

16  in deterrence also weighs in favor of a significant sentence.

17  The Second Circuit has repeatedly recognized the cost benefit

18  analysis that white collar criminals in particular can

19  undertake.  White collar crime is difficult to detect.  As

20  this case demonstrates, the gain can be in the millions, and

21  in the unlikely event you're caught after years of proceedings

22  you still may not go to jail at all.

23  We know that that's exactly what Mr. Gentile

24  thought, because as the Court knows, Mr. Lash overheard

25  Gentile telling his lawyers he could do a couple of years in

1  jail as if that was just the cost of doing business.  These

2  defendants are not in their 80s like some of the comparator

3  cases the defendants have suggested to Your Honor.  They've

4  accepted no responsibility.

5          There's no remorse and, in fact, in 2023, while this

6  case was pending, Mr. Schneider took and passed the investment

7  banking registered representative examination.  So while this

8  case was pending under indictment, he was planning for a

9  future in the business.  I've touched on this, but in our view

10  a significant sentence in this case presents no risk of

11  unwarranted disparities.  The defendants cited dozens of cases

12  and we looked at many of them.  And every case has to be

13  measured on the facts.  But I would call your attention to the

14  fact that many of them involve guilty pleas.  Many of them

15  involve elderly defendants and defendants with serious medical

16  issues or addictions, or different guidelines ranges, or they

17  involve one off bad decisions and far less significant frauds.

18          *Block,* for instance, the case they rely on so

19  heavily, the Court wrote during sentencing:  Did not

20  fundamentally involve long-term fraudulent conduct over a

21  period of years or even many months.  All of these cases are

22  different from this case.  No case of this scope, of this

23  duration, this scale, no case with thousands of victims, they

24  haven't given you any case like that with victims waiting

25  seven years or more for their money.

 1          For those reasons, Your Honor, we've asked the Court

 2    to impose a significant sentence.  It's a meaningful sentence

 3    that will punish these defendants, and after many years

 4    hopefully it will finally provide some measure of justice for

 5    the thousands of victims who have been waiting.

 6          THE COURT:  Thank you.  I'm going to need to break

 7    in approximately eight minutes.  We might as well break now.

 8          MR. MENCHEL:  And you wanted to hear from the

 9    lawyers first and then clients?

10          THE COURT:  Yes.  That's how I generally do it.  We

11    could do lawyer client, lawyer client, or we could do lawyer

12    lawyer, client client, however you want.

13          MR. MENCHEL:  We'll talk about that.  Thank you.

14          (Recess taken.)

15          THE COURT:  I'm told everyone is here.  I'm sorry

16    for the delay.  You have me for as long as you intend to go.

17          MR. MENCHEL:  I think dear Mr. Dearington wants to

18    be heard before I begin.

19          MR. DEARINGTON:  Your Honor, just briefly, we have a

20    procedural objection to some of the victim statements we just

21    heard.  I want to get it on the record.  So the first one is

22    that we had requested from the government 26.2 material under

23    Rule 32(I) and provide it for each of these persons who spoke

24    moments ago.  We think that means under the rule that to the

25    extent that their statements were testimonial and considered

1    by the Court in any way, that the failure to disclose any such

2    statements that they might have would preclude the Court from

3    considering their statements.

4         And then also we recognize that there's an adverse

5    authority under the confrontation clause.  We would, just for

6    the record, we would like to assert that as well.  Second,

7    some of these individuals just do not appear to meet the

8    requisites for being victims.  And two of them, just for

9    example, Mr. DeLuca and Ms. Mizrachi invested before the

10   alleged fraud periods.  So we wanted to put those on the

11   record for procedural reasons.

12        THE COURT:  Okay.  You've done that.

13        MR. MENCHEL:  Is it okay if I go to the podium?

14        THE COURT:  Sure.

15        MR. MENCHEL:  May it please the Court.  Your Honor,

16   I want to begin by just thanking you because it's obviously

17   very apparent to all of us that you paid very careful

18   attention during the trial, and I also know that you read the

19   submissions very, very carefully.  I know on behalf of myself

20   and Mr. Gentile, we thank you for that.

21        I don't want to go over everything, obviously, in

22   those submissions but I want to highlight a couple of things

23   that I think are important.  In its sentencing submission and,

24   again, here today we heard from a number of investors about

25   how they suffered greatly as a result of the investment they

128

1   made in GPB.  Apparently someone told these investors this was

2   a safe investment, that it was guaranteed, that it was

3   suitable for retirement, that it was suitable to pay for

4   medical expenses in the future, that it was suitable for

5   putting away money for your grandchild's college fund.

6           And many of those investors said that as a result of

7   being told those representations they lost all or a

8   significant portion of their life savings.  So I want to be

9   clear that, first of all, no one was more surprised to read

10  those statements and hear what those investors said today than

11  Mr. Gentile.  It's terribly sad.  It's terribly tragic.  But

12  if people were told that this investment was safe, that you

13  should use it to invest in as part of your long-term

14  retirement plan or to help pay for your medical expenses, or

15  for your grandkid's college, then that's horrible.  But none

16  of that can or should be attributable to Mr. Gentile.

17          If these people were told that these were safe and

18  guaranteed investments, then these people were lied to.  But

19  the important question I think that this Court needs to ask

20  itself is by whom.  Because we know from the many letters that

21  we read that they were told this not by Mr. Gentile or Mr.

22  Schneider, for that matter, but by their own investment

23  advisors or brokers, many of whom, by the way, those

24  investment advisors or brokers are now being sued because of

25  those misrepresentations that they made to those investors.

1    Simply put, these funds were never designed for people to

2    invest under those circumstances, nor were they marketed by

3    GPB as a safe, guaranteed, and suitable for the purposes for

4    which these people just said they invested.  In fact, the

5    opposite was true, Your Honor.  The opposite was true.

6              These funds were described in the subscription

7    agreements that these investors had to warrant they understood

8    when they signed up.  As quote, highly speculative and risky

9    and where there was a distinct possibility you could lose the

10   entirety of your investment.  Something that is quite common

11   in private equity ventures.

12             And that's why the investors had to warn, had to

13   certify when they signed the subscription agreement that they

14   understood the following.  Quote -- I'm sorry.  That the

15   investment was, quote, highly speculative which involved a

16   high degree of risk of loss of the entire investment, close

17   quote.  That if the entire investment is lost that the

18   investor, quote, has adequate means of providing for the

19   subscriber's current needs, anticipated future needs, and

20   possible contingencies and emergencies, close quote.

21             They had to certify and warrant, quote, that the

22   investor was, quote, able to bear the economic and other risks

23   of investment for an indefinite period of time, close quote.

24   And, quote, has no need for the liquidity in the investment

25   and could afford the complete loss of the investment, close

1    quote.  That was in each and every subscription agreement that

2    the investors in this case signed.

3           Not only did they have to sign and warrant that, but

4    their investment advisors and brokers had to also sign and

5    certify and warrant that their clients understood all of those

6    risks.  So all I can say here today is they were mislead.

7    Either they didn't read the stuff carefully or they were lied

8    to by their brokers, or some combination of the two.  But that

9    can't be laid at the feet of Mr. Gentile for the purposes of

10   this sentence.

11          THE COURT:  Sometimes I feel bad about interrupting

12   you, but I also want to give you a chance to respond.

13          MR. MENCHEL:  I'd rather you do.

14          THE COURT:  These investors did take on some risks,

15   but I don't think they took on the risk of not having the

16   investment represented to them accurately.  I mean these

17   investors were entitled to rely on what they were being told

18   about the investment, that money that was being paid out to

19   them reflected income from the portfolio companies, for

20   example, or that the balance sheets accurately reflected

21   income guarantees to the extent they existed.  Those don't

22   seem like the kinds of things that these investors were

23   waiving by signing these disclaimers.

24          MR. MENCHEL:  I completely agree and I was going to

25   get to that.  What I'm simply saying is those

131

misrepresentations are far worse than the misrepresentations, I respectfully submit, that the misrepresentations for which Mr. Gentile was convicted.  That's the only point I was trying to make.

There's a conflation going on here that somehow they're the ones that told the investors those things.  They didn't.  He was convicted very clearly of lying to the investors, if you accept the verdict, as we have to, that when they were getting distributions, those distributions were solely coming from the profits of the business.  But that's a very different thing then your money's guaranteed, it's safe, great for retirement, and all the things we heard about today. That's the only point I'm making.  In fact, there's not a single piece of marketing that I saw in this case that targeted people that wanted to invest in these funds as a way to secure their retirement or provide for the medical needs. That wasn't introduced in this case.

So, respectfully, to take what happened to these investors, if we take them at their word and I have no reason not to, who never should have invested these funds if they couldn't afford to lose their investment in deciding what punishment to give Mr. Gentile, I respectfully submit would be wrong and unjust.

Now, let's talk about the fraud he was convicted of, because I think that's what you're here to decide the sentence

1    on.  As I just said, taking the verdict, as you must, is that

2    the investors were mislead about the nature of the

3    distributions that they were being paid, which, by the way,

4    were never guaranteed.  I'm sure the Court remembers this.  At

5    any time they had the authority to not distribute anything at

6    all.

7            The underlying operating documents made clear also

8    that the funds had the right to pay investor distributions

9    with investor money.  Now, I'm raising that because the

10   government says that's irrelevant.  I respectfully submit it's

11   not.  If you're lying about something that's blatantly

12   illegal, or that's just flatly false like this is a guaranteed

13   investment that you're always going to make your money on,

14   that's one type of fraud.  If you're lying about the nature of

15   the funds of the distributions are being paid, but they had

16   the legal right to do it, I think that matters.

17           They didn't engage in something that they didn't

18   have the right to do legally.  I understand the jury's

19   verdict, but I think that's an important consideration.  I

20   think it's also important from a mitigation standpoint that we

21   not lose sight of the fact that the financials did often

22   disclose that when the distributions were made they clearly

23   weren't fully covered.

24           By the end of this trial, any one of us could look

25   at these statements, I know you could, I know I could, and see

133

1    that the amount of money they got from the profits was not

2    sufficient to cover the distributions.  That was not hidden

3    from them, with the exception of the performance guarantees

4    I'm going to address separately, which were one or two

5    episodes that happened in this case.

6              I think it's important that we realize this is not a

7    typical financial fraud case.  I've never seen another one

8    like it, frankly, where the government brought a case because

9    the nature of the misrepresentations dealt with how they got

10   their money back.  I haven't seen another case in the country

11   like it.  It's not a Ponzi or Pyramid scheme where this thing

12   was top to bottom fraud.  Your Honor knows that this was a

13   real company.  It's not a pump and dump scheme.  It's not a

14   massive accounting fraud where the books were cooked to show

15   vastly different things than the reality of what was going on.

16             It's not a channel stuffing case.  It's not a

17   company selling totally bogus and non-workable product.  Like

18   I said, I couldn't find another case like it in the country.

19             I would respectfully submit that one of the biggest

20   problems the government has in this case, putting aside Your

21   Honor's loss issue is, did the success or failure of these

22   funds rise or fall on whether the investors were paid back

23   with their own money or with profits.  And the answer is no.

24   There's been no connection to show that the ultimate success

25   of these funds turned on how the investors got paid.  I think

1   that's another important factor in determining the appropriate

2   sentence.

3          Let me just briefly address the performance

4   guarantees.  I want to be clear, I'm not going to relitigate

5   this issue.  Your Honor made clear today, at least twice, how

6   Your Honor views performance guarantees.  I do want to

7   reorient you and sort of level set because this was a long

8   time ago this trial, and I want to remind the Court of some of

9   the testimony that happened.

10         Mr. Jacoby was testifying in this case on direct

11  examination, Mr. McConnell I believe was the prosecutor,

12  elicited that initially Mr. Gentile was going to pay that

13  money himself as a return of management fees.  I then did a

14  cross, just a page and a half, I wanted to read it to you on

15  that exact same point.  This at 997 of the record, question by

16  me, line 4.

17         And am I right you spent a lot of time with the jury

18  walking through how this was going to be a management fee

19  return?

20         Answer:  Yes.

21         Question:  And then it got switched over to a

22  performance guarantee, right?

23         Answer:  Yes.

24         Question:  And am I right that from a financial

25  aspect it's a wash whether or not the million 50 was booked as

1    a performance guaranty or whether or not it was booked as a

2    return of a management fee?

3            Answer:  Provided the money being used to pay it is

4    either from Mr. Lash or Mr. Gentile.

5            Question:  Yeah.  My only question is whether it's

6    labeled a management fee return or a performance guaranty.

7    From a financial standpoint it made no difference.

8            Answer:  For the income statement it would not have

9    changed the income statement.

10           Question:  It's a wash?

11           Answer:  Yeah.

12           Question:  And it was your testimony, I believe,

13   that Mr. Gentile was well aware whether it was return of a

14   management fee or performance guaranty that the fund was only

15   going to get 70 percent coverage even with the inclusion of

16   it, correct?

17           Answer:  Correct.

18           THE COURT:  So I'd love to ask you about the

19   testimony because it's on my mind.

20           MR. MENCHEL:  Why did he do it?

21           THE COURT:  There's the why but let me ask you a

22   different question also.  I don't find that testimony

23   particularly exculpatory or sympathetic.  The way I'm seeing

24   it is your client had the option of getting the coverage ratio

25   up by putting in his own money, a non-fraudulent act, right,

1    totally within his discretion to do it.

2         Nobody would be prosecuting him for doing that and

3    it would have improved the coverage ratio, and thereby not

4    worried investors about putting money in the same a lower

5    coverage ratio would have.  Instead, he chose to do this in a

6    fraudulent way that saved him from having to put in the money.

7    That testimony seems, for me, very bad for Mr. Gentile.

8         MR. MENCHEL:  I understand that.  That's what I was

9    going to answer.  If you remember, he actually loaned Mr. Lash

10   a lot of the money.  That's why you saw all those transfers

11   going through.  I understand the Court's position on that, and

12   it can be seen as an act of greed.  I'm going to respectfully

13   submit it was really about principle.  Admittedly, he did it

14   wrongly, accepting the jury's verdict as I have to.

15        These automobile dealerships underperformed and

16   there was testimony about this.  I think I crossed Mr. Lash on

17   it.  He felt Mr. Gentile did it.  That's on your shoulders and

18   you should be the one to pay it.  My only point in making this

19   point to you, Your Honor, is it wasn't done because he had no

20   other means to do it.  He felt as a matter of principle it

21   should have been him.  It was done wrongly according to the

22   jury's verdict, and we have to accept that.  I wanted to

23   answer that question to you because it's not about the money.

24   He loaned him the money.

25        THE COURT:  I'm just trying to understand what

1    you're saying.  You're explaining why he did the performance

2    guaranty, and your explanation is basically he thought it

3    would be a just world if he had, in fact, guaranteed the

4    perform and so they did this guaranty because he thinks like

5    in retrospect that's the deal we should have made so now we're

6    going to create these guarantees.

7            MR. MENCHEL:  There was other testimony that there

8    were a lot of performance guarantees, including, I think, from

9    Mr. Lash but certainly from Mr. Dibre and others for the

10   dealerships.  It was something they touted.  It was something

11   that was put in there, and that's the answer I have.  I'm not

12   saying it fully exonerates what he did.

13           I'm just trying to make the point that it didn't

14   matter to the investors one way or the other.  They weren't

15   mislead either way because they would have gotten the money

16   either way.  I don't think the investors would have cared and

17   it was disclosed as it was disclosed.  That's the point I'm

18   trying to make.

19           THE COURT:  Okay.

20           MR. MENCHEL:  Okay.  Now, I want to just talk a

21   couple minutes about who this man is because I've been

22   representing him for many years now, and I've gotten to know

23   him quite well and his family.  The way it was presented in

24   their submission, and just now by Mr. Axelrod, is that this is

25   a man that's been driven by greed and that being an accountant

138

1    wasn't good enough for him and so he set up the funds as a way

2    to perpetrate the fraud.

3              That's just not what happened here. It's just not

4    what happened. I think it's a little offensive to suggest

5    that just because someone is a professional and has had a good

6    career that deciding to do something new and adventurous means

7    it wasn't enough for him. The government doesn't know this

8    man. They haven't spent years getting to know him like the

9    people in this courtroom have and like I have, and they

10   certainly don't know what was in his head or in his heart when

11   he started the funds.

12             Even under the worst interpretation possible there's

13   no evidence that Mr. Gentile wanted to harm investors or that

14   it was greed that made him set up these funds in the first

15   instance. I want to mention a couple of facts that run

16   counter to that narrative.

17             First of all, he did run this fund for a number of

18   years before the government alleges the fraud even occurred.

19   So the idea that this was set up in mind is just not supported

20   by the record. He personally loaned over $2 million to

21   Holdings 1. He personally supported lines of credit to GPB

22   Funds by executing personal guarantees on behalf of the funds

23   in tens of millions of dollars, and he and his wife personally

24   invested nearly $3 million in the funds as late as March 2017.

25             And I think all these things evidence a genuine

1   belief and intention that he thought the funds would succeed.

2   No fraudster would do that.  They wouldn't put their own money

3   in and wouldn't guarantee loans.  They wouldn't put their own

4   personal guarantees up if all they're trying to do is rip

5   people off.

6           So who is this man?  Well, I think the fact that

7   this courtroom is packed today and has been packed during the

8   trial with his friends and family speaks more about the kind

9   of man he is than I ever could.  He's not just giving up his

10  money.  He's giving up his time.  There were numerous examples

11  in the submissions, I know Your Honor read them, of Mr.

12  Gentile flying thousands of miles to visit friends or family

13  who were sick or grieving or dealing with some other family

14  crisis.

15          Letters saying he was the first one there and the

16  last one to leave when one of their loved ones was dying from

17  cancer or dementia or had a heart attack and so on.  He's even

18  supported these people in the lead up to this trial and

19  continues to support them after he was convicted.  There's a

20  consistent pattern that comes across in the 75 letters that

21  were submitted on his behalf, which in and of itself, at least

22  in my experience, that's an extraordinary number of letters by

23  any account.

24          These people have shown up for Mr. Gentile because

25  he has shown up for them.  I think this Court should take that

140

 1    into account.  He served as a mentor not only to his friends

 2    but to his friends' children.  His commitment to his family is

 3    like one I've never seen.  His relationship with his clients,

 4    he doesn't treat them like clients.  He treats them like

 5    family and friends.  That's the way he treated me.

 6          I've learned things from this man about how to deal

 7    with clients.  I want to address one other aspect of this and

 8    that's this idea that Mr. Gentile, this was in their

 9    submission, was arrogant in his greed and they cited Lash's

10    testimony that Gentile said, quote, investor money was his

11    money and he could do with it really anything he wanted to.

12    We heard that testimony during the trial and we heard other

13    testimony like from Mr. Jacoby that an Amex card was used

14    where Mr. Schneider was billing things to the funds.  We heard

15    about a private jet that Mr. Jacoby said the funds bought.

16          Those were reckless and irresponsible statements for

17    which there was no foundation.  In fact, the evidence was the

18    opposite.  It took a long time but we finally got to the CFO

19    who was actually around, and it wasn't Mr. Jacoby, when that

20    plane was purchased.  And at page 2668 of the record she was

21    asked this question.

22          Question, line 8:  Are you aware that in January of

23    2017 a private jet was used for travel for certain GPB

24    employees?

25          Answer:  I don't remember the exact time, but I know

141

1  that there was a private jet in use.  And what I mean by "in

2  use" it wouldn't be that GPB would pay for the whole private

3  jet.

4           Question:  That's right.  GPB would not pay for the

5  jet, correct?

6           Answer:  That's correct.

7           Question:  So GPB would only be paying for the price

8  of a flight, right?

9           Answer:  The price of the flight according to the

10  company's policy, correct.

11           So this idea that they were using this as their own

12  personal piggy bank, that there's been embezzlement, that's

13  not the crime, again, for which he was convicted.  Just having

14  witnesses say irresponsible things like he was using this like

15  his own piggy bank, where they were buying jets or Ferraris

16  with the funds is just not true.  We heard it repeatedly here

17  today unfortunately by some of these investors who have been

18  led to believe it is true.

19           One last thing.  We heard a lot about the investors

20  being blocked from getting their money back.  Putting aside

21  that this was supposed to be a long-term investment anyway in

22  which you certify that you could handle the illiquidity of the

23  investment for years, the government claims that for more than

24  six years GPB investors had their money locked up because of

25  the defendant's criminal conduct.  That's just flatly false,

1    just flatly false.

2         So the Court is aware, Mr. Gentile voluntarily

3    stepped down as CEO of GPB Capital Holdings within a day of

4    being indicted and did not oppose the appointment of a

5    monitor.  The notion that because he fought against the

6    appointment of a receiver has somehow prevented the current

7    management from making distributions to the investors is just

8    not true.

9         In no less than ten filings, and I have them if you

10   want me to hand them up to you, Mr. Gentile repeatedly made

11   clear that he requests and fully supports distributions to be

12   made to investors.  Again, I'll hand those up to you.  He has

13   never, I repeat never, opposed that such distributions be

14   made.

15        The fact that the current management, or the

16   monitor, has not done so is not due to Mr. Gentile's challenge

17   of receivership.  In fact, the monitorship order that he

18   entered into in 2021 allowed for the approval of a

19   distribution plan and there was nothing that prevented the

20   monitor or management from doing so before and after Mr.

21   Gentile's opposition to the receivership.

22        The only thing he's currently objecting to is his

23   belief that a Delaware Court is the appropriate court to

24   continue to oversee the advancement of proceedings, that it

25   has been overseeing since the inception of this case.

1          THE COURT:  Can I ask, I mean, probably everybody is

2    upset.  I'm certainly upset hearing the testimony of folks

3    whose money has been locked up for years because of the

4    circumstances.  Isn't the initial mover there just the fraud?

5          MR. MENCHEL:  I would say no, because when he turned

6    over and relinquished control of the company, the plan allowed

7    for a distribution.  One of the things he was frustrated about

8    and why he was trying to appoint his own management was they

9    weren't making distributions.  So yes, the fraud certainly

10   turned the company upside down, but there was new management

11   with a monitor who was empowered to approve a distribution

12   plan.  They just haven't done it.  He has not objected to it.

13         I just want to end on this.  We see a lot of the

14   same guidelines enhancements that sort of all capture the same

15   conduct, and when you combine that with what I think is a very

16   outside loss table calculation, not saying your calculations,

17   the table itself, we get a really Draconian number that I

18   don't think is consistent with the conduct in this case.  It's

19   just not.  Again, these people have suffered, no question

20   about it, but it's not because of the misrepresentations in

21   this case that is causing their suffering today.

22         Armed bank robbers aren't getting sentences like the

23   type of sentence that would be followed if the Court were to

24   give a guideline sentence.  With that, Your Honor, I

25   appreciate the Court's time.  I'll turn it over to Mr. Gentile

1    to make his statement.

2            THE COURT:  Sure.

3            DEFENDANT GENTILE:  I want to thank you, Your Honor,

4    and all the staff involved in these proceedings.  It was a

5    very difficult time and I respect the hard work and personal

6    sacrifice that went into completing this trial.

7            I want to thank my friends and family, colleagues,

8    who stood by me with their unwavering support throughout this

9    entire process over the several years that they had to endure

10   since the beginning of this investigation eight years ago, the

11   indictment four years ago, and the trial last year.

12           I also want to apologize to my friends, former

13   colleagues, and most importantly to my family.  They did not

14   deserve this.  The pain that this trial caused them will live

15   with me forever.  I know I cannot make that up, but I promise,

16   Your Honor, I will try.  I also want to speak briefly to the

17   investors in GPB, some of whom I know are here today or are

18   listening on the phone.  I have also read the statements made

19   by some of the investors, which were very difficult for me to

20   read.

21           I heard those of you who spoke today, that I

22   disappointed you.  That was never my intention.  I want all of

23   you to know that I truly believed in GPB.  I always intended

24   for everyone to make money in this endeavor.  In fact, I

25   personally invested in GPB.  I asked my family and friends to

1    invest in GPB, and they did.  GPB's success and its investors'

2    success I viewed as my success, my friends' success, and my

3    family's success.

4        It is and always has been my sincere hope that when

5    the assets lined portfolios, companies, in which we all

6    invested are sold that everyone who is part of the GPB family

7    is made whole and then some.  I'm sorry if that's not how it

8    works out for each and every one of you.  Finally, I want --

9    I'd like to thank everyone on my defense team for the

10   relentless hard work and dedication to my case.  Thank you,

11   Your Honor.

12           THE COURT:  Thank you, sir.

13           MR. COLTON:  Could I request five minutes?

14           THE COURT:  Sure.

15           MR. COLTON:  Thank you, Your Honor.

16           (Recess taken.)

17           MR. COLTON:  I'd like to start, Your Honor, by

18   echoing some of the thoughts that were expressed to thank the

19   Court, the Court staff, and everyone involved for all of the

20   efforts and all the attention throughout not only a long day

21   but a long trial, and I appreciate that the Court allowed all

22   sides, defense counsel, prosecutors, to make their arguments,

23   do their jobs, make their case, and I appreciate the

24   attention.  On behalf of Mr. Schneider and the entire defense

25   team, I say thank you for that.

146

1        I would like to confine my remarks mostly right now

2   to the 3553(a) factors, that go into the Court's determination

3   of the appropriate sentence.  I submit far and away the most

4   important is the first factor, the history and characteristics

5   of the defendant.  Who is Jeffry Schneider?  Jeffry Schneider

6   is not -- I have one, if you want it.

7        THE COURT:  Do you have one here?

8        MR. COLTON:  I do.  I would submit, Your Honor, that

9   there is far more to Jeffry Schneider, Jeff, as we've come to

10  know him, then just this case, the cases around it, GPB, or

11  Ascendant Capital, much, much more.

12       The courts have recognized that people with big

13  hearts, who extend helping hands, who have a generosity of

14  spirit, that alone justifies a substantial reduction in

15  whatever the guidelines might say.  I submit, Your Honor, that

16  those are the characteristics that define the full life that

17  Jeff has led.

18       Jeff wasn't born given a high lifestyle.  He was

19  born, lived in a small apartment on the upper west side when

20  the upper west side is not what it is today.  He was mugged

21  several times as a child and had to endure a lot, but he was

22  undeterred.  He worked as a child.  He worked his way through

23  college.  He sold lemonade as a child.  He is no stranger to

24  hard work, and he had to keep up because he was a scholarship

25  kid with much richer families.  But Jeff would not be deterred

1  because he understood the value of hard work.

2         He put himself through college by being a waiter

3  during college and then a janitor, taking out the garbage,

4  cleaning toilets, cleaning cigarette butts off the street.

5  That's the hard work that got Jeffry Schneider out of that

6  small apartment on the upper west side.

7         But what truly defines him is his generosity and

8  genuine care for others, that the letters that Your Honor got

9  just so dramatically exemplify.  And I'm not going to go

10  through 50 plus letters, but I'd like to highlight a few of

11  the examples that reflect who Jeff Schneider is, who Jeff is.

12  As Matt Butterfield wrote after he lost his wife after a

13  15-year battle with brain cancer, Jeff was one of the few

14  extremely supportive and generous friends.  Jeff always made

15  time for me to offer a helping hand.

16         His former assistant, Tina Domino writes, how Jeff

17  was more interested in others' success than his own.  She was

18  very clear when she suffered the most difficult time in her

19  life, suffering from cancer, Jeff was her biggest cheerleader

20  and the emotional support during this challenging time was

21  critical to her.

22         On a less dramatic note, Stan Smirky writes about

23  what happens when he was trying to pass the Series 7 exam,

24  which he failed twice.  He called his friend, Jeff, and said

25  I'm anxious.  What did Jeff do?  He immediately dropped

148

everything in his busy schedule, sat with Stan for hours
drafting up a study plan and schedule to help him through that
difficult time.

He was always there for his family and continues to
be there for his family.  His niece describes a touching
moment where she was so riddled with fear and anxiety for
going away to summer camp for the first time that Jeff climbed
into the backseat, sat with her and comforted her for hours.
That's who Jeffry Schneider is.  His children, of course, are
the most special to him.

The letters describe how he goes out of his way
consistently to do even the smallest things to be close to
them, to do things for them, even if it's just driving them to
school so he can have car time with them.

THE COURT:  We still have a public line open.  If
you all wouldn't mind, if you're on the public line if you
would please mute your phone because we're picking up voices
on the phone.

MR. COLTON:  The letters describe the truly special
relationship that Jeff has with all his children, but most
notably with his youngest daughter, who he takes out every
morning for walks with the dog and spends time teaching her
words and stopping every few feet to pick up something for her
treasurer box.  All that aside, Your Honor, what truly defines
Jeff is his generosity to strangers.

1          The letters describe a remarkable story of Jeff on

2    Christmas seeing an encampment of unhoused individuals.  And

3    not like most who are successful running away, being scared,

4    thinking those people are pariahs, he went straight into the

5    camp, went tent to tent talking to people, asking them about

6    their lives and hugging each and every one of them.  He didn't

7    care about any potential danger or imagine danger.  He just

8    wanted to show these people on Christmas that somebody cared.

9    The story of Mary Sanchez, an 85 year old woman, is truly

10   dramatic.  Jeff was at dinner.  He looks out the window and

11   sees this 85 year old woman dragging groceries in 100 degree

12   heat.  He doesn't know her.  He's never met her.  He jumps out

13   of the restaurant, onto the street, helps her home with her

14   groceries and, of course, being Jeff, he engages her in

15   conversation because he's interested in everyone, stranger

16   alike, and he finds out she's about to lose her home to

17   fraudsters.

18          So what happens?  He helps her hire the

19   professionals.  He helps her.  He intercedes on her behalf and

20   she keeps her home.  Another dramatic story of who Jeff is.

21   His daughter plays with another child in the park and he

22   learns, I won't use the person's name, that this woman is a

23   victim, and her child, of domestic violence.  Jeff does not

24   know these people.  He's never met them, other than seeing

25   them in the park.

150

1       He not only helps them, he invites them into his

2  home to make sure they have a safe sanctuary in this terrible

3  time.  That's who Jeff Schneider is.  And Jeff has always been

4  someone who's generous with his time and charitable

5  volunteering at local food banks, charitable organizations,

6  and making sure that his children do it with him because the

7  import of giving back to the community.

8       I've had the opportunity to observe Jeff in action

9  over these years and see these remarkable characteristics that

10  he really cares about everyone, and taught me lessons that I

11  will take with me.

12       Your Honor may be familiar with the cafe down right

13  by the security station.  There's a very, very outgoing,

14  affable guy behind the desk and it was always fun to interact

15  with him before coming up to court.  I was coming out of there

16  one day during the trial and Jeff was walking in.  I say yeah,

17  that guy is really a pistol.  He's got a lot of energy.

18       Jeff says, I bet you don't know his name.  I bet you

19  don't know where he's from.  I was ashamed to admit it, I

20  didn't.  Jeff knew Jermaine, he knew his story, he interacted

21  with him, and he talked to him as somebody he really cared

22  about because he cares about people.  I took that lesson.

23  Frankly, I was disappointed to find out when I went to go say

24  hello to Jermaine he doesn't work on Fridays.  That's who Jeff

25  Schneider is.

1          And this is at a time when he's at the worst part of

2    his life, literally on trial for his life, on trial for his

3    freedom.  I think that's where you can really judge who a

4    person is.  And little things that Your Honor might not have

5    seen, for example, before court during trial Michelle was

6    carrying heavy water into the courtroom for everybody to have

7    water on a hot summer day.  The first person out of the chair

8    to help her was always Jeff.  Not I have all these lawyers, I

9    have all these people.  That's who Jeff Schneider is.

10          When I came down with Covid during the course of the

11   trial, it caused a delay in the trial.  Every day, multiple

12   times a day, Jeff Schneider reached out to make sure that I

13   was okay, not because I was his lawyer and I was defending

14   him, but because Jeff Schneider really cared and it was very

15   clear.  When you react like that in the worst time of your

16   life, I think that shows who you really are.

17          So I submit that the first factor of 3553(a)(1), the

18   history and characteristics of the defendant, mitigate in

19   favor of leniency.  The second factor, as the Court is aware,

20   is the quote need for the sentence imposed.  I know the Court

21   knows the standard, that the sentence should be sufficient but

22   not greater than necessary to comply with the basic gains of

23   sentencing, which would reflect the seriousness of the

24   offense, protect respect for the law -- promote respect for

25   the law, excuse me.  Afford adequate deterrence, protect the

152

1    public from further crimes of the defendant, and provide the

2    defendant with needed training, care, or treatment.

3            I would argue that each of these support the

4    sentence that we request in our papers.  This is a serious

5    offense, there's no question, what the jury convicted of and,

6    as Mr. Menchel said, we have to respect the jury's verdict and

7    we do.  But just punishment, the guidelines are way, way out

8    of line with reality and that's not my opinion alone.  It's my

9    opinion, along with countless judges, commentators, and

10   jurists.  Guidelines have been called a stain.  They've been

11   called a travesty because they don't reflect the seriousness

12   of the offense in the white collar arena.

13           But it is serious and the question is how much to

14   weigh those guidelines, and I submit very limited.  I submit

15   that there's no need for a substantial sentence to promote

16   deterrence.  Specific deterrence is the question of whether

17   there's a need for a harsh sentence to deter Jeff Schneider.

18   The answer is no.

19           The odds of recidivism with somebody who is 56 years

20   old is very, very small.  That's what the studies show.  He

21   has certainly suffered dramatically as a result of this whole

22   experience.  We talk about general deterrence.  I ask this,

23   who would want to be Jeff Schneider right now.  Who would want

24   to have a career ruined, your finances ruined, your friends,

25   many of them who have abandoned you.  The true ones, of

153

course, stand by.  Be a pariah in your community, but worse, who would want to look into the faces of your children and your wife and your elderly parents and see what you put them through.

Nobody would want to go through that.  Nobody would look at that and say he got away with it.  He's been living through hell and he will continue to live through hell no matter what this Court's sentence is because countless cases await, countless stresses await, and the difficulty of trying to rebuild a life await.  But as you'll hear from him, he is committed to doing so.

I'm not going to repeat a lot of the case law that we've cited to Your Honor, but there's numerous cases that demonstrate that general and specific deterrence can be and often are satisfied by the collateral consequences of conviction and by just having to go through the dramatic and difficult processes or even just a probationary sentence.

As far as Jeff's risk of specific deterrence, he's been on release for over four years with no incident.  He's not a danger to the public.  He has been here when he's supposed to be here.  He left the country, with the Court's permission, and he returned.  He has been a model supervisee. The government will tell you he's refused to accept responsibility for what he's done.  No.  He exercised his right under the United States Constitution to a trial and

154

1    that's what he did.

2         And if he took a test to try to further a new career

3    while he was presumed innocent, that, too, is what you do when

4    you are presumed innocent.  You think you're innocent, you

5    believe you're innocent, and you try to build for the future.

6    So he should not be punished for that.  He certainly hasn't

7    gone out and managed other people's money or done anything

8    like that, and certainly no evidence that he pursued the

9    career just from taking that test.

10        At the end of the day there's a lot for Your Honor

11   to consider, but the question of the argument that he's failed

12   to take responsibility because he exercised his right for a

13   trial is just something --

14        THE COURT:  Do you just not believe in this way of

15   thinking about things?  I mean there is the argument that

16   there should not be such a thing as acceptance of

17   responsibility credit because it constitutes a trial penalty.

18   You made that argument.  Is that the argument you're making?

19        MR. COLTON:  Yes.  That's the argument that Judge

20   Rakoff in a recent case laid out.  That doesn't mean that Jeff

21   Schneider doesn't feel tremendous sympathy for the people who

22   suffered.  It simply means that by stating his innocence by

23   pursuing his constitutional rights there should be no penalty

24   for that.  That's the argument that we're making.

25        The other factors are fairly straightforward;

1   3553(a)(3), the kinds of sentences available.  It is clear

2   under the statutes that a probationary sentence is available

3   since these are Class C and D felonies and that the statutes

4   overrule the advisory guidelines.

5          We've already talked about the advisory guidelines

6   calculations and why they don't reflect what a proper sentence

7   should be.  Most importantly, after the history of the

8   defendant, the characteristic of the defendant, is the need to

9   avoid unwarranted sentencing disparities.  I have to say I was

10  very surprised to hear the government say the *Block* case is so

11  different.  According to the government, trial transcript

12  page 4026, the *Block* case is incredibly similar.  Page 4301,

13  the *Block* case, the *Block* arrest was highly relevant given the

14  similarity between the *Block* case and this one.

15         And the government used the *Block* case and hammered

16  it in summation to get a conviction in this case.  And there

17  the Court imposed a sentence of 18 months far, far, far below.

18         THE COURT:  I think the government makes the point

19  that what the judge said in the *Block* case is this is

20  basically like a couple late nights where they engage in some

21  acts of misjudgment.  That's the judge's rationale in that

22  case.  How should I think about that here?

23         MR. COLTON:  I think the government can't have its

24  cakes and eat it too, Your Honor.  If the government is saying

25  the case is so similar, so the same to convince a jury to

156

1    convict, to get the evidence in, which was a hard fought

2    evidentiary battle because it was so prejudicial, then they

3    can't now stand up before you and say it's very different.

4    They have to accept if they say it's similar and they got a

5    Court ruling in their favor because they said it was similar,

6    they should have to stay with that position.

7             THE COURT:  Okay.

8             MR. COLTON:  There are many other cases that we

9    cite.  I'm not going to go through them all because I'm sure

10   the Court has read it.  Multiple, multiple cases have

11   substantial fraud with substantial losses, even losses far

12   beyond what the Court found here where there was a sentence

13   between probation and one to two years of imprisonment,

14   nothing close to what the government is asking for here.

15             Now, I make one point because the government is

16   asking for such a lengthy sentence, and I want to make sure

17   the Court is aware, though, it is our position that we

18   shouldn't come close to this number.  The BOP policy does not

19   allow someone to be in a camp or a minimum security facility

20   if they get more than ten years.

21             So I'm very hopeful that we're nowhere close to that

22   and don't believe that the sentencing factors justify that, or

23   that's the least sentence to accomplish the goals.  But it is

24   surely something that should be on the Court's mind when the

25   Court thinks about what it is that the government is asking.

1              When we look at the guidelines, without the loss

2    amount, without the 18 points that the Court found, for Mr.

3    Schneider the guidelines are 24 to 30 months.  With the loss

4    amount, 168 to 210.  It's such a dramatic, dramatic increase

5    that I urge the Court to discount dramatically, the

6    guidelines.  As Judge Garaufis called it, unabated use of the

7    guidelines loss is a great shame for many.

8              And as the *Adelson* case put it, it's an utter

9    travesty of justice.  So I ask the Court when the Court does

10   its calculus of all of the sentencing factors to discount the

11   guidelines, consider the history of the defendant, consider

12   who he is, what he's done over his entire life, and the affect

13   on his family and what he's already been through.

14             It's clear that this is a serious case.  It's also

15   clear that the country, the community, the city, will not be

16   safer if Jeff Schneider is not there.  He poses no danger.

17   His life has been put in tatters and he's been punished

18   dramatically.  So we ask the Court to express leniency.  And I

19   know it's a huge ask, but in the case of someone who has done

20   so much for so many, who has been the rock for so many, who's

21   done so much charitable work and wants to continue that, a

22   sentence of home confinement with dramatic community service

23   requirements is sufficient to meet the needs of the sentencing

24   statutes.  I thank you, Your Honor.

25             THE COURT:  Thank you.  I'm happy to hear from Mr.

1  Schneider, if he wants to speak.

2      DEFENDANT SCHNEIDER:  Thank you, Your Honor for

3  giving me a couple of minutes to speak.  I'll try to be brief.

4  I know it's been a long day.  I want to start off by thanking

5  you, Mr. Chan, all your clerks, Michelle, Michael, Apeksha,

6  Laura, who is not here, Glenn, thank you all very, very much.

7          As everyone has said, it's been a very long case and

8  it's coming to an end, but thank you for all the time and

9  attention you've put on it.  I recognize many, many, many

10  people have been hurt as a result of this case.  I've read

11  some of the victim letters and they're terrible, and I'm

12  saddened by reading them.  I mean it's my hope that everybody

13  gets their money back when the receiver finishes his plan of

14  distribution.  I am one of the investors.  I invested almost

15  all of my retirement savings, as well as other money, into

16  this.  So I'm waiting alongside the investors.  I did that

17  because I believed that investing in GPB Funds was a good

18  thing.

19          So again, I want to thank my family and friends,

20  specifically my wife.  I'm just very sorry for everything I've

21  put my family and friends through.  It's something, as you can

22  imagine, I'll be living with for the rest of my life.  The

23  uncertainty I've created for my wife, my children, has been

24  terrible.

25          In closing, I would humbly ask that you consider my

159

1  entire life and my history and grant me leniency in your

2  sentencing.  As I said, I'm truly sorry for everyone that has

3  been affected by the case.  I know it's a lot of people.  It's

4  not just the investors, but also their families.  I hope Your

5  Honor will consider imposing a sentence that allows me to be

6  there for my wife and four children, especially my two year

7  old.

8          I believe I have a lot of good to offer, as you

9  heard from Glenn.  I believe I have a lot of positive things

10 to offer to society still, and I simply ask that Your Honor

11 gives me the opportunity to do so.  That's all I have.  Thank

12 you very much.

13         THE COURT:  Thank you, sir.  In imposing sentence I

14 have to consider certain factors that are set out in Title 18

15 United States Code Section 3553(a).  They include the need for

16 a sentence to reflect the seriousness of the crime, to promote

17 respect for the law, to provide just punishment for the

18 offense, to deter criminal conduct by the defendant and all

19 others who seek to engage in this type of crime, and to

20 protect the public.

21         Ultimately I'm required to impose a sentence that's

22 sufficient but not greater than necessary to comply with the

23 purposes of sentencing set out in 3553(a).  We spent a lot of

24 time on the guidelines.  This is not really a guidelines

25 focused case for me.  I'm really focused on those

1    Section 3553(a) factors.

2            So this case involves a business or set of

3    businesses that were headed by Mr. Gentile with marketing

4    handled by Mr. Schneider.  Companies were billed as income

5    producing private equity and the model involved buying mature

6    companies that are earning profit and paying monthly

7    distributions from those profits to investors, while also

8    having the goal of having a distribution event at the end of

9    the day where the companies together are sold and there's a

10   payout to investors from that.

11           That's a real business model.  I think everybody

12   accepts the defendants didn't start out with the idea of

13   starting these companies with the goal of taking money from

14   investors fraudulently.  And I don't doubt that both Mr.

15   Schneider and Mr. Gentile intended for investors to actually

16   make money from these companies.

17           Nevertheless, I think the evidence at trial showed

18   that they engaged in fraudulent conduct, rather than accept

19   that they might encounter difficulties in their ability to

20   continue to raise capital for these businesses.  So at the

21   outset, the marketing material for these businesses conveyed

22   to investors that their distributions were coming from profits

23   earned by the operating companies.

24           Over time the income from the operating companies

25   was not sufficient to cover the distributions.  The defendants

1   made some changes to the marketing materials as the

2   circumstances changed, and I think that's something that's

3   entitled to some credit.  But, for instance, when the

4   marketing materials initially conveyed unequivocally that the

5   distributions were 100 percent funds from operations, over

6   time that language was removed.

7            Nevertheless, the marketing materials or the

8   materials used to market the funds continue to misstate the

9   source of distributions, for example, the private placement

10  memorandum stated, while we have no present plans to do so, we

11  could include, omitting the ellipses, invested capital and the

12  amounts distribute we distribute, more ellipses, which may

13  reduce the amount of capital available to acquire and operate

14  dealerships and make other permitted acquisitions.

15           At the time that language was put into the PPMs,

16  investor capital was already being used to pay distributions.

17  So the statement that we have no present plans to do so was

18  false.

19           These misstatements went to the core of the

20  company's business, a company that is making enough money to

21  pay out eight percent in returns to investors from operating

22  profits every year is, obviously, a very appealing investment.

23  You heard from folks on the phone about why that was

24  appealing.

25           A company that is making a fluctuating amount and is

162

1   an eight percent figure by paying investors their own money

2   back is, obviously, a less attractive investment.  I think the

3   trial record reflected the defendants understood this.  The

4   evidence at trial showed that they were invited to either cut

5   distributions or to update it, the marketing language, in a

6   way that would have indicated where the distributions were

7   actually coming from.

8           They didn't want to do either of those things

9   because they understood that doing so would have materially

10  impacted their ability to raise funds and that was important

11  to their ability to make money, among other things.  These

12  were businesses where these investors were paying a two

13  percent management fee on their investment.

14          So that's one piece of fraud.  The other is these

15  performance guarantees.  I talked about them a little bit

16  today.  To me, they're the more disturbing piece.  One piece

17  is sort of misrepresentations that become inaccurate over time

18  and aren't changed in a way that captures what's really going

19  on.  These are just fabricated documents that are intended to

20  mislead investors about the financial health of the

21  businesses.

22          I asked Mr. Menchel about it.  You know, a key

23  moment for me is when the distributions seem to be

24  substantially under covered and Mr. Gentile has the reaction

25  initially well, I could return some of my compensation and

163

1    then the coverage would be better, but he doesn't do that.  He

2    instead fabricates a document that's like a pretend

3    performance guaranty and the money is moved around from

4    various accounts to make it appear that this is a bona fide

5    performance guaranty that's being paid by Mr. Lash.

6              It just seems like a pretty egregious kind of

7    fraudulent activity, and I haven't heard a persuasive

8    alternative explanation for what's going on there.  We heard

9    today from folks who invested and have suffered harm as a

10   result of the fact that they were invested.  These are not

11   folks who are also wealthy that this is immaterial to them.

12   We have investors who spoke today, included folks who are

13   delaying their retirement or concerned about having a

14   second -- needing to go get a second job because they don't

15   have the money that they were relying on.  The money is tied

16   up and they have not received anywhere near their money back.

17             We heard from somebody who invested their money with

18   GPB, invested money that was actually a charitable trust with

19   GPB, the money that came from the investment was intended to

20   fund medical care for others and it has not been able to be

21   used in that way, obviously.  So I guess I take the point that

22   these are investors who may be there are other things that

23   were said to them that aren't the defendants' fault about how

24   this is a safe investment, and the defendants aren't on the

25   hook for those misrepresentations.

1          But what we've heard from the investors in this case

2    is that the representation about how these distributions will

3    be sourced was important to them and their decision to invest.

4    And so that's one of the contributors that these

5    misrepresentations is one of the reasons why they're in this

6    position now where they're suffering financial harm.

7          So I guess those are all factors that go to the

8    seriousness of the offense.  They go to the need to protect

9    the public, to provide general deterrence to others who might

10   be inclined to consider similar offense conduct.  I think

11   these are serious crimes.  I'm also considering in this case

12   the many affidavits that have been submitted in support of all

13   the defendants by their friends and family.  So obviously a

14   lot of love and a lot of good deeds that are part of both Mr.

15   Schneider's and Mr. Gentile's history.

16         I'm considering the fact that this is not a purely

17   fraudulent enterprise from the outset.  As I said, it's a

18   legitimate business idea at the outset where then fraudulent

19   conduct occurs.  I'm considering the fact that the victims may

20   be largely made whole, at least they'll be partly made whole

21   at the end of the day, albeit after substantial harm caused by

22   the delay in this case.

23         So I calculated the guidelines at the outset.  We

24   spent a lot of time on them.  I calculated offense levels of

25   37 and 35, which would lead to very high guidelines amounts.

1    The sentence I'm intending to impose is below guideline

2    sentences in this case.  If I calculated the guidelines the

3    other way, I would impose above guideline sentences.  I would

4    impose the same sentences either way because I don't think the

5    guidelines are really a useful guide here.

6              My intention is to impose a sentence of seven years

7    with respect to Mr. Gentile, and six years with respect to Mr.

8    Schneider and the difference in the sentences is reflective of

9    the distinction in role of the two individuals.

10             Let's talk about supervised release and restitution

11   and forfeiture.  There are two supervised release conditions

12   that are recommended for both defendants.  I'd be inclined to

13   impose them.  I think there was at least one sentencing

14   submission that was objected to.  So I'm happy to hear out

15   those objections, if you want to be heard about them.  But the

16   one is complying with the restitution order.  I take it no one

17   is going to object to that, and the other is a financial

18   disclosure condition that is basically imposed in every case

19   where there's going to be a continuing financial obligation.

20   That's the one where I'm aware that somebody objected.  If you

21   want to be heard on that, I'm happy to hear it.

22             MS. RIVIERE-BADELL:  We don't need to be heard, Your

23   Honor.

24             THE COURT:  So I'll impose a term of three years of

25   supervised release to contain in those two conditions.

1   There's a $500 special assessment that's mandatory for Mr.

2   Gentile, and a $300 special assessment that's mandatory for

3   Mr. Schneider.  As to restitution and the amount of

4   forfeiture, we're basically deferring those.  Right?  I

5   entered the forfeiture orders and you all want a date to be

6   heard on restitution in the future.  Is that right?

7          MS. RIVIERE-BADELL:  Yes, Your Honor.

8          MR. AXELROD:  That's correct, Your Honor.  I take it

9   Your Honor's orally pronouncing forfeiture?

10          THE COURT:  Yes, I already pronounced the forfeiture

11   orders I previously entered.  I may need to say that I'm

12   dividing up the sentences in a way that probation recommended,

13   which is just to say that the sentences are concurrent except

14   there's a statutory max on one of them, on Count 1, for each

15   defendant.

16          So for those I'm only imposing the statutory max.

17   I'll waive the substance abuse testing condition for both

18   defendants because of a low likelihood of substance abuse.  I

19   believe in the priority of restitution and probation doesn't

20   recommend a fine in this case because of the priority of

21   restitution.  Do you agree with that position?

22          MR. AXELROD:  I believe probation did not recommend

23   a fine as to Mr. Schneider, but may have recommended a fine as

24   to Mr. Gentile.

25          THE PROBATION OFFICER:  We did not recommend a fine

167

1   for either.

2        MR. AXELROD:  I read it wrong, Your Honor.

3        THE COURT:  Okay.  So this is your moment if you

4   want to take a different position.  Otherwise, I'm going to

5   adopt probation's recommendation on that.

6        MR. AXELROD:  We're fine with that, Your Honor.

7        THE COURT:  Do you want me to make recommendations

8   as to designation?

9        MR. BUCKLEY:  Yes, Judge, thank you.  On behalf of

10  Mr. Gentile, we would request that the Court recommend the

11  camp at Otisville in upstate New York.

12       THE COURT:  Okay.  I'll make that recommendation.

13  As you know, I'm just a recommender.  BOP has its own

14  classification system and makes the final decision.  I'm going

15  to say that's to promote family visitation?

16       MR. BUCKLEY:  Exactly.

17       MR. COLTON:  Thank you, Your Honor.  For Mr.

18  Schneider we'd ask that the Court recommend the FCI Bastrop

19  satellite camp to facilitate family visits.

20       THE COURT:  I'll make that recommendation, and I'll

21  set a surrender date that's 60 days out to allow the BOP to

22  make a designation.

23       MR. COLTON:  I think we both have, remarkably,

24  clients with oral surgery issues and we'd like to be heard on

25  that.

168

1          MR. BUCKLEY:  Yes.  Thank you, Judge.  With regard

2     to Mr. Gentile, and we have a letter here from his dentist,

3     which we can hand up or submit to the Court afterwards, but

4     the long and short of it is we would ask, given the nature of

5     the procedure and the length of time that the procedure takes,

6     it's a multistep procedure that requires certain periods of

7     time between each step to go forward.

8          That surrender should be set for November 15th,

9     which would provide adequate time for the procedure to run its

10    course, or the procedures, I should say.

11         MS. MATHEWS:  Your Honor, we learned about this

12    procedure last night by a letter actually that's dated

13    March 27, 2025.  I have not had an opportunity to even inquire

14    with BOP whether they could accommodate this.  And so at this

15    point we think Your Honor should set the 60 days that you

16    indicated you wanted to do and allow us the opportunity to

17    consult with BOP before pushing this out to November.

18         THE COURT:  Yes.  November is a pretty far date.

19    I'm open to it, but I don't think the government's had a fair

20    opportunity to respond at this point.  I'll set the 60 days

21    and you all can litigate after.

22         MR. MENCHEL:  I just want to explain a little bit

23    more what it is so you understand because it sounds like a

24    long time.  I've had this procedure.  It's a dental implant

25    and in order to do -- he's in the middle of it.  First, if you

1    don't have enough bone, which he doesn't and I didn't when I

2    had it, they have to do a bone graft.  The graft has to then

3    hold, heal, and get firm before they can do it.  If you don't

4    do that, you're at risk of losing other teeth as the teeth

5    start to shift.  It's not a cosmetic thing.  It's a real

6    thing.

7              THE COURT:  I think it's entirely possible that the

8    government is going to look at this and they're going to say

9    it's going to be hard for BOP to do this, and it genuinely

10   takes this amount of time, and, therefore, we're taking the

11   position that the November date is fine.  But they might have

12   a different view.

13             MR. MENCHEL:  I just wanted you to know what it was.

14             MR. COLTON:  Your Honor, for Mr. Schneider, there's

15   a similar issue.  I can hand up a similar letter, though it's

16   dated yesterday, that I provided to the government this

17   morning.  I see the Court's point, which is basically it's

18   going to be a holding place of 60 days, but we're free to

19   confer with the government and make another application.  So I

20   just want to make sure that's what it is so I won't bother to

21   hand it up.  But if we need to make an application, we'll

22   submit medical to probation.

23             As to the 60 days, I just note that I think BOP may

24   be going a little bit more slowly than previously.  Yesterday

25   in the Southern District it was a four-month reporting date.

1  Again, if the Court is saying that it's without prejudice to a

2  further application, then I'll leave it there for now.

3          THE COURT:  Yes.  My general practice is if there

4  has about not been a designation that's made by the 60th day

5  or by whatever date, I would be inclined to extend the

6  surrender date rather than have Mr. Gentile or Mr. Schneider

7  to surrender to the MDC.  We can cross that bridge when we

8  come to it.  I've been having okay success, but who knows.

9          MR. COLTON:  Your Honor, relatedly, I thought I

10 heard the Court say there's two issues, there's forfeiture and

11 restitution.

12         THE COURT:  Yes.

13         MR. COLTON:  We had requested a hearing on

14 forfeiture.  I have to get with the government to make

15 suggestions or schedule that, but I would ask that -- and I

16 assume the same request for Mr. Gentile, that those hearings

17 be held at a time when the defendants are still on release to

18 be able to allow them to participate in those hearings

19 because, obviously, forfeiture is punishment and they should

20 be here.  And to put the expense on the taxpayers and the

21 difficulty of transport doesn't seem to be worthwhile.  So I

22 just ask the Court consider that in the schedule.

23         THE COURT:  That seems like a fair point.  Might my

24 view is this case has been going on for a long time.  To the

25 extent we can wrap it up sooner rather than later, that's in

1  everybody's interests.  I don't know what is the reason why we

2  are unable to resolve the forfeiture issue sooner rather than

3  later.

4         MR. AXELROD:  I think we just need to discuss

5  internally with defense counsel.  I take the point that

6  there's an interest in doing this while they're out.  They're

7  also asking to be out until November, but we need to talk

8  about it.

9         THE COURT:  Okay.  So can you all put in an update

10  letter in two weeks?  Does that seem reasonable?

11         MR. AXELROD:  I think we can do it much sooner than

12  that, Your Honor.  I just want to talk to Ms. Weigel, who is

13  not here, of course, and speak with defense counsel about it.

14         THE COURT:  All right.  So the sentence is imposed

15  as stated.  As I said, I don't find the guidelines to be a

16  particularly useful guide in this case.  I'm imposing what is

17  a below guideline sentence given the guidelines calculations

18  that I made.  If I had calculated the loss, then I would have

19  put the same sentence as an above a guidelines sentence.

20         I find the sentence is sufficient but not greater

21  than necessary to serve the purposes of 3553(a), including the

22  need to promote respect for the law and to afford adequate

23  general deterrence.  To the extent that you all did not give

24  up your right to appeal, and you all did not give up your

25  right to appeal, you have the right to file an appeal.  It has

1    to be filed within 14 days of the entry of judgment, which I'm

2    hoping we'll do on Monday.  If you can't afford to pay the

3    costs of an appeal, you can apply for leave to appeal without

4    paying those costs.  I take it there are no open counts?

5            MR. AXELROD:  There are no open counts, Your Honor.

6            THE COURT:  Is there anything else for us to discuss

7    today?

8            MS. MATHEWS:  Your Honor, one final thing.  At this

9    point the government would actually request what we think is a

10   pretty modest modification to the release conditions that the

11   defendants are currently on.  I think they've been out on bail

12   packages in the amount of $500,000.  Obviously given the

13   significant incarceratory sentences that the Court imposed

14   today significantly changed the calculus here and the

15   situation we're in, and very much so increase the incentive

16   for them to flee.

17           And so in light of those sentences, the government

18   would request not only that the 500,000 be increased, but also

19   that they be placed on electronic monitoring.

20           MR. COLTON:  Your Honor, we would object to that and

21   note they've been on, at least Mr. Schneider and I'm sure for

22   Mr. Gentile, four months ago probation recommended a 20 year

23   sentence.  The government recommended a 13 year sentence.

24   They were facing dramatic possibilities of a dramatic sentence

25   and they are here.

1         So there is no indication that their behavior would

2   change such that the expense and difficulty of electronic

3   monitoring should be, and there's no reason to think that

4   their behaviors would change after being completely compliant

5   for years.

6         MR. BUCKLEY:  Judge, on behalf of Mr. Gentile, we

7   similarly object.  We think that the record of compliance to

8   date and the reasons that Mr. Colton cited easily establish

9   clear and convincing evidence that the current bail conditions

10  are sufficient under 3143, and that there's no need for a

11  modification at this time.  They have been here and complied

12  in every respect, and this is just an unnecessary modification

13  that we think should be outright rejected.

14        THE COURT:  I'm just catching up to where Mr.

15  Buckley is, which is -- we're on --

16        MR. AXELROD:  You're in 3143.

17        THE COURT:  Right.

18        MS. MATHEWS:  Your Honor, there's really a

19  presumption of detention here.  And the burden is clearly on

20  the defendants to show by clear and convincing evidence that

21  they do not impose a risk of flight.  And I think all they're

22  saying here is they've complied up until now, but up until now

23  they've been seeking -- they thought they might get probation.

24  They came here today seeking that.  They have not actually

25  been sentenced until today.

174

1          THE COURT:  I guess there's two pieces here, there's

2     the money piece and the electronic monitoring piece.  Do you

3     have a money amount that you're seeking?

4          MR. AXELROD:  Your Honor, the PSR shows that Mr.

5     Gentile has -- I think it's -- and you can debate how you

6     measure liquidity but at least $2 million in securities and

7     cash on hand.  He has properties that are worth tens of

8     millions of dollars.  Mr. Schneider a little less so, but

9     there are difficulties in valuing the assets he has.

10          I think we're looking for an amount that's

11     meaningful as a deterrent.  I think that amount may differ

12     between them.  I think it's like I would say 5 million for

13     Gentile and 2 million for Schneider.

14          MR. COLTON:  Your Honor, the PSR demonstrates that

15     Mr. Schneider doesn't have that kind of money.  He has a

16     two-year old child.  He has a family.  There's no evidence

17     that he's going to disappear in any way and that the addition

18     of finances would change his behavior.

19          He has come back every single time.  There's no

20     indication he's going to leave his family in the lurch.  The

21     cosigner is his wife, the mother of his youngest child.  It

22     seems unnecessary to secure the attendance of Mr. Schneider at

23     the next hearings and to report voluntarily, as the Court has

24     ordered.  It seems punitive.

25          THE COURT:  What is the -- I mean, this may not be

1  the right way to think about it, but these are personal

2  recognizance bonds.  Nobody is asking the defendants to put

3  out money; is that correct?

4          MS. MATHEWS:  That's correct.

5          MR. COLTON:  Oh, I'm sorry.  I misunderstood.  The

6  request was for just an increase the --

7          THE COURT:  Just to increase the size of the amount.

8  We're all in a world where you're telling me there's no risk

9  they're going to skip town, and I guess we're going to have a

10 different dollar amount, 2 million or 5 million on the bonds.

11 It just seems --

12         MR. BUCKLEY:  Your Honor, on behalf of Mr. Gentile

13 we're fine with that.

14         MR. COLTON:  I misunderstood.  Obviously we're

15 saying he's not going to run.

16         THE COURT:  So I'll make those changes.  As to

17 electronic monitoring, I don't know, guys.  I haven't seen a

18 pretrial report in this case.  I didn't know this was coming.

19 I wasn't the judge who set bail.  Any foreign ties?

20         MR. AXELROD:  Mr. Gentile has visited family in

21 Italy on several occasions during this case.  There's just a

22 lot of money floating around in this case that we have not

23 traced.  I think that that's clear.  They are in a very

24 different position.  It's not the case that you can't flee

25 with your family.

176

1          It's not the case that as sentencing dates get

2     closer, and so as the Court said, if they're not going to

3     flee, then what's the harm?  There's a presumption in favor of

4     detention here, and really all they've given you is well

5     they've complied thus far.  I don't even know if that meets

6     their burden to rebut the presumption, but I certainly think

7     that on those facts alone location monitoring is a relatively

8     reasonable ask in a case like this.

9          THE COURT:  I am thinking about other factors beyond

10    just complied thus far.  Everybody has a family that they're

11    very close to that's here in the United States, and fleeing in

12    the United States I think these folks would know is not a

13    practical idea.  So you really have to have these folks

14    relocating to somewhere else and they're not going to be

15    extraditable.  I'm not hearing facts that would suggest that.

16          I'll order the modifications to the bond amount.

17    I'm not going to order electronic monitoring because I think

18    with that bond in place, with all the facts I know, the

19    defendants have established by clear and convincing evidence

20    that they're not likely to flee or present a danger to the

21    community if they're released pending sentencing.  These are

22    all like adjacent to each other.

23          MR. BUCKLEY:  It's either 3143, Judge, or 3144.

24          THE COURT:  We agreed the clear and convincing

25    evidence standard not fleeing.

1           MR. AXELROD:  It's all in the same.

2           THE COURT:  All right.  Anything else you want to

3    talk about today?

4           MR. COLTON:  A couple smaller items.  As far as I

5    understand it, this is from appellate counsel, that there is

6    some lack of certainty when the Court puts off the final order

7    of forfeiture if there's going to be one, an order of

8    restitution if there's going to be one as the due dates for an

9    appeal.  I think the Court is empowered under federal rule of

10   appellate procedure 4B5 to extend the due date for the notice

11   of appeal until the final restitution and forfeiture order.  I

12   can't represent to the Court that we would even take that

13   risk, but to the extent that the Court can say that that is a

14   rational and intelligent thing to do, since we don't know

15   fully what we're appealing from yet, I would ask the Court.

16          THE COURT:  Okay.  I haven't researched this

17   question.  But I take it that you all don't -- to the extent I

18   have the power to do it, any objection?  I guess if I were you

19   I'd still file the notice of appeal.

20          MR. COLTON:  I understand the point.

21          MR. AXELROD:  The way I understood this should work,

22   and it seems full proof, there's a judgment, they appeal the

23   judgment, there's an amended judgment, they file a new notice

24   of appeal, I don't think we need to do anything else beyond

25   that because I think that that seems fairly safe.  And I also

178

1    have not researched this question.

2          THE COURT:  To the extent it's within my power, I'll

3    extend the deadline until such time as I file the amended

4    judgment that we're all -- you know what, you should file a

5    notice of appeal.  What sometimes happens in these cases is

6    folks are envisioning the amended judgment and it turns out

7    not to be necessary for one reason or another.  You should

8    file an appeal.

9          MR. COLTON:  Understood, Your Honor.  With respect,

10   just briefly, to the forfeiture order that was issued, it has

11   a provision.  It gives 30 days to pay.  I assume since there's

12   no number that's just a form and there's no actual obligation?

13         THE COURT:  Yes.

14         MR. COLTON:  I assume that if there is an order of

15   forfeiture after the hearing, we can then discuss timing and

16   payment and things of that nature at that time?

17         THE COURT:  Yes.

18         MR. COLTON:  Thank you.  One more thing.  Could I

19   have a moment?  From that, there is nothing to raise on that

20   point.  I just want to make sure I understand what's going to

21   happen because of the forfeiture and restitution is the

22   parties are going to speak to one another and hopefully get a

23   letter to the Court within two weeks.

24         THE COURT:  Definitely get an order to the Court

25   within two weeks.

1          MR. COLTON:  I understood that there's an outside.

2    I didn't think the Court's order was voluntary.

3          THE COURT:  Great.  Sometimes we set a date for

4    figuring out restitution.  I'm not doing that because you all

5    are going to give me a proposed date, but you all know I have

6    an outside date and I want to set a date before the outside

7    date.

8          MR. AXELROD:  We're clear.

9          THE COURT:  All right.  Great.  Thank you all for

10   your effective advocacy in this case, and I wish you all good

11   luck.

12

13         (Proceedings concluded at 5:26 p.m.)

14         - - - - - - - - - - - - - - - - -

15

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   /S/ Nicole Sesta, RMR, CRR
     Court Reporter/Transcriber

20

21   May 17, 2025
        Date

22

23

24

25